# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

TAIHO PHARMACEUTICAL CO. LTD. and
TAIHO ONCOLOGY, INC.

                Plaintiffs,

      v.

ACCORD HEALTHCARE INC., *et al.*,

                Defendants.

C.A. No. 21-838-JLH
**CONSOLIDATED ANDA CASE**



**EXHIBIT 2**
**PLAINTIFFS' STATEMENT OF ISSUES OF FACT**

**TABLE OF CONTENTS**

I.   OVERVIEW OF LONSURF AND THE CLAIMED INVENTION ............................... 2

    A.   Lonsurf ................................................................................................. 2

    B.   Taiho's Clinical Trials ......................................................................... 2

    C.   Taiho Inventor Discovered 20 mg/m² Twice Daily Could be
         Successfully Used to Treat SRI Patients ............................................. 5

    D.   Lonsurf Was Approved at a Reduced Dose for SRI Patients ............... 8

    E.   FDA Required Generics to Include Dosing SRI Patients in its
         Label .................................................................................................... 9

II.  THE ASSERTED PATENTS .............................................................................. 12

    A.   Priority Date of the Asserted Patents ................................................. 13

    B.   Overview of the Asserted Patents ....................................................... 13

    C.   Overview of the '399 File History ...................................................... 22

    D.   Overview of the '004 File History ...................................................... 29

III. A PERSON OF ORDINARY SKILL IN THE ART .............................................. 34

IV.  VALIDITY OF THE '399 AND '004 PATENTS ................................................... 34

    A.   Overview of the Asserted Art .............................................................. 35

         1.   Lonsurf FDA Approval Package .............................................. 35

         2.   Lonsurf Report ........................................................................ 49

         3.   2015 Lonsurf Label ................................................................. 50

         4.   FDA Guidance ......................................................................... 52

         5.   NCT '117 ................................................................................. 54

         6.   Cleary Poster ........................................................................... 56

    B.   Overview of Additional Art ................................................................ 58

         7.   Doogue .................................................................................... 58

         8.   Hurria ...................................................................................... 60

9.    Doi...............................................................................................60

10.   Sakamoto..................................................................................61

11.   Hong..........................................................................................62

12.   Janus.........................................................................................63

13.   Cleary........................................................................................63

14.   Mehvar......................................................................................64

15.   Munar........................................................................................65

16.   Booka........................................................................................65

17.   Lichtman...................................................................................66

18.   Huang........................................................................................67

19.   Emura........................................................................................68

20.   Trifluridine Monograph ...........................................................69

C.   Administering a Fixed-Dose Combination Drug Like Lonsurf and Determining an Appropriate Dose and Regimen Was Not Predictable............................................................................................69

D.   The Asserted Claims of the '004 and '399 Patents Are Not Anticipated by the Lonsurf FDA Approval Package Nor Rendered Obvious by the Lonsurf FDA Approval Package in View of the General Knowledge and Experience of a POSA, Optionally further in View of FDA Guidance ...................................................................72

21.   Claims 1-4, 7, 17-18, 20, 24, and 28 of the '004 Patent and Claim 10 of the '399 Patent are Not Anticipated by the Lonsurf FDA Approval Package ..............................................72

22.   Claims 1-4, 7, 17-18, 20, 24, and 28 of the '004 Patent and Claim 10 of the '399 Patent Are Not Obvious.........................77

E.   The Asserted Claims of the '004 and '399 Patents are not Invalid as Obvious Over the 2015 Lonsurf Label in View of NCT '117, FDA Guidance, and the General Knowledge and Experience of a Person of Ordinary Skill in the Art........................................................82

1.   Dose reductions were not undertaken in SRI patients and were for adverse events, not renal insufficiency......................................83

    2.     There was no motivation to modify the treatment existing at the time of the claimed invention for SRI patients and the 2015 Label and NCT '117 suggest that the Lonsurf dose might not change in SRI patients ................................................. 85

    3.     There was no reasonable expectation of successfully treating an SRI patient with Lonsurf ........................................... 86

    4.     There was no motivation to combine the 2015 Lonsurf Label with NCT '117 and FDA Guidance ................................. 87

F.    The Asserted Claims of the '004 and '399 Patents are not Invalid as Obvious Over the Lonsurf Report or the 2015 Lonsurf Label in View of FDA Guidance, and the General Knowledge and Experience of a Person of Ordinary Skill in the Art, Optionally in Further View of NCT '117 ..................................................... 87

    1.     Dose reductions were not undertaken in SRI patients and were for adverse events, not renal insufficiency ...................................... 88

    2.     There was no motivation to modify the treatment existing at the time of the claimed invention for SRI patients and the Lonsurf Report, 2015 Lonsurf Label, and NCT '117 suggested that the Lonsurf dose might not change in SRI patients .................................................................. 88

    3.     There was no reasonable expectation of successfully treating SRI patients with Lonsurf ........................................... 89

    4.     There was no motivation to combine the Lonsurf Report, 2015 Lonsurf Label, NCT '117 and FDA Guidance ............................... 89

G.    The Asserted Claims of the '004 and '399 Patents are not Invalid as Obvious Over the Lonsurf Report or the 2015 Lonsurf Label in View of the Cleary Poster, and the General Knowledge and Experience of a POSA, Optionally Further in View of NCT '117 ....................... 89

    1.     Dose reductions were not undertaken in SRI patients and were for adverse events, not renal insufficiency ...................................... 90

    2.     The clearance equations disclosed in the Cleary Poster were not reliable for extrapolating to SRI patients ........................................... 90

    3.     There was no motivation to modify the treatment existing at the time of the claimed invention for SRI patients and the Lonsurf Report, 2015 Lonsurf Label, Cleary Poster, and NCT '117 suggest that the Lonsurf dose might not change in SRI patients ................................................................... 92

iii

4. There was no reasonable expectation of successfully treating SRI patients with Lonsurf ............................................................... 92

5. There was no motivation to combine the Lonsurf Report, 2015 Lonsurf Label, Cleary Poster, and NCT '117 ................................. 93

**H.** Objective Evidence of Non-Obviousness .............................................................. 93

**I.** The Asserted Claims of the '004 and '399 Patents are not Invalid for Lack of Written Description Under 35 U.S.C. § 112(a) ................................. 94

## PLAINTIFFS' STATEMENT OF THE ISSUES OF FACT

Plaintiffs Taiho Pharmaceutical Co., Ltd. and Taiho Oncology, Inc. ("Taiho" or "Plaintiffs") submit the following statement of facts believed to be contested in this case in response to Defendants MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc.'s ("MSN" or "Defendants") Statement of Issues of Fact. In submitting this Statement, Taiho does not contend that any or all such facts are relevant or admissible at trial in this matter. Moreover, Taiho does not assume the burden of proof or production with regard to that fact. The facts contained within this Statement include facts directed to issues upon which Defendants bear the burden of proof, *i.e.*, validity. The facts set forth in this Statement are based on information presently known to Taiho, including through Defendants' discovery responses, invalidity contentions, and expert discovery. Although Taiho has tried to anticipate the factual issues that Defendants intend to contest at trial, Defendants may not raise some or all of these and/or may seek to modify these issues or raise additional issues for which Taiho reserves the right to proffer additional facts and evidence at trial in response thereto. In addition, some of Defendants' arguments or evidence may be objectionable and the subject of motions to be filed at a later date. Thus, at trial, Taiho intends to offer evidence as to the issues of fact identified below as well as evidence to rebut evidence offered by Defendants. Taiho incorporates by reference their expert reports in support of any proof to be presented by expert testimony.

Taiho submits this statement pursuant to Local Rule 16.3(c)(4). By submitting this statement, Taiho is in no way waiving its rights to amend or supplement its submission after considering Defendants' submissions, whether made part of this Pretrial Order or otherwise made apparent in pretrial proceedings, the trial itself, or post-trial briefing. To the extent this exhibit contains issues of law, those issues are incorporated into Taiho's Statements of Law that Remain to be Litigated by reference. To the extent Taiho's Statements of Law that Remain to be Litigated

1

contains issues of fact, those issues are incorporated by reference into this exhibit.  Taiho reserves

the right to further modify, supplement and/or amend the Final Pretrial Order and the attachments

thereto, including this exhibit, in light of any future rulings by the Court and/or issues that remain

open until the entry of the Final Pretrial Order.

## I.  OVERVIEW OF LONSURF AND THE CLAIMED INVENTION

### A.  Lonsurf

1.  Colorectal cancer that has spread to other parts of the body (*i.e.*, metastatic) is generally incurable (with some exceptions) and generally has a 5-year survival rate of approximately 16%.  The goal of treatment for patients with metastatic colorectal cancer is to prolong life and improve quality of life.

2.  Lonsurf is an oral chemotherapy drug used to treat metastatic colon or rectal cancer in patients previously treated with or who cannot receive certain chemotherapy drugs.  Lonsurf is comprised of two active compounds: trifluridine (FTD) and tipiracil (TPI) in a fixed dose combination.  FTD is the cancer-fighting agent that helps prevent tumor growth, and TPI inhibits the breakdown of FTD.

3.  FDA granted initial marketing approval for Lonsurf in 2015.  This initial approval did not include approval for treating patients suffering from severe renal impairment (SRI).

### B.  Taiho's Clinical Trials

4.  FTD was first discovered in 1962 but was never developed as an anti-cancer drug because it rapidly breaks down in the body.  DEFS-TT-000069 at 74 (2014 Report on the Deliberation Results of Lonsurf from the Japanese Pharmaceutical and Food Safety Bureau).  In the 1990s, Taiho hypothesized that if they could prevent FTD from breaking down, they could develop it as an anti-cancer agent.  After years of work and testing, Taiho discovered that a uracil

derivative (TPI) could be used in combination with FTD allowing for consistent levels of FTD in the body.  DEFS-TT-005546 at 667, 681 (Lonsurf FDA Approval Package).

5.    Taiho conducted numerous clinical trials to receive FDA Approval for Lonsurf. These clinical trials involved administering Lonsurf to patients with largely normal renal function, with a small number of patients having mild renal impairment and an even smaller number having moderate renal impairment.  None of these trials, nor any other study, involved administering Lonsurf to SRI patients.

6.    J001-10040010 and TPU-TAS-102-101: These studies showed Lonsurf was tolerated in doses up to 35 mg/m$^2$/dose twice daily for five days interspersed with two days' rest for two weeks, followed by a two-week rest period, repeated every four weeks.  TAI-LONS-00022879 at 887 (PopPK Study Report).  In J001-10040010, also known in documents as the "Japanese Dose-Finding Study," a dose of 15 to 35 mg/m$^2$ twice daily five days a week followed by 2 days rest for 2 weeks every 4 weeks was administered to patients with largely normal renal function—creatinine clearance of 92 mL/min.[1]  In that same study, the pharmacokinetics of FTD and TPI were assessed after single and multiple doses of Lonsurf.  Taiho determined that FTD exposure "tended to increase more than expected based on the increase in dose."  TAI-LONS-03269591 at 610-611 (TAS-102-107 Clinical Study Report).  Pharmacokinetics were not evaluated in TPU-TAS-102-101.  No SRI patients were included in these studies.

7.    J004-10040040, TPU-TAS-102-102, TPU-TAS-102-103, and TPU-TAS-102-104: These studies evaluated the pharmacokinetic contribution of TPI (TPU-TAS-102-102), cardiac safety of Lonsurf (TPU-TAS-102-103), bioavailability of Lonsurf (TPU-TAS-102-104), and food

---

[1] The creatinine clearance values associated with renal function are: (i) normal renal function – greater than 80 mL/min; (ii) mild renal impairment – 50-80 mL/min; (iii) moderate renal impairment – 30-50 mL/min; (iv) severe renal impairment – less than 30 mL/min; and (v) end stage renal disease – requires dialysis.  DEFS-TT-000848 at 855 (FDA Guidance).

3

effect on Lonsurf (J004-10040040).  TAI-LONS-00022879 at 887 (PopPK Study Report); TAI-LONS-03269591 at 606 (TAS-102-107 Clinical Study Report); TAI-LONS-00022879.  No SRI patients were included in these studies.

8.　　TPU-TAS-102-103, also known as the "QTc Study," involved evaluating cardiac safety in patients given Lonsurf.  In TPU-TAS-102-102, also known as the "PK Contribution Study," FTD exposure was compared after administration of equivalent doses of FTD in the presence of TPI (as Lonsurf) or as FTD alone (no TPI).  In both studies, the patients largely had normal renal function—a creatinine clearance of 109 mL/min for the QTc Study and 108 mL/min for the PK Contribution Study.  TAI-LONS-02556823 (Cleary Poster).  In both studies, the patients were given 35 mg/m$^2$ twice daily, 5 days a week followed by 2 days rest for 2 weeks, every 4 weeks.  *Id.*  No SRI patients were included in these studies.

9.　　J003-10040030: This study evaluated the safety and efficacy of administering Lonsurf twice daily at a dose of 35 mg/m$^2$/dose to colorectal cancer patients with normal, mild, and moderate renal impairment.  Based on this study, Lonsurf was approved in Japan on March 24, 2014 for the treatment of patients with unresectable, advanced, or recurrent colorectal cancer.  DEFS-TT-005546 at 674 (Lonsurf FDA Approval Package).  This study did not involve any patients with SRI.

10.　　TPU-TAS-102-301: In TPU-TAS-102-301, also known as the RECOURSE study, patients were given Lonsurf at 35 mg/m$^2$ twice daily 5 days a week followed by 2 days rest for 2 weeks, every 4 weeks.  *Id.*  The patients largely had normal renal function, with an average creatinine clearance of 102 mL/min.  *Id.*  This study involved sparse sampling of data (samples collected from patients at 1, 3, and 6 hours after administering Lonsurf), where data from or around day 12 of cycle 1 was used for subsequent analysis in a PopPK study.  DEFS-TT-005546 at 6044

4

(Lonsurf FDA Approval Package). The analysis of the data from this study showed that there were increased exposures of FTD and TPI in patients with mild to moderate renal impairment, but that those results "might be confounded by the relatively smaller body weights in the mild (median body weight=64 kg, n=38) and moderate (median body weight=59 kg, n=16) renal impaired patients when compared to normal renal function (median body weight=78 kg, n=84.)." *Id.* at 6002.

11. The RECOURSE study was not designed to assess Lonsurf use in patients with renal impairment. TAI-LONS-03293661 at 662 (Saif). No SRI patients were involved in the study.

**C.      Taiho Inventor Discovered 20 mg/m$^2$ Twice Daily Could be Successfully Used to Treat SRI Patients**

12. TPI is cleared primarily through the kidneys and as a result, SRI patients were excluded from nearly all of the studies Taiho conducted.

13. During the course of seeking approval, Taiho committed to undertake a dedicated renal study to analyze the effect of the pharmacokinetics of Lonsurf on patients with renal impairment and to determine whether Lonsurf could be successfully used to treat SRI patients. The dedicated renal impairment study was a phase I open label study. It was conducted to evaluate the "pharmacokinetics and safety of FTD/TPI in patients with advanced solid tumors and normal renal function or varying degrees of RI, and thereby develop guidance for making dosing adjustments in patients with RI," including in SRI patients. TAI-LONS-03293661 at 662 (Saif).

14. The study conducted in 2 parts: a pharmacokinetic part ("Cycle 1") and an extension part ("Cycle 2"). *Id.* In Cycle 1, patients were enrolled into one of three cohorts based on their baseline renal function: (i) Cohort 0 - normal renal function (CrCl $\geq$ 90 mL/min), (ii) Cohort 1 - mild renal impairment (CrCl 60-89 mL/min), and (iii) Cohort 2 - moderate renal

impairment (CrCl 30-59 mL/min). *Id.* Twelve patients were enrolled with normal renal function, twelve with mild renal function, and eleven with moderate renal function. *Id.* Six to eight patients per cohort is the typical size recommended for renal impairment studies, so the sample size of the enrolled patients was sufficient. *Id.* Each cohort also included equal number of patients, as suggested by FDA Guidance. DEFS-TT-000848 at 855 (FDA Guidance).

15.     In the dedicated renal impairment study, patients in Cohorts 0-2 received a 35 mg/m$^2$/dose twice daily of Lonsurf for five days interspersed with two days rest for two weeks, followed by a two-week rest period. TAI-LONS-03293661 at 662 (Saif). On days 1 and 12, blood samples were collected within 30 minutes prior to dosing Lonsurf, and 0.5, 1, 2, 4, 6, 8, 10, and 12 hours after dose. *Id.* Urine samples also were collected before administering the morning dose and from 0-12 hours after the dose was administered. *Id.* Concentrations of FTD and TPI were then measured in Cycle 1 using the blood and urine samples. *Id.*

16.     Among other things, the dedicated renal impairment study found that FDA exposure increased with decreasing renal function on Day 12. *Id.* FTD exposure over 12 hours was increased by 15% in patients with mild renal impairment and by 50% in patients with moderate renal impairment, compared to patients with normal renal function. *Id.* This finding suggested that FTD clearance correlates with renal function. *Id.*

17.     After Cycle 1 was completed, an interim safety and pharmacokinetic assessment was conducted. *Id.*; TAI-LONS-03269591 at 610 (TAS-102-107 Clinical Study Report, Background). As discussed in further detail below in Sections II.B and I, the inventor performed a regression analysis using data collected from cohorts 1-3 to create a formula (FTD CL/F = 0.3432 x CLcr$^{0.4870}$) that he then used to create a reliable estimate of FTD exposure in SRI patients, if SRI patients were administered a Lonsurf dose of 15 mg/m$^2$, 20 mg/m$^2$, or 25 mg/m$^2$ twice per day.

The inventor sought an FTD exposure in SRI patients that was comparable to the FTD exposure of patients with normal renal function taking 35 mg/m$^2$ twice per day.  TAI-LONS-03293661 at 664 (Saif).

18.    The inventor concluded that if Taiho administered 15 mg/m$^2$ to an SRI patient, there was a chance that the FTD exposure in SRI patients would be lower than the FTD exposure in normal renal function patients, resulting in decreased Lonsurf efficacy.  TAI-LONS-03298917 at 924 ('004 Patent at 9:49-55); TAI-LONS-00000014 at 20 ('399 Patent at 9:49-55).  The inventor further recognized that because SRI patients have unstable renal function, FTD exposure could exceed the expected level when Lonsurf was administered at 25 mg/m$^2$.  TAI-LONS-03298917 at 924 ('004 Patent at 9:49-55); TAI-LONS-00000014 at 20 ('399 Patent at 9:49-55).

19.    The inventor determined that a starting dose of 20 mg/m$^2$ twice daily was the best dose for an SRI patient to have a comparable drug exposure as normal renal function patients given 35 mg/m$^2$ twice daily.  TAI-LONS-03298917 at 924 ('004 Patent at 9:66-10:2); TAI-LONS-00000014 at 20 ('399 Patent at 9:54-57); TAI-LONS-03293661 at 662 (Saif).  In Cycle 2, the inventor tested 20 mg/m$^2$ twice daily in SRI patients.  TAI-LONS-03293661 at 662 (Saif).

20.    In Cycle 2, "patients in the severe RI cohort were enrolled one at a time to ensure safety and tolerability." *Id.*  The second patient was treated only after data were analyzed for the first patient.  And the third patient was treated only after data were analyzed for the second patient.  After the third patient finished Cycle 1, the remaining SRI patients were enrolled in parallel. *Id.*

21.    Eight patients total were enrolled in the SRI cohort. *Id.* at 664.  These patients received a Lonsurf dose of 40 mg/m$^2$/day on days 1-5 and 8-12 of a 28-day cycle.  In the case of adverse events due to toxicity, one dose reduction of 5 mg/m$^2$ per dose down to 30 mg/m$^2$/day was allowed. *Id.*

22.     The mean CrCL of the patients enrolled in the study were: (i) normal renal function – 123 mL/min; (ii) mild renal impairment – 71.3 mL/min; (iii) moderate renal impairment – 46 mL/min; and (iv) SRI – 23.9 mL/min.  *Id.* at 665.

23.     The inventor determined that patients with mild, moderate, and severe renal impairment had an FTD exposure that was not significantly different from patients with normal renal function.  *Id.* at 668-669.  The inventor also found that TPI exposure was significantly higher for patients with mild, moderate, and severe renal impairment as compared to normal renal function patients.  *Id.*

24.     The study concluded that 35 mg/m$^2$ twice per day (i.e., the same starting dose as for patients with normal renal function) was appropriate in patients with mild or moderate renal impairment and 20 mg/m$^2$ twice per day was appropriate for SRI patients.  TAI-LONS-03293661 (Saif).

**D.     Lonsurf Was Approved at a Reduced Dose for SRI Patients**

25.     In December 2019, FDA approved Taiho's amendment of the Lonsurf label to include the recommended dose for SRI patients.  The label was amended to state "[n]o dose adjustment is recommended for patients with mild or moderate renal impairment. . . . Reduce the dose of LONSURF for patients with severe renal impairment." TAI-LONS-0364696 at 700 (2022 Citizen's Petition).  The label was further amended to state that the recommended dosage for SRI patients is 20 mg/m$^2$ twice daily on days 1 through 5 and days 8 through 12 of each 28-day cycle. TAI-LONS-03649696 at 700 (2022 Citizen's Petition).

26.     The label was also updated to include the total exposure (AUC) of FTD and TPI in patients with varying levels of renal impairment, including that the $AUC_{0-last}$ of FTD increased by 140% and TPI by 614% compared to patients with normal renal function.  TAI-LONS-03649696 at 701 (2022 Citizen's Petition).

**E.       FDA Required Generics to Include Dosing SRI Patients in its Label**

27.    In 2022, FDA required generic companies seeking approval for a generic version of Lonsurf to include in their labeling the pharmacokinetics and dosage reduction required in SRI patients for the "safety" of SRI patients.  TAI-LONS-03649696 at 696 and 705 (2022 Citizen's Petition).

28.    Around February 10, 2022, Taiho filed a Citizen's Petition with FDA requesting that FDA not permit generic companies seeking approval to market a generic version of Lonsurf to omit "those portions of the Lonsurf label describing pharmacokinetics in and dosage reduction instructions for patients with severe renal impairment, and other information form Taiho's dedicated renal impairment study." TAI-LONS-03649696 (2022 Citizen's Petition).  The Citizen's Petition states that the "primary study establishing the safety and efficacy of Lonsurf for the metastatic colorectal cancer indication was TPU-TAS-102-302 (RECOURSE). . . ." TAI-LONS-03649696 at 697 (2022 Citizen's Petition).  The Citizen's Petition further states that:

> Based on population PK analyses in subjects who received TAS-102, FDA found that renal function was a primary intrinsic factor affecting the exposure to trifluridine and to tipiracil after TAS-102 administration[].  This means FDA found that a patient's exposure to trifluridine and tipiracil after taking TAS-102 would vary based on the patient's renal function.  FDA found that patients with renal impairment could have increased tipiracil exposure leading to increased trifluridine exposure due to increased inhibition of trifluridine metabolism by tipiracil, which may lead to more treatment-limiting severe toxicity.

TAI-LONS-03649696 at 698 (2022 Citizen's Petition).

29.    The Citizen's Petition recognizes that FDA required Taiho to conduct a dedicated renal impairment study to determine the appropriate dose, if any, of Lonsurf that could be administered to SRI patients.  TAI-LONS-03649696 at 698 (2022 Citizen's Petition).  Taiho submitted its findings to FDA after completing the dedicated renal impairment study.  TAI-LONS-

03649696 at 699 (2022 Citizen's Petition).  The Citizen's Petition summarized Taiho's clinical trial results, stating:

> [S]evere renal impairment increased the steady-state AUC (dose-normalized) of trifluridine by 2.4-fold.  There was no meaningful difference found in the safety profile of TAS-102 in subjects with severe renal impairment who received the reduced dose of 20 mg/m$^2$ compared to subjects with normal renal function and mild renal impairment who received the recommended dose of 35 mg/m$^2$. Therefore, a dose of TAS-102 at 20 mg/m2 twice daily was determined to be appropriate and tolerable for subjects with severe renal impairment.

TAI-LONS-03649696 at 700 (2022 Citizen's Petition).

30.     On January 1, 2020, FDA approved Taiho supplementing Lonsurf's label to state that for SRI patients, the recommended dosage of Lonsurf is 20 mg/m$^2$ twice daily with food on days 1-5 and days 8-12 of each 28-day cycle.  TAI-LONS-03649696 at 700 (2022 Citizen's Petition).  FDA also approved including in the label that the Lonsurf dose for SRI patients could be reduced to 15 mg/m$^2$ twice daily in SRI patients who cannot tolerate a dose of 20 mg/m2 twice daily and discontinued in patients who are not able to tolerate a daily dose of 15 mg/m$^2$. *Id.*

31.     The Citizen's Petition shows that subsection 8.6 on renal impairment and subsection 12.3 on pharmacokinetics in renally impaired patients were updated to include the recommended dose for SRI patients and to identify the exposure of FTD and TPI in patients with different levels of renal impairment:

> Subsection 8.6:
> No dose adjustment is recommended for patients with mild or moderate renal impairment (CLcr of 30 to 89 mL/min as determined by the Cockroft-Gault formula).  Reduce the dose of Lonsurf for patients with severe renal impairment (CLcr of 15 to 29 mL/min)) [see Dosage and Administration (2.3)].  The pharmacokinetics of trifluridine and tipiracil have not been studied in patients with end stage renal disease.
>
> Subsection 12.3:

10

In a dedicated renal impairment study, all patients received LONSURF 35 mg/m$^2$ twice daily except for patients with severe renal impairment who received 20 mg/m$^2$ twice daily. Mild renal impairment (CLcr of 60 to 89 mL/min as determined by the Cockcroft-Gault formula) had no clinically important effect on steady-state AUC$_{0\text{-last}}$ of trifluridine and tipiracil. Moderate renal impairment (CLcr of 30 to 59 mL/min) increased steady-state AUC0-last of trifluridine by 56% and tipiracil by 139% compared to normal renal function (CLcr $\geq$ 90 mL/min). Severe renal impairment (CLcr of 15 to 29 mL/min) increased the dose-normalized steady-state AUC$_{0\text{-last}}$ of trifluridine by 140% and tipiracil by 614% compared to normal renal function. The pharmacokinetics of trifluridine and tipiracil have not been studied in patients with end stage renal disease.

32.     The Citizen's Petition states that for patient safety, the generic applicant must include on its label the recommended dosage for SRI patients and pharmacokinetic information relating to SRI patients:

Standard of care for patients with metastatic colorectal cancer and gastric or gastroesophageal junction adenocarcinoma who have disease progression on or after prior therapy would include the use of cytotoxic drugs and antibodies (e.g., platinum compounds, bevacizumab, cetuximab), which can potentially cause renal impairment. In addition to prior therapy that may have caused renal impairment[]. Age and comorbidities associated with these cancers may be present, which are additional factors contributing to the presence of renal impairment. A patient with an indicated cancer may have acceptable renal function at the time of treatment initiation but may develop renal disease or experience worsening of their renal disease and develop severe renal impairment during the course of cancer treatment (e.g., due to a treatment regimen with other potentially nephrotoxic therapies). Severe renal impairment can develop without advance warning, and once a patient has severe renal impairment, an appropriate dose reduction, as described in the Lonsurf labeling is needed. As a patient's renal function may change over time and any patient could develop severe renal impairment during treatment for the indicated cancers, the dose reduction and related PK information on increased drug exposure for patients with severe renal impairment is necessary information for health care professionals to know in the treatment of any patient. Although the dose reduction and related PK information in labeling directly pertains to patients with severe renal impairment, it also provides an important signal to health care professional as they treat

11

> patients without severe renal impairment. It alerts health care professional that the renal function of patients without severe renal impairment needs closer and systematic monitoring, particularly when creatinine clearance is decreasing, because once severe renal impairment develops, a dose reduction is necessary. Because of these considerations, omission of such dose reduction and related PK information for patients with severe renal impairment would render the generic less safe than Lonsurf for the remaining, nonprotected conditions of use.

TAI-LONS-03649696 at 708 (2022 Citizen's Petition).

33.    FDA acknowledges that prior to the inventor conducting the dedicated renal impairment study, FDA did not know whether an SRI patient could be successfully treated with Lonsurf:

> When Lonsurf was first approved, FDA determined that its benefit in treating patients with metastatic colorectal cancer, which is a serious and life threatening disease with a poor prognosis, outweighed the risk of temporarily having incomplete information of the manner in which it would affect renal function. At that time, Lonsurf's labeling stated that the pharmacokinetics of trifluridine and tipiracil had not been studied in patients with severe renal impairment. However, because of the serious risk associated with increased trifluridine exposure in patients with impaired renal function, upon approval, FDA required Taiho to conduct [the dedicated renal impairment study]. This study showed that in patients with severe renal impairment, the exposures of Lonsurf's two active ingredients are significantly increased. The Agency now knows that a safer way to prescribe Lonsurf for patients with severe renal impairment is to decrease the dose of Lonsurf.

TAI-LONS-03649696 at 9710 (2022 Citizen's Petition).

34.    FDA granted Taiho's Citizen Petition, confirming the importance of the inventor's discovery of what Lonsurf dosage to administer to SRI patients.

## II. THE ASSERTED PATENTS

35.    The asserted patents in this case are U.S. Patent Nos. 10,960,004 (the "'004 Patent") and 10,456,399 (the "'399 Patent") (collectively, the "Asserted Patents"). The Asserted Patents have the same specifications.

12

A. **Priority Date of the Asserted Patents**

36.    Both Asserted Patents claim a priority date of February 5, 2016, which is the filing date of Provisional Application No. 62/291,799.

37.    MSN sets forth two potential priority dates—February 3, 2017 (the date of Application No. PCT/JP2017/003994)[2] and February 5, 2016 (the date provisional application no. '799 was filed), but neither MSN nor its expert (Dr. Dreicer) identify any prior art dated between the February 5, 2016 and February 3, 2017 filing dates.  Taiho is not aware of any prior art falling within that time period.  As set forth in the Asserted Patents, Taiho claims priority to February 5, 2016.

B.    **Overview of the Asserted Patents**

38.    The Asserted Patents are directed to "[a] method for treating cancer in patients with a creatinine clearance of 15 mL/min or more and less than 30 mL/min," i.e., SRI patients, with a combination of FTD and TPI (i.e., Lonsurf).  TAI-LONS-00000014 ('399 Patent at Abstract); TAI-LONS-03298917 ('004 Patent at Abstract).

39.    The Background of the Invention section explains that FTD is incorporated into the DNA of tumor cells, thereby inhibiting DNA synthesis and function of the tumor cells.  TAI-LONS-03298917 at 20 ('004 Patent at 1:33-36); TAI-LONS-00000014 at 16 ('399 Patent at 1:21–26, 30–33).  The same section further explains that TPI "suppresses the decomposition of FTD by thymidine phosphorylase . . . thereby potentiating the antitumor effect of FTD."  TAI-LONS-03298917 at 20 ('004 Patent at 1:33-36); TAI-LONS-00000014 at 16 ('399 Patent at 1:21–26, 30–

---

[2] The '399 Patent originally issued October 29, 2019, from U.S. Patent Application No. 16/054,073 (the "'073 Application"), which was filed on August 3, 2018.  The '399 Patent is a continuation of Application No. PCT/JP2017/003994, which was filed on February 3, 2017.  The '004 Patent originally issued on March 30, 2021, from U.S. Application No. 16/574,180 (the "'180 Application), which was filed as a continuation of the '073 Application on September 18, 2019.

33). The specifications explain that a combination of FTD and TPI is typically administered orally to adults twice daily at a total dose of 70 mg/m$^2$/day for 5 consecutive days, followed by 2 days of rest. TAI-LONS-03298917 at 20 ('004 Patent at 1:44-50); TAI-LONS-00000014 at 16 ('399 Patent at 1:41–46). This dosing regimen is repeated twice, followed by 14 rest days. TAI-LONS-03298917 at 20 ('004 Patent at 1:44-50); TAI-LONS-00000014 at 16 ('399 Patent at 1:41–46).

40. The Background of the Invention section further discloses that TPI is renally excreted. TAI-LONS-03298917 at 20 ('004 Patent at 1:52); TAI-LONS-00000014 at 16 ('399 Patent at 1:49). It was thus understood that when the FTD/TPI combination (Lonsurf) was administered to renally impaired patients, there was a substantial risk that TPI clearance would be reduced as compared to patients having normal kidney function. It was further understood that that the presence of TPI increased exposure of FTD by inhibiting the breakdown of FTD. TAI-LONS-03298917 at 20 ('004 Patent at 1:52-55); TAI-LONS-00000014 at 16 ('399 Patent at 1:49–52).

41. In a clinical trial that took place prior to the claimed invention, patients with mild and moderate renal impairment were described as having increased "side effects related to myelosuppression . . . as compared to [patients with] normal renal function." TAI-LONS-03298917 at 20 ('004 Patent at 1:55-66); TAI-LONS-00000014 at 16 ('399 Patent at 1:52–63).

42. The specifications classify renal impairment levels using creatinine clearance (CLcr) values, which are calculated using the Cockroft-Gault equation. TAI-LONS-03298917 at 20 ('004 Patent at 1:66-2:1); TAI-LONS-00000014 at 16 ('399 Patent at 1:63–65). The specifications further explain that because Lonsurf had not been administered to patients having a CLcr of 15 to 29 mL/min (SRI patients) in the prior clinical trial, there was no information

14

available about the safety or efficacy of the combination drug in those patients. TAI-LONS-03298917 at 20 ('004 Patent at 2:5-10); TAI-LONS-00000014 at 16 ('399 Patent at 2:2–6).

43.    The specifications recognize that it is "[g]enerally . . . necessary to adjust the dose or dosing interval depending on the degree of renal function . . . and it is recommended to select the dose based on pharmacokinetics (PK) according to the FDA guidance." TAI-LONS-03298917 at 20 ('004 Patent at 2:11-16); TAI-LONS-00000014 at 16 ('399 Patent at 2:8–12). The specifications also recognize that "it is not easy to perform cancer treatment that is safer and has high effectiveness on a cancer patient with [SRI]." TAI-LONS-03298917 at 20 ('004 Patent at 2:16-18; TAI-LONS-00000014 at 16 ('399 Patent at 2:13–15). The Summary of the Invention section explains that the inventor identified an appropriate dose of Lonsurf for cancer patients with SRI to achieve "a remarkable anticancer effect . . . while avoiding severe side effects." TAI-LONS-03298917 at 20 ('004 Patent at 2:37-43); TAI-LONS-00000014 at 16 ('399 Patent at 2:33–39).

44.    The Detailed Description of the Invention section discloses an oral, Lonsurf dose of "30 to 50 $mg/m^2$/day as FTD-equivalent," with the dose being "preferably 40 $mg/m_2$/day," divided into "preferably twice" a day (20 $mg/m^2$ per dose). TAI-LONS-03298917 at 22 ('004 Patent at 5:48-57); TAI-LONS-00000014 at 18 ('399 Patent at 5:39–48). This dose is administered to "a cancer patient with [a] CLcr of less than 30 mL/min, . . . and particularly preferably, a cancer patient with [a] CLcr of 15 mL/min or more and 29 mL/min or less." TAI-LONS-03298917 at 22 ('004 Patent at 6:37-42); TAI-LONS-00000014 at 18 ('399 Patent at 6:28–33). The specifications also provide several formulae for calculating a patient's body surface area, as well as the Cockcroft-Gault equation for calculating the patient's CLcr, which "is an index of renal function." TAI-LONS-03298917 at 22 ('004 Patent at 6:1-30, 6:42-55); TAI-LONS-00000014 at 18 ('399

15

Patent at 5:51–6:27, 6:34–49).  The specifications disclose that several types of cancer can be treated with the disclosed dosing regimen, including "gastrointestinal cancer (e.g., esophageal cancer, gastric cancer, duodenal cancer, liver cancer, biliary tract cancer (gallbladder/bile duct cancer), pancreatic cancer, small intestinal cancer, large bowel cancer (colorectal cancer, colon cancer, rectal cancer))," and "breast cancer."  TAI-LONS-03298917 at 22-23 ('004 Patent at 6:64-7:22); TAI-LONS-00000014 at 18 ('399 Patent at 6:56–7:8).

45.    The Examples section includes Example 1, which discusses "Dose Estimation in Cancer Patients with Severe Renal Impairment."  TAI-LONS-03298917 at 23 ('004 Patent at 7:63-64); TAI-LONS-00000014 at 19 ('399 Patent 7:54–55).  Example 1 explains that FTD pharmacokinetics were studied in three cohorts of patients, all of whom received Lonsurf at a dose of 35 mg/m$_2$ twice daily.  TAI-LONS-03298917 at 23 ('004 Patent at 8:1-14); TAI-LONS-00000014 at 19 ('399 Patent 7:57–8:3).  The three cohorts included: Cohort 0, having normal renal function (CLcr $\geq$ 90mL/min); Cohort 1, having mild renal impairment (CLcr: 60 to 89 mL/min); and Cohort 2, having moderate renal impairment (CLcr: 30 to 59 mL/min).  TAI-LONS-03298917 at 23 ('004 Patent at 8:1-14); TAI-LONS-00000014 at 19 ('399 Patent 7:57–8:3).  On Days 1 and 12 of the dosing cycle, blood was collected from each patient.  TAI-LONS-03298917 at 23 ('004 Patent at 8:14-20); TAI-LONS-00000014 at 19 ('399 Patent 8:3–9).  On each day blood samples were taken "predose and at 0.5, 1, 2, 4, 6, 8, 10, [and] 12 hours after administration," FTD and TPI concentrations in those samples were measured.  TAI-LONS-03298917 at 23 ('004 Patent at 8:14-20); TAI-LONS-00000014 at 19 ('399 Patent 8:3–9).  Certain pharmacokinetic results calculated from those measurements are shown below in Table 1 from the specifications:

16

TABLE 1

Pharmacokinetic parameters of FTD and TPI
(Cohort 0: normal, Cohort 1: mild renal impairment, Cohort 2: moderate renal impairment)

| Compound | Cohort | Subject | Day 1 | | | | Day 12 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | $C_{max}$ (ng/mL) | $AUC_{0-12}$ (hr * ng/mL) | $t_{1/2}$ (hr) | CL/F (L/hr) | $C_{max}$ (ng/mL) | $AUC_{0-12}$ (hr * ng/mL) | $t_{1/2}$ (hr) | CL/F (L/hr) |
| FTD | 0 | N | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| | | Mean | 2882 | 7873 | 1.26 | 8.72 | 5235 | 20124 | 2.09 | 3.29 |
| | | SD | 1372 | 2819 | 0.38 | 4.20 | 2662 | 7395 | 0.67 | 1.12 |
| | | CV % | 47.6 | 35.8 | 30.1 | 48.1 | 50.9 | 36.7 | 32.0 | 33.9 |
| | 1 | N | 12 | 12 | 12 | 12 | 11 | 11 | 11 | 11 |
| | | Mean | 3161 | 7292 | 1.79 | 10.08 | 4667 | 23383 | 2.40 | 4.1 |
| | | SD | 1363 | 2634 | 0.49 | 5.95 | 2676 | 13634 | 0.75 | 3.71 |
| | | CV % | 43.1 | 36.1 | 27.5 | 59.0 | 57.3 | 58.3 | 31.3 | 90.6 |
| | 2 | N | 11 | 11 | 11 | 11 | 10 | 8 | 8 | 8 |
| | | Mean | 2763 | 8135 | 1.90 | 9.17 | 6014 | 30405 | 3.22 | 2.1 |
| | | SD | 1362 | 3556 | 0.43 | 4.86 | 2273 | 7747 | 1.02 | 0.41 |
| | | CV % | 49.3 | 43.7 | 22.8 | 53.0 | 37.8 | 25.5 | 31.7 | 19.6 |
| TPI | 0 | N | 10 | 9 | 9 | 9 | 10 | 9 | 9 | 9 |
| | | Mean | 46.5 | 234 | 2.04 | 148.5 | 48.8 | 247 | 2.61 | 128.3 |
| | | SD | 18.3 | 121 | 0.37 | 81.8 | 21.9 | 100 | 0.73 | 58.2 |
| | | CV % | 39.4 | 51.8 | 18.2 | 55.1 | 44.9 | 40.3 | 28.1 | 45.3 |
| | 1 | N | 12 | 11 | 11 | 11 | 11 | 9 | 9 | 9 |
| | | Mean | 93.9 | 380 | 2.33 | 105.1 | 67.8 | 383 | 2.54 | 83.1 |
| | | SD | 40.9 | 193 | 0.68 | 86.1 | 27.9 | 105 | 0.73 | 17.5 |
| | | CV % | 43.5 | 50.9 | 29.3 | 81.9 | 41.1 | 27.5 | 28.7 | 21 |
| | 2 | N | 11 | 10 | 10 | 10 | 10 | 8 | 8 | 8 |
| | | Mean | 100.4 | 494 | 2.42 | 64.8 | 111.7 | 602 | 2.63 | 62 |
| | | SD | 40.2 | 181 | 0.40 | 18.6 | 53.5 | 321 | 0.44 | 32.7 |
| | | CV % | 40.0 | 36.7 | 16.4 | 28.7 | 47.9 | 53.4 | 16.7 | 52.8 |

TAI-LONS-03298917 at 23 ('004 Patent at Table 1); TAI-LONS-00000014 at 19 ('399 Patent at Table 1).

46.    Example 1 explains that because "FTD is an active component showing anticancer activity," while "TPI is a modulator to increase the concentration of FTD in the plasma . . ., the FTD concentration . . . is most strongly related to the effect and safety of" Lonsurf.  TAI-LONS-03298917 at 23 ('004 Patent at 8:54-59); TAI-LONS-00000014 at 19 ('399 Patent at 8:43–48). "The $AUC_{0-12}$ of FTD in patients with mild renal impairment (Cohort 1) and patients with moderate renal impairment (Cohort 2) [were] higher by about 16% and about 51%, respectively, as compared to that in patients with normal renal function [Cohort 0]."  TAI-LONS-03298917 at 23 ('004 Patent at 8:59-63); TAI-LONS-00000014 at 19 ('399 Patent at 8:48–52).  The inventor's work showed that "the AUC of FTD increases with the deterioration of renal function," thereby

17

suggesting "the need for reducing the dose of [Lonsurf] . . . for patient[s] with [SRI]." TAI-LONS-03298917 at 23 ('004 Patent at 8:59-66); TAI-LONS-00000014 at 19 ('399 Patent at 8:52–55). The inventor's work also demonstrated that "[t]he half-life of FTD is sufficiently short as compared to the administration interval when [administering] twice a day, . . . [and] thus the effect of [Lonsurf] can be maintained by reducing to the appropriate dose without changing the administration interval." TAI-LONS-03298917 at 24 ('004 Patent at 9:4-9); TAI-LONS-00000014 at 19 ('399 Patent at 8:60–65).

47. To determine the Lonsurf dose for SRI patients, the inventor performed "a regression analysis of oral clearance (CL/F) and creatinine clearance (CLcr) of FTD on Day 12 after administration was performed [in Cohorts 0, 1, and 2]." TAI-LONS-03298917 at 24 ('004 Patent at 9:10-13); TAI-LONS-00000014 at 19 ('399 Patent at 8:67–9:2). FIG. 1 from the specifications shows the result of the inventor's power regression analysis:

18



TAI-LONS-03298917 at 19 ('004 Patent at Figure 1); TAI-LONS-00000014 at 15 ('399 Patent at Figure 1).

48.    From this regression analysis, the inventor "approximate[d] the relationship of both parameters to the following power function curve[:] FTD CL/F (L/hr) = 0.3432 × CLcr (mL/min)$^{0.4870}$ [.]" TAI-LONS-03298917 at 24 ('004 Patent at 9:15-19); TAI-LONS-00000014 at 20 ('399 Patent at 9:4–7).  The inventor used this equation to calculate the FTD oral clearance ("CL/F") for each category of renal function (i.e., normal, mild, moderate, and severe), using the

19

CLcr range for each category, as shown in Table 2 below.  TAI-LONS-03298917 at 24 ('004 Patent at 9:20-24); TAI-LONS-00000014 at 20 ('399 Patent 9:8–12).

## TABLE 2

Range of FTD oral clearance estimated from power regression equation and range of AUC in each dose

| | CLcr (mL/min) | | | FTD CL/F on Day 12 (L/hr) | | | Dose (mg/m$^2$) | AUC ratio to Control | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Min | Mid | Max | Min | Mid | Max | | Min | Mid | Max |
| Normal | 90 | 109 | | 3.07 | 3.37 | | 35 | 1.10 | 1.00 | |
| Mild | 60 | 75 | 89 | 2.52 | 2.81 | 3.05 | 35 | 1.34 | 1.20 | 1.10 |
| Moderate | 30 | 45 | 59 | 1.80 | 2.19 | 2.50 | 35 | 1.87 | 1.54 | 1.35 |
| Severe | 15 | 22.5 | 29 | 1.28 | 1.56 | 1.77 | 15 | 1.13 | 0.92 | 0.82 |
| | | | | | | | 20 | 1.50 | 1.23 | 1.09 |
| | | | | | | | 25 | 1.88 | 1.54 | 1.36 |

TAI-LONS-03298917 at 24 ('004 Patent at Table 2) (yellow annotations added); TAI-LONS-00000014 at 20 ('399 Patent at Table 2) (yellow annotations added).

49.    The columns in Table 2 under the heading "CLcr (mL/min)" identify the "min, mid, and max" creatinine clearances for patients with normal renal function (CLcr $\geq$ 90mL/min); mild renal impairment (CLcr: 60 to 89 mL/min); moderate renal impairment (CLcr: 30 to 59 mL/min); and SRI (CLcr: 15 to 29 mL/min).  TAI-LONS-03298917 at 24 ('004 Patent at Table 2); TAI-LONS-00000014 at 20 ('399 Patent at Table 2).  The columns in Table 2 under the heading "FTD CL/F on Day 12 (L/hr)" identify the FTD oral clearance calculated using the equation (FTD CL/F (L/hr)=0.3432×CLcr(mL/min)$^{0.4870}$) for each creatinine clearance value (e.g., 0.3432×90 mL/min$^{0.4870}$ = 3.07 L/hr, etc.).  TAI-LONS-03298917 at 24 ('004 Patent at 9:19-24, Table 2); TAI-LONS-00000014 at 20 ('399 Patent at 9:8–12, Table 2).

20

50.      Next, "the ratio was calculated using a median CLcr (109 mL/min) of the patient with normal renal function as a control (1.00)."  TAI-LONS-03298917 at 24 ('004 Patent at 9:23-25); TAI-LONS-00000014 at 20 ('399 Patent at 9:13–15).  That is, each Lonsurf dose (in mg/m$^2$) was divided by its respective calculated FTD oral clearance value, then normalized to that of a patient having a CLcr of 109 mL/min (*e.g.*, ((35 mg/m2 ÷ 3.07 L/hr) ÷ (35 mg/m2 ÷ 3.37 L/hr)) = 1.10, etc.).  TAI-LONS-03298917 at 24 ('004 Patent at 9:23-25, Table 2); TAI-LONS-00000014 at 20 ('399 Patent at 9:13–15, Table 2).  The resulting "AUC ratio to Control" values, highlighted in yellow in Table 2 above, "suggested that the AUC of FTD when administering [Lonsurf] to the patient with [SRI] in 15 mg/m2, 20 mg/m2, and 25 mg/m2 [doses] is similar to the AUC when administering 35 mg/m2 to the patients with normal renal function, . . . mild renal impairment, and . . . moderate renal impairment."  TAI-LONS-03298917 at 24 ('004 Patent at 9:25-32); TAI-LONS-00000014 at 20 ('399 Patent at 9:15–21).

51.      The inventor recognized the "possibility that the AUC of FTD when administered [to SRI patients] in 15 mg/m$^2$ [could be] lower than the AUC of the patient with normal renal function, and [thus] the effect [of the drug could be] attenuated."  TAI-LONS-03298917 at 24 ('004 Patent at 9:60-63); TAI-LONS-00000014 at 20 ('399 Patent at 9:49–52).  The inventor further recognized that "since renal function of the patient with [SRI] is unstable, there [was] a possibility that the AUC of FTD exceeds the prediction when administering in 25 mg/m2."  TAI-LONS-03298917 at 24 ('004 Patent at 9:63-66); TAI-LONS-00000014 at 20 ('399 Patent at 9:52–55).

52.      The inventor concluded that the "most preferred" starting dose of Lonsurf in SRI patients "is administered in 20 mg/m$^2$."  TAI-LONS-03298917 at 24 ('004 Patent at 9:66-10:2); TAI-LONS-00000014 at 20 ('399 Patent at 9:55–58).  At this starting dose (40 mg/m$^2$/day as FTD-

21

equivalent), "efficacy can be expected while maintaining safety."  TAI-LONS-03298917 at 24 ('004 Patent at 10:3-7); TAI-LONS-00000014 at 20 ('399 Patent at 9:61–63).

### C.    Overview of the '399 File History

53.    The '073 Application, which issued as the '399 Patent, was filed on August 3, 2018, with 28 claims.  Original claim 1 is reproduced below:

> 1. A method for treating cancer in patients with creatinine clearance of less than 30 mL/min, comprising dividing a combination drug containing α,α,α-trifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1 : 0.5, in a dose of 30 to 50 mg/m²/day as FTD-equivalent, into two to four times a day, and orally administering it to the patient.

54.    On August 3, 2018, Taiho also filed an IDS, disclosing several references, which the examiner considered on September 25, 2018.

55.    On August 3, 2018, Taiho also requested Track One prioritized examination of the '073 Application, which was granted.

56.    On August 24, 2018, Taiho filed a supplemental IDS disclosing three references: (i) "Mayer et al., 'Randomized Trial of TAS-102 for Refractory Metastatic Colon Cancer,' The New England Journal of Medicine, May 14, 2015"; (ii) the clinical trial protocol referenced in Mayer et al.—"Protocol No.: TPU-TAS-102-301"; and (iii) "A Phase I Study of TAS-102 in Patients with Advanced Solid Tumors with Renal Impairment, ClinicalTrials.gov."  The parties refer to "A Phase I Study of TAS-102 in Patients with Advanced Solid Tumors with Renal Impairment, ClinicalTrials.gov" as "NCT '117," and MSN asserts NCT '117 as prior art against the Asserted Patents.  The examiner considered these references on September 25, 2018.

57.    On August 24, 2018, Taiho also filed a preliminary amendment, amending claim 1 as shown below:

22

1. A method for treating cancer ~~in patients with creatinine clearance of less than 30 mL/min~~, comprising:
<u>detecting a creatinine clearance of a patient before starting a treatment; and</u>
~~dividing~~ <u>starting the treatment by orally administering to the patient with a creatinine clearance of less than 30 mL/min</u> a combination drug ~~containing~~ <u>comprising</u> α,α,α-trifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5, [[in]] a dose of 30 to <u>40</u> [[50]] mg/m²/day as FTD-equivalent, [[into]] <u>in</u> two to four <u>divided doses</u> ~~times a day, and orally administering it to the patient~~.

58.    In the preliminary amendment, Taiho also amended claims 2-5, canceled claims 8-28, and added new claims 29-51.

59.    In the remarks accompanying Taiho's preliminary amendment, Taiho stated:

The enclosed IDS includes the article titled 'Randomized Trial of TAS-102 for Refractory Metastatic Colon Cancer' in the May 14, 2015 issue of the New England Journal of Medicine ('2015 article') and the Protocol referenced in the 2015 article. The 2015 article reports on clinical trials of TAS-102, the combination drug recited in claim 1, but the patients were not those with severe renal impairment having a significantly low level (less than 30 mL/min) of creatinine clearance. There were two instances where the initial dose of 70 mg/m²/day was reduced in three 5 mg steps to 40 mg/m²/day because of adverse events. See page 1916 of the 2015 article and page 39 of the Protocol. But neither of the patients had a creatinine clearance of less than 30 mL/min.

Prior to the present invention there were no reported instances of treating patients with severe renal impairment having a significantly low level (less than 30 mL/min) of creatinine clearance with TAS-102. To determine an effective treatment and an appropriate dose for such patients[,] Applicant studied the effect of dosing on the AUC level. Specifically, Applicant calculated the effect of dosing using a regression analysis as shown in Table 2 in the specification, [0047]. The calculation shows that the AUC of severely impaired renal function patients at a dose of 25 mg/m² (50 mg/m²/day) results in almost doubling the AUC. This indicates that those with low levels of creatinine clearance may have unacceptably high levels of TAS-102 in the blood instead of being excreted in the urine, which may cause an unacceptable level of adverse events and poor patient

23

compliance. On the other hand, too low an AUC could result in the drug not providing [the] desired anti-cancer benefit.

By starting a treatment of the patient with severe renal impairment at a dose of from 30 to 40 mg/m$^2$/day the method of claim 1 can provide successful cancer treatment at a tolerable level of adverse events. Prior to the present invention this had not been considered possible.

60.     In a Non-Final Office Action dated October 9, 2018, the pending claims were rejected under 35 U.S.C. § 112(a) for lack of enablement for the "treatment of cancer without limitation (i.e., no named cancer)." The Examiner noted, however, that the specification was "enabling for using instant composition for treating colon cancer [and] breast cancer." After noting that the "instant claimed invention is highly unpredictable," the Examiner noted that the rejection could be overcome by incorporating a "named cancer supported by the specification (i.e., see claims 6-7 and 29-30) into claim 1." Claim 6 recited, in part, "wherein the cancer is gastrointestinal cancer or breast cancer." Claim 7, recited in part, "wherein the cancer is large bowel cancer." And claims 29 and 30 recited in part "wherein the cancer is gastrointestinal cancer" (claim 29) and "wherein the cancer is breast cancer" (claim 30).

61.     The Examiner also rejected the claim under § 112(b) for the phrase "in two to four divided dose[s]" as being indefinite and ambiguous. The pending claims were also rejected under 35 U.S.C. § 103 as being unpatentable over the combination of: (i) Doi et al. (British Journal of Cancer, 2012, 107:429-434); (ii) Sakamoto et al. (U.S. Publication No. 2016/0082032); (iii) Ito et al. (U.S. Publication No. 2014/0213602); (iv) Emura et al. (U.S. Patent No. 7,799,783); (v) Ito et al. (U.S. Patent No. 9,371,380); and (vi) Hurria et al. (Drugs Aging, 2005, 22(9): 785-791). The pending claims were also rejected for obviousness-type double patenting over Emura et al. and Ito et al. in view of Hurria et al.

24

62.    In a Non-Final Office Action response dated January 9, 2019, Taiho amended claim 1 as follows:

> 1. A method for treating cancer which is one of gastrointestinal cancer, large bowel cancer and breast cancer, comprising:
> detecting a creatinine clearance of a patient before starting a treatment; and starting the treatment by orally administering to the patient with a creatinine clearance of less than 30 mL/min a combination drug comprising α,α,α- trifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1 : 0.5, a daily dose of 30 to 40 mg/m²/day as FTD-equivalent, divided into two to four portions for administration in two to four divided doses.

63.    Taiho also amended claims 3 and 31.  In its response to the examiner, Taiho explained that "[i]t is the examiner's position that it would be obvious to reduce the dose for patients with severe renal impairment.  The examiner has provided no evidence that dose reduction would be possible while maintaining the drug's efficacy.  The evidence is to the contrary."  Taiho directed the Examiner to a presentation by Emura et al. comparing TAS-102 with Teysuno—another orally administered cancer drug containing a 5-FU (fluorouracil) prodrug.  Taiho further stated:

> TAS-102 and Teysuno® both involve inhibition of thymidylate synthase and its incorporation into DNA.  Teysuno® has been approved in Europe, and attached is a copy of the label for Teysuno® including the 5-FU prodrug tegafur.  The label reports that Teysuno® should not be used on patients with severe renal impairment. . . .
>
> The dose modification section [of the Teysuno® label] for renal impairment on page 6 reads (underline added):
>
> - Severe renal impairment (CrCl below 30 mL/min)
> - Although roughly similar daily exposure to 5-FU would be expected in patients with severe renal impairment at a dose of 20 mg/m2 once daily compared to 30 mg/m2 twice daily in patients with normal renal function (see section 5.2), administration of Teysuno is not recommended due to possibly higher incidence of adverse events of the blood and

25

> <u>lymphatic system disorders unless the benefits clearly outweigh the risks</u> (see sections 4.4 and 4.8).
>
> . . . Thus, the label clearly shows that a dose reduction did not work for administering Teysuno® to patients severe renal impairment.
>
> Based on such issue with Teysuno® that raised the concern for higher incidence of adverse events, there was no reason to expect that it would be different for TAS-102. As stated above, Teysuno® and TAS-102 both involve inhibition of thymidylate synthase and its incorporation into DNA. Since a dose reduction did not work for Teysuno®, one skilled in the art would not have reasonably expected that a simple dose reduction for TAS-102 would lead to an effective treatment without concern for higher incidence of adverse events.
>
> None of the references cited by the examiner concern the administration of TAS-102 to patients with severe renal impairment. This is not surprising given the warnings for Teysuno®. None of the cited references contains any direction for using TAS-102 in patients with severe renal failure. . . . The only evidence concerned with renal impairment and an orally administered drug is Teysuno® where the European Medicine Agency (EMA) clearly stated that Teysuno® cannot be administered to patients with severe renal impairment."

64.    To address the examiner's obviousness-type double patenting rejection, Taiho explained that "Emura and Ito are prior art and cannot be properly applied as double patenting. Neither of these patents when taken with Hurria suggests that it is possible to successfully reduce the TAS-102 dose in patients with severe renal failure."

65.    In a Final Office Action dated March 8, 2019, the Examiner found that Taiho's claim amendments overcame the rejections under § 112, and found the arguments Taiho made to overcome the Examiner's § 103 rejection over Doi et al., Sakomoto et al., Ito et al., and Hurria et al. were "persuasive," confirming those prior art references were "distinct from the instant invention." The Examiner further found that Taiho's arguments regarding the examiner's obviousness-type double patenting rejection over Ito et al. in view of Hurria et al. were

26

"persuasive." The examiner maintained the § 103 and obviousness-type double patenting rejections over Emura et al. in view of Huria et al.

66.    On July 11, 2029, Taiho and the Examiner discussed the Examiner's § 103 and obviousness-type double patenting rejections during a telephone interview.

67.    Taiho filed a Final Office Action response on July 12, 2019, stating that: "The office action asserts that Hurria suggests that reducing the dose of an anti-cancer drug to patients with impaired renal clearance would be obvious. This assertion is incorrect because Hurria is not directed to a renally impaired patient population. . . . . Of the patients reviewed[,] 97% had a normal creatinine [clearance]." As Taiho further explained, Hurria concludes that "[p]rospective studies are needed to compare the actual versus calculated $CL_{CR}$ in older patients, and to study the impact of modifying chemotherapy dose according to renal function on toxicity, response, and overall survival." Taiho also explained that the "[f]luorouracil used by Hurria is sold in an oral, prodrug form under the trade name Teysuno®," and that "[t]he Teysuno label teaches that . . . (Teysuno) should not be used with renally impaired patients and that no safe dose has been identified." Taiho additionally explained that "Teysuno® and TAS-102 both involve inhibition of thymidylate synthase and its incorporation into DNA. Since a dose reduction did not work for Teysuno®, one skilled in the art would not have reasonably expected that a simple dose reduction for TAS-102 would lead to an effective treatment without concern for higher incidence of adverse events."

68.    On August 9, 2019, the Examiner issued a Notice of Allowance, stating that Taiho's arguments were "persuasive" to overcome the § 103 and obviousness-type double patenting rejections. The Examiner further stated that the claims "are neither anticipated nor rendered obvious over the art of record," and that "[a] suggestion for modification of a reference to obtain the instant methods of use has not been found."

69.    On August 14, 2019, Taiho paid the issue fee.  An Issue Notification was mailed on September 11, 2019.

70.    On September 12, 2019, Taiho filed a Request for Continued Examination and a supplemental IDS disclosing several references, including: (i) an Extended European Search Report issued August 27, 2019, in a related case and (ii) "Lonsurf (TAS-102), combination product of trifluridine and tipiracil hydrochloride at a molar ratio of 1:0.5."   "Lonsurf (TAS-102) combination product of trifluridine and tipiracil hydrochloride at a molar ratio of 1:0.5" is a section of FDA Review Package for NDA 207981, which MSN refers to as the "Lonsurf FDA Approval Package."   The Lonsurf FDA Approval Package was cited in the Extended European Search Report.  MSN also asserts the Lonsurf FDA Approval Package as prior art against the Asserted Patents.

71.    The Extended European Search Report ("EESR") cites the "Clinical Pharmacology and Biopharmaceutics Review" portion of the Lonsurf FDA Approval Package, and states that the Lonsurf FDA Approval Package discloses that patients with mild or moderate renal impairment who were administered Lonsurf have a higher incidence of adverse events and experienced greater dose reductions than patients with normal renal function, and systemic exposure (AUC) for trifluridine and tipiracil was higher in patients with mild and moderate renal impairment than for patients with normal renal function.  The EESR further explains that while the Lonsurf FDA Approval Package states that no SRI patients were treated with Lonsurf, one would know how to calculate the dose for SRI patients using the pharmacokinetics of FTD disclosed in the Lonsurf FDA Approval Package.  This is the same argument MSN and its expert make in this case. Specifically, the EESR states:

> D1 [the Lonsurf FDA Approval Package] teaches that the proposed dosing regimen of Lonsurf is 35 $mg/m^2$/dose administered orally

twice daily.  D1 also reports the tolerability and safety at dose levels of e.g. 30 and 35 mg/m2.  D1 further teaches that creatinine clearance (CLcr) is a significant covariate for pharmacokinetic (PK) of FTD and TPI.  D1 shows that patients with moderate renal impairment (Clcr=30 to 59 mL/min) have a higher incidence of ≥ Grade 3 adverse events, serious adverse events, and dose delays and reduction compared to patients with normal renal function and patients with mild renal impairment (CLcr = 60 to 89 mL/min).  D1 additionally teaches that the mean values of AUC at steady stat for trifluridine were 31% higher in patients with mild renal impairment and 43% higher in patients with moderate renal impairment and that for patients with normal renal function.  Similar effect of renal impairment on the tipiracil exposure is observed.  D1 states that no dose adjustment to the starting dose of Lonsurf is recommended in patients with mild or moderate renal impairment; however patients with mild or moderate renal impairment should be monitored for increased toxicity, since tipiracil is a PKmodulator that enhances the systemic exposure of trifluridine by inhibiting TPase, the increased exposure of trifluridine in patients with mild and moderate renal impairment could be the secondary effect mediated by the increased tipiracil exposure leading to increased inhibition of trifluridine metabolism in the same patients with renal impairment. No patients with severe renal impairment (CLcr < 3 0 mL/min) were enrolled in any of the studies.

The additional technical feature of claim 1 over D1 is that a dose of 30 - 50 mg/m2/day divided in two to four times a day is rally administered to patients with creatinine clearance of less than 30 mL/min.

The technical effect of the invention is not known because no patients with severe renal impairment are treated with the combination drug.

72.    On September 27, 2019, the examiner considered these references.  A second Issue Notification was mailed October 9, 2019.  The '399 Patent issued October 29, 2019.

### D.    Overview of the '004 File History

73.    The '180 Application, which issued as the '004 Patent, was filed on September 18, 2019, with 31 claims.  Original claim 1 is reproduced below:

> 1. A method for treating gastrointestinal cancer, large bowel cancer or breast cancer in a patient with a creatinine clearance of less than 30 mL/min, comprising:

29

orally administering a drug comprising α,α,α-trifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1 : 0.5, at a daily dose of 30 to 40 mg/m²/day as FTD-equivalent, in two to four doses a day to the patient with a creatinine clearance of less than 30 mL/min.

74. On September 18, 2019, Taiho filed an IDS, disclosing a number of references, including: "'Phase I Study of TAS-102 in Patients With Advanced Solid Tumors With Renal Impairment, ClinicalTrials.gov," which the parties again refer to as "NCT '117"; "'Lonsurf (TAS-102), combination product of trifluridine and tipiracil hydrochloride at a molar ratio of 1:0.5,' CLINICAL PHARMACOLOGY AND BIOPHARMACEUTICS REVIEW(S)," which is a section of the Lonsurf FDA Approval Package; Doi et al. (British Journal of Cancer, 2012, 107:429-434); Sakamoto et al. (U.S. Publication No. 2016/0082032); Ito et al. (U.S. Publication No. 2014/0213602); Emura et al. (U.S. Patent No. 7,799,783); Ito et al. (U.S. Patent No. 9,371,380); Hurria et al. (Drugs Aging, 2005, 22(9): 785-791); Doogue et al. (Clin. Biochem. Rev., vol. 32, 1 May 2011, 69-73); Hong et al. (Cancer, vol. 107, no. 6, 1 January 2006, 1383-1390); Munar et al. (Am. Fam. Physician, 15 May 2007, 1487-1496); Booka et al. (Gastric Cancer, Spring Japan, Tokyo, vol. 19, no. 3, 25 August 2015, 876-886); Mayer et al., Randomized Trial of TAS-102 for Refractory Metastatic Colon Cancer, The New England Journal of Medicine, May 14, 2015, Pages 1909-191 ("Mayer"); Protocol No.: TPU-TAS-102-301, Taiho Pharmaceutical Co., Ltd; Taiho Oncology Inc., 2014, 448 pages ("Protocol"); and the Extended European Search Report ("EESR") issued August 27, 2019 in European Patent Application No. 17747563.9 (EP counterpart to the Asserted Patents), filed February 3, 2017. MSN asserts NCT '117 and the Lonsurf FDA Approval Package as prior art against the Asserted Patents. The Examiner considered these references on December 5, 2019.

75.    A copy of the Extended European examination can be found in the prosecution history of the '399 Patent.  TAI-LONS-00004056 at 5028-5031 ('399 Prosecution History).  The European examination sets forth one of the same invalidity arguments that MSN makes.  Citing to the "Clinical Pharmacology and Biopharmaceutics Review" portion of the Lonsurf FDA Approval Package, the European examination states that the Lonsurf FDA Approval Package discloses that patients with mild or moderate renal impairment who were administered Lonsurf have a higher incidence of adverse events and experienced greater dose reductions than patients with normal renal function.  *Id.* at 5028-5031.  The European examination goes on to state that systemic exposure for FTD and TPI was higher in patients with mild and moderate renal impairment than in patients with normal renal function.  *Id.*

76.    The European examination further explains that one would know how to calculate the dose for SRI patients using the pharmacokinetics of FTD disclosed in the Lonsurf FDA Approval Package even though the Lonsurf FDA Approval Package states that no SRI patients were treated with Lonsurf.  TAI-LONS-00004056 at 5028-5031 ('399 Prosecution History).  This is the same argument that MSN makes.  The U.S. examiner considered both the Clinical Pharmacology and Biopharmaceutics Review and the Extended European Search Report arguments.  TAI-LONS-03298926 at 141 ('400 Prosecution History).

77.    With respect to Mayer and the Protocol (RECOURSE), Mayer references the RECOURSE and states that there were two instances where the initial dose of 70 mg/m$^2$/day was reduced in three 5 mg steps to 50 mg/m$^2$ /day due to adverse events.  TAI-LONS-00004056 at 4262–63 ('399 Prosecution History).  Mayer goes on to explain that neither of the patients had a creatinine clearance of less than 30 mL/min (i.e., an SRI patient).  TAI-LONS-00004056 at 4262–63 ('399 Prosecution History).  This is cumulative over the disclosures of the Lonsurf FDA

31

Approval Package that MSN relies on, because Mayer and the Protocol set forth the same information about RECOURSE as is disclosed in the Lonsurf FDA Approval Package.

78.    On December 17, 2019, Taiho filed a supplemental IDS disclosing several additional references, which the Examiner considered on January 7, 2020.

79.    In a Non-Final Office Action dated January 13, 2020, the pending claims were rejected for both statutory double patenting and obviousness-type double patenting over the '399 Patent.

80.    On March 13, 2020, Taiho filed a supplemental IDS disclosing several additional references, which the Examiner considered on May 12, 2020.

81.    In a Non-Final Office Action dated April 13, 2020, Taiho filed a terminal disclaimer to the '399 Patent and amended claim 1 as follows:

> 1. A method for treating gastrointestinal cancer, large bowel cancer or breast cancer in a patient with a creatinine clearance of ~~less than 30 mL/min~~ 15 mL/min – 29 mL/min, comprising:
>     orally administering a drug comprising $\alpha,\alpha,\alpha$-trifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1 : 0.5, at a daily dose of 30 to 40 mg/m²/day as FTD-equivalent, in two to four doses a day to the patient with a creatinine clearance of ~~less than 30 mL/min~~ 15 mL/min – 29 mL/min.

82.    The terminal disclaimer was approved on April 14, 2020.

83.    On June 12, 2020, the Examiner mailed a Notice of allowance, stating that the allowed claims "are neither anticipated nor rendered obvious over the art of record." The Examiner further stated that "[a] suggestion for modification of a reference to obtain the instant methods of use has not been found."

84.    On June 19, 2020, Taiho filed a supplemental IDS disclosing an office action dated May 28, 2020, from a related Taiwanese application. Taiho also disclosed "'CENTER FOR DRUG EVALUATION AND RESEARCH,' CLINICAL PHARMACOLOGY NDA REVIEW,"

32

which is a section of the Lonsurf FDA Approval Package cited in the Taiwanese office action. The Examiner considered these references on June 23, 2020.

85.    On August 12, 2020, Taiho filed a Request for Continued Examination and an additional Supplemental IDS, disclosing a number of references, including "'The Report on the Deliberation Results of Lonsurf,' PHARMACEUTICAL AND FOOD SAFETY BUREAU MINISTRY OF HEALTH, LABOUR AND WELFARE OF JAPAN," which the parties refer to as the "Lonsurf Report"; "'Guidance for Industry Pharmacokinetics in Patients with Impaired Renal Function - Study Design, Data Analysis, and Impact on Dosing and Labeling,' U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, May, 1998," which the parties refer to as the "FDA Guidance"; Mehvar (American Journal of Pharmaceutical Education, 2006, 70(5) Article 96); and Janus et al. (British Journal of Cancer, 2010, 103:1815-1821).  MSN asserts the Lonsurf Report and FDA Guidance as prior art against the Asserted Patents.  The Examiner considered these references on November 4, 2020.

86.    On December 2, 2020, the Examiner mailed a second Notice of Allowance, again stating that the allowed claims "are neither anticipated nor rendered obvious over the art of record," and that "[a] suggestion for modification of a reference to obtain the instant methods of use has not been found."

87.    On February 19, 2021, Taiho filed a supplemental IDS, disclosing a number of references, including an office action dated December 23, 2020, from a related New Zealand application and "CLINICAL TRIAL NCT02301117, 'A Phase I Study of TAS-102 in Patients With Advanced Solid Tumors With Renal Impairment,'" also known as "NCT '117," and Lichtman et al. (European Journal of Cancer, 43, 3007, 14-34), both of which were cited in the

33

New Zealand office action.  MSN asserts NCT '117 as prior art against the Asserted Patents.  The Examiner considered these references on February 23, 2021.

88.    On March 2, 2021, Taiho paid the issue fee.  On March 10, 2021, an Issue Notification was mailed.  The '004 Patent issued on March 30, 2021.

### III. A PERSON OF ORDINARY SKILL IN THE ART

89.    A person of ordinary skill in the art with respect to the '399 and '004 Patents would have been a multidisciplinary team with (1) one person having a Ph.D. in pharmaceutical sciences or a related field and approximately two to three years of experience, research, or training in one or more areas of pharmacy, pharmaceutical sciences, preclinical and clinical drug development, medicine, pharmacokinetics, or pharmacology or a bachelor's degree in pharmaceutical sciences or a related field with a greater amount of experience, research, or training in one or more areas of pharmacy, pharmaceutical sciences, preclinical and clinical drug development, medicine, pharmacokinetics, or pharmacology and (2) a medical doctor with at least five years of practical experience in the clinical treatment of patients with gastrointestinal cancer and with access to consult with a nephrologist, if needed.

### IV. VALIDITY OF THE '399 AND '004 PATENTS

90.    None of the prior art MSN relies on anticipates or renders the claimed invention obvious.  None of the art discloses, teaches or suggests treating SRI patients with Lonsurf at any dose or on any dosing regimen, and there would have been no motivation to combine or modify the prior art references with a reasonable expectation of successfully treating an SRI patient with Lonsurf.

91.    MSN improperly uses hindsight to cherry pick statements from the prior art, while ignoring other statements and disclosures that do not support their invalidity theories.

34

Additionally, the arguments MSN advances are the same or similar to the arguments disclosed during prosecution of the Asserted Patents that Taiho successfully overcame.

92.     As discussed below, the specifications of the Asserted Patents describe in detail how the inventor arrived at the dose and dosing regimen for treating SRI patients with the claimed cancers, including the testing and analysis performed to arrive at the claimed invention.  The specifications also describe in detail that the claimed method for treating realizes "a remarkable anticancer effect . . . while avoiding severe side effects."  TAI-LONS-03298917 at 20 ('004 Patent at 2:37-43); TAI-LONS-00000014 at 16 ('399 Patent at 2:33-39).  A POSA reading the specifications of the Asserted Patents along with the figure and examples would understand that the inventor disclosed and possessed the subject matter of the Asserted Claims.

93.     For the reasons discussed below, and as will be shown at trial, MSN fails to meet its burden that the Asserted Patents are invalid.

A.  **Overview of the Asserted Art**

94.     The following is a general overview of the prior art MSN has cited in its Statement of Facts.  It is not intended to be an exhaustive discussion of all the limitations and shortcomings of the art and/or how such art undermines MSN's legal theories.  Those arguments are reserved for post-trial briefing and nothing herein shall be used or considered to be a waiver of any position or argument that Taiho may maintain or make in response to MSN's invalidity arguments.

1.  **Lonsurf FDA Approval Package**

95.     The "Lonsurf FDA Approval Package" is the FDA Review Package for NDA 207981.  It is dated September 22, 2015, and includes information relating to FDA approval of Lonsurf for treatment of patients with metastatic colorectal cancer.  DEFS-TT-005546 (Lonsurf FDA Approval Package).  The Lonsurf FDA Approval Package includes various sections, including the NDA Approval Letter for Lonsurf, the 2015 labeling for Lonsurf, and FDA review

35

reports, such as the division director "summary review," "medical review(s)," the "clinical pharmacology and biopharmaceutics review(s)," and "other reviews." DEFS-TT-005546 at 47 (Lonsurf FDA Approval Package). The clinical pharmacology and biopharmaceutics review section of the Lonsurf FDA Approval Package was considered by the patent office during prosecution of both Asserted Patents. TAI-LONS-03298926 at 8963 ('004 Prosecution History); TAI-LONS-00004056 at 4908–09, 4912 ('399 Prosecution History).

96.    At a high level, the FDA Approval Package shows that:

- Lonsurf was not indicated for treatment of SRI patients. DEFS-TT-005546 at 64, 68 (Lonsurf FDA Approval Package).

- No SRI patients were enrolled in the disclosed clinical studies, including RECOURSE. DEFS-TT-005546 at 64, 68 (Lonsurf FDA Approval Package).

- The pharmacokinetics of FTD and TPI had not been studied in patients with SRI. DEFS-TT-005546 at 64, 68 (Lonsurf FDA Approval Package).

- FDA required Taiho to conduct a dedicated renal impairment study to assess whether pharmacokinetics are altered in SRI patients so that the proper dose, if any, of Lonsurf could be determined for SRI patients. DEFS-TT-005546 at 51, 600, 605, 666, 6000, 6026 (Lonsurf FDA Approval Package).

- A POSA would not have used the pharmacokinetic models[3] disclosed in the FDA Approval Package to determine how to dose an SRI patient with Lonsurf. The data used to create these pharmacokinetic models came from patients with largely normal renal function. DEFS-TT-005546 at 6002, 6026, 6041-42 (Lonsurf FDA Approval Package).

---

[3] Taiho refers to these pharmacokinetic models as PopPK models or equations.

97.     NDA Approval Letter: The NDA Approval Letter for Lonsurf required Taiho to conduct the dedicated renal impairment study to determine the appropriate dose, if any, of Lonsurf for SRI patients:

Section 505(o)(3) of the Federal Food, Drug, and Cosmetic Act (FDCA) authorizes FDA to require holders of approved drug and biological product applications to conduct postmarketing studies and clinical trials for certain purposes, if FDA makes certain findings required by the statute.

We have determined that an analysis of spontaneous postmarketing adverse events reported under subsection 505(k)(1) of the FDCA will not be sufficient to assess signals of a serious risk of impaired hepatic and renal function on the pharmacokinetics of Lonsurf (trifluridine and tipiracil) resulting in excessive toxicity to include myelosuppression.

Furthermore, the new pharmacovigilance system that FDA is required to establish under section 505(k)(3) of the FDCA will not be sufficient to assess these serious risks.

Finally, we have determined that only a clinical trial (rather than a nonclinical or observational study) will be sufficient to assess signals of a serious risk of impaired hepatic and renal function on the pharmacokinetics of Lonsurf (trifluridine and tipiracil) resulting in excessive toxicity to include myelosuppression.

Therefore, based on appropriate scientific data, FDA has determined that you are required to conduct the following:

2963-1 Complete the ongoing clinical pharmacokinetic trial to determine an appropriate dose of Lonsurf (trifluridine and tipiracil) in patients with moderate to severe hepatic impairment in accordance with the FDA Guidance for Industry entitled "Pharmacokinetics in Patients with Impaired Hepatic Function: Study Design, Data Analysis, and Impact on Dosing and Labeling."

2963-2 Complete the ongoing clinical pharmacokinetic trial to determine an appropriate dose of Lonsurf (trifluridine and tipiracil) in patients with severe renal impairment in accordance with the FDA Guidance for Industry entitled "Pharmacokinetics in Patients with Impaired Renal Function: Study Design, Data Analysis, and Impact on Dosing and Labeling."

DEFS-TT-005546 at 51 (Lonsurf FDA Approval Package).

98.     2015 Lonsurf Label: The 2015 Lonsurf label discloses that Lonsurf is a "combination of trifluridine, a nucleoside metabolic inhibitor, and tipiracil, a thymidine

phosphorylase inhibitor, indicated for the treatment of patients with metastatic colorectal cancer who have been previously treated with fluropyrimidine, oxaliplatin- and irinotecan-based chemotherapy, an anti-VEGF biological therapy, and if RAS wild-type, an anti-EGFR therapy." DEFS-TT-005546 at 57 (Lonsurf FDA Approval Package). The 2015 Label further states that patients "with moderate renal impairment may require dose modifications for increased toxicity." DEFS-TT-005546 at 57 (Lonsurf FDA Approval Package).

99. The 2015 Lonsurf label also states that the recommended starting dose for Lonsurf is 35 mg/m$^2$/dose up to a maximum of 80 mg per dose orally twice daily on Days 1 through 5 and Days 8 through 12 of each 28-day cycle. DEFS-TT-005546 at 57-58 (Lonsurf FDA Approval Package). The 2015 Lonsurf Label states that if the patient experiences (i) "[f]ebrile neutropenia," (ii) "[u]ncomplicated Grade 4 neutropenia (which has recovered to greater than or equal to 1,500/mm$^3$) or thrombocytopenia (which has recovered to greater than or equal to 75,000/mm$^3$) that results in more than 1 week delay in start of next cycle," or "[n]on-hematologic Grade 3 or Grade 4 adverse reaction except for Grade 3 nausea and/or vomiting controlled by antiemetic therapy or Grade 3 diarrhea responsive to antidiarrheal medication," the dose "from the previous dose level" can be reduced by 5 mg/m$^2$/dose. DEFS-TT-005546 at 58 (Lonsurf FDA Approval Package). The 2015 Lonsurf Label further states that a "maximum of 3 dose reductions are permitted to a minimum dose of 20 mg/m$^2$ twice daily." DEFS-TT-005546 at 58 (Lonsurf FDA Approval Package).

100. The 2015 Lonsurf Label discusses "Study 1," also known as the RECOURSE study. DEFS-TT-005546 at 69-70 (Lonsurf FDA Approval Package). Study 1 did not include any SRI patients. DEFS-TT-005546 at 64-70 (Lonsurf FDA Approval Package).

101.    Section 8.7 of the 2015 Lonsurf Label states with respect to renal impairment, "[n]o dedicated clinical studies have been conducted to evaluate the effect of renal impairment on the pharmacokinetics of LONSURF."  DEFS-TT-005546 at 64 (Lonsurf FDA Approval Package). The 2015 Lonsurf Label states:

> In Study 1, patents with moderate renal impairment (CLcr = 30 to 59 mL/min, n= 47) had a higher incidence (difference of at least 5%) of ≥ Grade 3 adverse events, serious adverse events, and dose delays and reductions compared to patients with normal renal function (CLcr ≥ 90 mL/min, n= 306) or patients with mild renal impairment (CLcr = 60 to 89 mL/min, n= 178).  No dose adjustment to the starting dose of LONSURF is recommended in patients with mild or moderate renal impairment (CLcr of 30 to 89 mL/min); however patients with moderate renal impairment may require dose modification for increased toxicity.  No patients with severe renal impairment (CLcr < 30 mL/min) were enrolled in Study 1.  *[see Clinical Pharmacology (12.3)]*

DEFS-TT-005546 at 64 (Lonsurf FDA Approval Package).

102.    Section 12.3 of the 2015 Lonsurf Label additionally discusses the pharmacokinetics of TPI and FTD in Lonsurf in patients with normal, mild, and moderate renal impairment:

> After twice daily dosing of Lonsurf, systemic exposure (area under the concentration curve, AUC of trifluridine increased more than dose-proportionally over the dose range of 15 to 35 $mg/m^2$.  After administration of Lonsurf 35 $mg/m^2$ twice daily, the mean elimination half-life ($t_{1/2}$) of trifluridine was 1.4 hours and of tipiracil was 2.1 hours after a single dose.  The mean elimination half-life at steady state of trifluridine was 2.1 hours and of tipiracil was 2.1 hours after a single dose. The mean elimination half-life at steady state of trifluridine was 2.1 hours and of tipiracil was 2.4 hours.  The accumulation of trifluridine was 3-folder for $AUC_{0-last}$ and 2-fold for peak plasma concentration ($C_{max}$) at steady state while no accumulation was observed for tipiracil.  Administration of a single dose of LONSURF containing tipiracil and trifluridine 35 $mg/m^2$ increased the mean $AUC_{0-last}$ of trifluridine by 37-fold and $C_{max}$ by 22-fold with reduced variability compared to trifluridine 35 $mg/m^2$ alone.

DEFS-TT-005546 at 67 (Lonsurf FDA Approval Package).

103.    Section 12.3, however, states that the pharmacokinetics of TPI and FTD in Lonsurf have not been studied in patients with SRI:

> In Study 1, the estimated mean AUC of trifluridine at steady state was 31% higher in patients with mild renal impairment (CLcr = 60 to 89 mL/min, n= 38) and 43%

39

higher in patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n= 16) than that in patient with normal renal function (CLcr ≥ 90 mL/min, n= 84) based on the population pharmacokinetic analysis. The estimated mean AUC of tipiracil was 34% higher in patients with mild renal impairment and 65% higher in patients with moderate renal impairment than that in patients with normal renal function. The pharmacokinetics of trifluridine and tipiracil have not been studied in patients with severe renal impairment (CLcr < 30 mL/min) or end-stage renal disease. *[see Use in Specific Populations (8.7)]*

DEFS-TT-005546 at 68 (Lonsurf FDA Approval Package).

104.    The 2015 Lonsurf label discusses the absorption, distribution, metabolism, and excretion of Lonsurf. DEFS-TT-005546 at 67. With respect to distribution, the 2015 Lonsurf label states that trifluridine "mainly binds to human serum albumin. The in vitro protein binding of trifluridine in human plasma is greater than 96%, independent of drug concentration and presence of tipiracil." DEFS-TT-005546 at 67 (Lonsurf FDA Approval Package).

105.    <u>Division Director Summary Review</u>**:** The division director summary review provides an overview of Lonsurf and the RECOURSE study. The summary states that "[t]he only post-marketing requirements were identified by the clinical pharmacology review team, to complete ongoing studies assessing whether, and how, pharmacokinetics are altered in patients with severe renal impairment and moderate to severe hepatic impairment." DEFS-TT-005546 at 600 (Lonsurf FDA Approval Package).

106.    <u>Medical Review - August 21, 2015, Clinical Review</u>**:** One clinical reviewer stated that "the Applicant is required to complete the following (ongoing clinical pharmacology trials in Table 1" to "ensure that a safe dose can be recommended to patients with renal or hepatic impairment." DEFS-TT-005546 at 665 (Lonsurf FDA Approval Package). Table 1 is shown below:

40

Table 1: Clinical Pharmacology Post market Requirements

| Drug Development Question | Rationale | PMR |
|---|---|---|
| Should the dose of TAS-102 be modified in patients with moderate or severe hepatic impairment? | The active component trifluridine (FTD) in TAS-102 is mainly eliminated by metabolism via thymidine phosphorylase (TPase) to form an inactive metabolite, 5-(trifluoromethyl) uracil (FTY). Because TPase is found in the liver and gastrointestinal tract, patients with hepatic impairment may have higher FTD exposures than patients with normal hepatic function, which may lead to more treatment-limiting severe toxicity. | Complete a pharmacokinetic study to determine the appropriate dose of TAS-102 in patients with hepatic impairment. Final Protocol Submission: Submitted Trial Completion: 9/30/ 2017 Final Report Submission: 12/31/2017 |
| Should the dose of TAS-102 be modified in patients with severe renal impairment? | The pharmacokinetic modulator tipiracil (TPI) in TAS-102 is a thymidine phosphorylase (TPase) inhibitor, which is primarily eliminated by urinary excretion in its unchanged form. Patients with renal impairment may have increased TPI exposure leading to increasing in trifluridine (FTD) exposure due to increased inhibition of FTD metabolism (via TPase) by TPI, which may lead to more treatment-limiting severe toxicity. | Complete a pharmacokinetic study to determine the appropriate dose of TAS-102 in patients with renal impairment. Final Protocol Submission: Submitted Trial Completion: 9/30/ 2017 Final Report Submission: 12/31/2017 |

DEFS-TT-005546 at 666 (Lonsurf FDA Approval Package).

107.    Clinical Review, August 21, 2015: The clinical review section discusses the pharmacokinetics of TPI and FTD.  It discusses that the various Taiho clinical trials show that FTD accumulates in the body after multiple doses, but the mechanism for accumulation was unknown:

The dosing levels ranged from 50 to 180 $mg/m^2$/day in the U.S. trials and from 30 to 70 $mg/m^2$/day in the trial conducted in Japan.  The half-life of FTD was approximately 2 hours, and depends on whether or not TPI is present.  After administration of TAS-102 35 $mg/m^2$ twice daily, the mean elimination half-life ($t_{1/2}$) of trifluridine was 1.4 hours and of tipiracil was 2.1 hours after a single dose.  The $t_{1/2}$ at steady state of trifluridine was 2.1 hours and of tipiracil was 2.4 hours.  Both the maximum observed plasma concentration ($C_{max}$) and the area under the plasma concentration-time curve (AUC) of FTD tended to increase after repeated administration to 2- to 3-fold higher than after initial dosing of TAS-102.  After twice daily dosing of TAS-102, systemic exposure (area under the concentration curve, AUC) of trifluridine increased more than dose proportionally over the dose range of 15 to 35 $mg/m^2$.  The accumulation of trifluridine was 3-fold for $AUC_{0-last}$ and 2-fold for peak plasma concentration ($C_{max}$) at steady-state while no accumulation was observed for tipiracil.  Administration of a single dose of TAS-102 containing tipiracil and trifluridine 35 $mg/m^2$ increased the mean $AUC_{0-last}$ of trifluridine by 37-fold and $C_{max}$ by 22-fold with reduced variability compared to

41

trifluridine 35 mg/m$^2$ alone.  The mechanism for accumulation of FTD has not been clarified.

DEFS-TT-005546 at 682 (Lonsurf FDA Approval Package).

108.    Clinical Pharmacology and Biopharmaceutics Review(s): MSN relies on this section of the Lonsurf FDA Approval Package for its anticipation and obviousness arguments. While MSN also relies on other sections of the Lonsurf FDA Approval Package, the other sections of the Lonsurf FDA Approval Package are duplicative of the information in the clinical pharmacology and biopharmaceutics review section.

109.    The clinical pharmacology and biopharmaceutics review section discloses that the "proposed dosing regimen of Lonsurf is 35 mg/m$^2$/dose administered orally twice daily (BID), within 1 hour after completion of morning and evening meals, for 5 days a week with 2 days rest for 2 weeks, repeated in each 28-day[] cycle.  The tolerability of TAS-102 was evaluated at dose levels of 15, 20, 25, 30, and 35 mg/m$^2$ in a Phase 1 dose-finding study conducted in Japanese patients with advanced solid tumors (Study J001-10040010)."  DEFS-TT-005546 at 6001 (Lonsurf FDA Approval Package).  Study J001-10040010 did not include SRI patients.

110.    The clinical pharmacology and biopharmaceutics review further states that "[d]ose adjustment is not recommended in patients with mild hepatic impairment, and mild to moderate renal impairment.  The pharmacokinetics of Lonsurf has not been studied in patients with moderate to severe hepatic impairment, and patients with severe renal impairment."  DEFS-TT-005546 at 999 (Lonsurf FDA Approval Package).

111.    The clinical pharmacology and biopharmaceutics review discloses that a pharmacokinetic study to "determine the appropriate dose of Lonsurf in patients with renal impairment" is required to be conducted:

42

| Drug Development Question | Rational | PMR |
|---|---|---|
| Should the dose of Lonsurf be modified in patients with moderate or severe hepatic impairment? | The active component trifluridine (FTD) in Lonsurf is mainly eliminated by metabolism via thymidine phosphorylase (TPase) to form an inactive metabolite, 5-(trifluoromethyl) uracil (FTY). Because TPase is found in the liver and gastrointestinal tract, patients with hepatic impairment may have higher FTD exposures than patients with normal hepatic function, which may lead to more treatment limiting severe toxicity. | Complete a pharmacokinetic study to determine the appropriate dose of Lonsurf in patients with hepatic impairment.<br><br>Final Protocol Submission: Submitted<br><br>Trial Completion: 9/30/ 2017<br><br>Final Report Submission: 12/31/2017 |
| Should the dose of Lonsurf be reduced in patients with severe renal impairment? | The pharmacokinetic modulator tipiracil (TPI) in Lonsurf is a thymidine phosphorylase (TPase) inhibitor, which is primarily eliminated by urinary excretion in its unchanged form. Patients with renal impairment may have increased TPI exposure leading to increasing in trifluridine (FTD) exposure due to increased inhibition of FTD metabolism (via TPase) by TPI, which may lead to more treatment limiting severe toxicity. | Complete a pharmacokinetic study to determine the appropriate dose of Lonsurf in patients with renal impairment.<br><br>Final Protocol Submission: Submitted<br><br>Trial Completion: 9/30/ 2017<br><br>Final Report Submission: 12/31/2017 |

DEFS-TT-005546 at 6000 (Lonsurf FDA Approval Package).

112.    The clinical pharmacology and biopharmaceutics review further states: "The pharmacokinetics of trifluridine and tipiracil have not been studied in patients with severe renal impairment (Clcr < 30 mL/min) or end-stage renal disease. . . . A dedicated renal impairment is currently on going and will be submitted as a PMR study."  DEFS-TT-005546 at 6002 (Lonsurf FDA Approval Package); *see also* DEFS-TT-005546 at 6026 (Lonsurf FDA Approval Package) ("No dedicated clinical studies have been conducted to evaluate the effect of renal impairment on the PK of TAS-102. . . . No dose adjustment to the starting dose of Lonsurf is recommended in patients with mild or moderate renal impairment (CLcr of 30 to 89 mL/min); however, patients with mild or moderate renal impairment should be monitored for increased toxicity.  No patients

43

with severe renal impairment (Clcr <30 mL/min) were enrolled in Study RECOURSE.  A dedicated renal impairment is currently on going and will be submitted as a PMR study.”).

113.    The clinical pharmacology and biopharmaceutics review section further states that “[p]opulation PK analyses with data from 239 patients who received TAS-102 treatment indicated that body size and renal function are the primary intrinsic factors affecting the exposure to trifluridine and to tipiracil after TAS-102 administration.”  DEFS-TT-005546 at 6002 (Lonsurf FDA Approval Package).

114.    The clinical pharmacology and biopharmaceutics review section further states with respect to RECOURSE that while the pharmacokinetics of FTD and TPI had not been studied in SRI patients, the increase in exposure (AUC) of FTD and TPI in patients with mild to moderate renal impairment may be confounded by the smaller body weights of the patients in the mild to moderate renal impairment cohorts:

> [T]he mean values of AUC for trifluridine at steady state were 31% higher in patients with mild (CLcr = 60-89 mL/min, n =38) and 43% higher in patients with moderate (CLcr = 30 to 59 mL/min, n= 16) renal impairment than those in patients with normal (CLcr $\geq$ 90 mL/min, n=84) renal function. Similar effect of renal impairment on the tipiracil exposure was observed (34% higher in patients with mild and 68% higher in patients with moderate renal impairment than that in patients with normal renal function).  The pharmacokinetics of trifluridine and tipiracil have not been studied in patients with severe renal impairment (CLcr < 30 mL/min) or end-stage renal disease.  The increased exposures of trifluridine and tipiracil in patients with mild to moderate impairment might be confounded by the relatively smaller body weights in the mild (median body weigh=64 kg, n= 38) and moderate (median body weight=59 kg, n=16) renal impaired patients when compared to normal renal function (median body weight=78 kg, n=84).

DEFS-TT-005546 at 6002 (Lonsurf FDA Approval Package).  Figure 7 also shows that the mean exposure (AUC) of FTD increased from normal to mild and moderate renal impairment and that this increase may be confounded by the smaller body weights in the mild and moderate renally impaired patients as compared to patients with normal renal function.

44

**Figure 7**. Effect of Renal Impairment on AUCss of Trifluridine in Study RECOURSE

DEFS-TT-005546 at 6024 (Lonsurf FDA Approval Package).

115.    The clinical pharmacology and biopharmaceutics review section further states under the question "What are the findings by population PK analyses to support the dosing of Lonsurf in overall patient population or/and subgroups of patients":

> [T]he effect of renal impairment on PK is not clinically important.  In phase 3 study TPU-TAS-102-103 [RECOURSE], the AUC at steady state of FTD following the proposed dosing was increased by 31% in patients with mild renal impairment (CLcr = 60-89 mL/min, n=38) and 43% higher in patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n=16) as compared to patients with normal renal function (CLcr ≥ 90 mL/min, n=84). . . . However, there is substantial overlap in exposure of FTD and TPI among patients with different renal function (Figure 9), so no adjustment on starting dose is warranted for patients with mild and moderate renal impairment (CLcr of 30 to 89 mL/min).

DEFS-TT-005546 at 6041-42 (Lonsurf FDA Approval Package).  Figure 9, which compares the exposure of FTD and TPI across each renal function group in the RECOURSE study is shown below:

Figure 9. Comparison of AUC of FTD and TPI across each renal function group in phase 3 study TPU-TAS-102-301

Sources: Sponsor's Analysis of renal function effects on PK from study TPU-TAS-102-30, Page 5 and 7

DEFS-TT-005546 at 6042 (Lonsurf FDA Approval Package).

116.    The clinical pharmacology and biopharmaceutics review section also discloses that a population pharmacokinetics (PopPK) model was created for FTD and TPI. DEFS-TT-005546 at 6021 (Lonsurf FDA Approval Package). The data from the RECOURSE study (TPU-TAS-102-301), the Japanese dose-finding study (J001-10040010), the PK contribution study (TPU-TAS-102-102), and the QT$_C$ study (TPU-TAS-102-103) were used to create the PopPK model. DEFS-TT-005546 at 6006-07 (Lonsurf FDA Approval Package). The PopPK model (or equations) created for each of FTD and TPI are shown below.

   a.   FTD:

$$Vd/F = 10.0 \times (BSA/1.81)^{0.94} \times \exp(\eta i, _{Vd/F})$$
$$CL/F = 2.93 \times (CLCR/103)^{0.507} \times (ALB/3.90)^{-0.633} \times \exp(\eta i, _{CL/F})$$

   TPI:

$$Vd/F = 192 \times (BSA/1.81)^{1.46} \times \exp(\eta i, _{Vd/F})$$
$$CL/F = 88.7 \times (CLCR/103)^{0.592} \times \exp(\eta i, _{CL/F})$$

DEFS-TT-005546 at 6021 (Lonsurf FDA Approval Package).

117.    These equations were derived from data collected from the RECOURSE study (TPU-TAS-102-301), the Japanese dose-finding study (J001-10040010), the PK contribution study (TPU-TAS-102-102), and the QT$_C$ study (TPU-TAS-102-103). DEFS-TT-005546 at 6006-

46

07 (Lonsurf FDA Approval Package). In all of these studies, except the Japanese dose-finding study, the patients received a Lonsurf dose of 35 mg/m$^2$ twice daily five days a week followed by two days of rest for two weeks every 4 weeks. DEFS-TT-005546 at 6006-07 (Lonsurf FDA Approval Package). In the Japanese dose-finding study, the patients received a Lonsurf dose of between 15-35 mg/m$^2$ twice daily and on the same dosing schedule as the patients in the other studies. DEFS-TT-005546 at 6006-07 (Lonsurf FDA Approval Package). The average of the patient data used from the RECOURSE, PK Contribution, QTc, and Japanese dose-finding study were 102, 108, 109, and 92 mL/min, respectively, with an average CrCL across all studies of 103 mL/min. TAI-LONS-02556823 (Cleary Poster). These CrCL values show that the average patient in all four studies exhibited normal kidney function. No SRI patients were included.

118.    The RECOURSE study also did not involve similar numbers of patients with normal renal function and mild and moderate renal impairment. The PopPK model was overweighted with patients having normal renal function. A model developed from such data could understate or overstate the exposure a patient with renal insufficiency would be expected to have to one or both components of Lonsurf. As such, a POSA would not have used the PopPK models to determine a dose of Lonsurf for SRI patients.

119.    Additionally, the RECOURSE study included patients in the normal renal function group and mild and moderate renal impairment groups that were not balanced in terms of body weight. DEFS-TT-005546 at 6024 (Lonsurf FDA Approval Package). This complication would have created further doubt about using the RECOURSE data to create the PopPK models discussed above.

120.    <u>Other Reviews</u>: The other reviews section used the PopPK models above—CL/F = 2.93 x (CLCR/103)$^{0.507}$ x (ALB/3.90)$^{-0.633}$ x exp($\eta$i, CL/F) for FTD—and determined that the mean

47

relative ratio of FTD exposure in patients with "mild (CLcr = 60-89 mL/min) and moderate (CLcr = 30-59 mL/min) renal impairment compared to patients with normal renal function (median CLcr-103 mL/min) in this population, were estimated to be 1.07~1.32 and 1.32~1.87, respectively." DEFS-TT-005546 at 6110 (Lonsurf FDA Approval Package). Using the same equations, the other review section states that if "a patient with severe renal impairment (CLcr = 15~29 mL/min) received TAS-102 35 mg/m$^2$, the mean relative ratio of daily AUC compared to patients with normal renal function (median CLcr = 103 mL/min) in the patient population analyzed, is estimated to be 1.90~2.66." DEFS-TT-005546 at 6111 (Lonsurf FDA Approval Package). A different section of the Lonsurf FDA Approval Package provides a different estimate, hypothesizing that exposure in patients with SRI is "estimated" to be doubled or tripled. DEFS-TT-005546 at 6088 (Lonsurf FDA Approval Package).

121. FDA also used the oral clearance equation for TPI to determine that the TPI exposure in patients with mild renal impairment (CLcr = 60-89 mL/min) compared to patients with normal renal function (median CLcr = 103 mL/min) was estimated to be 1.09~1.38.[4] DEFS-TT-005546 at 6110 (Lonsurf FDA Approval Package). While recognizing that TPI might affect FTD drug exposure, FDA did not use its equations to determine the exposure of TPI in SRI patients.

122. Even though the mean relative ratio of FTD exposure was higher in mild and moderate renally impaired patients as compared to patients with normal renal function, FDA did not require a dose adjustment for those patients. And despite FDA's estimations of the mean relative ratio of FTD exposure in SRI patients, FDA required the inventor to conduct the dedicated renal impairment study "to determine an appropriate dose of Lonsurf (trifluridine and tipiracil) in

---

[4] FDA also estimated TPI exposure for moderate renally impaired patients as compared to SRI patients, but the data are cut off in the document. DEFS-TT-005546 at 6110 (Lonsurf FDA Approval Package).

48

patients with severe renal impairment. . . .”  DEFS-TT-005546 at 6070 (Lonsurf FDA Approval Package).

### 2.     Lonsurf Report

123.    The Lonsurf Report is dated February 7, 2014 and is from the “Evaluation and Licensing Division, Pharmaceutical and Food Safety Bureau Ministry of Health, Labour and Welfare” in Japan.  DEFS-TT-000069.  The Lonsurf Report was cited during prosecution of the ’004 Patent in the August 12, 2020 Information Disclosure Statement.  TAI-LONS-03298926 at 9567 (’004 Prosecution History).

124.    The Lonsurf Report discloses that in J001-10040040—“21 patients with advanced solid tumor received FTD-TPI orally at a dose of 15 to 35 $mg/m^2/dose$ BID after breakfast and supper in 28-day cycles, each consisting of two 5 days on/2 days off treatment sub-cycles, followed by a 14-day rest period.  As a result, PK profiles of FTD, FTY, TPI, and thymidine were determined. . . .”  DEFS-TT-000069 at 114-115 (Lonsurf Report).  The Lonsurf Report goes on to state that “[n]o clinical studies have been conducted to investigate the PK of FTD-TPI in patients with renal impairment.”  DEFS-TT-000069 at 117 (Lonsurf Report).  The Lonsurf Report further discloses that a precaution on the use of Lonsurf for renally impaired patients will be included in the package insert because “[a]s TPI appears to be hardly metabolized before excretion in urine in humans . . . . renal impairment may increase exposure to TPI and inhibit the metabolism of FTD to affect the PK of FTD.”  DEFS-TT-000069 at 117 (Lonsurf Report).

125.    The Lonsurf Report goes on to disclose that a precaution on the use of Lonsurf for renally impaired patients will also be included because “FTD-TPI was not administered to patients with severe renal impairment. . . .”  DEFS-TT-000069 at 118 (Lonsurf Report).  Lonsurf (i.e., FTD-TPI) was only administered to patients with normal, mild, and moderate renal impairment.  DEFS-TT-000069 at 118 (Lonsurf Report).

49

### 3.    2015 Lonsurf Label

126.    The 2015 Lonsurf Label is the label that FDA first approved for Lonsurf in 2015. The 2015 Lonsurf Label is identical to the 2015 Lonsurf label that appears in the Lonsurf FDA Approval Package above.

127.    The 2015 Lonsurf Label states that it is a "combination of trifluridine, a nucleoside metabolic inhibitor, and tipiracil, a thymidine phosphorylase inhibitor, indicated for the treatment of patients with metastatic colorectal cancer who have been previously treated with fluropyrimidine, oxaliplatin- and irinotecan-based chemotherapy, an anti-VEGF biological therapy, and if RAS wild-type, an anti-EGFR therapy."  DEFS-TT-005252 (2015 Lonsurf Label).

128.    The 2015 Lonsurf Label further discloses that the recommended starting dose for Lonsurf is 35 mg/m$^2$/dose up to a maximum of 80 mg per dose orally twice daily on Days 1 through 5 and Days 8 through 12 of each 28-day cycle.  DEFS-TT-005252 (2015 Lonsurf Label).  The 2015 Label further states that patients "with moderate renal impairment may require dose modifications for increased toxicity."  DEFS-TT-005252 (2015 Lonsurf Label).

129.    The 2015 Lonsurf Label discloses that if the patient experiences (i) "[f]ebrile neutropenia," (ii) "[u]ncomplicated Grade 4 neutropenia (which has recovered to greater than or equal to 1,500/mm3) or thrombocytopenia (which has recovered to greater than or equal to 75,000/mm3) that results in more than 1 week delay in start of next cycle," or "[n]on-hematologic Grade 3 or Grade 4 adverse reaction except for Grade 3 nausea and/or vomiting controlled by antiemetic therapy or Grade 3 diarrhea responsive to antidiarrheal medication," the dose "from the previous dose level" can be reduced by 5 mg/m$^2$/dose.  DEFS-TT-005252 at 53 (2015 Lonsurf Label).  The 2015 Lonsurf Label states that a "maximum of 3 dose reductions are permitted to a minimum dose of 20 mg/m$^2$ twice daily."  DEFS-TT-005252 at 53 (2015 Lonsurf Label).

130.    The 2015 Lonsurf Label discusses "Study 1," also known as the RECOURSE study. DEFS-TT-005252 at 82-83 (2015 Lonsurf Label).  Study 1 did not include any SRI patients. DEFS-TT-005252 at 82-83 (2015 Lonsurf Label).

131.    Section 8.7 of the 2015 Lonsurf Label states that with respect to renal impairment, "[n]o dedicated clinical studies have been conducted to evaluate the effect of renal impairment on the pharmacokinetics of LONSURF."  DEFS-TT-005252 at 59 (2015 Lonsurf Label).  The 2015 Lonsurf Label goes on to state that:

> In Study 1, patents with moderate renal impairment (CLcr = 30 to 59 mL/min, n= 47) had a higher incidence (difference of at least 5%) of $\geq$ Grade 3 adverse events, serious adverse events, and dose delays and reductions compared to patients with normal renal function (CLcr $\geq$ 90 mL/min, n= 306) or patients with mild renal impairment (CLcr = 60 to 89 mL/min, n= 178).  No dose adjustment to the starting dose of LONSURF is recommended in patients with mild or moderate renal impairment (CLcr of 30 to 89 mL/min); however patients with moderate renal impairment may require dose modification for increased toxicity.  No patients with severe renal impairment (CLcr < 30 mL/min) were enrolled in Study 1.  *[see Clinical Pharmacology (12.3)]*

DEFS-TT-005252 at 59 (2015 Lonsurf Label) (emphasis added).

132.    Section 12.3 of the 2015 Lonsurf Label additionally discusses the pharmacokinetics of TPI and FTD in Lonsurf in patients with normal, mild, and moderate renal impairment:

> After twice daily dosing of Lonsurf, systemic exposure (area under the concentration curve, AUC of trifluridine increased more than dose-proportionally over the dose range of 15 to 35 mg/m$^2$.  After administration of Lonsurf 35 mg/m$^2$ twice daily, the mean elimination half-life ($t_{1/2}$) of trifluridine was 1.4 hours and of tipiracil was 2.1 hours after a single dose.  The mean elimination half-life at steady state of trifluridine was 2.1 hours and of tipiracil was 2.1 hours after a single dose. The mean elimination half-life at steady state of trifluridine was 2.1 hours and of tipiracil was 2.4 hours.  The accumulation of trifluridine was 3-folder for $AUC_{0-last}$ and 2-fold for peak plasma concentration ($C_{max}$) at steady state while no accumulation was observed for tipiracil.  Administration of a single dose of LONSURF containing tipiracil and trifluridine 35 mg/m$^2$ increased the mean $AUC_{0-last}$ of trifluridine by 37-fold and $C_{max}$ by 22-fold with reduced variability compared to trifluridine 35 mg/m$^2$ alone.

DEFS-TT-005252 at 62 (2015 Lonsurf Label).

133.    Section 12.3 states that the pharmacokinetics of TPI and FTD in Lonsurf have not been studied in patients with SRI:

> In Study 1, the estimated mean AUC of trifluridine at steady state was 31% higher in patients with mild renal impairment (CLcr = 60 to 89 mL/min, n= 38) and 43% higher in patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n= 16) than that in patient with normal renal function (CLcr ≥ 90 mL/min, n= 84) based on the population pharmacokinetic analysis.  The estimated mean AUC of tipiracil was 34% higher in patients with mild renal impairment and 65% higher in patients with moderate renal impairment than that in patients with normal renal function.  The pharmacokinetics of trifluridine and tipiracil have not been studied in patients with severe renal impairment (CLcr < 30 mL/min) or end-stage renal disease.  *[see Use in Specific Populations (8.7)]*

DEFS-TT-005252 at 63 (2015 Lonsurf Label) (emphasis added).

134.    The 2015 Lonsurf Label also discusses the absorption, distribution, metabolism, and excretion of Lonsurf.  DEFS-TT-005252 at 62.  With respect to distribution, the 2015 Lonsurf Label states that trifluridine "mainly binds to human serum albumin.  The in vitro protein binding of trifluridine in human plasma is greater than 96%, independent of drug concentration and presence of tipiracil."  DEFS-TT-005252 at 62 (2015 Lonsurf Label).

### 4.    FDA Guidance

135.    "Guidance for Industry Pharmacokinetics in Patients with Impaired Renal Function – Study Design, Data Analysis, and Impact on Dosing and Labeling" was published by FDA and dated May 1998.  DEFS-TT-000848 (FDA Guidance).  FDA Guidance was disclosed during the prosecution of the '004 Patent in the August 12, 2020 information disclosure statement.  TAI-LONS-03298926 at 9567 ('004 Prosecution History).  FDA Guidance discloses general guidance to those who "plan to conduct studies to assess the influence of renal impairment on the pharmacokinetics of an investigational drug."  DEFS-TT-000848 at 51 (FDA Guidance).

136.    Importantly, FDA Guidance is directed to assessing a single drug product and not a fixed combination drug like Lonsurf.  FDA Guidance warns that "special consideration should be given to combination drug products," and discourages the use of fixed combination drugs in patients with impaired renal function when the pharmacokinetics of each drug in the combination drug is not comparably affected by impaired renal function:

> Special consideration should be given to combination drug products. Dosing adjustments should be recommended according to the degree of renal impairment, provided there is sufficient information to indicate that the pharmacokinetics/pharmacodynamics of the individual components of the combination product are comparably affected by impaired renal function.  In situations in which this does not apply, the following statement should be adapted:
> Because the doses of this fixed combination product cannot be individually titrated and impaired renal function results in a reduced clearance of component A to a much greater extent than component B, combination drug should generally be avoided in patients with suspected or documented renal impairments. . . .

DEFS-TT-000848 at 65 (FDA Guidance).

137.    While FDA Guidance is directed to assessing single drugs, it emphasizes the need for pharmacokinetic studies in patients with renal impairment:

> A PK study in patients with impaired renal function is recommended when the drug is likely to be used in these patients and (1) renal impairment is likely to significantly alter the PK of a drug and/or its active/toxic metabolites and (2) a dosage adjustment is likely to be necessary for safe and effective use in such patients.  In particular, a study in patients with impaired renal function is recommended when the drug or its active metabolites exhibit a narrow therapeutic index and when excretion and/or metabolism occurs primarily via renal mechanisms (excretion or metabolism).

DEFS-TT-000848 at 52 (FDA Guidance).

138.    FDA Guidance also states that the study design disclosed is for "drugs whose pharmacodynamics (*i.e.*, concentration-response relationship) are known to be unaffected by renal impairment. . . ."  DEFS-TT-000848 at 853 (FDA Guidance).  FDA Guidance further states that

when performing a study, to "ensure adequate representation of patients with various degrees of renal impairment, recruitment of approximately equal numbers of patients from each of the following groups is suggested:

| Group | Description | Estimated Creatinine Clearance (milliliters/ minutes) |
|---|---|---|
| 1 | Normal renal function | > 80 mL/min |
| 2 | Mild renal impairment | 50-80 mL/min |
| 3 | Moderate renal impairment | 30-50 mL/min |
| 4 | Severe renal impairment | <30 mL/min |
| 5 | ESRD | Requiring dialysis |

DEFS-TT-000848 at 55 (FDA Guidance).

139.    With respect to population pharmacokinetic studies, FDA Guidance states that they can be used so long as a "sufficient number of patients and a sufficient representation of a range of renal function [are included so] that the study could detect PK differences large enough to warrant dosage adjustment." DEFS-TT-000848 at 58 (FDA Guidance).  FDA Guidance also states that "[p]atients with severe renal impairment often are excluded or poorly represented in population PK studies.  When that occurs for a drug that is likely to be administered to such patients, a separate study should be conducted to assess PK in patients with severe renal impairment. . . ." DEFS-TT-000848 at 58 (FDA Guidance).

### 5.    NCT '117

140.    "History of Changes for Study: NCT02301117 A Phase I study of TAS-102 in Patients with Advanced Solid Tumors with Renal Impairment" was published on November 21, 2014.  DEFS-TT-001144 (NCT '117).  NCT '117 was disclosed during prosecution of the '004

54

Patent in the September 18, 2019 information disclosure statement.  TAI-LONS-03298926 at -8963 ('004 Prosecution History).  NCT '117 was also disclosed during prosecution of the '399 Patent in the August 24, 2018 information disclosure statement.  TAI-LONS-00004056 at 4800 ('399 Prosecution History).

141.    NCT '117 outlines at a high level an early iteration of Taiho's study design for the dedicated renal impairment study.  NCT '117 discloses that the study is a "[p]hase 1, open-label study to evaluate the safety, tolerability, and pharmacokinetics of TAS-102 in patients with advanced sold tumors with varying degrees of renal impairment."  DEFS-TT-001144 at 46-47 (NCT '117).   NCT '117 explains that the study was to be conducted in 2 parts: "the Pharmacokinetic Part (Cycle 1) and the Extension Part (Cycles 2 and beyond).  Patients may continue to receive treatment with TAS-102 during the study extension party only after completion of the Pharmacokinetic Part."  DEFS-TT-001144 at 47 (NCT '117).  NCT '117 discloses the table below, which suggests that that the dose to be administered to patients with mild and moderate renal impairment is 35 mg/m$^2$/dose of TAS-102:

| Arms | Assigned Interventions |
| --- | --- |
| Experimental: Mild Renal Impairment<br>35 mg/m2/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle. Number of cycles: approximately 4 or until discontinuation criteria is met. | Drug: TAS-102 |
| Experimental: Moderate Renal Impairment<br>35 mg/m2/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle. Number of cycles: approximately 4 or until discontinuation criteria is met. | Drug: TAS-102 |
| Experimental: Severe Renal Impairment<br>35 mg/m2/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle. Number of cycles: approximately 4 or until discontinuation criteria is met. The dose level of severe cohort will be determined based on the Interim Assessment of mild and moderate cohorts | Drug: TAS-102 |

DEFS-TT-001144 at 48 (NCT '117).

55

142. The table also suggests that while "the dose level of [the] severe cohort will be determined based on the Interim Assessment of mild and moderate cohorts," the investigators anticipated administering a dose of "35 mg/m$^2$/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28-day cycle." DEFS-TT-001144 at 48 (NCT '117). NCT '117 does not disclose any results of the dedicated renal impairment study.

### 6. Cleary Poster

143. The Cleary Poster discloses that it was presented at the 2015 American Society of Clinical Oncology (ASCO). TAI-LONS-02556823 (Cleary Poster). The Cleary Poster discloses that the objectives of the poster are to establish PopPK models for FTD and TPI and identify significant intrinsic and extrinsic factors that affect drug exposure, such as demographic characteristics (*e.g.*, body surface area, age, gender, race, and weight), renal function, liver function, and concomitant medication. TAI-LONS-02556823 (Cleary Poster).

144. The Cleary Poster combined sparse sampling data from the RECOURSE study (TPU-TAS-102-301), the Japanese dose-finding study (J001-10040010), the PK contribution study (TPU-TAS-102-102), and the QT$_C$ study (TPU-TAS-102-103) to create PopPK models for FTP and TPI. TAI-LONS-02556823 (Cleary Poster). The Cleary Poster discloses that the PopPK models for FTD and TPI are:

Trifluridine:

$$Vd/F \text{ (L)} = 10.0 \times (BSA/1.81)^{0.94}$$
$$CL/F \text{ (L/h)} = 2.93 \times (CrCL/103)^{0.507} \times (ALB/3.90)^{-0.633}$$

Tipiracil:

$$Vd/F \text{ (L)} = 192 \times (BSA/1.81)^{1.46}$$
$$CL/F \text{ (L/h)} = 88.7 \times (CrCL/103)^{0.592}$$

TAI-LONS-02556823 (Cleary Poster).

56

145.    The Cleary Poster states that the sampling data used to create the PopPK models were "sparse" from the RECOURSE study (only 3 time points on days 9, 10, or 11) and more "extensive" in the other studies (data collected from day 12).  TAI-LONS-02556823 (Cleary Poster).  The number of patients whose data was used to generate the PopPK models were heavily weighted to the RECOURSE patients.  More RECOURSE patients were included to generate the PopPK models than patients from all the other studies combined.  Day 1 data were not used to generate the PopPK model, because the model assumes linear pharmacokinetics.

146.    The number of individuals analyzed for each study and the number of concentration data analyzed are shown below in the two most right columns:

|  | Number of Individuals | Number of Concentration Data | Number of Concentration Data Excluded | Number of Individuals Analyzed | Number of Concentration Data Analyzed |
|---|---|---|---|---|---|
| RECOURSE | 138 | 832 | 6 | 138 | 826 |
| PK contribution study | 39 | 546 | 2 | 39 | 544 |
| QTc study | 41 | 812 | 6 | 41 | 806 |
| Japanese dose-finding study | 21 | 378 | 0 | 21 | 378 |
| Total | 239 | 2568 | 14 | 239 | 2554 |

TAI-LONS-02556823 (Cleary Poster).

147.    All of the patients whose data were used to create the PopPK model received a Lonsurf dose of 35 mg/m$^2$ twice daily five days a week followed by two days of rest for two weeks every 4 weeks, except for patients in the Japanese dose-finding study who received a Lonsurf dose of between 15-35 mg/m$^2$ twice daily and on the same dosing schedule as the patients in the other studies.[5]  TAI-LONS-02556823 (Cleary Poster).  The average CrCL in mL/min of the patient data used from the RECOURSE, PK Contribution, QTc, and Japanese dose-finding study are 102, 108,

---

[5] FTD exhibits nonlinear, time-dependent pharmacokinetics at different doses, which is not accounted for by the PopPK model.  The PopPK model assumes that FTD exhibits linear pharmacokinetics.

57

109, and 92 mL/min, respectively, with an average CrCL across all studies of 103 mL/min. TAI-LONS-02556823 (Cleary Poster). These CrCL values all indicate that the mean patient in all four studies exhibited normal kidney function. No SRI patients were included.

148. Additionally, the body weight across the four studies also was not balanced, with the mean body weight being 72.6 kg (RECOURSE), 78.3 kg (PK Contribution Study), 80.6 kg (QTc Study), and 58 kg (Japanese Dose-Finding Study). TAI-LONS-02556823 (Cleary Poster). The body weight was also not balanced between each renal cohort—normal renal function, mild renal impairment, and moderate renal impairment—within the RECOURSE study. DEFS-TT-005546 at 6024 (Lonsurf FDA Approval Package). As such, the underlying studies did not have balanced cohorts of patients with normal renal function, mild renal impairment, and moderate renal impairment or balanced weights across the studies or renal cohorts within the study. This is an additional reason that a person of ordinary skill in the art in 2016 would not have considered exposure data derived from mainly normal patients—and a PopPK model based on those data—to accurately predict drug exposure in SRI patients treated with Lonsurf. The imbalance in body weight distribution across studies also would have created further doubt about using the data from the studies to predict Lonsurf exposure in SRI patients.

### B.  Overview of Additional Art

149. While MSN identifies the additional art described below as setting forth background knowledge of a POSA, MSN's expert has not relied on any of these references as part of his opinions in this matter. Thus, Taiho simply provides an overview of these references that MSN has identified in its Statement of Contested Facts.

#### 7.  Doogue

150. Doogue and Polasek, Drug dosing in renal disease, *Clin Biochem Rev*, 32:69-73 (2011) ("Doogue") (DEFS-TT-001426–30) is a "mini-review" of the "principles of dose

adjustment in renal disease." DEFS-TT-001426 (Doogue). Doogue was considered by the patent office during prosecution of both Asserted Patents. TAI-LONS-03298926 at 9141 ('004 Prosecution History); TAI-LONS-00004056 at 5056 ('399 Prosecution History).

151. Doogue "describes how to adjust drug dose to account for the pharmacokinetic changes that occur in renal disease," explaining that a "drug dose should be reduced proportionally to the predicted reduction in drug clearance." DEFS-TT-001426 (Doogue). Doogue also reviews certain pharmacokinetic concepts, including the therapeutic index, drug clearance, excretion, and estimation of kidney function. DEFS-TT-001426–29 (Doogue).

152. Doogue explains that "[w]hen prescribing for a patient with decreased renal function[,] the characteristics of both the patient and the drug should be considered." DEFS-TT-001426 at 29 (Doogue). Although Doogue discusses several drugs, none are cancer drugs or fixed-dose combination therapies. DEFS-TT-001426–29 (Doogue).

153. If a POSA were to apply Doogue's disclosures to Lonsurf, which would not be correct, Doogue would have taught away from the claimed invention, because Doogue discloses that dose should be proportional to renal function. Whether by Equation 1 (DEFS-TT-001426 at 27) or Equation 2 (DEFS-TT-001426 at 28), were a POSA to follow Doogue, the Lonsurf dose would not fall near the claimed range of 30-40 mg/m$^2$/day at all. TPI is essentially entirely cleared by the kidneys, while FTP is essentially not cleared by the kidneys. If a POSA were to consider TPI alone, whether by Equation 1 or 2, the dose would be approximately 1/8 to 1/3 the normal dose (8.75 – 23.3 mg/m$^2$/day, resulting from the fact that normal renal function is 90-120 mL/min and SRI is 15-29 mL/min). If a POSA considered FTD alone, whether by Equation 1 or 2, the dose would be unchanged from patients having normal renal function (70 mg/m$^2$/day). None of the numbers fall anywhere near the claimed range.

### 8.   Hurria

154.   Hurria et al., Effect of creatinine clearance on patterns of toxicity in older patients receiving adjuvant chemotherapy for breast cancer, *Drugs Aging* 22(9): 785-791 (2005) ("Hurria") discloses a study involving 126 patients designed to "determine the association between calculated creatinine clearance ($CL_{CR}$) and grade 3 or 4 toxicities during adjuvant chemotherapy in women ≥65 years of age with breast cancer. DEFS-TT-000882 (Hurria). Hurria was cited by the Examiner and overcome by Taiho during prosecution of the '399 Patent. TAI-LONS-00004056 at 4770-78, 4810-13, 4854-56, 4877-80, 4889. Hurria also was considered during prosecution of the '004 Patent. TAI-LONS-03298926 at 9141 ('004 Prosecution History).

155.   Hurria concludes that "$CL_{CR}$ should be considered when determining chemotherapy dosage in the elderly." DEFS-TT-000882 at 83 (Hurria). Hurria explains that "[f]luorouracil is cleared through nonrenal mechanisms and, therefore, dose adjustments of this drug are not typically made in the face of renal impairment." DEFS-TT-000882 at 86 (Hurria). Hurria does not provide any guidance as to how a chemotherapy dosage should be estimated or calculated based on any patient's $CL_{CR}$. DEFS-TT-000882–88 (Hurria). Hurria acknowledges that "[p]rospective studies are needed . . . to study the impact of modifying chemotherapy dose according to renal function on toxicity, response and overall survival." DEFS-TT-000882 at 87 (Hurria).

### 9.   Doi

156.   Doi et al., Phase I study of TAS-102 treatment in Japanese patients with advanced solid tumors, *British Journal of Cancer*, 107(3):429-434 (2012) ("Doi") describes a phase 1 dose-escalation study of Lonsurf in Japanese patients. DEFS-TT-002029 (Doi). Doi was cited by the Examiner and overcome by Taiho during prosecution of the '399 Patent. TAI-LONS-00004056

60

at 4770-75, 4810-13, 4854 ('399 Prosecution History).  Doi was considered during prosecution of the '004 Patent.  TAI-LONS-03298926 at 9141 ('004 Prosecution History).

157.    The "primary objective of the phase I study in Doi was to establish the maximum tolerated dose (MTD) and [dose-limiting toxicities] in Japanese patients to determine the optimal phase II dose, and the secondary objective was to examine the PKs and preliminary efficacy of TAS-102."  DEFS-TT-002029 (Doi).  Patients in Doi received a "starting dose of 30 mg m$^{-2}$ per day," and depending upon their observed dose-limiting toxicities, could receive increased doses of 40 mg m$^{-2}$ per day, 50 mg m$^{-2}$ per day, 60 mg m$^{-2}$ per day, or 70 mg m$^{-2}$ per day.  DEFS-TT-002029 at 30–31 (Doi).  To participate in this study, patients were required to have "adequate renal function (creatinine levels $\leq$ 1 mg dl$^{-1}$)."  DEFS-TT-002029 at 30 (Doi).  Doi does not discuss how renal impairment influences the maximum tolerated dose or dose-limiting toxicities of Lonsurf.  Nor does Doi discuss whether any of the studied doses are appropriate for renally impaired patients.  DEFS-TT-002029–34 (Doi).

### 10.    Sakamoto

158.    U.S. Patent Application Publication No. 2016/0082032 to Sakamoto et al. ("Sakamoto") is the U.S. national phase publication of International Application No. PCT/JP2014/063085 (published as WO 2014/185528 on November 20, 2014).  Sakamoto was cited by the Examiner and overcome by Taiho during prosecution of the '399 Patent.  TAI-LONS-00004056 at 4770-75, 4810-13, 4854 ('399 Prosecution History).  Sakamoto was considered during prosecution of the '004 Patent.  TAI-LONS-03298926 at 9141 ('004 Prosecution History).

159.    Sakamoto describes "a method for predicting the therapeutic effect of" Lonsurf. DEFS-TT-000218 (Sakamoto).  Sakamoto describes dosing Lonsurf as follows:

> 2 to 4 times a day in an FTD amount of 20 to 80 mg/m2 (per body surface area)/day, preferably 2 to 3 times a day in an FTD amount of 50 to mg/m2(per body surface area)/day, more preferably 2 times

> a day in an FTD amount of 70 mg/m2 (per body surface area)/day.
> The frequency of administration per day is not particularly limited,
> and is 2 to 4 times, preferably 2 or 3 times, more preferably 2 times.

DEFS-TT-000218 at 22 (Sakamoto). Sakamoto does not discuss renal impairment, let alone describe how to account for renal function or SRI when determining a dose or dosing regimen within the described ranges. *See* DEFS-TT-000218–225 (Sakamoto).

### 11. Hong

160. Hong et al., Phase I study to determine the safety and pharmacokinetics of oral administration of TAS-102 in patients with solid tumors, *American Cancer Society*, 107(6):1383-1390 (2006) ("Hong") describes a phase I dose-finding study of Lonsurf. TAI-LONS-00004056 at 5019 (Hong). Hong was considered by the patent office during prosecution of both Asserted Patents. TAI-LONS-03298926 at 9141 ('004 Prosecution History); TAI-LONS-00004056 at 5056 ('399 Prosecution History).

161. Patients enrolled in the dose-finding study received Lonsurf at doses of 50 mg/m$^2$/day, 60 mg/m$^2$/day, or 100 mg/m$^2$/day. TAI-LONS-00004056 at 5022–23 (Hong). Patients were required to have "adequate renal function (creatinine ≤ 1.5 mg/dL)" to participate in the study. TAI-LONS-00004056 at 5020 (Hong). Hong noted that "abnormal accumulation of FTD in plasma on Day 14 . . . does not appear to be secondary to TPI," suggesting the unpredictability of combination drug treatment in patients having normal renal function, let alone SRI patients. TAI-LONS-00004056 at 5026 (Hong). Hong concluded that "50 mg/m$^2$/day was a tolerable dose" of Lonsurf and recommended this dose for Phase II studies. TAI-LONS-00004056 at 5019 (Hong). Hong made no dosing recommendations for patients without adequate renal function. TAI-LONS-00004056 at 5019–26 (Hong).

### 12.    Janus

162.    Janus et al., Cancer and renal insufficiency results of the BIRMA study, British Journal of Cancer, 103(12):1815-1821 (2010) ("Janus") describes "the results of the Belgian Renal Insufficiency and Anticancer Medications (BIRMA) study, a large, national cohort, multicentric, retrospective study that was conducted to assess the prevalence of [renal insufficiency] in cancer patients in Belgium." DEFS-TT-000754 (Janus). Janus was considered by the patent office during prosecution of the '004 Patent. TAI-LONS-03298926 at 9567 ('004 Prosecution History).

163.    One goal of the in Janus was "to describe the profile and dosage of the anticancer drugs prescribed according to the level of renal function." DEFS-TT-000754 (Janus). Janus did not seek to identify an appropriate dose of common cancer drugs in renally impaired patients. Instead, drugs patients were already receiving "that required dosage adjustment were identified in accordance with their pharmacokinetics and available recommendations from two . . . reference books on dosage adjustment in patients with RI." DEFS-TT-000754 at 55 (Janus).

164.    Janus found "that a significant number of RI patients receiving chemotherapy requiring dose reduction in case of RI did not receive dose adjustment." DEFS-TT-000754 at 59 (Janus). Janus concluded that "[o]ncologists should check the appropriate dose of chemotherapeutic drugs in relation to actual renal function before prescribing to their patients." DEFS-TT-000754 at 59 (Janus).

### 13.    Cleary

165.    Cleary et al., Population pharmacokinetic (PK) analysis of TAS-102 in patients (pts) with metastatic colorectal cancer (mCRC): Results from 3 phase 1 trials and the phase 3 RECOURSE trial, *Journal of Clinical Oncology*; 33(15):2579-80 (2015) is the abstract accompanying the Cleary Poster, discussed below. The objective of the population PK ("PopPK") study described in Cleary was "to establish population PK models for FTD and TPI, and to identify

significant intrinsic and extrinsic factors that influence drug exposure." NAT-TT-113065 (Cleary Abstract). The study found that "[r]enal function and body size were the primary determinants of the PK of [Lonsurf], highlighting the importance of monitoring renal function in [patients] treated with [Lonsurf]." NAT-TT-113065 (Cleary Abstract). Cleary does not suggest using the final models of FTD and TPI to determine a Lonsurf dose in SRI patients. *See* NAT-TT-113065–66 (Cleary Abstract).

### 14. Mehvar

166. Mehvar, Estimation of pharmacokinetic parameters based on the patient-adjusted population data, American Journal of Pharmaceutical Education 70(5) Article 96, 1-8 (2006) ("Mehvar") "describes the 2 main methods of obtaining population kinetic data, namely the two-stage method and nonlinear mixed effect model, and their applications to the pharmacokinetic-based design of dosage regimens." DEFS-TT-000908 (Mehvar). Mehavar "describes the learning tools that [he] uses for [a] session of his pharmacokinetics course. DEFS-TT-000908 (Mehvar). Mehvar was considered by the patent office during prosecution of the '004 Patent. TAI-LONS-03298926 at 9567 ('004 Prosecution History).

167. Mehvar discloses that the "traditional (or two-stage) method" is one in which a drug is first "administered to a group of patients . . . to determine the pharmacokinetic parameters of the drug in each patient," and then "the relationships between the pharmacokinetic parameters and patient characteristics (such as age, weight, gender, and degree of renal function) . . . are determined by categorization and/or regression analysis." DEFS-TT-000908 at 09 (Mehvar). Mehvar further discloses that "caution should be exercised when using reported population pharmacokinetic relationships based on this method[,] because most of these data have been obtained in a small number of tightly controlled patients, making extrapolations to other patient populations extremely risky." DEFS-TT-000908 at 11 (Mehvar).

64

168. The nonlinear mixed effects model is one in which "the data from [gathered from routine clinical monitoring of patients] is put together[,] and the average and variability of the pharmacokinetic parameters are estimated for the whole population rather than each individual patient." DEFS-TT-000908 at 11–12 (Mehvar).

169. Mehvar states that "[o]nce the adjusted population pharmacokinetic parameters are estimated in individual patients, dosage regimens . . . may be designed based on the pharmacokinetic principles," but that "[t]his topic . . . is covered in a separate session" of his course. DEFS-TT-000908 at 13 (Mehvar).

### 15. Munar

170. Munar and Singh, Drug dosing adjustments in patients with chronic kidney disease, *American Family Physician* 75(10):1487-1496 (2007) ("Munar") seeks to familiarize physicians "with commonly used medications that require dosage adjustments." DEFS-TT-001323 (Munar). Munar was considered by the patent office during prosecution of both Asserted Patents. TAI-LONS-03298926 at 9141 ('004 Prosecution History); TAI-LONS-00004056 at 5056 ('399 Prosecution History).

171. Munar reviews dosing requirements in patients with chronic kidney disease for different drug categories (e.g., antihypertensives, hypoglycemic agents, antimicrobials, analgesics, NSAIDs, statins, and herbal therapies). DEFS-TT-001323 at 24–32 (Munar). None of these categories of drugs are anticancer agents.

### 16. Booka

172. Booka et al., Development of an S-1 dosage formula based on renal function by a prospective pharmacokinetic study, Gastric Cancer 19:876-886 (2016) ("Booka") describes "a prospective pharmacokinetic study to develop an S-1 dosage formula based on renal function." DEFS-TT-006160 (Booka). S-1 is also called "TS-1" or "Teysuno." Booka was considered by

65

the patent office during prosecution of both Asserted Patents. TAI-LONS-03298926 at 9141 ('004 Prosecution History); TAI-LONS-00004056 at 5056 ('399 Prosecution History).

173. Booka involved "sixteen cancer patients with various degrees of renal function." DEFS-TT-006160 (Booka). Of the sixteen patients, four had normal renal function, five had mild renal impairment, five had moderate renal impairment, and two had severe renal impairment. DEFS-TT-006160 at 64 (Booka). Booka conducted a population PK analysis on the data from this prospective pharmacokinetic study. DEFS-TT-006160 at 63 (Booka).

174. From the analysis of patients with various degrees of renal function, Booka "provides a novel dosing recommendation for S-1 in Europe" for SRI patients. DEFS-TT-006160 at 68 (Booka). The authors note that "[f]urther validation is needed to confirm the formula for practical application." DEFS-TT-006160 at 69 (Booka).

### 17. Lichtman

175. Lichtman et al., International Society of Geriatric Oncology (SIOG) recommendations for the adjustment of dosing in elderly cancer patients with renal insufficiency, European Journal of Cancer, 43(1):14-34 (2007) ("Lichtman") "outlines recommended dosing adjustments for cancer drugs in [elderly cancer patients with renal insufficiency] according to renal function." DEFS-TT-006171 (Lichtman). Lichtman was considered by the patent office during prosecution of the '004 Patent. TAI-LONS-03298926 at 9641 ('004 Prosecution History).

176. Lichtman explains that "[t]he impact of physiological changes associated with age (for example[,] modifications of renal function . . .) on the pharmacokinetic and pharmacodynamic properties of drugs can be considerable, particularly for the renal elimination of drugs and metabolites. This is specially so for those drugs that are principally renally excreted . . . . These drugs typically have a narrow therapeutic range and for patients who present reduced renal function, careful dose adjustment is indicated to avoid drug accumulation and toxicity." DEFS-

TT-006171 at 72 (Lichtman).   Lichtman describes using a PopPK approach "to obtain the relationship between drug clearance and patients' covariates."   DEFS-TT-006171 at 73 (Lichtman).

177.    Lichtman states that "[f]or most drugs, it would be helpful to have at least some broad guidelines to assist dose adjustment," but that [i]n patients with renal impairment, comprehensive guidelines for dose adjustment exist for very few chemotherapy agents." DEFS-TT-006171 at 72 (Lichtman).  Lichtman also describes "three methods to adjust dosage according to the degree of renal failure: [i] reduce the unitary dosage without modifying the administration interval; [ii] increase the dosing interval without reducing the unitary dose; [and [iii]] reduce the unitary dose and increase the dosing interval."  DEFS-TT-006171 at 73 (Lichtman).  Lichtman also reviews the existing dosage recommendations for various cancer agents, which do not include Lonsurf.  DEFS-TT-006171 at 74-83 (Lichtman).  Lichtman also discloses that for fluorouracil, caution is warranted for use in SRI patients (DEFS-TT-006171 at 6181), and for capecitabine, use in SRI patients is contraindicated (DEFS-TT-006171 at 6177).

### 18.    Huang

178.    Huang et al., When to conduct a renal impairment study during drug development: US Food and Drug Administration perspective, *Clinical Pharmacology & Therapeutics*, 86(5): 475-479 (2009) ("Huang") describes FDA's "current recommendations on (i) when to conduct a renal impairment study during drug development, (ii) considerations in study design and data analysis, and (iii) the labeling implications of results."  DEFS-TT-006192 at 93 (Huang).

179.    Huang recommends that "[a] PK study should be conducted in patients with impaired renal function . . . if the drug is substantially renally eliminated."  DEFS-TT-006192 at 93 (Huang).  Huang states that a "reduced PK study design would be most appropriate for drugs that are eliminated predominantly via a nonrenal route, when the major elimination route cannot

be determined . . ., or when there are multiple elimination pathways and the impact of impaired renal function is not easily predicted." DEFS-TT-006192 at 94 (Huang). Huang further states that a "full study design [with adequate numbers of subjects with various levels of impaired renal function] would apply most obviously to drugs that are predominantly renally eliminated." DEFS-TT-006192 at 94 (Huang). Huang also cautions that "[u]nderstanding the complex effects on drug exposure of other coexisting factors (e.g., modulation of enzyme or transporter pathways . . . by concomitantly administered drugs . . .) may be important, especially for drugs with a narrow therapeutic range." DEFS-TT-006192 at 95 (Huang).

### 19. Emura

180. U.S. Patent No. 7,799,783 to Emura et al. ("Emura"), filed on January 26, 2005, and issued on September 21, 2010, "relates to a method for treating a cancer comprising orally administering a composition containing [Lonsurf] at a dose of 20 to 80 mg/m$^2$/day in terms of FTD in 2 to 4 divided portions per [day]." TAI-LONS-0000022 (Emura). Emura was cited by the Examiner and overcome by Taiho during prosecution of the '399 Patent. TAI-LONS-00004056 at 4770-78, 4810-13, 4854-56, 4877-80, 4889. Emura also was considered during prosecution of the '004 Patent. TAI-LONS-03298926 at 9141 ('004 Prosecution History).

181. Emura describes Lonsurf administration:

> in an oral dose of 20 to 80 mg/m$^2$/day in terms of FTD in 2 to 4 divided portions; however, the dose is preferably given in 2 to 3 divided portions. A dosage interval for the composition is preferably 6 hours or more.

TAI-LONS-0000022 at 28 (Emura). Emura does not discuss renal impairment at all, let alone how to account for patients' renal function, including SRI. *See* TAI-LONS-0000022–30 (Emura).

### 20.    Trifluridine Monograph

182.    APO-Trifluridine, Trifluridine Ophthalmic Solution 1%, Product Monograph ("Trifluridine Monograph") is dated October 22, 2003.  DEFS-TT-000889–907.  It is the Apotex, Inc. product monograph for trifluridine ophthalmic solution, which is used as a topical antiviral agent.  DEFS-TT-000889 (Trifluridine Monograph).  It describes the pharmacokinetics of trifluridine following IV administration, but states that "systemic absorption from the eye is minimal."  DEFS-TT-000889 at 91 (Trifluridine Monograph).  It also describes the results of various toxicology studies in animals dosed subcutaneously, intravenously, and ocularly.  DEFS-TT-000889 at 899-903 (Trifluridine Monograph).

### C.  <u>Administering a Fixed-Dose Combination Drug Like Lonsurf and Determining an Appropriate Dose and Regimen Was Not Predictable</u>

183.    Developing an appropriate treatment regimen for SRI patients who have cancer, including metastatic colorectal cancer, was unpredictable at the time of the claimed invention (and is still unpredictable today).  To determine an appropriate dose of Lonsurf to administer to an SRI patient, a POSA would have needed to consider how each drug component of Lonsurf (TPI and FTD) is absorbed, distributed, metabolized, or excreted from the body.

184.    A POSA would also have needed to understand the pharmacokinetics of how SRI patients would likely be exposed to each drug component of Lonsurf.  This is because at the time of the claimed invention (and still now), SRI patients, who are extremely fragile patients, are difficult to treat.  While SRI patients have very poor kidney function, there is some function remaining such that dialysis is not yet warranted.  As such, there is little margin for error in drug dosing especially for drugs that are renally excreted, and any excess toxicity from any drug administered could lead to end stage renal disease (ESRD), sepsis, or death.

185.    As such, at the time of the claimed invention, to develop a treatment regimen for SRI patients who have cancer, including metastatic colorectal cancer, a POSA would have had to consider at least the following issues that were known in the art:

- At least one prior art reference shows that FTD accumulated in the body but the mechanism for accumulation was not known. DEFS-TT-005546 at 683 (Lonsurf FDA Approval Package). A POSA would have understood that the pharmacokinetics of FTD would need to be studied to assess whether FTD accumulation is a result of nonlinear time-dependent pharmacokinetics and if so, what modifications would be necessary to determine if Lonsurf could be administered to SRI patients and if so, the appropriate dose.

- It was known at the time of the claimed invention that FTD "mainly binds to human serum albumin" and "*in vitro* protein binding of FTD in human plasma is greater than 96%." *Id.* at 67. SRI patients may have lower serum albumin and thus reduced FTD binding, meaning that there would be more unbound FTD in in the body of SRI patients. More unbound FTD could increase drug distribution and clearance. Thus, a POSA would have needed to understand the potential effect of altered plasma protein binding on the pharmacokinetics of Lonsurf in SRI patients, because it would have been important to determine if Lonsurf could be administered to SRI patients and if so,  the appropriate dose.

- The intact nephron hypothesis (INH) was a long-known concept that underlies much pharmacokinetic modeling but may not be a suitable model for drugs eliminated through the kidneys by tubular mechanisms, as is the case with TPI but not FTD in Lonsurf. A POSA thus would have needed to account for the potential

70

inapplicability of the INH in assessing the appropriate dose of Lonsurf in SRI patients.

186. Adding to the lack of predictability in the art is the number of possibilities as of the time of the claimed invention for handling treatment of an SRI patient with Lonsurf. Among them were: (i) it may not have been possible to use Lonsurf to treat an SRI patient, (ii) it may have been safer and more effective to return to an earlier line of treatment than to try Lonsurf, (iii) the dosing schedule could be changed in SRI patients, (iv) the molar ratio of Lonsurf could be changed in SRI patients, (v) the dosing schedule could stay the same in SRI patients, (vi) the dosing amount could be unchanged in SRI patients, (vii) the dosing amount of Lonsurf could be changed (i.e., reduced) in SRI patients, or the (viii) the molar ratio, dosing schedule, and/or dosing amount could all change or all stay the same. It was not predictable at the time of the claimed invention which option would yield an appropriate treatment, if any, for SRI patients with Lonsurf.

187. Teysuno—a fixed-dose combination anti-cancer drug that existed prior to Lonsurf—illustrates the unpredictability in the art as of the time of the claimed invention in dosing SRI patients with a combination drug like Lonsurf. Specifically, Teysuno has two drug components that function similarly to the FTD and TPI in Lonsurf. It was determined that Teysuno—even at a reduced dose and with a change in the dosing schedule from twice to once a day—was not recommended to be administered to SRI patients due to the instability in their renal function. TAI-LONS-00004056 at 4811 ('399 File History); TAI-LONS-03091545 at 591, 669 (Teysuno's Global Investigator's Brochure). Based on Teysuno (as well as other anti-cancer drugs at the time of the claimed invention that were on the market but not recommended for SRI patients), a POSA would have thought that Lonsurf should not be used to treat SRI patients. Notwithstanding this experience and knowledge, the Taiho inventor ultimately determined from a dedicated renal

71

impairment study that, unlike Teysuno, a starting dose of Lonsurf of 20 mg/m$^2$ twice a day could be used to treat SRI patients.

188.    For at least the foregoing reasons, developing a treatment regimen for SRI patients based solely on prior art knowledge was unpredictable at the time of the claimed invention.

**D.    The Asserted Claims of the '004 and '399 Patents Are Not Anticipated by the Lonsurf FDA Approval Package Nor Rendered Obvious by the Lonsurf FDA Approval Package in View of the General Knowledge and Experience of a POSA, Optionally further in View of FDA Guidance**

189.    The Lonsurf FDA Approval Package does not anticipate the Asserted Claims because it does not disclose – explicitly or inherently – treating SRI patients with Lonsurf at any dose or on any regimen.  It thus lacks a disclosure of necessary elements of every Asserted Claim.

190.    The Lonsurf FDA Approval Package in view of the general knowledge and experience of a POSA and/or further in view of FDA Guidance also would not have rendered the Asserted Claims obvious.  Not only are the arguments and prior art that are being advanced similar or the same as those disclosed during prosecution of the Asserted Patents (and that Taiho successfully overcame), but there was no motivation to combine the prior art references with a reasonable expectation of success.  Indeed, the Lonsurf FDA Approval Package suggested that the Lonsurf dose might not change in SRI patients, while FDA Guidance taught away from the claimed invention.

**21.    Claims 1-4, 7, 17-18, 20, 24, and 28 of the '004 Patent and Claim 10 of the '399 Patent are Not Anticipated by the Lonsurf FDA Approval Package**

191.    The Lonsurf FDA Approval Package does not anticipate the Asserted Claims of the Asserted Patents.

192.    *First*, the Lonsurf FDA Approval Package does not disclose administering Lonsurf to a patient with a creatinine clearance between 15 and 29 mL/min (i.e., a severely renally impaired

72

patient.).  While Study J001-10040010 in the Lonsurf FDA Approval Package shows that Lonsurf was previously administered at dose levels of 15, 20, 25, 30, and 35 mg/m$^2$, the patients in Study J001-10040010 were required to have adequate renal function (creatinine levels $\leq$ 1.5 [mg/dl]). DEFS-005546 at 6001 (Lonsurf FDA Approval Package); DEFS-TT-002029 at 30 (Doi, Phase 1 Study of TAS-102 Treatment in Japanese Patients with Advanced Solid Tumors, British Journal of Cancer, 2012).  The study thus excluded patients with SRI (i.e., patients with a serum creatinine level above 2 mg/dl).  In fact, the average renal function of the patients in Study J001-10040010 was 92 mL/min.  TAI-LONS-02556823 (Cleary Poster).  A creatinine clearance $\geq$ 90 mL/min means that the patient has normal renal function.

193.    The Lonsurf FDA Approval Package thus does not disclose administering Lonsurf to SRI patients.  It discloses the opposite—that no severely renally impaired ("SRI") patients had been treated with Lonsurf.  Specifically, the Lonsurf FDA Approval Package discloses that:

- No SRI patients were enrolled in any of the disclosed clinical studies, including Study J001-10040010 (discussed above) or RECOURSE, which included sparsely sampled data and enrolled patients with normal renal function, mild renal impairment and moderate renal impairment and whose mean renal function across the cohorts was normal.  DEFS-TT-005546 at 5546, 5551, 5564, 5600, 5665, 5682, 5999, 6000, 6002, 6026 (Lonsurf FDA Approval Package).

- The pharmacokinetics of the Lonsurf drug components (FTD and TPI) had not been studied in SRI patients.  *Id.* at 5546, 5564, 5999, 6000, 6002, and 6026.

- A study—known as the dedicated renal impairment study—was ongoing to determine whether an appropriate Lonsurf treatment could be developed for SRI patients.  *Id.* at 5546, 5600, 665, 6000, 6026.

73

- Taiho needed to conduct the dedicated renal impairment study. *Id.* at 5546, 5551, 5600, 5665, and 6000.

194.   ***Second***, and relatedly, the Lonsurf FDA Approval Package does not disclose administering a reduced dose of Lonsurf to an SRI patient. Where dose reductions were disclosed in the Lonsurf FDA Approval Package, they were disclosed as being done in non-SRI patients in response to adverse events and not for renal insufficiency. *See, e.g., id.* at 5559, 5594, 5564. A POSA would not have justified using a reduced dose of Lonsurf in SRI patients because the dosage of Lonsurf could be reduced due to adverse events in non-SRI patients. SRI is not an adverse event, and the fact that some portion of patients with adequate kidney function nevertheless had adverse events and subsequently received a reduced dose of Lonsurf would not have informed a POSA as to how to treat an SRI patient with Lonsurf. Indeed, the Lonsurf FDA Approval Package discloses that FDA would not permit observation of adverse events to be used as a substitute for modeling renal insufficiency because such an analysis would not be sufficient to assess signals of a serious risk of impaired renal and hepatic function. *Id.* at 5551. As such, FDA required Taiho to conduct its dedicated renal impairment study to determine an appropriate dose, if any, of Lonsurf for SRI patients. *Id.*

195.   ***Third,*** a POSA would not have contemplated using the clearance equation for FTD—$CL/F = 2.93 \times (CLCR/103)_{0.507} \times (ALB/3.90)_{-0.633} \times \exp(\eta i, {}_{CL/F})$—disclosed in the Lonsurf FDA Approval Package to reduce the Lonsurf dose in an SRI patient from 35 mg/m$^2$ by 1.90-2.66 times, resulting in an estimated dose of 26-37 mg/m$^2$/day. As a preliminary matter, the clearance equation was not disclosed in the context of dosing but was developed to identify factors that influence drug exposure in the analyzed population and other similarly situated patients.

74

196.    A POSA would not have considered the FTD clearance equation to be a reliable model to use to determine what Lonsurf dose should be administered to an SRI patient, because the clearance equation was derived from studies, including the RECOURSE study where there was a sparse sampling of data, that were not aimed at assessing the effect of renal function on Lonsurf exposure.  Those studies did not have balanced cohorts of patients (for example, roughly equal numbers of patients having normal renal function, mild impairment, and moderate impairment).  TAI-LONS-02556823 (Cleary Poster).  Not only did none of the studies include SRI patients, but the *average* patient in each study had normal kidney function (creatinine clearance of patients in each study was 102, 108, 109, and 92 mL/min with an average CrCL across all studies of 103 mL/min).  *Id.*

197.    As a second example, the Lonsurf FDA Approval Package discloses that weight was not comparable among renal function groups in at least one of the studies (RECOURSE).  DEFS-TT-005546 at 6024 (Lonsurf FDA Approval Package).  The Lonsurf FDA Approval Package discloses that this unevenness means that the increase in exposure of one of Lonsurf's drug components (FTD) from normal to mild and moderate renal impairment might be confounded by the smaller body weights in the mild and moderate renally impaired patients as compared to the patients with normal renal function.  *Id.*  The studies used to derive the clearance equation should have had cohorts that were not only balanced in numbers, but also in intrinsic characteristics, such as weight.

198.    Moreover, a different section of the Lonsurf FDA Approval Package discloses in the context of a study assessing adverse cardiac events, that SRI is estimated to result in doubling or tripling exposure of FTD in the body.  *Id.* at 600.  While FDA did not make any dosing estimate in SRI patients based on this estimated exposure, if one were to use the estimated exposure (which

75

a POSA would have deemed inappropriate and which the FDA also believed was inappropriate because it required Taiho to conduct the dedicated renal impairment study), one would arrive at a total dose of 23.4-35 mg/m$^2$/day for an SRI patient. This estimated dose is different than the estimated dose discussed above (26.5-36.8 mg/m$^2$/day).

199. As further evidence of the unreliability of the FTD clearance equation, the Lonsurf FDA Approval Package also discloses a clearance equation for TPI. *Id.* at 6021 and 6049. While a POSA would not have relied on the TPI clearance equation to extrapolate a dose for SRI patients, if one had done so, one would have arrived at an estimated dose of 22.4-33 mg/m$^2$/day of Lonsurf for an SRI patient. This dose range is again different than the two doses discussed above—23.4-35 mg/m$^2$/day and 26.5-36.8 mg/m$^2$/day.

200. Additionally, a POSA would not have used the FTD clearance equation above as a basis to determine what dose of Lonsurf to administer to an SRI patient, because the pharmacokinetics of FTD and TPI had not been studied to evaluate the effect of renal function on their exposure. For example, a POSA would not have known how to account for TPI exposure in SRI patients. As the dedicated renal impairment study ended up showing, TPI exposure in SRI patients was 614% greater than in patients with normal renal function, which is 6 times higher than the level of TPI exposure estimated in the Lonsurf FDA Approval Package.

201. ***Finally***, disparate sections of the Lonsurf FDA Approval Package created at different times by different people at FDA cannot be pieced together to anticipate the Asserted Claims. The Lonsurf FDA Approval has a number of different sections including: "Clinical Pharmacology and Biopharmaceutics Review," the "Other Review, Clinical Inspection Summary," the "Summary Review.", the "Clinical Review," the "Other Reviews, Thorough QT Study Review," "Other Reviews, Appendix," "Medical Review," "Labeling," and the "Approval

76

Letter." As just an example, the "Other Reviews" section includes a number of reports signed and dated by different individuals, including Gina Davis on September 16, 20125; Otto Townsend and Chi-Ming Tu on September 10, 2015; Dinko Reckic, Kinag Liu, Moh Jee Ng, Qianyu Dang, Michael Li, and Norman Stockbridge on December 3, 2014; Morgan Walker, Carole Broadnax, Lashawn Griffiths on September 3, 2015. DEFS-TT-005546 (Lonsurf FDA Approval Package) at 84, 86, 112-113, and 117. As another example, the "Approval Letter" was signed on September 22, 2025 by Richard Pazdur and the "Summary Review" section was dated September 21, 2015 and is from Patricia Keegan. *Id.* at 554-555 and 604-605. The Lonsurf FDA Approval Package does not disclose all of the claimed elements of the Asserted Claims for the reasons discussed above. Additionally, the Lonsurf FDA Approval Package cannot anticipate the Asserted Claims due to the disparate nature—i.e., different arrangement of the purported claim elements—in its disclosure.

### 22. Claims 1-4, 7, 17-18, 20, 24, and 28 of the '004 Patent and Claim 10 of the '399 Patent Are Not Obvious

202. For the reasons discussed above, the Asserted Claims are not obvious over the Lonsurf FDA Approval Package alone or in combination with the general knowledge and experience of a POSA and/or in view of FDA Guidance.

203. At the time of the claimed invention, a POSA would have known that determining a Lonsurf treatment regimen for SRI patients, who are very fragile due to the cancer and prior chemotherapy treatments, was a complex problem that required a careful, nuanced, and inventive approach.

#### a. There was no motivation to modify the treatment existing at the time of the claimed invention (35 mg/m² twice daily) for SRI patients

204. As discussed above, at the time of the claimed invention, and as disclosed in the Lonsurf FDA Approval Package, the pharmacokinetics of Lonsurf had not been studied in SRI

patients or in any study intended to evaluate the effect of renal impairment on Lonsurf exposure, and so Lonsurf was not indicated for treating SRI patients. In fact, the Lonsurf FDA Approval Package disclosed that Taiho should conduct the dedicated renal impairment study to assess the pharmacokinetics of Lonsurf in SRI patients and thereby determine what regimen, if any, of Lonsurf should be administered to an SRI patient. *Id.* at 5551, 5600, 5605, 5666, 6000, and 6026. This would have made sense to a POSA, because a POSA would have understood that if an SRI patient vulnerable from having received prior chemotherapy treatments were incorrectly dosed with Lonsurf, that patient could experience ESRD, sepsis, or death.

205.    Moreover, there were a number of options as of the time of the claimed invention for handling treatment of an SRI patient, including: (i) it may not have been possible to use Lonsurf to treat an SRI patient, (ii) it may have been safer and more effective to return to an earlier line of treatment than to try an unproven one like Lonsurf, (iii) the dosing schedule could be changed in SRI patients, (iv) the molar ratio of Lonsurf could be changed in SRI patients, (v) the dosing schedule could stay the same in SRI patients, (vi) the dosing amount could be unchanged in SRI patients, (vii) the dosing amount of Lonsurf could be changed (i.e., reduced) in SRI patients, or the (viii) the molar ratio, dosing schedule, and dosing amount—or various subsets of them—could all change or all stay the same. It was not predictable at the time of the claimed invention which option to take.

### b. *The Lonsurf FDA Approval Package suggested that the Lonsurf dose might not change in SRI patients*

206.    The Lonsurf FDA Approval Package repeatedly discloses that Taiho should conduct the dedicated renal impairment study to determine an appropriate dose of Lonsurf in SRI patients. *Id.* at 5551, 5665, 5600, and 6041-6042. The Lonsurf FDA Approval Package also states

that the effect of renal impairment on pharmacokinetics is not clinically important, suggesting to a POSA that there should be no dose change in SRI patients.

207.    Moreover, while the Lonsurf FDA Approval Package discloses an FTD clearance equation into which one could use the SRI creatinine clearance values as inputs, one could also use as inputs the creatinine clearance values for mild and moderate renal impairment.  Based on arguments advanced by MSN's expert, which are incorrect, a POSA would have used those equations to reduce the dose of Lonsurf in patients with mild and moderate renal impairment (and would have thought it more appropriate to use the TPI clearance equation over the FTD clearance equation since TPI is renally excreted).  But the Lonsurf FDA Approval Package discloses the opposite—that no dose adjustment to the starting dose of Lonsurf is recommended in patients with mild or moderate renal impairment.  Given this instruction against reducing the dose of Lonsurf in patients with mild or moderate renal impairment, a POSA would have thought that the dose for SRI patients also should not be reduced.

208.    And as discussed above, the Lonsurf FDA Approval Package indicates that adverse events should not be used as a substitute for renal sufficiency to determine the Lonsurf dose in SRI patients.

### c.    *There was no reasonable expectation of successfully treating an SRI patient with Lonsurf*

209.    Not only had the pharmacokinetics of Lonsurf not been studied in SRI patients, but no dedicated renal impairment study had been performed to determine the effect of renal impairment on the pharmacokinetics of Lonsurf.  *See, e.g., id.* at 5564 and 5568.  The prior art, thus, provided no data or reliable way to model likely Lonsurf exposure in SRI patients.  Consequently, a POSA would have avoided treating SRI patients with Lonsurf.  The risk of toxicity, other serious adverse events, ESRD, and death was too great given the instability of the

79

renal function in SRI patients and that patients with renal impairment could have increased TPI exposure, leading to increased FTD exposure (due to increased inhibition of FTD metabolism by TPI) and thus toxicity. Whether Lonsurf could be used to treat SRI patients was thus unpredictable.

210.    Indeed, in study J001-10040010, where patients were required to have adequate renal function and had an average renal function of normal (92 mL/min), the incidence of an adverse event was higher in patients with renal impairment than in those without renal impairment. DEFS-TT-002029 at 30 (Doi, Phase 1 Study of TAS-102 Treatment in Japanese Patients with Advanced Solid Tumors, British Journal of Cancer, 2012); TAI-LONS-02556823 (Cleary Poster); DEF-TT-000069 at 143 (Lonsurf Report). This would have suggested to a POSA that applying a reduced dose of Lonsurf to an SRI patient could not be used to treat an SRI patient with a reasonable expectation of success.

211.    Relatedly, the Lonsurf Report shows that in two studies—Study TAS102-J003 and Study TAS102-J001—the incidence of adverse events increased in patients with mild and moderate renal impairment as compared to patients with normal renal function. DEFS-TT-000069 at 118 (Lonsurf Report). The Lonsurf Report also shows, however, that the incidence of adverse events actually decreased in patients with moderate renal impairment as compared to patients with mild renal impairment:

**Incidence of adverse drug reactions related to bone marrow suppression by renal function**

| Renal function | n (%) | | | |
|---|---|---|---|---|
| | Platelet count decreased (Grade 4 or lower) | Red blood cell count decreased (Grade 4 or lower) | Haemoglobin decreased (Grade 3 or 4) | Neutrophil count decreased (Grade 4) |
| Normal | 17/49 (34.7) | 8/49 (16.3) | 3/49 (6.1) | 7/49 (14.3) |
| Mild impairment | 24/50 (48.0) | 24/50 (48.0) | 14/50 (28.0) | 12/50 (24.0) |
| Moderate impairment | 8/20 (40.0) | 6/20 (30.0) | 5/20 (25.0) | 4/20 (20.0) |

DEFS-TT-000069 at 118 (Lonsurf Report). There is no explanation in the Lonsurf Report for why the incidence of adverse events was less in patients with moderate renal impairment as compared

80

to patients with mild renal impairment, further suggesting to a POSA that a reduced dose of Lonsurf could not be used to treat an SRI patient with a reasonable expectation of success.

212. This lack of predictability, in part, is why the Lonsurf FDA Approval Package discloses that the FDA required Taiho to conduct its dedicated renal impairment study, which was carefully designed with balanced cohorts and dense sampling of data. The dedicated renal impairment study showed that FTD exhibits unexplained, nonlinear, time-dependent behavior, meaning that FTD accumulates in the body after multiple doses (and is unexpectedly more pronounced in SRI patients than in patients with normal renal function or mild renal impairment). TAI-LONS-03293661 at 668 (Saif). This phenomenon shows why a POSA would not have relied upon the clearance equations disclosed in the Lonsurf FDA Approval Package.

213. Additionally, based on the prior art fixed-dose combination anti-cancer drug Teysuno, which existed prior to Lonsurf and has two drug components that function similarly to the FTD and TPI in Lonsurf, a POSA would not have contemplated that a reduced dose of Lonsurf could be used to treat an SRI patient. Teysuno—even after having been tested at a reduced dose and with a change in the dosing schedule from twice to once a day—was not recommended to be administered to SRI patients due to the instability in their renal function, unless the benefits clearly outweighed the risks. TAI-LONS-00004056 at 4810-12 ('399 Prosecution History). There were also other anti-cancer drugs (e.g., cisplatin and methotrexate) at the time of the claimed invention that could not be used to treat an SRI patient at any dose.

214. Thus, at the time of the claimed invention, a POSA would not have had a reasonable expectation that an SRI patient could have been treated successfully with Lonsurf.

        ***d.  There would have been no motivation to combine the Lonsurf FDA Approval Package with FDA Guidance***

215.    While FDA Guidance discloses that renal impairment studies should be performed, the Lonsurf FDA Approval Package already disclosed that a dedicated renal impairment study was underway.  A POSA thus would not have sought guidance as to whether to conduct an SRI study from FDA Guidance, when an SRI study was already being performed as disclosed in the Lonsurf FDA Approval Package.

        ***e.  FDA Guidance teaches away from relying on the population PK model disclosed in the Lonsurf FDA Approval Package***

216.    FDA Guidance, which is directed to assessing a single drug and not a combination drug like Lonsurf, teaches away from relying on the population pharmacokinetic studies used to create the clearance equations disclosed in the Lonsurf FDA Approval Package.  FDA Guidance discloses that in a study in patients with renal impairment, there should be balanced cohorts of patients from each renal function group studied (e.g., normal, mild, moderate, and severe).  DEFS-TT-000848 at 55 (FDA Guidance).  The population pharmacokinetic studies disclosed in the Lonsurf FDA Approval Package, however, were not evenly balanced and mostly included patients with normal renal function—so much so that the <u>average</u> patient had normal renal function.  TAI-LONS-02556923 (Cleary Poster).

217.    For all of the reasons discussed above, the Lonsurf FDA Approval Package alone or in combination with the general knowledge and experience of a POSA and/or in view of FDA Guidance would not have rendered obvious the Asserted Claims.

**E.  <u>The Asserted Claims of the '004 and '399 Patents are not Invalid as Obvious Over the 2015 Lonsurf Label in View of NCT '117, FDA Guidance, and the General Knowledge and Experience of a Person of Ordinary Skill in the Art</u>**

218.    The 2015 Lonsurf Label in view of NCT '117. FDA Guidance, and the general knowledge and experience of a POSA would not have rendered the Asserted Claims obvious.  Each

of the references is missing critical elements of the Asserted Claims, and none of the references

discloses or teaches administering the claimed dose and dosing regimen to SRI patients.

219.    Moreover, not only are the arguments and prior art that are being advanced similar

or the same as those disclosed during prosecution of the Asserted Patents (and that Taiho

successfully overcame), but there was no motivation to combine the prior art references with a

reasonable expectation of success.  Indeed, the 2015 Lonsurf Label, and NCT '117 suggest that

the Lonsurf dose might not change in SRI patients, while FDA Guidance taught away from the

claimed invention.

### 1.    Dose reductions were not undertaken in SRI patients and were for adverse events, not renal insufficiency

220.    *First*, the 2015 Lonsurf Label does not disclose administering a reduced dose of

Lonsurf to SRI patients.  Rather, the 2015 Lonsurf Label discloses administering a dose of Lonsurf

of 70 mg/m$^2$/day divided into two portions for non-SRI patients, and allows for a dose reduction

in non-SRI patients to 20 mg/m$^2$ twice daily who experience cytotoxicity (i.e., an adverse event).

DEFS-TT-005252 at 564 (Lonsurf Label).

221.    A POSA would not have looked to the dose reduction in the 2015 Lonsurf Label

due to adverse events and concluded that Lonsurf could be administered to SRI patients at a

reduced dose.  At the time of the claimed invention, the Lonsurf FDA Approval Package would

have been available to a POSA and would have informed a POSA's evaluation of the 2015 Lonsurf

Label, because the 2015 Lonsurf Label is included word-for-word in the Lonsurf FDA Approval

Package.  For the reasons discussed above, the Lonsurf FDA Approval Package shows that the

FDA would not allow observation of adverse events to be used as a substitute for studying the

effects of renal insufficiency and required Taiho to conduct the dedicated renal impairment study.

DEFS-TT-005546 at 5551 (Lonsurf FDA Approval Package).

222.    Additionally, the 2015 Lonsurf Label itself discloses that (i) no patients with SRI were studied in RECOURSE, (ii) no dedicated clinical studies had been conducted to evaluate the effect of renal impairment on the pharmacokinetics of Lonsurf, and (iii) the pharmacokinetics of TPI and FTP in Lonsurf had not been studied in SRI patients.  DEFS-TT-005252 at 59, 63 (Lonsurf Label).

223.    *Second*, NCT '117 does not disclose administering 40 mg/m$^2$/day to SRI patients. Rather, it discloses that the investigators anticipated administering a dose of 35 mg/m$^2$/dose of Lonsurf twice daily on days 1-5 and days 8-12 of each 28-day cycle to SRI patients.  DEFS-TT-001144 at 48 (NCT '117).  This is the same dose that was disclosed in the 2015 Lonsurf Label to be administered to patients with normal renal function and mild and moderate renal impairment. NCT '117 also disclosed that the dose for SRI patients might need to be adjusted based on the results of the Interim Analysis of data from the pharmacokinetic phase of the study.  *Id.*

224.    *Third,* FDA Guidance would not have taught a POSA to alter the dose of Lonsurf in SRI patients, especially given that NCT '117 already disclosed that a study was ongoing to assess the appropriate dose of Lonsurf in SRI patients and that the investigators anticipated administering the same dose to SRI patients as was administered to non-SRI patients in the 2015 Lonsurf Label.  *Id.*  Moreover, FDA Guidance is directed to assessing a single drug and not a combination drug like Lonsurf, warning that "special consideration should be given to combination drug products."  DEFS-TT-000848 at 65 (FDA Guidance).  FDA Guidance also discourages the use of fixed combination drugs (like Lonsurf) in patients with impaired renal function, when the pharmacokinetics of each drug in the combination drug is not comparably affected by impaired renal function, as is the case with Lonsurf.  *Id.*  Given these disclosures in FDA Guidance, FDA Guidance would not have taught a POSA to change the Lonsurf dose in SRI patients.

84

**2.  There was no motivation to modify the treatment existing at the time of the claimed invention for SRI patients and the 2015 Label and NCT '117 suggest that the Lonsurf dose might not change in SRI patients**

225.    The 2015 Lonsurf Label discloses that Lonsurf was not indicated for the treatment of SRI patients, because the effects of renal impairment on the pharmacokinetics of Lonsurf had not been studied.  NCT '117 discloses that a dedicated renal impairment study was to be performed to determine the pharmacokinetics of Lonsurf in SRI patients and thereby determine the appropriate dose of Lonsurf in SRI patients.  DEFS-TT-001144 at 48 (NCT '117).  A POSA would have understood that a dedicated renal impairment study needed to be performed, because if an SRI patient who is already fragile from prior chemotherapy treatments were incorrectly dosed with Lonsurf, that patient could experience serious adverse events, including toxicity, ESRD, or death.

226.    Moreover, a POSA would not have dosed an SRI patient at 20 mg/m$^2$ twice daily to prevent adverse events based on the 2015 Lonsurf Label's disclosure that patients with moderate renal impairment experienced more serious adverse events.  The 2015 Lonsurf Label specifically discloses that despite experiencing more serious adverse events, no dose adjustment is recommended in patients with mild or moderate renal impairment.  DEFS-TT-005252 at 59 (Lonsurf Label).  The fact that the dose of Lonsurf was not changed in patients with moderate renal impairment despite the adverse events suggests to a POSA that the Lonsurf dose might also not change in SRI patients.  And for the reasons discussed above, a POSA would not have used adverse events as a substitute for renal sufficiency.  The 2015 Lonsurf Label thus provides no motivation to modify the dosage of Lonsurf for non-SRI patients for patients with SRI.

227.    Neither NCT '117 and FDA Guidance provide a motivation to modify the dose of Lonsurf for non-SRI patients for patients with SRI either.  As discussed above, NCT '117 teaches that while "the dose level of [the] severe cohort will be determined based on the Interim Assessment of mild and moderate cohorts," the investigators anticipated administering 35

85

mg/m$^2$/dose twice a day of Lonsurf to SRI patients.  DEFS-TT-001144 at 48 (NCT '117).  This is the same dose that was to be administered to patients with mild and moderate renal impairment.  NCT '117 also shows that the dedicated renal impairment study was ongoing, suggesting to a POSA to wait for the results of the study's Interim Assessment before administering Lonsurf to an SRI patient.  *Id.*  And for the reasons discussed above with respect to FDA Guidance, while it suggests that studies should be conducted in patients with impaired renal function to determine if the dosage should be different, a study was already being performed as shown in NCT '117 (and the Lonsurf FDA Approval Package).  FDA Guidance does not disclose or teach anything identifying what dose of Lonsurf should be administered to an SRI patient.

228.    Finally, as discussed above, a number of treatment options were available for non-SRI patients at the time of the claimed invention.  Nothing in the 2015 Lonsurf Label, NCT '117, or FDA Guidance would have motivated a POSA to choose amongst those options for treating an SRI patient.

### 3. There was no reasonable expectation of successfully treating an SRI patient with Lonsurf

229.    For the reasons discussed above, there would have been no reasonable expectation of successfully treating an SRI patient with Lonsurf.  The 2015 Lonsurf Label (i) repeatedly states that no dedicated renal impairment study had been performed to assess the effect of renal impairment on the pharmacokinetics of Lonsurf and (ii) warned healthcare providers that there were no data in SRI patients.  A POSA would not have treated SRI patients with Lonsurf because the risk of an SRI patient experiencing toxicity, ESRD, or death was too great.

**4. There was no motivation to combine the 2015 Lonsurf Label with NCT '117 and FDA Guidance**

230.    A POSA would not have been motivated to combine the 2015 Lonsurf Label with NCT '117 simply because they both concern Lonsurf.  Alleging that two references relate to the same technology is not an adequate reason to combine the references.

231.    Moreover, a POSA would not have been motivated to combine FDA Guidance with the 2015 Lonsurf Label and NCT '117.  While FDA Guidance discloses that renal impairment studies should be performed, NCT '117 already disclosed that a dedicated renal impairment study was underway.  A POSA thus would not have sought guidance as to whether to conduct an SRI study from FDA Guidance, when an SRI study was already being performed as disclosed in NCT '117.

**F. The Asserted Claims of the '004 and '399 Patents are not Invalid as Obvious Over the Lonsurf Report or the 2015 Lonsurf Label in View of FDA Guidance, and the General Knowledge and Experience of a Person of Ordinary Skill in the Art, Optionally in Further View of NCT '117**

232.    The Lonsurf Report or 2015 Lonsurf Label in view of FDA Guidance and the general knowledge and experience of a POSA and/or in further view of NCT '117 would not have rendered the Asserted Claims obvious.  Each of the references is missing critical elements of the Asserted Claims, and none of the references discloses or teaches administering the claimed dose and dosing regimen to SRI patients.

233.    Additionally, not only are the arguments and prior art that are being advanced similar or the same as those disclosed during prosecution of the Asserted Patents (and that Taiho successfully overcame), but there was no motivation to combine the prior art references with a reasonable expectation of success.  Indeed, the Lonsurf Report, 2015 Lonsurf Label, and NCT '117 suggest that the Lonsurf dose might not change in SRI patients, while FDA Guidance taught away from the claimed invention.

87

1.    **Dose reductions were not undertaken in SRI patients and were for adverse events, not renal insufficiency**

234.    The Lonsurf Report does not disclose administering a dose of 40 mg/m$^2$/day divided into two portions to an SRI patient.  While the Lonsurf Report discloses administering 15 to 25 mg/m$^2$/dose (or 30-60 mg/m$^2$/day) in Study Tas102-J0001, a dose-finding study in patients having normal renal function, the Lonsurf Report expressly states that (i) Lonsurf had not been administered to SRI patients and (ii) no clinical studies had been performed to assess the effects of renal impairment on the pharmacokinetics of Lonsurf.  DEFS-TT-000069 at 114-115, 117 (Lonsurf Report).

235.    And for the reasons discussed above, the 2015 Lonsurf Label, NCT '117, and FDA Guidance do not disclose administering a reduced dose of Lonsurf to SRI patients.

2.    **There was no motivation to modify the treatment existing at the time of the claimed invention for SRI patients and the Lonsurf Report, 2015 Lonsurf Label, and NCT '117 suggested that the Lonsurf dose might not change in SRI patients**

236.    A POSA would not have reduced the dose of Lonsurf in patients with SRI to 20 mg/m$^2$ twice daily based on the Lonsurf Report.  While the Lonsurf Report shows that the incidence of adverse events increased in patients with mild and moderate renal impairment as compared to patients with normal renal function, the incidence of adverse events decreased in patients with moderate renal impairment as compared to patients with mild renal impairment. DEFS-TT-000069 at 118 (Lonsurf Report).  The Lonsurf Report fails to provide any explanation for why this was the case.  As such, a POSA would not have expected based on the Lonsurf Report that the incidence of adverse events would be greater in SRI patients than that in patients with mild or moderate renal impairment.  A POSA thus would not have been motivated to decrease the dose of Lonsurf in SRI patients.  For these same reasons, and those discussed above, the Lonsurf Report suggested that the Lonsurf dose might not change in SRI patients.

88

237. And for the reasons discussed above, there was no motivation to modify the treatment existing at the time of the claimed invention for SRI patients. Indeed, as discussed above, the 2015 Lonsurf Label and NCT '117 suggested that the Lonsurf dose might not change in SRI patients, and FDA Guidance does not disclose or teach anything identifying what dose of Lonsurf should be administered to an SRI patient.

**3. There was no reasonable expectation of successfully treating SRI patients with Lonsurf**

238. For the reasons discussed above, a POSA would not have had a reasonable expectation of success in treating SRI patients with Lonsurf.

**4. There was no motivation to combine the Lonsurf Report, 2015 Lonsurf Label, NCT '117 and FDA Guidance**

239. A POSA would not have been motivated to combine the Lonsurf Report or the 2015 Lonsurf Label with NCT '117 simply because they all concern Lonsurf. That references relate to the same technology is not a sufficient reason to combine those references for obviousness.

240. For the same reasons discussed above, a POSA would not have been motivated to combine FDA Guidance with the Lonsurf Report or 2015 Lonsurf Label and NCT '117.

**G. The Asserted Claims of the '004 and '399 Patents are not Invalid as Obvious Over the Lonsurf Report or the 2015 Lonsurf Label in View of the Cleary Poster, and the General Knowledge and Experience of a POSA, Optionally Further in View of NCT '117**

241. The Lonsurf Report or 2015 Lonsurf Label in view of the Cleary Poster and the general knowledge and experience of a POSA and/or in further view of NCT '117 would not have rendered the Asserted Claims obvious. Each of the references is missing critical elements of the Asserted Claims, and none of the references disclose or teach administering the claimed dose and dosing regimen to SRI patients.

242.    Moreover, not only are the arguments and prior art that are being advanced similar or the same as those disclosed during prosecution of the Asserted Patents (and that Taiho successfully overcame), but there was no motivation to combine the prior art references with a reasonable expectation of success.  Indeed, the Lonsurf Report, 2015 Lonsurf Label, Cleary Poster, and NCT '117 suggest that the Lonsurf dose might not change in SRI patients.

### 1.    Dose reductions were not undertaken in SRI patients and were for adverse events, not renal insufficiency

243.    The Cleary Poster does not disclose administering a reduced dose of Lonsurf to SRI patients.  While the Cleary Poster (like Lonsurf) discloses that Lonsurf was administered in a study at a dose of 30-70 mg/m$^2$/day in two divided doses, that dose-finding study did not include SRI patients.  In fact, the Cleary Poster shows that the mean CrCl for patients in that study was normal (92 mL/min).  TAI-LONS-02556823 (Cleary Poster).

244.    For the reasons discussed above, the Lonsurf Report, the 2015 Lonsurf, and NCT '117 do not disclose administering a reduced dose of Lonsurf to SRI patients.

### 2.  The clearance equations disclosed in the Cleary Poster were not reliable for extrapolating to SRI patients

245.    First, like the clearance equations disclosed in the Lonsurf FDA Approval Package, a POSA would not have considered the clearance equations disclosed in the Cleary Poster—CL/F (L/h) = $2.93 \times (CrCL/103)_{0.507} \times (ALB/3.90)_{-0.633}$—to be reliable to use to determine what Lonsurf dose should be administered to an SRI patient.  This is because the clearance equations in the Clearly Poster, like those in the Lonsurf FDA Approval Package, were derived from studies that did not have balanced cohorts of patients.  For example, none of the studies included SRI patients and the average creatinine clearance in each study was 102, 108, 109, and 92 mL/min with an average CrCL across all studies of 103 mL/min, meaning that the average patient in each study had normal kidney function.  TAI-LONS-02556823 (Cleary Poster).  As a second example, the

cohorts in the RECOURSE study were not balanced with respect to body weight (as shown in the Lonsurf FDA Approval Package, which would have been available to a POSA at the time of the claimed invention). Relatedly, the population pharmacokinetic model disclosed in Cleary was heavily weighted toward the sparsely sampled RECOURSE study, because more than half of the patients whose data was used to the build the population pharmacokinetic model were enrolled in RECOURSE. Since the underlying studies were not balanced, a POSA would not have viewed the clearance equation in Cleary as a way to determine a dose of Lonsurf that could be used to treat SRI patients.

246.    Finally, the Cleary Poster discloses a clearance equation to estimate the exposure of TPI in SRI patients, but does not actually provide the results in performing the calculation—i.e., the exposure of TPI in SRI patients. *Id.* Nonetheless, for the reasons discussed above, a POSA would not have known how to use the two clearance equations disclosed in the Cleary Poster to determine what dose of Lonsurf to administer to SRI patients, let alone understand how to account for TPI exposure in SRI patients. It is thus not surprising that nowhere in the Cleary Poster are the clearance equations disclosed to estimate any dose of Lonsurf to administer to an SRI patient. In fact, the Cleary Poster expressly states that a clinical trial—i.e., the dedicated renal impairment study—is ongoing to establish the safety of Lonsurf in patients with impaired renal function. This provides further evidence that a POSA would not have relied on the clearance equations to determine an appropriate dose for Lonsurf in SRI patients. Rather, the POSA would have waited for the pharmacokinetic phase of the dedicated renal impairment study to be complete and its data analyzed, to determine whether it would be appropriate to administer Lonsurf to an SRI patient.

91

**3. There was no motivation to modify the treatment existing at the time of the claimed invention for SRI patients and the Lonsurf Report, 2015 Lonsurf Label, Cleary Poster, and NCT '117 suggest that the Lonsurf dose might not change in SRI patients**

247. The Cleary Poster would have provided no motivation to decrease dose of Lonsurf in SRI patients. A POSA would not have been motivated to use the FTD clearance equation in the Cleary Poster to determine the dose for SRI patients due to the increased adverse events in patients with worsening renal function as disclosed in the 2015 Lonsurf Label and the Lonsurf Report. As discussed above, the 2015 Lonsurf Label and Lonsurf Report suggest that the Lonsurf dose might not change in SRI patients. Likewise, Cleary taught that dosing of Lonsurf by body surface area was adequate to reduce the variability of exposure to FTD and TPI in Lonsurf. This disclosure would have taught a POSA that no dosing modification would have been required in SRI patients. Moreover, the Cleary Poster expressly stated that a clinical study was ongoing to evaluate treatment of SRI patients with Lonsurf. This disclosure would have taught a POSA to not administer Lonsurf to an SRI patient.

248. And for the reasons discussed above, there would have been no motivation to modify treatment for non-SRI patients for treatment of SRI patients as disclosed in the Lonsurf Report, 2015 Lonsurf Label and NCT '117. In fact, all of these references suggest that the Lonsurf dose might not change in SRI patients.

**4. There was no reasonable expectation of successfully treating SRI patients with Lonsurf**

249. For the reasons discussed above, a POSA would not have had a reasonable expectation of success in treating SRI patients with Lonsurf. Moreover, a POSA would not have had a reasonable expectation of using the clearance equations disclosed in the Cleary Poster to successfully treat SRI patients with Lonsurf.

92

250.    First, the population pharmacokinetic models were not disclosed in the Cleary Poster in the context of dosing but were developed to identify factors that influence drug exposure in the analyzed population and other similarly situated patients.  Additionally, as discussed above, the pharmacokinetic models were not reliable because they (i) heavily weighted towards the sparse sampling data from the RECOURSE study and (ii) did not include any SRI patients, or balanced cohorts of patients with decreasing renal function, or with balanced intrinsic characteristics (e.g., weight).  For the reasons discussed above, this is why the inventor ran a balanced, densely sampled, and careful study to determine the dose of Lonsurf in SRI patients.

**5.  There was no motivation to combine the Lonsurf Report, 2015 Lonsurf Label, Cleary Poster, and NCT '117**

251.    As discussed above, a POSA would not have been motivated to combine the prior art references simply because they all concern Lonsurf.  That these references relate to the same technology is not a sufficient reason to combine the references.

**H.  Objective Evidence of Non-Obviousness**

252.    Long felt but unmet need, unexpected results, and copying further show that the Asserted Claims would not have been obvious.

253.    **Long Felt but Unmet Need:**  Numerous documents produced in this case show that gastrointestinal cancers, including colorectal cancer, are among the most frequently diagnosed cancers in the world.  Medical doctors and researchers in the field recognized that there was a lack of treatment options for these patients, especially in patients who had previously failed other chemotherapy regiments, and that there was an unmet need for new treatments.  As a result, Lonsurf was developed.  Medical doctors and researchers recognized that Lonsurf provided a viable new option to cancer patients who required further treatment (e.g., third line treatments) after failure of previous chemotherapy regimens.  This need especially existed for SRI patients,

93

because prior to the claimed invention in the Asserted Patents, there was no third line treatment available for SRI patients. That there was a need for anti-cancer treatment in SRI patients who required further treatment is objective evidence of long felt but unmet need.

254. **Unexpected Results:** Based on Teysuno—an anti-cancer drug that functions similarly to Lonsurf—a POSA would have expected that Lonsurf should not be administered to SRI patients, because Teysuno was not recommended for administration to SRI patients. That the dedicated renal impairment study ultimately showed that Lonsurf could be administered at a dose of 30 to 40 mg/m$^2$/day to SRI patients is objective evidence of unexpected results.

255. **Copying:** Instead of developing its own drug to treat metastatic colon or rectal cancer in SRI patients who have previously been treated with or cannot received certain chemotherapy drugs, MSN copied Lonsurf's SRI dose and dosing regimen. The fact that MSN decided to copy Lonsurf's SRI dose and dosing regimen instead of developing its own drug and dosing regimen is objective evidence of copying.

## I. The Asserted Claims of the '004 and '399 Patents are not Invalid for Lack of Written Description Under 35 U.S.C. § 112(a)

256. Asserted Claim 1 of the '004 Patent covers a method for treating gastrointestinal cancer, large bowel cancer in an SRI patient (creatinine clearance of 15 mL/min-29 mL/min) by orally administering Lonsurf at a daily dose of 30-40 mg/m$^2$/day in two to four doses a day to an SRI patient. The Asserted Claims of the '004 Patent also include administering Lonsurf to an SRI patient in a dose of 40 mg/m$^2$/day in two doses a day (claim 2), in a dosing schedule of 5-day consecutive oral administrations and 2-day rest, per week (claims 3 and 17) and 5-day consecutive oral administrations and 2-day rest is repeated twice, followed by rest for 14 days (claims 4 and 18). The Asserted Claims of the '004 Patent also cover a method, wherein colorectal cancer is treated (claims 7, 20, 24, and 28). Similarly, Asserted Claim 10 of the '399 Patent covers treating

94

gastrointestinal cancer, large bowel cancer, and breast cancer by detecting a creatinine clearance of a patient and orally administering to the patient with SRI (creatinine clearance of 15 mL/min or more and 29 mL/min or less) Lonsurf in a molar ratio of 1:0.5 at a daily dose of 40 mg/m$^2$/day divided into two portions for administration. The specifications of the Asserted Patents not only provide support for each claim limitation, but also disclose how the inventor arrived at the claimed invention, including that the claimed method for treating realizes "a remarkable anticancer effect . . . while avoiding severe side effects." TAI-LONS-03298917 at 20 ('004 Patent at 2:37-43); TAI-LONS-00000014 at 16 ('399 Patent at 2:33-39). Thus, a POSA reading the specifications of the Asserted Patents along with the figure and examples would understand that the inventor possessed the subject matter of the Asserted Claims.

257. The specifications of the Asserted Patents disclose that the FTD/TPI combination of Lonsurf is typically administered to adults twice daily at a total dose of 70 mg/m$^2$/day for 5 consecutive days, followed by 2 days of rest. TAI-LONS-03298917 at 20 ('004 Patent at 1:44-50); TAI-LONS-00000014 at 16 ('399 Patent at 1:41–46). The specifications disclose that this regimen is repeated twice, followed by 14 days of rest. *Id.* The specifications further explain that TPI is excreted renally, so when Lonsurf is administered to patients with renal impairment, the renal clearance of TPI is reduced as compared to patients with normal kidney function. TAI-LONS-03298917 at 20 ('004 Patent at 1:52); TAI-LONS-00000014 at 16 ('399 Patent at 1:49). The presence of TPI increases exposure of FTD in the body by inhibiting the metabolism of FTD. As such, another consequence of administering Lonsurf to patients with renal impairment if that their exposure to FTD—the anticancer component in Lonsurf—could increase. TAI-LONS-03298917 at 20 ('004 Patent at 1:52-55); TAI-LONS-00000014 at 16 ('399 Patent at 1:49–52).

95

258.    The specifications explain that in a prior clinical trial, patients with mild and moderate renal impairment had increased side effects related to myelosuppression as compared to patients with normal renal function. TAI-LONS-03298917 at 20 ('004 Patent at 1:55-66); TAI-LONS-00000014 at 16 ('399 Patent at 1:52–63). The specifications classify renal impairment using a patient's creatinine clearance, which the specifications disclose is calculated using the Cockroft-Gault equation. TAI-LONS-03298917 at 20 ('004 Patent at 1:66-2:1); TAI-LONS-00000014 at 16 ('399 Patent at 1:63–65). The specifications additionally explain that there was no prior art information about the safety and efficacy of administering Lonsurf to SRI patients, because the prior clinical trial did not involve SRI patients. TAI-LONS-03298917 at 20 ('004 Patent at 2:5-10); TAI-LONS-00000014 at 16 ('399 Patent at 2:2–6).

259.    The Summary of the Invention in the specifications disclose that the invention identified an appropriate dose of Lonsurf for SRI cancer patients while avoiding severe side effects. TAI-LONS-03298917 at 20 ('004 Patent at 2:37-43); TAI-LONS-00000014 at 16 ('399 Patent at 2:33–39). Example 1 in the specifications disclose the dose to administer to SRI patients and how the inventor arrived at that dose.

260.    Specifically, Example 1 explains that the pharmacokinetics of FTD were studied in three cohorts of patients: Cohort 0, having normal renal function (CLcr $\geq$ 90mL/min); Cohort 1, having mild renal impairment (CLcr: 60 to 89 mL/min); and Cohort 2, having moderate renal impairment (CLcr: 30 to 59 mL/min). TAI-LONS-03298917 at 23 ('004 Patent at 7:66-8:14); TAI-LONS-00000014 at 19 ('399 Patent 7:57–8:3). All of these patients received Lonsurf at a dose of 35 mg/m$^2$ twice daily. *Id.* Densely-sampled pharmacokinetic data were collected. Blood was sampled from each patient on Days 1 and 12 of the dosing cycle. TAI-LONS-03298917 at 23 ('004 Patent at 8:14-20); TAI-LONS-00000014 at 19 ('399 Patent 8:3–9). On Days 1 and 12 of

96

the dosing cycle, blood samples were taken "predose and at 0.5, 1, 2, 4, 6, 8, 10, [and] 12 hours after administration, and FTD and TPI concentrations" in those samples were measured. TAI-LONS-03298917 at 23 ('004 Patent at 8:14-19); TAI-LONS-00000014 at 19 ('399 Patent 8:3–9). Certain pharmacokinetic parameters calculated from those experimental measurements are shown below in Table 1 from the specifications:

TABLE 1

Pharmacokinetic parameters of FTD and TPI (Cohort 0: normal, Cohort 1: mild renal impairment, Cohort 2: moderate renal impairment)

| Compound | Cohort | Subject | Day 1 | | | | Day 12 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | $C_{max}$ (ng/mL) | $AUC_{0-12}$ (hr * ng/mL) | $t_{1/2}$ (hr) | CL/F (L/hr) | $C_{max}$ (ng/mL) | $AUC_{0-12}$ (hr * ng/mL) | $t_{1/2}$ (hr) | CL/F (L/hr) |
| FTD | 0 | N | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| | | Mean | 2882 | 7873 | 1.26 | 8.72 | 5235 | 20124 | 2.09 | 3.29 |
| | | SD | 1372 | 2819 | 0.38 | 4.20 | 2662 | 7395 | 0.67 | 1.12 |
| | | CV % | 47.6 | 35.8 | 30.1 | 48.1 | 50.9 | 36.7 | 32.0 | 33.9 |
| | 1 | N | 12 | 12 | 12 | 12 | 11 | 11 | 11 | 11 |
| | | Mean | 3161 | 7292 | 1.79 | 10.08 | 4667 | 23383 | 2.40 | 4.1 |
| | | SD | 1363 | 2634 | 0.49 | 5.95 | 2676 | 13634 | 0.75 | 3.71 |
| | | CV % | 43.1 | 36.1 | 27.5 | 59.0 | 57.3 | 58.3 | 31.3 | 90.6 |
| | 2 | N | 11 | 11 | 11 | 11 | 10 | 8 | 8 | 8 |
| | | Mean | 2763 | 8135 | 1.90 | 9.17 | 6014 | 30405 | 3.22 | 2.1 |
| | | SD | 1362 | 3556 | 0.43 | 4.86 | 2273 | 7747 | 1.02 | 0.41 |
| | | CV % | 49.3 | 43.7 | 22.8 | 53.0 | 37.8 | 25.5 | 31.7 | 19.6 |
| TPI | 0 | N | 10 | 9 | 9 | 9 | 10 | 9 | 9 | 9 |
| | | Mean | 46.5 | 234 | 2.04 | 148.5 | 48.8 | 247 | 2.61 | 128.3 |
| | | SD | 18.3 | 121 | 0.37 | 81.8 | 21.9 | 100 | 0.73 | 58.2 |
| | | CV % | 39.4 | 51.8 | 18.2 | 55.1 | 44.9 | 40.3 | 28.1 | 45.3 |
| | 1 | N | 12 | 11 | 11 | 11 | 11 | 9 | 9 | 9 |
| | | Mean | 93.9 | 380 | 2.33 | 105.1 | 67.8 | 383 | 2.54 | 83.1 |
| | | SD | 40.9 | 193 | 0.68 | 86.1 | 27.9 | 105 | 0.73 | 17.5 |
| | | CV % | 43.5 | 50.9 | 29.3 | 81.9 | 41.1 | 27.5 | 28.7 | 21 |
| | 2 | N | 11 | 10 | 10 | 10 | 10 | 8 | 8 | 8 |
| | | Mean | 100.4 | 494 | 2.42 | 64.8 | 111.7 | 602 | 2.63 | 62 |
| | | SD | 40.2 | 181 | 0.40 | 18.6 | 53.5 | 321 | 0.44 | 32.7 |
| | | CV % | 40.0 | 36.7 | 16.4 | 28.7 | 47.9 | 53.4 | 16.7 | 52.8 |

TAI-LONS-03298917 at 23 ('004 Patent at Table 1); TAI-LONS-00000014 at 19 ('399 Patent at Table 1).

261. Example 1 explains that since "FTD is an active component showing anticancer activity," while "TPI is a modulator to increase the concentration of FTD in the plasma . . ., the FTD concentration . . . is most strongly related to the effect and safety of" Lonsurf. TAI-LONS-03298917 at 23 ('004 Patent at 8:54-59); TAI-LONS-00000014 at 19 ('399 Patent at 8:43-48).

97

Example 1 further explains that "[t]he $AUC_{0-12}$ of FTD in patients with mild renal impairment (Cohort 1) and patients with moderate renal impairment (Cohort 2) [were] higher by about 16% and about 51%, respectively, as compared to that in patients with normal renal function [Cohort 0]." TAI-LONS-03298917 at 23 ('004 Patent at 8:59-63); TAI-LONS-00000014 at 19 ('399 Patent 8:48–52).

262.    The inventor's analysis in Example 1 thus shows that "the AUC of FTD increases with the deterioration of renal function," suggesting "the need for reducing the dose of [Lonsurf] . . . for patient[s] with [SRI]." TAI-LONS-03298917 at 23 ('004 Patent at 8:63-66); TAI-LONS-00000014 at 19 ('399 Patent 8:52–55).  The inventor's analysis also shows that "[t]he half-time of FTD is sufficiently short as compared to the administration interval when [administering] twice a day, . . . [and] thus the effect of [Lonsurf] can be maintained by reducing to the appropriate dose without changing the administration interval." TAI-LONS-03298917 at 24 ('004 Patent at 9:4-9:); TAI-LONS-00000014 at 19 ('399 Patent 8:60–65).  The specifications thus disclose that the dosing regimen to be used in SRI patients is the same dosing regimen used in non-SRI patients—twice daily for 5 consecutive days, followed by 2 rest days.  The specification discloses that this procedure is repeated twice, followed by 14 rest days.  TAI-LONS-03298917 at 20 ('004 Patent at 1:45-50); TAI-LONS-00000014 at 16 ('399 Patent 1:41–46).

263.    To determine the appropriate dose of Lonsurf for SRI patients, the specification discloses that the inventor performed "a regression analysis of oral clearance (CL/F) and creatinine clearance (CLcr) of FTD on Day 12 after administration was performed [in Cohorts 0, 1, and 2]." TAI-LONS-03298917 at 24 ('004 Patent at 9:10-14); TAI-LONS-00000014 at 19-20 ('399 Patent 8:67–9:2).  FIG. 1 from the Asserted Patents, shown below, discloses the result of the inventor's power regression analysis.



RELATIONSHIP BETWEEN CREATININE CLEARANCE AND ORAL CLEARANCE OF FTD

264.    From this analysis, the specification explains that the inventor "approximate[d] the relationship of both parameters to the following power function curve[:] FTD CL/F (L/hr)=0.3432×CLcr (mL/min)$_{0.4870}$ [.]" TAI-LONS-03298917 at 24 ('004 Patent at 9:15-19); TAI-LONS-00000014 at 20 ('399 Patent at 9:4–7).  As disclosed in the specifications, this equation was used to calculate the FTD oral clearance ("CL/F") for each category of renal function (normal, mild, moderate, and severe impairment), using the CLcr range for each category, as shown in Table 2 below.  TAI-LONS-03298917 at 24 ('004 Patent at 9:20-24); TAI-LONS-00000014 at 20 ('399 Patent 9:8–12).

## TABLE 2

Range of FTD oral clearance estimated from power regression equation and range of AUC in each dose

| | CLcr (mL/min) | | | FTD CL/F on Day 12 (L/hr) | | | Dose (mg/m$^2$) | AUC ratio to Control | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Min | Mid | Max | Min | Mid | Max | | Min | Mid | Max |
| Normal | 90 | 109 | | 3.07 | 3.37 | | 35 | 1.10 | 1.00 | |
| Mild | 60 | 75 | 89 | 2.52 | 2.81 | 3.05 | 35 | 1.34 | 1.20 | 1.10 |
| Moderate | 30 | 45 | 59 | 1.80 | 2.19 | 2.50 | 35 | 1.87 | 1.54 | 1.35 |
| Severe | 15 | 22.5 | 29 | 1.28 | 1.56 | 1.77 | 15 | 1.13 | 0.92 | 0.82 |
| | | | | | | | 20 | 1.50 | 1.23 | 1.09 |
| | | | | | | | 25 | 1.88 | 1.54 | 1.36 |

265.    In Table 2, the columns under the heading "CLcr (mL/min)" identify the "min, mid, and max" creatinine clearances for patients with normal renal function (CLcr ≥ 90mL/min); mild renal impairment (CLcr: 60 to 89 mL/min); moderate renal impairment (CLcr: 30 to 59 mL/min); and severe renal impairment (CLcr: 15 to 29 mL/min). TAI-LONS-03298917 at 24 ('004 Patent at Table 2); TAI-LONS-00000014 at 20 ('399 Patent at Table 2).  In Table 2, the columns under the heading "FTD CL/F on Day 12 (L/hr)" identify the FTD oral clearance calculated using the equation (FTD CL/F (L/hr)=$0.3432 \times$CLcr (mL/min)$_{0.4870}$) for each creatinine clearance value (e.g., $0.3432 \times 90$ mL/min$_{0.4870}$ = 3.07 L/hr).  TAI-LONS-03298917 at 24 ('004 Patent at 9:19- 24, Table 2); TAI-LONS-00000014 at 20 ('399 Patent at 9:8–12, Table 2).  Then, as disclosed in the specifications, "the ratio was calculated using a median CLcr (109 mL/min) of the patient with normal renal function as a control (1.00)." TAI-LONS-03298917 at 24 ('004 Patent at 9:23-25); TAI-LONS-00000014 at 20 ('399 Patent at 9:13–15).  That is, each Lonsurf dose was divided by its respective calculated FTD oral clearance value, then normalized to that of a patient having a CLcr of 109 mL/min (e.g., (($35$ mg/m$^2$ ÷ 3.07 L/hr) ÷ ($35$ mg/m$_2$ ÷ 3.37 L/hr)) = 1.10).  TAI-

100

LONS-03298917 at 24 ('004 Patent at 9:23-25, Table 2); TAI-LONS-00000014 at 20 ('399 Patent at 9:13–15, Table 2).

266. As disclosed in the specifications, the resulting "AUC ratio to Control" values, highlighted in yellow in Table 2 above, "suggested that the AUC of FTD when administering [Lonsurf] to the patient with [SRI] in 15 $mg/m^2$, 20 $mg/m^2$, and 25 $mg/m^2$ [doses] is similar to the AUC when administering 35 $mg/m^2$ to the patients with normal renal function, . . ., mild renal impairment, and . . . moderate renal impairment." TAI-LONS-03298917 at 24 ('004 Patent at 9:25-32); TAI-LONS-00000014 at 20 ('399 Patent at 9:15–21).

267. The specifications recognize the "possibility that the AUC of FTD when administered [to SRI patients] in 15 $mg/m^2$ [could be] lower than the AUC of the patient with normal renal function, and [thus] the effect [of the drug could be] attenuated." TAI-LONS-03298917 at 24 ('004 Patent at 9:60-63); TAI-LONS-00000014 at 20 ('399 Patent at 9:49–52). The specification also recognized that "since renal function of the patient with [SRI] is unstable, there [was] a possibility that the AUC of FTD exceeds the prediction when administering in 25 $mg/m_2$." TAI-LONS-03298917 at 24 ('004 Patent at 9:63-66); TAI-LONS-00000014 at 20 ('399 Patent at 9:52-55).

268. The specification thus concludes that the "most preferred" starting dose of Lonsurf in SRI patients "is administered in 20 $mg/m^2$." TAI-LONS-03298917 at 24 ('004 Patent at 9:66-10:2); TAI-LONS-00000014 at 20 ('399 Patent at 9:55–58). As disclosed in the specifications, at this starting dose—40 $mg/m^2/day$ as FTD-equivalent)—"efficacy can be expected while maintaining safety." TAI-LONS-03298917 at 24 ('004 Patent at 10:3-7); TAI-LONS-00000014 at 20 ('399 Patent at 9:61–63). The specifications also explain that the dose is divided into twice a day—20 $mg/m^2$ per dose—and administered orally to "a cancer patient with [a] CLcr of less than

101

30 mL/min, . . . and particularly preferably, a cancer patient with [a] CLcr of 15 mL/min or more and 29 mL/min or less." TAI-LONS-03298917 at 22 ('004 Patent at 5:48-50, 6:37-42); TAI-LONS-00000014 at 18 ('399 Patent at 5:39–48; 6:28–33).

269.    The specifications further explain that several types of cancer can be targeted with the claimed treatment regimen, including "gastrointestinal cancer (*e.g.*, esophageal cancer, gastric cancer, duodenal cancer, liver cancer, biliary tract cancer (gallbladder/bile duct cancer), pancreatic cancer, small intestinal cancer, large bowel cancer (colorectal cancer, colon cancer, rectal cancer))," and "breast cancer." TAI-LONS-03298917 at 222-23 ('004 Patent at 6:64-7:5); TAI-LONS-00000014 at 18 ('399 Patent 6:56–7:8).

270.    The specification need not disclose data showing that Lonsurf had actually been administered to or worked in an SRI patient, let alone one with breast cancer. The specification need only describe what is claimed. As discussed above, the specification provides ample support for the claimed inventions.

271.    With respect to the $R^2$ value (0.1436) for the regressions analysis shown in Figure 1 of the specifications, the regression analysis is predictive of the dose to be given to an SRI patient, because the data are adequately, evenly, and randomly distributed to either side of the line that models the distributed data. Viewing the $R^2$ value in isolation can be misleading.

272.    For example, Anscombe's quartet includes four different datasets described using the same linear equation and that have almost identical $R^2$ values. Only one of the predicted linear equations (Figure 1 below) is appropriate as a model for the data depicted, because it shows a linear relationship with random scattering of the data, even though the $R^2$ is ~ 0.67, which is far below a perfect fit (i.e., where $R^2 = 1$):



273.    A POSA would also understand that while the $R^2$ in Figures 2, 3, and 4 are also ~

0.67, the $R^2$ is misleading in Figures 2, 3, and 4 because there is not a linear relationship between

the data (Figure 2), the outlier's impact on the linear relationship in the data is not reflected in the

graph (Figure 3), and there is no linear trend in the data (Figure 4).  Anscombe's quarter thus shows

that while $R^2$ is one statistic that can be used to evaluate data, it can be misleading.  As such, a

POSA would perform a visual inspection of the data to ensure that the model captures the observed

data accurately and not just rely on the $R^2$ value.

274.    The regression analysis disclosed in the specifications is a reliable way to estimate

the dose of Lonsurf in SRI patients.  Not only is the regression analysis based on data measured

103

directly in each subject, but the FDA allowed Taiho to use the regression analysis disclosed in the Asserted Patents to determine the appropriate dose of Lonsurf to administer to an SRI patient in the dedicated renal impairment study. The results of the dedicated renal impairment study allowed Taiho to seek approval to amend its Lonsurf label to add a dosage indication for SRI patients. If the FDA thought that Taiho's methodology were unreliable, they would have required Taiho to use a different method to determine the appropriate dose, if any, of Lonsurf in SRI patients.

275. For the reasons discussed above, there is more than sufficient written description support for the Asserted Claims.