# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| TAIHO PHARMACEUTICAL CO., LTD. and TAIHO ONCOLOGY, INC., | ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 21-838-JLH |
| v. | ) ) | |
| MSN LABORATORIES PRIVATE LTD. and MSN PHARMACEUTICALS INC., | ) ) ) | |
| Defendants. | ) ) | |

**EXHIBIT 3**

**<u>DEFENDANTS' STATEMENT OF ISSUES OF FACT</u>**

## TABLE OF CONTENTS

Page

I.    THE PATENTS-IN-SUIT ...................................................................................... 2

    A.    The '399 Patent ...................................................................................... 2

        1.    The priority date of the '399 patent ............................................. 2

        2.    The Asserted Claims of the '399 patent ....................................... 2

        3.    The specification of the '399 patent ............................................. 3

        4.    The prosecution history of the '399 patent ................................... 7

    B.    The '004 Patent .................................................................................... 11

        1.    The priority date of the '004 patent ........................................... 11

        2.    The Asserted Claims of the '004 patent ..................................... 12

        3.    The specification of the '004 patent ........................................... 13

        4.    The prosecution history of the '004 patent ................................. 13

II.   A PERSON OF ORDINARY SKILL IN THE ART ("POSA") ...................................... 14

III.  THE SCOPE AND CONTENT OF THE ASSERTED PRIOR ART TO THE PATENTS-IN-SUIT ................................................................................................ 15

    A.    Asserted Prior Art to the Patents-in-Suit .............................................. 16

        1.    Lonsurf Report ........................................................................... 16

        2.    2015 Lonsurf Label .................................................................... 19

        3.    LONSURF FDA Approval Package ............................................ 20

        4.    FDA Guidance ............................................................................ 28

        5.    NCT '117 ................................................................................... 30

        6.    Cleary Poster ............................................................................. 31

    B.    Background Knowledge of a POSA ...................................................... 34

        1.    Doogue ....................................................................................... 34

        2.    Hurria ......................................................................................... 36

i

|   |   |   |   |
|---|---|---|---|
| | 3. | Doi | 36 |
| | 4. | Sakamoto | 37 |
| | 5. | Hong | 38 |
| | 6. | Janus | 39 |
| | 7. | Cleary | 39 |
| | 8. | Mehvar | 40 |
| | 9. | Munar | 41 |
| | 10. | Booka | 42 |
| | 11. | Lichtman | 43 |
| | 12. | Huang | 44 |
| | 13. | Emura | 45 |
| | 14. | Trifluridine Monograph | 47 |

IV.   THE ASSERTED CLAIMS OF THE PATENTS-IN-SUIT ARE INVALID UNDER 35 U.S.C. § 112 FOR LACK OF WRITTEN DESCRIPTION ......................... 47

A.   Plaintiffs' Experts Offer Written Description Arguments That Are Directly Contradicted By Their Arguments Concerning Anticipation/Obviousness ......... 53

1.   Dr. Abrams's contradictory written description arguments ..................... 53

1.   Dr. Taft's  contradictory written description arguments .......................... 57

V.   THE ASSERTED CLAIMS OF THE PATENTS-IN-SUIT ARE INVALID AS ANTICAPTED AND/OR OBVIOUS UNDER 35 U.S.C. §§ 102 and 103 ..................... 63

A.   The Asserted Claims of the Patents-In-Suit are Invalid as Anticipated by the LONSURF FDA Approval Package and/or Obvious Over the LONSURF FDA Approval Package in View of the General Knowledge and Experience of a POSA, Optionally in Further View of FDA Guidance ................................ 63

1.   Claim 10 of the '399 patent ........................................................ 63

2.   Claim 1 of the '004 patent ........................................................ 75

3.   Plaintiffs' experts will not be able to rebut the strong case of anticipation and/or obviousness of claim 10 of the '399 patent and claim 1 of the '004 patent ........................................................ 76

4.    The dependent claims of the '004 patent ................................................. 85

B.    The Asserted Claims of the Patents-In-Suit are Invalid as Obvious Over the 2015 Lonsurf Label in View of NCT '117, FDA Guidance, and the General Knowledge and Experience of a POSA ................................................. 88

1.    Claim 10 of the '399 patent ..................................................................... 89

2.    Claim 1 of the '004 patent ....................................................................... 96

3.    Plaintiffs' experts will not be able to rebut the strong case of obviousness of claim 10 of the '399 patent and claim 1 of the '004 patent .................. 96

4.    The dependent claims of the '004 patent ................................................ 106

C.    The Asserted Claims of the Patents-In-Suit are Invalid as Obvious Over the Lonsurf Report and/or the 2015 Lonsurf Label in View of FDA Guidance, and the General Knowledge and Experience of a POSA, optionally in further view of NCT '117 ...................................................................................... 109

1.    Claim 10 of the '399 patent ..................................................................... 109

2.    Claim 1 of the '004 patent ....................................................................... 117

3.    Plaintiffs' experts will not be able to rebut the strong case of obviousness of claim 10 of the '399 patent and claim 1 of the '004 patent ...................................................................................... 118

4.    The dependent claims of the '004 patent ................................................ 127

D.    The Asserted Claims of the Patents-In-Suit are Invalid as Obvious Over the Lonsurf Report and/or the 2015 Lonsurf Label in View of the Cleary Poster, and the General Knowledge and Experience of a POSA, optionally in further view of NCT '117 ...................................................................................... 130

1.    Claim 10 of the '399 patent ..................................................................... 131

2.    Claim 1 of the '004 patent ....................................................................... 141

3.    Plaintiffs' experts will not be able to rebut the strong case of obviousness of claim 10 of the '399 patent and claim 1 of the '004 patent ...................................................................................... 141

4.    The independent claims of the '004 patent ............................................. 153

E.    Secondary Considerations ................................................................................. 157

1.    Long-felt but unmet need ......................................................................... 158

2.      Alleged evidence of copying carries little weight here and does not overcome a finding of obviousness ........................................................... 160

3.      Comparison to Teysuno does not provide evidence of unexpected results ............................................................................................................... 161

Defendants MSN Laboratories Private Ltd. and MSN Pharmaceuticals Inc. (collectively, "MSN" or "Defendants") identify the following issues of fact that remain to be litigated, which is based on Defendants' claims and Defendants' current understanding of Plaintiffs Taiho Pharmaceutical Co., Ltd. and Taiho Oncology, Inc.'s (collectively, "Taiho" or "Plaintiffs") claims and the proceedings in this action to date. If Plaintiffs seek to introduce different arguments, Defendants reserve the right to supplement this statement. To the extent Defendants' Statement of Issues of Law contains issues of fact, those issues are incorporated herein by reference. Likewise, should the Court determine that any issue identified below is more appropriately considered an issue of law, Defendants incorporate such issues by reference into their Statement of Issues of Law.

By including a fact herein, Defendants do not assume the burden of proof or production with regard to that fact. Nor do Defendants concede that any genuine factual dispute exists as to any of the issues listed below. Defendants reserve the right to revise this statement in light of the Court's rulings, in response to Plaintiffs' positions, or as otherwise may be appropriate. The following statements are not exhaustive, and Defendants reserve the right to prove any matters identified in their pleadings, contentions, interrogatory responses, and/or expert reports. Defendants also intend to offer evidence as to the issues of fact and issues of law identified in this pretrial order. Defendants further intend to offer evidence to rebut evidence offered by Plaintiffs and to argue that Plaintiffs are precluded from offering evidence in support of theories and claims not adequately disclosed in accordance with the scheduling order. Defendants incorporate by reference their expert reports in support of any proof to be presented by expert testimony.

## I.    THE PATENTS-IN-SUIT

### A.    The '399 Patent

1.    The '399 patent is entitled "Method For Treating Cancer Patients With Severe Renal Impairment," and issued on October 29, 2019. The face of the '399 patent names Kenichiro Yoshida as the inventor of the '399 patent and names Taiho Pharmaceutical Co., Ltd. as the assignee of the '399 patent.

#### 1.    The priority date of the '399 patent

2.    The '399 patent was filed as U.S Patent Application No. 16/054,073 ("the '073 Application") on August 3, 2018, and is a continuation of Application No. PCT/JP2017/003994 ("PCT '994"), filed on February 3, 2017. The '399 patent claims priority back to U.S. Provisional Application No. 62/291,799 ("the '799 Provisional"), filed on February 5, 2016. If the '399 patent is entitled to the priority date of the '799 Provisional (i.e., Feb. 5, 2016), then all references published before February 5, 2015 are prior art to the '399 patent and all publications not derived from the named inventor's work that published before February 5, 2016, are also prior art to the '399 patent. Defendants do not concede that claim 10 of the '399 patent is entitled to the February 5, 2016 priority date. Therefore, if the '399 patent is not entitled to the priority date of the '799 Provisional (i.e., Feb. 5, 2016), then all references published before February 3, 2016, are prior art to the '399 patent and all references not derived from the named inventor's work that published before February 3, 2017, are also prior art to the '399 patent.

#### 2.    The Asserted Claims of the '399 patent

3.    Plaintiffs assert that Defendants infringe claim 10 of U.S. Patent No. 10,456,399 (the '399 patent"). Claim 10 depends from claims 1 and 2, and incorporates all of its limitations by reference. Asserted claim 10 of the '399 patent, as well as claims 1 and 2 from which claim 10

2

depends, are set forth below.

> 1. A method for treating cancer which is one of gastrointestinal cancer, large bowel cancer, comprising:
>
> detecting a creatinine clearance of a patient; and
>
> orally administering to the patient with a creatinine clearance of less than 30 mL/min a combination drug comprising α,α,α-trifluorothymidine (FTD) and 5- chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5, a daily dose of 30 to 40 mg/m$^2$/day as FTD-equivalent, divided into two to four portions for administration.
>
> 2. The method for treating cancer according to claim 1, wherein the combination drug is administered to the patient with a creatinine clearance of 15 mL/min or more and 29 mL/min or less.
>
> 10. The method for treating cancer according to claim 2, wherein a dose of 40 mg/m$^2$/day as FTD-equivalent is divided in two portions.

### 3.    The specification of the '399 patent

4.    The '399 patent states that it is directed to "to a method for treating cancer patients with severe renal impairment." '399 patent, 1:17-18. In the Background of the Invention section, the '399 patent states that:

> Trifluridine (also known as: α,α,α-trifluorothymidine; hereinafter, also referred to as "FTD") exhibits an antitumor effect by DNA synthesis inhibition by thymidylate production-inhibiting action and DNA function inhibition by incorporation into DNA. Tipiracil hydrochloride (chemical name: 5 -chloro-6-[(2-iminopyrrolidine1-yl)methyl]pyrimidine-2,4(1H, 3H)-dione hydrochloride; hereinafter, also referred to as "TPI") has inhibitory effect against thymidine phosphorylase. It is known that TPI suppresses the decomposition of FTD by thymidine phosphorylase in the living body, thereby potentiating the antitumor effect of FTD.

*Id*. at 1:22-32.

5.    The '399 patent also discloses: "[c]urrently, a combination drug containing FTD and TPI in a molar ratio of 1:0.5 (hereinafter also referred to as 'FTD/TPI combination drug') . . . was approved as a therapeutic agent for advanced and recurrent colorectal cancer in the U.S." *Id.* at 1:34-39. The FTD/TPI combination drug is "orally administered twice a day for 5 consecutive

3

days, followed by rest for 2 days. This procedure is repeated twice, and followed by rest for 14 days." *Id*. at 1:44-46.

6.      The '399 patent discloses that "TPI is a renal excretory drug, thus it is theoretically considered that, when the FTD/TPI combination drug is administered to the patients with impaired renal function, exposure to FTD can be increased." *Id*. at 1:49-52. The '399 patent further discloses that in a clinical trial, patients with renal impairment, based on creatinine clearance ("CLcr"), experienced a higher incidence of side effects compared to patients with normal renal function:

> [T]he incidence of side effects related to myelosuppression (decrease in platelet count, decrease in erythrocyte count, decrease in hemoglobin, decrease in neutrophil count) tends to be higher in mild renal impairment (CLcr: 60 to 89 mL/min) and moderate renal impairment (CLcr: 30 to 59 mL/min), as compared to normal renal function (CLcr:90 mL/min). The creatinine clearance (CLcr) value of the patient is calculated using Cockcroft-Gault equation, and classified based on the classification criteria of renal function in the Food and Drug Administration (FDA), Guidance for Industry, Pharmacokinetics in Patients with Impaired Renal Function-Study Design, Data Analysis, and Impact on Dosing and Labeling.

*Id.* at 1:57-2:2. Accordingly, the '399 patent explains: "it is necessary to adjust the dose or dosing interval depending on the degree of renal function in drug administration to the patients with renal impairment, and it is recommended to select the dose based on pharmacokinetics (PK) according to the FDA guidance." *Id.* at 2:8-12.

7.      Notably, the '399 patent discloses that the FTD/TPI combination drug has not been administered to patients with severe renal impairment:

> Therefore, the patients with severe renal impairment (CLcr: 15 to 29 mL/min) have not been applicable, thus the FTD/TPI combination drug is not administered to the patient either in the clinical trial performed so far, and there is no information of safety and efficacy.

*Id.* at 2:2-7. Further, the '399 patent explains, "it is not easy to perform cancer treatment that is safer and has a high effectiveness on a cancer patient with severe renal impairment." *Id.* at 2:13-15.

8.       In terms of cancers that are the target of the claimed treatment methods, the '399 patent identifies, among others, "gastrointestinal cancer (e.g., . . . large bowel cancer (colorectal cancer, colon cancer, rectal cancer))." *Id.* at 6:58-62.

9.       The '399 patent includes one example, entitled "(Example 1) Dose Estimation in Cancer Patients with Severe Renal Impairment." *See id.* at 7:54-9:63. Example 1 describes a study where the "[p]harmacokinetic of FTD was studied in patients with solid cancer including colorectal cancer." *Id.* at 7:57-58. The patients were divided into cohorts based on renal function, as calculated by the Cockcroft-Gault equation, a standard equation that is used to assess renal function by estimating a patient's glomerular filtration rate. *Id.* at 7:66-8:3. The cohorts included those with normal renal function (CLcr: ≥90 mL/min), mild renal impairment (CLcr: 60-89 mL/min), and moderate renal impairment (CLcr: 30-59 mL/min). *Id.* The pharmacokinetic parameters of FTD and TPI in the different cohorts are reported in Table 1:

TABLE 1

Pharmacokinetic parameters of FTD and TPI
(Cohort 0: normal, Cohort 1: mild renal impairment, Cohort 2: moderate renal impairment)

| | | | Day 1 | | | | Day 12 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Compound | Cohort | Subject | $C_{max}$ (ng/mL) | $AUC_{0-12}$ (hr * ng/mL) | $t_{1/2}$ (hr) | CL/F (L/hr) | $C_{max}$ (ng/mL) | $AUC_{0-12}$ (hr * ng/mL) | $t_{1/2}$ (hr) | CL/F (L/hr) |
| FTD | 0 | N | 10 | 10 | 10 | 10 | 10 | 10 | 10 | 10 |
| | | Mean | 2882 | 7873 | 1.26 | 8.72 | 5235 | 20124 | 2.09 | 3.29 |
| | | SD | 1372 | 2819 | 0.38 | 4.20 | 2662 | 7395 | 0.67 | 1.12 |
| | | CV % | 47.6 | 35.8 | 30.1 | 48.1 | 50.9 | 36.7 | 32.0 | 33.9 |
| | 1 | N | 12 | 12 | 12 | 12 | 11 | 11 | 11 | 11 |
| | | Mean | 3161 | 7292 | 1.79 | 10.08 | 4667 | 23383 | 2.40 | 4.1 |
| | | SD | 1363 | 2634 | 0.49 | 5.95 | 2676 | 13634 | 0.75 | 3.71 |
| | | CV % | 43.1 | 36.1 | 27.5 | 59.0 | 57.3 | 58.3 | 31.3 | 90.6 |
| | 2 | N | 11 | 11 | 11 | 11 | 10 | 8 | 8 | 8 |
| | | Mean | 2763 | 8135 | 1.90 | 9.17 | 6014 | 30405 | 3.22 | 2.1 |
| | | SD | 1362 | 3556 | 0.43 | 4.86 | 2273 | 7747 | 1.02 | 0.41 |
| | | CV % | 49.3 | 43.7 | 22.8 | 53.0 | 37.8 | 25.5 | 31.7 | 19.6 |
| TPI | 0 | N | 10 | 9 | 9 | 9 | 10 | 9 | 9 | 9 |
| | | Mean | 46.5 | 234 | 2.04 | 148.5 | 48.8 | 247 | 2.61 | 128.3 |
| | | SD | 18.3 | 121 | 0.37 | 81.8 | 21.9 | 100 | 0.73 | 58.2 |
| | | CV % | 39.4 | 51.8 | 18.2 | 55.1 | 44.9 | 40.3 | 28.1 | 45.3 |
| | 1 | N | 12 | 11 | 11 | 11 | 11 | 9 | 9 | 9 |
| | | Mean | 93.9 | 380 | 2.33 | 105.1 | 67.8 | 383 | 2.54 | 83.1 |
| | | SD | 40.9 | 193 | 0.68 | 86.1 | 27.9 | 105 | 0.73 | 17.5 |
| | | CV % | 43.5 | 50.9 | 29.3 | 81.9 | 41.1 | 27.5 | 28.7 | 21 |
| | 2 | N | 11 | 10 | 10 | 10 | 10 | 8 | 8 | 8 |
| | | Mean | 100.4 | 494 | 2.42 | 64.8 | 111.7 | 602 | 2.63 | 62 |
| | | SD | 40.2 | 181 | 0.40 | 18.6 | 53.5 | 321 | 0.44 | 32.7 |
| | | CV % | 40.0 | 36.7 | 16.4 | 28.7 | 47.9 | 53.4 | 16.7 | 52.8 |

5

10.    The '399 patent notes that:

FTD is an active component showing anticancer activity in the FTD/TPI combination drug, and TPI is a modulator to increase the concentration of FTD in the plasma. Therefore, the FTD concentration in the plasma after repeated administrations is most strongly related to the effect and safety of the FTD/TPI combination drug. The AUC0-12 of FTD in patients with mild renal impairment (Cohort 1) and patients with moderate renal impairment (Cohort 2) are higher by about 16% and about 51%, respectively, as compared to that in patients with normal renal function. Thus, the AUC of FTD increases with the deterioration of renal function, and the need for reducing the dose of the FTD/TPI combination drug is suggested for patient with severe renal impairment. . . . The half-time of FTD is sufficiently short as compared to the administration interval when administrating twice a day, 12 hours, thus the effect of the FTD/TPI combination drug can be maintained by reducing to the appropriate dose without changing the administration interval.

*Id.* at 8:42-65.

11.    The '399 patent further explains that "[i]n order to determine the appropriate dose for the patients with severe renal impairment, a regression analysis of oral clearance (CL/F) and creatinine clearance (CLcr) of FTD on Day 12 after administration was performed." The results of the regression analysis in Figure 1:

RELATIONSHIP BETWEEN CREATININE CLEARANCE
AND ORAL CLEARANCE OF FTD



6

*Id.* at 8:66-9:3; Fig.1. Notably, the regression analysis shown in Figure 1 above provided an r-squared (r2) value of 0.1436.

12.    The '399 patent then uses a power function curve to estimate the relationship between oral clearance and creatinine clearance and shows the results of that analysis in Table 2:

### TABLE 2

Range of FTD oral clearance estimated from power regression equation and range of AUC in each dose

| | CLcr (mL/min) | | | FTD CL/F on Day 12 (L/hr) | | | Dose (mg/m²) | AUC ratio to Control | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Min | Mid | Max | Min | Mid | Max | | Min | Mid | Max |
| Normal | 90 | 109 | | 3.07 | 3.37 | | 35 | 1.10 | 1.00 | |
| Mild | 60 | 75 | 89 | 2.52 | 2.81 | 3.05 | 35 | 1.34 | 1.20 | 1.10 |
| Moderate | 30 | 45 | 59 | 1.80 | 2.19 | 2.50 | 35 | 1.87 | 1.54 | 1.35 |
| Severe | 15 | 22.5 | 29 | 1.28 | 1.56 | 1.77 | 15 | 1.13 | 0.92 | 0.82 |
| | | | | | | | 20 | 1.50 | 1.23 | 1.09 |
| | | | | | | | 25 | 1.88 | 1.54 | 1.36 |

*Id.* at 9:4-25. The '399 patent explains that "[b]ased on the above, in the patient with severe renal impairment (CLcr: 15 to 29 mL/min), it is most preferred that the FTD/TPI combination drug is administered in 20 mg/m2." *Id.* at 9:55-58.

### 4.    The prosecution history of the '399 patent

13.    The '399 patent issued on October 29, 2019, from the '073 Application, which is a continuation of PCT '994, which claims priority to the '799 Provisional. A brief summary of the prosecution history is provided below.

14.    The '073 application was filed on August 3, 2018, with 28 claims. Independent claim 1 is reproduced below:

> 1. A method for treating cancer in patients with creatinine clearance of less than 30 mL/min, comprising dividing a combination drug containing α, α, αtrifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H, 3H)-dione hydrochloride in a molar ratio of 1:0.5, in a dose of 30 to 50 mg/m²/day as FTD-equivalent, into two to four times a day, and

7

orally administering it to the patient.

15.     On August 24, 2018, a Preliminary Amendment was filed, amending claim 1 as follows:

> 1. (Currently Amended) A method for treating cancer ~~in patients with creatinine clearance of less than 30 mL/min~~, comprising<u>:</u>
> <u>detecting a creatinine clearance of a patient before starting a treatment; and</u> ~~dividing~~ <u>starting the treatment by orally administering to the patient with a creatinine clearance of less than 30 mL/min</u> a combination drug ~~containing~~ <u>comprising</u> α, α, α-trifluorothymidine     (FTD)     and     5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5, [[in]] a dose of 30 to 40 [[50]] mg/m$^2$/day as FTD-equivalent, [[into]] <u>in</u> two to four <u>divided doses</u> ~~times a day, and orally administering it to the patient.~~

16.     In the Remarks/Arguments accompanying the Preliminary Amendment, the Applicant referenced a 2015 NEJM article, which "report[ed] on clinical trials of TAS-102, the combination drug recited in claim 1." Aug. 24, 2018 Preliminary Amendment at 7. According to the Applicant, the article reported that "[t]here were two instances where the initial dose of 70 mg/m$^2$/day was reduced in three 5 mg steps to 40 mg/m$^2$/day because of adverse events." *Id*. However, as the Applicant explained:

> Prior to the present invention there were no reported instances of treating patients with severe renal impairment having a significantly low level (less than 30 mL/min) of creatinine clearance with TAS-102. To determine an effective treatment and an appropriate dose for such patients, Applicant studied the effect of dosing on AUC level. Specifically, Applicant calculated the effect of using a regression analysis as shown in Table 2 in the specification, [0047]. The calculation shows that the AUC of severely impaired renal function patients as a dose of 25 mg/m$^2$ (50 mg/m$^2$/day) results in almost doubling the AUC. This indication that those with low levels of creatinine clearance may have unnecessarily high levels of TAS-102 in the blood instead of being excreted in the urine, which may cause an unacceptable level of adverse even and poor patient compliance. On the other hand, too low an AUC could result in the drug not providing desired ant1-cancer benefit.

> By starting a treatment of the patient with severe renal impairment at a dose of from 30 to 40 mg/m$^2$/day the method of claim 1 can provide successful cancer treatment at a tolerable level of adverse events. Prior to the present invention this had not been considered possible.

8

*Id.* at 7-8.

17.    On October 9, 2018, the USPTO issued an Office Action in which all pending claims (1-7 and 29-51) were rejected under 35 U.S.C. § 112 for lack of enablement and indefiniteness; under 35 U.S.C. § 103 "as being unpatentable over Doi et al., British Journal of Cancer, 2012, 107:429-434; Sakamoto et al. US 2016/0082032; Ito et al. US 2014/0213602; Emura et al. US 7,799,783 and Ito et al. US 9,371,380 in view of Hurria et al., Drugs Aging, 2005, 22(9):785-791;" and on the grounds of nonstatutory "obviousness-type double patenting as being unpatentable over claim[] 1 of Emura et al. US 7,799,783, or over claim 1 of Ito et al. U.S. 9,371,380 in view of Hurria et al., Drugs Aging, 2005, 22(9):785-791." Oct. 9, 2018 Office Action at 1, 8, 13.

18.    Applicant responded to the Office Action on January 9, 2019, amending claim 1 as follows:

> 1. (Currently Amended) A method for treating cancer <u>which is one of gastrointestinal cancer, large bowel cancer and breast cancer</u>, comprising<u>:</u> detecting a creatinine clearance of a patient ~~before starting a treatment~~; and ~~starting the treatment~~ by orally administering to the patient with a creatinine clearance of less than 30 mL/min a combination drug comprising α, α, α-trifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5, a <u>daily</u> dose of 30 to 40 mg/m$^2$/day as FTD-equivalent, <u>divided into two to four portions for administration</u> ~~in two to four divided doses~~.

Applicant amended claim 1 to specify the types of cancer being treated and clarify the daily dose to address the §112 rejections. Jan. 19, 2019 Amendment at 9-10. Further, the Applicant argued that none of the prior art references cited by the examiner involved the administration of TAS-102 to patients with severe renal failure. *Id.* at 7-9.

19.    The Applicant further argued that "the examiner has provided no evidence that a dose reduction would be possible while maintaining the drug's efficacy." *Id.* at 7. To support this

9

argument, the Applicant relied on a presentation by Emura that compared TAS-102 "with another orally administered cancer drug[:] Teysuno®." *Id.* The Applicant highlighted the fact that Teysuno's label states that the drug "should not be used on patients with severe renal impairment." *Id.* at 7-8. The Applicant concluded that "the label clearly shows that a dose reduction did not work for administering Teysuno® to patients with severe renal impairment." *Id.* at 8. The Applicant argued that because dose reduction "raised the concern for higher incidence of adverse events, there was no reason to expect at it would be different for TAS-102." *Id.* at 9. As the Applicant explained, "[s]ince a dose reduction did not work for Teysuno®, one skilled in the art would not have reasonably expected that a simple dose reduction for TAS-102 would lead to an effective treatment without concern for higher incidence of adverse events." *Id.* at 9. The Applicant then asserted that none of the cited references "concern the administration of TAS-102 to patients with severe renal impairment" and that "Hurria merely describes giving drugs to a patient with a mean creatinine clearance of from 60-80 mL/min." *Id.*

20.     On March 8, 2019, the USPTO issued a Final Rejection withdrawing the §112 rejections, but finding the Applicant's arguments with respect to obviousness or obviousness-type double patenting unpersuasive in view of Emura '783 and Hurria. As the examiner explained, "the instant dosage range and administration, 30 to 40 mg/m$^2$/day divided into two to four portions, are embraced within the scope of Emura et al. '783, which is from 20 to 80 mg/m$^2$/day in terms of FTD in 2 to 4 divided portions." Mar. 8, 2019 Final Rejection at 3.

21.     The Applicant initiated an Interview with the examiner, which occurred on July 11, 2019, to discuss the March 8, 2019 Final Rejection. On July 12, 2019, in response to the Final Rejection, the Applicant reported that the "interview focused on the Hurria…reference." July 12, 2019 Response at 2. In attempting to overcome the Hurria reference, the Applicant asserted that

10

Hurria "is not directed to a renally impaired patient population" and the creatinine clearance values from Hurria "were calculated and not measured values." *Id.* at 2-3. The Applicant concluded that "[n]one of the references cited by the examiner concern the administration of TAS-102 to patients with severe renal impairment." *Id.* at 5.

22.     On August 9, 2019, the USPTO issued a Notice of Allowance. On page 2, the Reasons for Allowance were as follows:

> 3. Applicant's arguments regarding the rejection of claims 1-9 and 29-51 under 35 U.S.C. 103(a) or under the obviousness-type double patenting over Emura et al. '783 in view of Hurria et al. have been fully considered and they are persuasive. Since Emura et al. '783 in view of Hurria et al. does not disclose or claim the instant methods of use, therefore it is distinct from the instant invention. The rejection of claims 1-9 and 29-51 under 35 U.S.C. 103(a) or under the obviousness-type double patenting over Emura et al. '783 in view of Hurria et al. has been withdrawn herein.
>
> 4. Claims 1-7 and 29-51 are neither anticipated not rendered obviousness over the art of record, and therefore are allowable. A suggestion for modification of a reference to obtain the instant methods of use has not been found. Claims 1-7 and 29-51 are allowed.

**B.     The '004 Patent**

23.     The '004 patent is entitled "Method For Treating Cancer Patients With Severe Renal Impairment," and issued on March 30, 2021. The face of the '004 patent names Kenichiro Yoshida as the inventor of the '004 patent and names Taiho Pharmaceutical Co., Ltd. as the assignee of the '004 patent.

### 1.     The priority date of the '004 patent

24.     The '004 patent was filed as U.S Patent Application No. 16/574,180 ("the '180 Application") on September 18, 2019, and is a continuation of the '073 Application, filed on August 3, 2018, now the '399 patent, which is a continuation of PCT '994, filed on February 3, 2017. The '004 patent claims priority back to the '799 Provisional, filed on February 5, 2016. If the '004 patent is entitled to the priority date of the '799 Provisional (i.e., Feb. 5, 2016), then all

11

references published before February 5, 2015 are prior art to the '004 patent and all publications not derived from the named inventor's work that published before February 5, 2016, are also prior art to the '004 patent. Defendants do not concede that any of the claims of the '004 patent are entitled to the February 5, 2016 priority date. Therefore, if the '004 patent is not entitled to the priority date of the '799 Provisional (i.e., Feb. 5, 2016), then all references published before February 3, 2016, are prior art to the '004 patent and all references not derived from the named inventor's work that published before February 3, 2017, are also prior art to the claims of the '004 patent.

### 2.    The Asserted Claims of the '004 patent

25.    Plaintiffs assert that Defendants infringe claims 1-4, 7, 17-18, 20, 24, and 28 of U.S. Patent No. 10,960,004 (the '004 patent"). The Asserted Claims of the '004 patent are set forth below.

1. A method for treating gastrointestinal cancer, large bowel cancer or breast cancer in a patient with a creatinine clearance of 15 mL/min-29 mL/min, comprising: orally administering a drug comprising $\alpha,\alpha,\alpha$-trifluorothymidine (FTD) and 5- chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5, at a daily dose of 30 to 40 mg/m$^2$/day as FTD-equivalent, in two to four doses a day to the patient with a creatinine clearance of 15 mL/min-29 mL/min.

2. The method of claim 1, wherein a dose of 40 mg/m$^2$/day as FTD-equivalent is administered in two doses a day.

3. The method of claim 1, wherein an administration schedule is 5-day consecutive oral administrations and 2-day rest, per week.

4. The method of claim 1, wherein an administration schedule of 5-day consecutive oral administrations and 2-day rest is repeated twice, followed by rest for 14 days.

7. The method of claim 6, wherein colorectal cancer is treated

17. The method of claim 2, wherein an administration schedule is 5-day consecutive oral administrations and 2-day rest, per week.

18. The method of claim 2, wherein an administration schedule of 5-day consecutive oral

12

administrations and 2-day rest is repeated twice, followed by rest for 14 days.

20. The method of claim 2, wherein colorectal cancer is treated.

24. The method of claim 3, wherein colorectal cancer is treated.

28. The method of claim 4, wherein colorectal cancer is treated.

### 3.    The specification of the '004 patent

26.    As the '004 patent is a continuation of the '399 patent, it contains the same specification/disclosure as the '399 patent.

### 4.    The prosecution history of the '004 patent

27.    The '004 patent issued on March 30, 2021, from the '180 Application, which is a continuation of the '073 Application (now the '399 patent), which is a continuation of PCT '994, which claims priority to the '799 Provisional. A brief summary of the prosecution history is provided below.

28.    In an Office Action dated January 13, 2020, the claims of the '180 Application were rejected for obviousness type double patenting over the claims of the '399 patent. Claim 1 was also rejected for same invention double patenting over claim 1 of the '399 patent.

29.    As shown below, the Applicant amended claim 1 in an April 13, 2020 Amendment, to address the double patenting rejection:

1. (currently amended) A method for treating gastrointestinal cancer, large bowel cancer or breast cancer in a patient with a creatinine clearance ~~of less than 30 mL/min~~ 15 mL/min-29 mL/min, comprising:

orally administering a drug comprising α,α,α,-trifluorothymidine (FTD) and 5-chloro6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5, at a daily dose of 30 to 40 mg/m$^2$/day as FTD-equivalent, in two to four doses a day to the patient with a creatinine clearance of ~~less than 30 mL/min~~ 15 mL/min-29 mL/min.

The Applicant subsequently filed a terminal disclaimer to address the obviousness type double

13

patenting rejection.

30.    On June 12, 2020, the Examiner issues a Notice of Allowance, providing the following reasons for allowance:

> Claims 1 and 3-31 are neither anticipated nor rendered obvious over the art of record, and therefore are allowable. A suggested for modification of a reference to obtain the instant methods of use has not been found. Claims 1 and 3-31 are allowed.

## II.    A PERSON OF ORDINARY SKILL IN THE ART ("POSA")

31.    The subject matter and relevant field of endeavor of the '399 and '004 patents fall within the pharmacokinetic, chemical, and pharmaceutical arts. Defendants will present evidence at trial that a POSA would have included a physician (M.D.) specializing in oncology with significant practical experience (e.g., 5–6 years' worth) in clinical oncology including the treatment of a large bowel cancer, e.g., colorectal cancer, biostatistics, and clinical pharmacology, including pharmacokinetic modeling, or a Pharm.D. or Ph.D. in pharmacology, pharmaceutics or a related field with experience in the use of clinical data in pharmaceutical development, including specifically significant experience with pharmacokinetics (including population PK modeling), pharmaceutical formulations, pharmaceutical dose determination, and the statistical analysis of pharmacokinetic and clinical data. This person could have a lower level of formal education if such a person had more years of practical experience in clinical oncology, pharmacology, pharmaceutics or a related field directed to the development of drug candidates and their recommended dosing and dosage schedule, such as for the treatment of cancer. The POSA would typically work as part of a team consisting of other POSAs with a Ph.D., Pharm.D., and/or M.D. in related fields. For example, it is understood that the POSA would also have access to POSAs having expertise in nephrology and would collaborate with them, as necessary.

14

## III.    THE SCOPE AND CONTENT OF THE ASSERTED PRIOR ART TO THE PATENTS-IN-SUIT

32.    Defendants identify the below-listed prior art that invalidates the Asserted Claims of the '399 patent and '004 patent.

- Report on the Deliberation Results of Lonsurf by the Evaluation and Licensing Division, Pharmaceutical and Food Safety Bureau Ministry of Health, Labour and Welfare of Japan, February 7, 2014 ("Lonsurf Report")

- Lonsurf Label 2015 ("2015 Lonsurf Label")

- FDA Review Package for NDA No. 207981 ("LONSURF FDA Approval Package")

- Pharmacokinetics in Patients with Impaired Renal Function – Study Design, Data Analysis, and Impact on Dosing and Labeling, May 1998 ("FDA Guidance")

- Study NCT02301117, A Phase I Study of TAS-102 in Patients with Advanced Solid Tumors with Renal Impairment, November 21, 2014 (v1) ("NCT02301117")

- James M. Cleary, et al., *Population pharmacokinetic (PK) analysis of TAS-102 in patients (pts) with metastatic colorectal cancer (mCRC): Results from 3 phase 1 trials and the phase 3 RECOURSE trial.* Poster Presentation (Poster #295); presented May 29 – June 2, 2015 ("Cleary Poster")

33.    Defendants identify the below-listed references as additional prior art for the '399 patent and '004 patent that demonstrates the background knowledge of a POSA as of the priority date of the Patents-in-Suit.

- Matthew P. Doogue & Thomas M. Polasek, Drug Dosing in Renal Disease, Clin Biochem Rev, 32:69-73 (May 2011) ("Doogue")

- Arti Hurria, et al., *Effect of Creatinine Clearance on Patterns of Toxicity in Older Patients Receiving Adjuvant Chemotherapy for Breast Cancer*, Drugs Aging 22(9): 785-791 (2005) ("Hurria")

- T. Doi et al., *Phase I study of TAS-102 treatment in Japanese patients with advanced solid tumours*, British Journal of Cancer, 107(3):429-434 (June 2012) ("Doi")

- WO2014185528 / U.S. Publication No. 2016/0082032 ("Sakamoto")

- Hong et al., *Phase I study to determine the safety and pharmacokinetics of oral*

15

*administration of TAS-102 in patients with solid tumors*, American Cancer Society, Vol. 107 (6), 1383-1390 (Sept. 2006) ("Hong")

- N. Janus, et al., *Cancer and Renal Insufficiency Results of the BIRMA Study*, British Journal of Cancer, 103(12):1815-1821 (2010) ("Janus")

- James M. Cleary, et al., *Population pharmacokinetic (PK) analysis of TAS-102 in patients (pts) with metastatic colorectal cancer (mCRC): Results from 3 phase 1 trials and the phase 3 RECOURSE trial*, Journal Of Clinical Oncology; Vol. 33, Iss. 15; Published online on May 20, 2015 ("Cleary")

- Reza Mehvar, *Estimation of Pharmacokinetic Parameters Based on the Patient-Adjusted Population Data*, American Journal of Pharmaceutical Education 70(5) Article 96, 1-8 (2006) ("Mehvar")

- Myrna Y. Munar & Harleen Singh, *Drug Dosing Adjustments in Patients with Chronic Kidney Disease*, American Family Physician 75(10):1487-1496 (2007) ("Munar")

- Eisuke Booka, et al., *Development of an S-1 dosage formula based on renal function by a prospective pharmacokinetic study*, Gastric Cancer 19:876-886 (2016) ("Booka")

- Stuart M. Lichtman, et al., *International Society of Geriatric Oncology (SIOG) recommendations for the adjustment of dosing in elderly cancer patients with renal insufficiency*, Eur. J. Cancer, 43(1):14-34 (2007) ("Lichtman")

- S-M Huang, et al., *When to Conduct a Renal Impairment Study During Drug Development: US Food and Drug Administration Perspective*, Clinical Pharmacology & Therapeutics, Vol. 86(5): 475-479 (2009) ("Huang")

- U.S. Patent No. 7,799,783 ("Emura")

- APO-Trifluridine, Trifluridine Ophthalmic Solution 1%, Product Monograph, October 22, 2003 ("Trifluridine Monograph")

A.    **Asserted Prior Art to the Patents-in-Suit[1]**

1.    **Lonsurf Report**

34.    Report on the Deliberation Results of Lonsurf by the Evaluation and Licensing

---

[1] Plaintiffs have conceded that these references are available as prior art to the Patents-in-Suit. *See, e.g.*, Plaintiffs' Second Supplemental Objections and Responses to Defendants' Joint First Set of Interrogatories (Nos-14) (Supplementing Interrogatory Nos. 1-2, 4) at Supplemental Response to Interrogatory No. 4 (12/28/23) ("Regarding the prior art references that Defendants have specifically identified and upon which Defendants expressly rely in the

16

Division, Pharmaceutical and Food Safety Bureau Ministry of Health, Labour and Welfare of Japan, February 7, 2014 ("Lonsurf Report") (DEFS-TT-000069-128) is dated February 7, 2014. It is prior art to the '399 and '004 patents.

35.    The Lonsurf Report discloses a combination drug product containing 15 mg of trifluridine and 7.065 mg of tipiracil HCl and 20 mg of trifluridine and 9.42 mg of tipiracil HCl used for treating advanced or recurrent colorectal cancer. Lonsurf Report at 1-2, 5. The tablets are described as "a combination of FTD and TPI at a molar ratio of 2:1." *Id*. at 6. The combination drug is administered based on body surface area of the patient at an initial dose of 35 mg/m$^2$/dose on the basis of trifluridine. *Id*. at 3, 5. However, "[t]he dose may be reduced according to the patient's condition." *Id*. The drug is "orally administered twice daily, after breakfast and after supper, in 28-day cycles, each consisting of two 5 days on/2 days off treatment sub-cycles, followed by a 14-day rest period." *Id*.

36.    The Lonsurf Report describes various studies of the FTD-TPI combination drug. In some of these studies, human cancer cell lines were implanted into nude mice. *Id*. at 9-13. Administration of FTD-TPI showed "a significantly stronger antiproliferative effect . . . in animals receiving FTD-TPI than in control animals receiving TS-1 [combination product of tegafur, gimeracil, and oteracil potassium]" when human breast cancer cells (MX-1) were implanted in nude mice. *Id*. at 13. Nude mice implanted with a human colon cancer cell line also experienced "significantly prolonged" survival times when administered FTD-TPI compared to controls. *Id*. at 11-12.

37.    The Lonsurf Report also describes a Japanese Phase I study in which 21 patients with advanced solid tumor received FTD-TPI "orally at a dose of 15 to 35 mg/m$^2$/dose BID after

---

obviousness allegations asserted in Defendants' AIC [Amended Invalidity Contentions], Taiho does not contend that any of the asserted prior art in Defendants' AIC is not available as prior art.").

17

breakfast and supper in 28-day cycles, each consisting of two 5 days on/2 days off treatment subcycles, followed by a 14-day rest period." *Id.* at 46. "PK profiles of FTD, FTY, TPI, and thymidine were determined." *Id.* FTY refers to 5-(trifluoromethyl) uracil or trifluorothymine, a metabolite of FTD. *Id.* at 16.

38.    "The Cmax, AUC0-10, and AUCinf values of FTD and TPI after single administration of FTD-TPI tended to increase as the dose level of FTD-TPI increased. A regression analysis using the power model did not confirm linearity of these PK parameters of FTD, but significant nonlinearity was not found. On the other hand, linearity was observed for TPI in this analysis." *Id.* at 46. FTD was found to be "mainly excreted as FTY in urine [and] [a]bout 20% of [the] TPI administered was excreted in urine." *Id.*

39.    The Lonsurf Report explains that no clinical studies "were conducted to investigate the PK of FTD-TPI in patients with renal impairment." *Id.* at 49. Instead, the Lonsurf Report explains that "a precaution on the use of FTD-TPI for patients with renal impairment will be provided in the package insert because the drug should be carefully administered" to patients with renal impairment because "renal impairment may increase exposure to TPI and inhibit the metabolism of FTD to affect the PK of FTD." *Id.*

40.    The Lonsurf Report further describes a Japanese phase II study (113 patients), and a Japanese phase I study (6 patients)." *Id.* The patients in those studies "were stratified by creatinine clearance (CrCL) calculated using the Cockcroft-Gault equation." *Id.* Those studies concluded that the "incidence of adverse drug reactions related to bone marrow suppression . . . tended to be higher in patients with mild to moderate renal function as compared with patients with normal renal function." *Id.* at 49-50. However, FTD-TPI "was not administered to patients with severe renal impairment or those with end-stage renal disease." *Id.* at 50. Instead, the Lonsurf

Report indicates that a "phase I clinical study in patients with renal impairment will be conducted . . . to investigate the PK profile of FTD-TPI" in patients with renal impairment. *Id.*

41.    The Lonsurf Report defines normal renal function as "a CrCL of ≥90 mL/min; mild renal impairment as 60 to 89 mL/min; moderate renal impairment as 30 to 59 mL/min; severe renal impairment as 15 to 29 mL/min; and end-stage renal disease as <15 mL/min." *Id.* at 50. These definitions are consistent with medical guidelines that would be known to a POSA in February 2016.

### 2.    2015 Lonsurf Label

42.    The 2015 Lonsurf Label (DEFS-TT-005252-90) was available in September 2015, and it is prior art to the '399 and '004 patents.

43.    The 2015 Lonsurf Label discloses in its Indication and Usage Section: "LONSURF is indicated for the treatment of patients with metastatic colorectal cancer who have been previously treated with fluoropyrimidine-, oxaliplatin- and irinotecan-based chemotherapy, and an anti-VEGF biological therapy, and if RAS wild-type, an anti-EGFR therapy." 2015 Lonsurf Label at 2 (DEFS-TT-005253).

44.    The 2015 Lonsurf Label further discloses that "[t]he recommended starting dose of LONSURF is 35 mg/m$^2$ up to a maximum of 80 mg per dose (based on the trifluridine component) orally twice daily within one hour of completion of morning and evening meals on Days 1 through 5 and Days 8 through 12 of each 28 day cycle until disease progression or unacceptable toxicity." *Id.*

45.    The 2015 Lonsurf Label teaches that LONSURF "contains trifluridine and tipiracil hydrochloride at a molar ratio of 1:0.5." *Id.* at 9 (DEFS-TT-005260); *see also id.* at 10 (DEFS-TT005261) ("LONSURF consists of a thymidine-based nucleoside analog, trifluridine, and the

19

thymidine phosphorylase inhibitor, tipiracil, at a molar ratio of 1:05 (weight ratio, 1:0.471).").

46.    Section 8.7 ("Renal Impairment") of the 2015 Lonsurf Label states:

No dedicated clinical studies have been conducted to evaluate the effect of renal impairment on the pharmacokinetics of LONSURF.

In Study 1, patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n=47) had a higher incidence (difference of at least 5%) of ≥ Grade 3 adverse events, serious adverse events, and dose delays and reductions compared to patients with normal renal function (CLcr ≥ 90 mL/min, n= 306) or patients with mild renal impairment (CLcr = 60 to 89 mL/min, n= 178).

No dose adjustment to the starting dose of LONSURF is recommended in patients with mild or moderate renal impairment (CLcr of 30 to 89 mL/min); however patients with moderate renal impairment may require dose modification for increased toxicity. No patients with severe renal impairment (CLcr < 30 mL/min) were enrolled in Study 1. *[see Clinical Pharmacology (12.3)].*

*Id.* at 8 (DEFS-TT-005259).

47.    Further, Section 12.3 ("Pharmacokinetics") of the 2015 Lonsurf Labels discloses:

**<u>Renal Impairment</u>**

In Study 1, the estimated mean AUC of trifluridine at steady state was 31% higher in patients with mild renal impairment (CLcr = 60 to 89 mL/min, n= 38) and 43% higher in patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n= 16) than that in patient with normal renal function (CLcr ≥ 90 mL/min, n= 84) based on the population pharmacokinetic analysis. The estimated mean AUC of tipiracil was 34% higher in patients with mild renal impairment and 65% higher in patients with moderate renal impairment than that in patients with normal renal function. The pharmacokinetics of trifluridine and tipiracil have not been studied in patients with severe renal impairment (CLcr < 30 mL/min) or end-stage renal disease. *[see Use in Specific Populations (8.7)].*

*Id*. at 12 (DEFS-TT-005263).

### 3.    LONSURF FDA Approval Package

48.    Taiho's Lonsurf tablets, 15 and 20 mg, were approved by FDA on September 22, 2015. *See* LONSURF FDA Approval Package at 1 (DEFS-TT-005546, 5549-5555). The FDA Review Package for NDA No. 207981 ("LONSURF FDA Approval Package") was available on

or about October 23, 2015. The LONSURF FDA Approval Package contains a number of FDA review reports including those titled "Summary Review," "Clinical Pharmacology and Biopharmaceutics Review(s)," and "Other Reviews," as well as a document titled "Administrative/Correspondence Documents." *Id.* at 2 (DEFS-TT-005547). The LONSURF FDA Approval Package reflects analysis done by the FDA and is not derived from the work of the named inventor—Kenichiro Yoshida. Therefore, the LONSURF FDA Approval Package is prior art to the '399 and '004 patents.

49.     The Summary Review from the LONSURF FDA Approval Package states that Lonsurf "consists of two drugs, trifluorithymidine (FTD; trifluridine) and tipiracil (TPI), in a fixed molar ratio of 1.0:0.5 that is supplied as tablets for oral administration in strengths of 15-mg and 20-mg, based on the trifluridine component." LONSURF FDA Approval Package, Summary Review at 2 (DEFS-TT-005590). According to the Summary Review, Taiho relied on a "single multicenter, randomized (2:1), double blind, placebo-controlled trial, Study TPU-TAS-102-301 (RECOURSE Trial)" to support the original approval of LONSURF in the United States. *Id.* Eligibility criteria for the RECOURSE Trial included "histologically documented metastatic colorectal cancer (mCRC)" and patients were "randomized to receive trifluridine/tipiracil at a dose of 35 mg/m$^2$ based on the trifluridine components or matching placebo administered orally twice daily after meals on Days 1 through 5 and Days 8 through 12 of each 28-day cycle until disease progression or unacceptable toxicity." *Id.* In the RECOURSE Trial, 533 patients were treated with trifluridine/tipiracil. *Id.* at 3 (DEFS-TT-005591).

50.     With respect to clinical pharmacology and pharmacokinetics, the Summary Review from the LONSURF FDA Approval Package states:

> The pharmacokinetics of trifluoridine/tipiracil were characterized, demonstrating that systemic exposure (AUC) of trifluridine increased more than dose

proportionally over the dose range of 15 to 35 mg/m2. The mean elimination halflife of trifluridine at steady state was 2.1 hours and of tipiracil was 2.4 hours. The clinical pharmacology program provided a nearly complete assessment of the pharmacokinetics of Lonsurf; the program contained dose-finding studies establishing the tolerability of the dosage regimen, the contribution of the tipiracil hydrochloride component as a pharmacokinetic modulator, the food effects on pharmacokinetic profile, the effects of Lonsurf on cardiophysiology, ADME (absorption, distribution, metabolism, excretion) of Lonsurf, relative bioavailability of Lonsurf in patients with cancer, and effects of organ (renal, hepatic) on pharmacokinetics.

*Id.* at 7 (DEFS-TT_005595).

51.    According to the Summary Review, "body size and renal function are the primary intrinsic factors affecting the exposure to trifluridine and tipiracil. Based on the PopPK analysis, the proposed adjustment for the dose by body surface area (BSA) was determined to be appropriate and supported the labeling recommendation that dose adjustment is required for patients with mild hepatic impairment, and mild to moderate renal impairment." *Id*.

52.    In terms of post-marketing requirements, the Summary Review discloses: "[t]he only post-marketing requirements were identified by the clinical pharmacology review team, to complete ongoing studies assessing whether, and how, pharmacokinetics are altered in patients with severe renal impairment and moderate to severe hepatic impairment." *Id.* at 12 (DEFS-TT-005600). Therefore, FDA reviewers recommended that Taiho "[c]omplete the ongoing clinical pharmacokinetic trial to determine an appropriate dose of Lonsurf (trifluridine and tipiracil) in patients with severe renal impairment in accordance with the FDA Guidance for Industry entitled "Pharmacokinetics in Patients with Impaired Renal Function: Study Design, Data Analysis, and Impact on Dosing and Labeling." *Id.* at 26 (DEFS-TT-005604).

53.    The Clinical Pharmacology and Biopharmaceutics Review(s) from the LONSURF FDA Approval Package disclose:

*Population Pharmacokinetic Analysis*: Population PK analyses with data from 239

patients who received TAS-102 treatment indicated that body size and renal function are the primary intrinsic factors affecting the exposure to trifluridine and to tipiracil after TAS-102 administration. Oral clearance of trifluridine also negatively correlated with serum albumin probably due to the high protein binding of trifluridine. Other covariates tested including age, sex, race, mild hepatic impairment, and concomitant administration of OCT2 inhibitor had no clinically meaningful impact on exposure to trifluridine or tipiracil. The proposed body surface area (BSA) adjusted dosing is justified.

**Renal Impairment**: In Study RECOURSE, the mean values of AUC for trifluridine at steady state were 31 % higher in patients with mild (CLcr = 60-89 mL/min, n =38) and 43% higher in patients with moderate (CLcr = 30 to 59 mL/min, n= 16) renal impairment than those in patients with normal (CLcr 2: 90 mL/min, n=84) renal function. Similar effect of renal impairment on the tipiracil exposure was observed (34% higher in patients with mild and 68% higher in patients with moderate renal impairment than that in patients with normal renal function). The pharmacokinetics of trifluridine and tipiracil have not been studied in patients with severe renal impairment (CLcr < 30 mL/min) or end-stage renal disease. The increased exposures of trifluridine and tipiracil in patients with mild to moderate impairment might be confounded by the relatively smaller body weights in the mild (median body weigh=64 kg, n= 38) and moderate (median body weigh=59 kg, n=l6) renal impaired patients when compared to normal renal function (median body weight=78 kg, n=84). Since tipiracil is a PK modulator increasing the systemic exposure of trifluridine by inhibiting TPase, the increased exposure of trifluridine in patients with mild to moderate renal impairment could be the secondary effect mediated by the increased tipiracil exposures leading to increased inhibition of trifluridine metabolism (via TPase) in the same patients with renal impairment. A dedicated renal impairment is currently on going and will be submitted as a PMR study.

LONSURF FDA Approval Package, Clinical Pharmacology and Biopharmaceutics Review(s) at 8 (DEFS-TT-006002). The Clinical Pharmacology and Biopharmaceutics Review(s) further disclose that "[i]n Study RECOURSE, patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n=47) had a higher incidence (difference of at least 5%) of > Grade 3 adverse events, serious adverse events, and dose delays and reductions compared to patients with normal renal function (CLcr > 90 mL/min, n= 306) and patients with mild renal impairment (CLcr = 60 to 89 mL/min, n= 178). *Id.* at 32 (DEFS-TT-006026)

54.     Additionally, the Clinical Pharmacology and Biopharmaceutics Review(s) state:

Creatinine clearance (CLcr) was a significant covariate for clearance (CL/F) of trifluridine and tipiracil, and serum albumin (ALB) was a significant covariate for CL/F of trifluridine. Other covariates tested including age, sex, race, hepatic function parameters, and concomitant administration of OCT2 inhibitors had no clinically meaningful impact on exposure to trifluridine or tipiracil. For the final model with BSA incorporated as covariate for Vd/F, and CLcr and/or ALB incorporated as covariates for CL/F, the variabilities were reduced. The final PPK model parameters and unexplained interindividual variability are listed in [] Table 16 and Table 17 below.

**Table 16.** Parameter Estimates of the Final Population PK Model for Trifluridine

| Parameter | Mean | RSE (%) | Shrinkage (%) |
|---|---|---|---|
| | | Population Mean | |
| Vd/F (L) | 10.0 | 2.32 | NA |
| CL/F (L/hr) | 2.93 | 2.30 | NA |
| KA (/hr) | 5.43 | 14.8 | NA |
| MTT (hr) | 0.640 | 7.23 | NA |
| CL$_{cr}$ | 0.507 | 11.8 | NA |
| ALB | -0.633 | 29.2 | NA |
| BSA | 0.940 | 16.3 | NA |
| | | Inter-individual Variability | |
| IIV Vd/F (CV%) | 25.3 | 17.0 | 26.2 |
| IIV CL/F (CV%) | 32.2 | 13.2 | 6.41 |
| COV between Vd/F and CL/F | 0.0401 | 27.9 | NA |
| IIV KA (CV%) | NA | NA | NA |
| IIV MTT (CV%) | 92.1 | 11.3 | 15.0 |
| | | Residual Variability | |
| σprop (%) | 21.1 | 6.45 | 20.3 |
| σadd (ng/mL) | 86.3 | 14.5 | |

IIV = inter-individual variability; add = additive error model; ALB = albumin; BSA = body surface area; CL$_{cr}$ = creatinine clearance; CL/F = apparent oral clearance; COV = covariance; CV = coefficient of variation; KA = absorption rate constant; MTT = mean transit time; η = inter-individual residual; NA = not applicable; at = number of transit compartment; σ = variance of residual error; prop = proportional residual error model; RSE = relative standard error; Vd/F = apparent distribution volume.
1-Compartment model with transit absorption model (at=4)
Vd/F = 10.0 · (BSA/1.81)$^{0.94}$ · exp(η, Vd/F)
CL/F = 2.93 · (CLCR/103)$^{0.507}$ · (ALB/3.90)$^{-0.633}$ ·exp(η, CL/F)
Source: Study 12DA25, Table 9.3.3-1.

Source: Table 14 summary of clinical pharmacology, Page 44

**Table 17.** Parameter Estimates of the Final Population PK Model for Tipiracil

| Parameter | Mean | RSE (%) | Shrinkage (%) |
|---|---|---|---|
| | Population Mean | | |
| Vd/F (L) | 192 | 8.49 | NA |
| V2 (L) | 240 | 16.0 | NA |
| CL/F (L/hr) | 88.7 | 2.90 | NA |
| Q (L/hr) | 16.0 | 12.8 | NA |
| KA (/hr) | 0.845 | 8.28 | NA |
| MTT (hr) | 0.867 | 5.85 | NA |
| $CL_{CR}$ | 0.592 | 15.1 | NA |
| BSA | 1.46 | 25.3 | NA |
| | Inter-individual Variability | | |
| IIV Vd/F (CV%) | 62.7 | 16.3 | 21.4 |
| IIV CL/F (CV%) | 44.3 | 14.7 | 4.58 |
| COV between Vd/F and CL/F | 0.137 | 23.9 | NA |
| IIV KA (CV%) | NA | NA | NA |
| IIV MTT (CV%) | 72.9 | 12.4 | 12.2 |
| | Residual Variability | | |
| σprop (%) | 27.1 | 4.24 | 20.3 |

IIV = inter-individual variability; BSA = body surface area; $CL_{CR}$ = creatinine clearance; CL/F = apparent oral clearance; COV = covariance; CV = coefficient of variation; KA = absorption rate constant; MTT = mean transit time; η = inter-individual residual; NA = not applicable; nt = number of transit compartment; σ = variance of residual error; prop = proportional residual error model; Q = clearance between compartment; RSE = relative standard error; Vd/F = apparent distribution volume of central compartment; V2 = apparent distribution volume of peripheral compartment.
3-compartment model with transit absorption model (nt=4).
Vd/F = 192 × (BSA/1.81)$^{1.46}$ × exp(η, vd)
CL/F = 88.7 × (CLCR/103)$^{0.592}$ × exp(η, cl/f)
Source: Study 12DA25, Table 9.3.6-1.

Source: Table 15  summary of clinical pharmacology, Page 45

*Id.* at 26-27 (DEFS-TT_006020-6021). As seen above in Table 16, the final population PK model for trifluridine (FTD) provided the following equations for Vd/F and CL/F, which are similar to those reported by Cleary and the Cleary Poster:

$$Vd/F = 10.0 \times (BSA/1.81)^{0.94} \times \exp(hi, Vd/F)$$

$$CL/F = 2.93 \times (CLCR/103)^{0.507} \times (ALB/3.90)^{-0.633} \times \exp(hi, CL/F)$$

*Id.*; *see also id.* at 60-61 (DEFS-TT-006047-6048) (Table 33) (disclosing the same final equations). Table 17 (above) provides the following equations for Vd/F and CL/F of TPI, which are also similar to those reported by Cleary and the Cleary Poster.

$$Vd/F = 192 \times (BSA/1.81)^{1.46} \times \exp(hi, Vd/F)$$

$$CL/F = 88.7 \times (CLCR/103)^{0.592} \times \exp(hi, CL/F)$$

*See also id.* at 62-63 (DEFS-TT-006049-6050) (Table 34) (disclosing the same final equations). A summary of the daily AUC of FTD in normal patients and those with mild

and moderate renal impairment is also provided in the Clinical Pharmacology and Biopharmaceutics Review. For example, Table 18 and Figure 7 of the Clinical Pharmacology and Biopharmaceutics Review report on the AUC for FTD at Day 12 from the population PK analysis in the RECOURSE Trial:

**Table 18.** Summary of Daily AUC for Each Renal Function Subgroup (PK Population in Study RECOURSE)

| Renal Impairment Based on CLcr | Analyte<br>PK Parameter<br>Unit<br>Period<br>Method | FTD<br>Daily AUC<br>ng*hr/mL<br>Day 12<br>Pop-PK | TPI HCl<br>Daily AUC<br>ng*hr/mL<br>Day 12<br>Pop-PK |
|---|---|---|---|
| Normal (CLcr >=90 mL/min) | n | 84 | 84 |
| | Mean | 38812.0 | 630.7 |
| | SD | 10905.3 | 300.5 |
| | CV | 28% | 48% |
| Mild Impairment (CLcr 60-89 mL/min) | n | 38 | 38 |
| | Mean | 50177.8 | 825.9 |
| | SD | 11835.6 | 343.0 |
| | CV | 24% | 42% |
| | Ratio of Geometric Mean to the Normal Group | | |
| | Estimate | 1.31 | 1.34 |
| | (95% CI) | (1.17 - 1.46) | (1.13 - 1.59) |
| Moderate Impairment (CLcr 30-59 mL/min) | n | 16 | 16 |
| | Mean | 54898.0 | 1060.9 |
| | SD | 13675.8 | 616.5 |
| | CV | 25% | 58% |
| | Ratio of Geometric Mean to the Normal Group | | |
| | Estimate | 1.43 | 1.65 |
| | (95% CI) | (1.22 - 1.68) | (1.29 - 2.11) |

Source: Table 1, Sponsor's response to the IR of analysis of renal function effect in Study RECOURSE

**Figure 7.** Effect of Renal Impairment on AUCss of Trifluridine in Study RECOURSE



*Id.* at 29-30 (DEFS-TT-006023-6024). Table 18 and Figure 7 demonstrate that AUC$_{FTD}$ and AUC$_{TPI}$ increase when moving from normal patients to those with mild renal impairment, and also

increase when moving from patients with mild renal impairment to patients with moderate renal impairment. *Id.*

55.     In addition to the disclosures discussed above, the Other Reviews from the LONSURF FDA Approval Package disclose that "[b]ased on a population pharmacokinetic analysis, the mean relative ratio of FTD AUC in patients with mild (CLcr = 60-89 mL/min) and moderate (CLcr = 30-59 mL/min) renal impairment compared to patients with normal renal function (median CLcr = 103 mL/min) in this population, were estimated to be 1.07~1.32 and 1.32~1.87,[6] respectively, using the final model developed for CL/F = 2.93 x (CLCR/103)$^{0.507}$ x (ALB/3.90)$^{-0.633}$ x exp(hi, CL/F)." LONSURF FDA Approval Package, Other Reviews at Appendix at 24 (DEFS-TT-006110).

56.     Other Reviews further discloses with respect to an "expected high clinical exposure scenario" in patients with severe renal impairment:

| Expected high clinical exposure scenario | Severe renal impairment: If a patient with severe renal impairment (CLcr = 15~29 mL/min) received TAS-102 35 mg/m$^2$, the mean relative ratio of daily AUC compared to patients with normal  renal function (median CLcr = 103 mL/min) in the patient population analyzed, is estimated to be 1.90~2.66, using the final model developed for CL/F of FTD. FTD CL/F = 2.93 × (CLcr/103)$^{0.507}$ × (ALB/3.90)$^{-0.633}$ ×exp($\eta_{i, CL/F}$) |
|---|---|

*Id.* at 25 (DEFS-TT-006111); *see also id.* at Interdisciplinary Review Team for QT Studies Consultation at 2 (DEFS-TT-006088) ("[s]evere renal impairment is estimated to result in doubling or tripling exposure").

57.     Finally, Other Reviews also comments on a Renal Impairment Pharmacokinetic Trial protocol submitted to FDA by Taiho:

> The pharmacokinetic modulator tipiracil (TPI) in Lonsurf is a thymidine phosphorylase (TPase) inhibitor, which is primarily eliminated by urinary excretion in its unchanged form. Patients with renal impairment would be expected to have increased TPI exposure leading to increasing in trifluridine (FTD) exposure due to

increased inhibition of FTD metabolism (via TPase) by TPI, which may lead to more treatment limiting severe toxicity.

The goal of the clinical pharmacokinetic trial is to determine an appropriate Lonsurf dose in patients with severe renal impairment.

…

Complete the ongoing clinical pharmacokinetic trial to determine an appropriate dose of Lonsurf (trifluridine and tipiracil) in patients with severe renal impairment in accordance with the FDA Guidance for Industry entitled "Pharmacokinetics in Patients with Impaired Renal Function: Study Design, Data Analysis, and Impact on Dosing and Labeling."

*Id.* at PMR/PMC Development Template at 4-5 (DEFS-TT-006069-6070).

### 4.    FDA Guidance

58.    Pharmacokinetics in Patients with Impaired Renal Function – Study Design, Data Analysis, and Impact on Dosing and Labeling ("FDA Guidance") (DEFS-TT-00848-866) is dated May 1998, and it is prior art to the '399 and '004 patents.

59.    FDA Guidance discloses that it is "intended for sponsors who, during the investigational phase of a drug development, plan to conduct studies to assess the influence of renal impairment on the pharmacokinetics of an investigational drug." FDA Guidance at 1. FDA Guidance notes that while renal impairment can cause "a decrease in renal excretion, or possibly renal metabolism, of a drug or its metabolites, renal impairment has also been associated with other changes, such as changes in absorption, hepatic metabolism, plasma protein binding, and drug distribution." *Id.* It further states: "These changes may be particularly prominent in patients with severely impaired renal function and have been observed even when the renal route is not the primary route of elimination of a drug. . . . PK characterization should be assessed in patients with renal impairment to provide rational dosing recommendations." *Id*. The document recognizes that a dosage adjustment may be necessary in patients with renal impairment because "renal

28

impairment is likely to significantly alter the PK of a drug and/or its active/toxic metabolites." *Id.* at 2.

60.    FDA Guidance explains that the safety and efficacy of a drug are generally established in clinical trials "involving relatively typical representatives from the target patient population." *Id.* at 3. However, usually patients with "significantly impaired renal function are explicitly excluded from participation in these studies." *Id.* The document also states that studies should be conducted "in patients with impaired renal function . . . to determine if the PK is altered to such an extent that the dosage should be adjusted from that established in the phase 3 trials." *Id.* at 3. The document recommends a "basic 'full' study design" with "adequate representation of patients with various degrees of renal impairment" recruited in equal numbers into the study and provides the following table of renal impairment categories:

| Group | Description | Estimated Creatinine Clearance (milliliters/ minutes) |
| --- | --- | --- |
| 1 | Normal renal function | > 80 mL/min |
| 2 | Mild renal impairment | 50-80 mL/min |
| 3 | Moderate renal impairment | 30-50 mL/min |
| 4 | Severe renal impairment | <30 mL/min |
| 5 | ESRD | Requiring dialysis |

*Id.* at 4-5.

61.    FDA Guidance describes creatinine clearance as a widely used measure of renal function that is "more practical than most other alternatives as a criterion for adjusting dosage in outpatient and inpatient settings." *Id.* at 6. The Cockcroft-Gault formula is recognized as one way of estimating creatinine clearance based on serum creatinine levels. *Id.* A "basic full study design" "provides the information needed to rationally adjust doses for patients with impaired renal

29

function." *Id.* at 7.

62. The document further recommends a data analysis to assess "whether [a] dosage adjustment is required for patients with impaired renal function and, if so, to develop dosing recommendations for such patients based on measures of renal function." *Id.* at 9. The data analysis includes estimating PK parameters, mathematically modeling the relationship between renal function and PK parameters, and developing dosing recommendations based on the data. *Id.* The PK data that can be used are listed as: area under the plasma concentration curve (AUC), peak concentration (Cmax), apparent clearance (CL/F), renal clearance (CLR), apparent volume of distribution (Vz/F or Vss/F), and terminal half-life (t1/2). *Id.* at 10. FDA Guidance recommends that a dosage be determined based on the study results and the relationship between renal function and the relevant PK parameters. *Id.*

### 5.    NCT '117

63. Study NCT02301117, *A Phase I Study of TAS-102 in Patients with Advanced Solid Tumors with Renal Impairment*, November 21, 2014 (v1) ("NCT '117") (DEFS-TT-001144-1151) was published on November 21, 2014, and it is prior art to the '399 and '004 patents.

64. The purpose of the Phase I study disclosed in NCT '117 was to "evaluate the safety, tolerability, and pharmacokinetics of TAS-102 in patients with advanced solid tumors with varying degrees of renal impairment." NCT '117 at 3-4 (DEFS-TT-001146-1147). The three arms of the study included patients with mild, moderate, and severe renal impairment. *Id*. at 5 (DEFS-TT-001148). The mild and moderate arms of the study received "35 mg/m2/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle." *Id.* According to NCT '117, "[t]he dose level of [the] severe cohort will be determined based on the Interim Assessment of mild and moderate cohorts." *Id.*

65.    NCT '117 discloses that the "[p]rimary [o]utcome [m]easures" are:

1. PK parameters of FTD, FTY, and TPI in plasma after a single dose of TAS-102 FTD, FTY and TPI: pharmacokinetic parameters Cmax, Tmax, AUC0-inf, and T1/2. FTD, FTY, and TPI: Ae% and CLr. FTD and TPI: CL/F. Vd/F of TAS102

* * *

2. Safety monitoring including adverse events, vital signs, and laboratory assessments
Through 30 days following last administration of study medication or until initiation of new anticancer treatment

*Id.*

### 6.    Cleary Poster

66.    James M. Cleary, et al., *Population pharmacokinetic (PK) analysis of TAS-102 in patients (pts) with metastatic colorectal cancer (mCRC): Results from 3 phase 1 trials and the phase 3 RECOURSE trial.* Poster Presentation (Poster #295); presented May 29 – June 2, 2015 ("Cleary Poster") (TAI-LONS-02556823) states on its face that it is a "[p]oster presented at 2015 American Society of Clinical Oncology (ASCO) Annual Meeting; May 29-June 2, 2015; Chicago, IL." Cleary Poster. Kenichiro Yoshida, the named inventor of the '399 and '004 patents, is not listed as an author on the poster. *Id.* Dr. Yoshida confirmed during his deposition that he was not listed as an author on the Cleary Poster, was not involved in the population PK analysis described therein, and did not work with Dr. Cleary on the poster. *See* Deposition Transcript of Dr. Kenichiro (Yoshida) Akaike, dated Nov. 29, 2023 ("Akaike Dep. Tr."), at 141:3-142:12. Therefore, the Cleary Poster is prior art to the '399 and '004 patents.

67.    The Cleary Poster states that "TAS-102 is an oral combination treatment comprised of an antineoplastic thymidine-based nucleoside analogue, trifluridine (FTD), and the thymidine phosphorylase inhibitor, tipiracil hydrochloride (TPI), at a molar ratio of 1:0.5 (weight ratio, 1:0.47)." *Id.* at Introduction. Figure 1 of the Cleary Poster depicts the components of TAS-102,

31

their mechanism of action, and the ratio of the components:



*Id.* at Figure 1.

68.     The Cleary Poster discloses that in "the phase 3 RECOURSE trial in patients with metastatic colorectal cancer (mCRC) refractory to standard therapies, TAS-102 demonstrated a significant improvement compared with placebo in median overall survival (7.1 vs 5.3 months; hazard ratio [HR]=0.68; P<0.0001) and progression-free survival (2.0 vs. 1.7 months; HR=0.48; P<0.0001)." *Id.* at Introduction. The Cleary Poster also discloses that "[t]he major elimination pathways of FTD and TPI are by thymidine phosphorylase metabolism and renal excretion, respectively." *Id.*

69.     The Cleary Poster states that the objectives of the studies were "[t]o establish population PK models for FTD and TPI" and "[t]o identify significant intrinsic and extrinsic factors that influence drug exposure." *Id.* at Objectives.

70.     With regard to the Methods, the Cleary Poster discloses the following:

- The population PK approach used the nonlinear mixed-effect modeling program, NONMEM version 7.2.0.

- The analysis consisted of sparse sampling data in RECOURSE (n=138 of 800 patients, 3 time points) and extensive sampling data in 3 TAS-102 phase 1 trials (n=101):

    - Japanese dose-finding study (JapicCTI-111545)

    - PK contribution study (NCT01867866)

    - QTc study (NCT01867879)

- The 138 RECOURSE patients were enrolled in the 28 sites from all geographic regions included in the RECOURSE pharmacokinetic analysis.

- TAS-102 was administered at 35 mg/m2 twice daily (15-35 mg/m2 in the Japanese dose-finding study) 5 days a week followed by 2 days rest for 2 weeks every 4 weeks.

- Plasma concentrations of FTD and TPI were determined in samples collected on day 12 in the studies except for RECOURSE, where blood sampling on days 9, 10, or 11 was allowed if day 12 was not feasible.

- The following patient characteristics were tested as covariates:

    - Demographic characteristics…

    - Liver function…

    - Renal function (serum creatinine or creatinine clearance [CrCL])

    - Gastrectomy

    - Concomitant medication…

    - Performance status

*Id.* at Methods.

71.    According to the Cleary Poster "[a]ctual doses based on BSA [body surface area] were similar among the studies except for the Japanese dose finding study, which included various doses ranging from the smaller doses to the registration dose (15 mg/m$^2$ per dose to 35 mg/m$^2$ per dose)." *Id.* at Results.

72.    In terms of Population PK (PPK) models of FTD and TPI, the Cleary Poster reports

33

that "CrCL was a significant covariate for apparent oral clearance (CL/F) in the final models of FTD and TPI." *Id.* at Population PK Models for FTD and TPI. The Cleary Poster further reports that the fixed effect for individual CL/F and Vd/F were modeled as follows:

FTD: … CL/F (L/h) = 2.93 x $(CRcl/103)^{0.507}$ x $(ALB/3.90)^{-0.633}$
TPI: … CL/F (L/h) = 88.7 x $(CrCL/103)^{0.592}$

*Id.* at Population PK Models for FTD and TPI.

73.    In summarizing the covariates analyzed, the Cleary Poster discloses that in terms of renal function, "CrCL was a significant covariate for CL/F in final models of both FTD and TPI. Urinary excretion is the main elimination route for TPI but a minor route for FTD. The significant relation between CrCL and CL/F of FTD is due to the secondary effect by TPI, the PK modulator of FTD." *Id.* at Summary of Covariates Analyzed. The Cleary Poster further discloses that serum albumin (ALB) was a "significant negative covariate for CL/F of FTD." *Id.*

74.    The Cleary Poster concludes that "[r]enal function and body size were the primary determinants of the pharmacokinetics (PK) of TAS-102, while serum albumin was negatively correlated with the oral clearance of FTD," that "[c]linicians should monitor renal function closely in patients treated with TAS-102," and that "[a]n additional clinical trial (NCT02301117) is ongoing to establish the safety of TAS-102 in patients with impaired renal function." *Id*. at Conclusions.

### B.    Background Knowledge of a POSA

#### 1.    Doogue

75.    Matthew P. Doogue & Thomas M. Polasek, *Drug Dosing in Renal Disease*, Clin Biochem Rev, 32:69-73 (May 2011) ("Doogue") (DEFS-TT-001426-1430) is dated May 2011, and is prior art to the '399 and '004 patents.

76.    Doogue describes techniques for determining drug dosing in patients with renal

disease. Doogue explains that renal disease can alter the effects of renally cleared drugs and that drug dosages are usually reduced in patients with renal disease in proportion to the predicted reduction in their clearance of the drug. Doogue at Abstract. The authors identify the degree of renal impairment and patient size as factors to be considered when adjusting drug dosing. *Id.* at 69. Doogue also states that drug dosages are typically reduced in renally impaired patients in proportion to the predicted decrease in their drug clearance rate as compared to patients with normal renal function. *Id.*

77.    Doogue notes that serum creatinine levels are most commonly used to evaluate a patient's renal function and provides equations for calculating a drug dose for that patient based on drug clearance, bioavailability, plasma concentration of the drug, and the fraction of drug excreted unchanged. *Id.* at 69-70. Based on these equations, Doogue indicates that "dose should be reduced in proportion to a patient's relative renal function for drugs that are 100% renally cleared, all other things being equal," but "the calculated dose can usually be rounded to the nearest whole or half tablet." *Id.* at 71. The Cockcroft-Gault equation may be used to calculate creatinine clearance and is recommended by the FDA for pharmacokinetic calculations. *Id.* at 72. The authors recognize that product information sheets (e.g., labeling) for pharmaceuticals "often have only crude dosing guidelines for renal impairment and sometimes specifically exclude patients with renal impairment," typically because patients with renal impairment were excluded from the primary studies. *Id.*

78.    Doogue concludes that "renal function is an important physiological variable that predictably affects the pharmacokinetics and thus clinical effectiveness of some drugs. Recognition of renal function as a prescribing issue is more important than the precision of different estimates of renal function. When prescribing for a patient with decreased renal function

35

the characteristics of both the patient and the drug should be considered." *Id.*

### 2. Hurria

79. Arti Hurria, et al., *Effect of Creatinine Clearance on Patterns of Toxicity in Older Patients Receiving Adjuvant Chemotherapy for Breast Cancer*, Drugs Aging 22(9): 785-791 (2005) ("Hurria") (DEFS-TT-000882-888) published in 2005, and is prior art to the '399 and '004 patents.

80. Hurria explains that a "progressive decline in renal function with aging" "contribute[s] to an increased risk of toxicity of cancer chemotherapy." Hurria at Abstract. "The presumed association between declining renal function and increased risk of toxicity from chemotherapy is based on the fact that many chemotherapy drugs are excreted renally." *Id.* at 789. Hurria also discusses the association between calculated creatinine clearance (CLCR) and drug toxicities in elderly breast cancer patients receiving different types of chemotherapy. *Id.* at Abstract, 787. The authors used the Cockcroft-Gault equation as one of two ways to estimate a patient's creatinine clearance rate and explains that a creatinine clearance rate of less than 50 ml/min is associated with an increased risk of fever and neutropenia. *Id.* at 787-788. The authors conclude that "[i]n this setting, chemotherapy dosage should be modified." *Id.* at 789.

### 3. Doi

81. T. Doi et al., *Phase I study of TAS-102 treatment in Japanese patients with advanced solid tumours*, British Journal of Cancer, 107(3):429-434 (June 2012) ("Doi") (DEFSTT-002029-2034) published online on June 26, 2012, and is prior art to the '399 and '004 patents.

82. Doi discloses that "TAS-102 consists of α, α, α-trifluorothymidine (TFT) and an inhibitor of thymidine phosphorylase (TPI)" "combined at a molar ratio of 1:0.5." Doi at 429,

36

Abstract. Doi discloses a Phase I study of TAS-102 in patients with "advanced solid tumours." *Id.* According to Doi, "TAS-102 was administered twice daily on days 1-5 and days 8-12 in a 28-day cycle to patients with solid tumours refractory to standard chemotherapy, to determine its maximum tolerated dose (MTD), dose-limiting toxicities (DLTs), and pharmacokinetics (PKs)." *Id.* Patients in Doi were treated with TAS-102 at doses of 30, 40, 50, 60, or 70 mg/m2 per day. *Id.* Doi discloses that "α, α, α-trifluorothymidine and TPI exposure increased dose dependently, and the percentage of decrease in neutrophil count and TFT exposure were significantly correlated." *Id.* Doi reports that Phase II studies "are ongoing in patients with colorectal cancer." *Id.*

### 4.    Sakamoto

83.    WO2014185528 / U.S. Publication No. 2016/0082032 ("Sakamoto") (DEFS-TT-000218-225) is titled "Therapeutic Effect Prediction Method for Colorectal Cancer Patient in Whom Expression of TK1 Protein has Increased" and published on March 24, 2016. Sakamoto is prior art to the '399 and '004 patents.

84.    Sakamoto discloses "a method for predicting the therapeutic effect of chemotherapy using an antitumor agent containing trifluridine ("FTD") and tipiracil hydrochloride ("TPI") at a molar ratio of 1:05 on a colorectal cancer patient. Sakamoto at Abstract, [0002].

85.    Sakamoto discloses that a "combination drug containing FTD and TPI at a molar ratio of 1:0.5 (hereinafter also referred to as 'FTD-TPI combination drug') is under development as a new antitumor agent against colorectal cancer." *Id.* at [0004]. Sakamoto further discloses that trifluridine is synonymous with α,α,α-trifluorothymidine and tipiracil hydrochloride has a chemical name of 5-chloro-6-[(2-iminopyrrolidin-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride. *Id.* at [0053]. Sakamoto also discloses that "[t]he production and sales of an antitumor agent containing FTD and TPI at a molar ratio of 1:05 have been approved in Japan

37

under the name 'Lonsurf combination tablet." *Id.* at [0059].

86.     In Example 1 of Sakamoto, patients with recurring colorectal cancer were administered the FTD-TPI combination drug twice a day in an FTD amount of 35 mg/m$^2$ , that is 70 mg/m$^2$/day, from day 1 to day 5 and from day 8 to day 12, over the course of 28 days. *Id.* at [0076]-[0077].

### 5.     Hong

87.     Hong et al., *Phase I study to determine the safety and pharmacokinetics of oral administration of TAS-102 in patients with solid tumors*, American Cancer Society, Vol. 107 (6), 1383-1390 (Sept. 2006) ("Hong") published in September 2006, and it is prior art to the '399 and '004 patents.

88.     Hong discloses "TAS-102 (TAIHO Pharmaceutical, Tokyo, Japan) is a novel antitumor nucleoside formed by the combination of 1 M FTD and 0.5 M TPI." Hong at 1384.

89.     Hong discloses a study to "determine the maximum tolerated dose, dose-limiting toxicities, pharmacokinetic profile, and recommended Phase II dose of an oral administration of TAS-102." *Id.* at 1383. Hong discloses "TAS-102 was administered orally once daily for 14 days, followed by a 1-week rest, repeated every 3 weeks. The initial dose of TAS-102 administered was 100 mg/m 2/day. The first 2 patients treated at that dose experienced substantial toxicity and, therefore, lower dose levels of TAS-102 were subsequently explored." *Id.*

90.     Hong further discloses "[c]linical PK studies were performed in all consenting patients in order to determine PK parameters of FTD, FTY, and TPI. These included half-life, maximum plasma concentration (Cmax ), AUC, clearance, and volume of distribution. During course 1, on days 1 and 14 whole blood samples were collected before and 30 minutes, 1, 2, 4, 6, 8, 12, and 24 hours after study drug administration. Urine was collected 0–8 hours, 8–16 hours,

and 16–24 hours after study drug administration." *Id.* at 1385.

91.    Hong concludes that "the MTD of TAS-102 is 50 mg/m 2/day when administered to advanced solid tumor patients daily for 14 days, followed by a 1-week rest." *Id*. at 1389.

**6.    Janus**

92.    N. Janus, et al., *Cancer and Renal Insufficiency Results of the BIRMA Study*, British Journal of Cancer, 103(12):1815-1821 (2010) ("Janus") (DEFS-TT-000754-760) published on November 9, 2010, and it is prior art to the '399 and '004 patents.

93.    Janus notes that "[h]alf of anticancer drugs are predominantly excreted in urine. Dosage adjustment in renal insufficiency (RI) is, therefore, a crucial issue." Janus at Abstract. The authors studied 1218 patients with various types of cancer, including 163 patients with colorectal cancer, and found that "all cancer patients are at risk for RI whatever the type of cancer." *Id.* at 1816. Janus reports that "RI is highly frequent in cancer patients" and that [o]ncologists should check the appropriate dose of chemotherapeutic drugs in relation to renal function before prescribing." *Id.* at Abstract, 1819, 1820.

94.    When the authors performed regression analyses, they found that "[a]ge, gender, bone metastasis, and medical history of chemotherapy were … risk factors for RI." *Id.* at 1819. Janus concludes that "[m]any anticancer drugs can cause RI, and many anticancer drugs require dose adaptation in RI." *Id*. at 1820.

**7.    Cleary**

95.    James M. Cleary, et al., *Population pharmacokinetic (PK) analysis of TAS-102 in patients (pts) with metastatic colorectal cancer (mCRC): Results from 3 phase 1 trials and the phase 3 RECOURSE trial*, Journal Of Clinical Oncology; Vol. 33, Iss. 15; Published online on May 20, 2015 ("Cleary") (NAT-TT-113065-113066). Kenichiro Yoshina, the named inventor of

39

the '399 and '004 patents, is not listed as an author on Cleary. *Id*. Therefore, Cleary is prior art to the '399 and '004 patents.

96.     Cleary discloses that "TAS-102 is comprised of…trifluridine (FTD), and…tipiracil hydrochloride (TPI), at a molar ration of 1:0.5 (weight ratio, 1:0.471)." Cleary (NAT-TT-113065-66). Cleary further discloses that "[t]he efficacy and safety of TAS-102 in pts with mCRC refractory to standard therapies were evaluated in the RECOURSE trial." *Id.* According to Cleary, objectives of the analysis were to "establish PK models of FTD and TPI, and to identify significant intrinsic and extrinsic factors that influence drug exposure." *Id.*

97.     Cleary found that "creatinine clearance (CLCR) was a significant covariate for apparent oral clearance (CL/F) in the final models of FTD and TPI," with the fixed effect modeled as: "FTD:…CL/F (L/h) = 2.93 x $(CLCR/103)^{0.507}$ x $(ALB/3.90)^{-0.633}$…TPI:…CL/F (L/h) = 88.7 x $(CLCR/103)^{0.592}$)." *Id*. Cleary concluded that "[r]enal function and body size were the primary determinants of the PK of TAS-102, highlighting the importance of monitoring renal function in pts treated with TAS-102." *Id.*

### 8.     Mehvar

98.     Reza Mehvar, *Estimation of Pharmacokinetic Parameters Based on the Patient Adjusted Population Data*, American Journal of Pharmaceutical Education 70(5) Article 96, 1-8 (2006) ("Mehvar") (DEFS-TT-000908-915) published on October 15, 2006, and is prior art to the '399 and '004 patents.

99.     Mehvar describes tools taught in a pharmacokinetics course for PharmD students to use population pharmacokinetic data adjusted for patient characteristics to make initial dosage regimens. Mehvar at Abstract. The article describes using the relationship between drug clearance and creatinine clearance to estimate how an individual patient will clear a drug based on that

40

patient's creatinine clearance rate. *Id.* at 1. Mehvar further suggests that a dosage regimen can be devised for an individual patient, by using a regression analysis to determine the relationship between population pharmacokinetics parameters such as AUC and patient characteristics such as creatinine clearance. *See id.* at 1-2.

100.    Mehvar also explains that individualizing a dosage regimen involves three steps: first, design of an initial dosage regimen; second, estimate patient-specific pharmacokinetic parameters; and third, adjusting the dosage regimen. *Id.* at 2. As an example of this process, Mehvar uses creatinine clearance and the clearance of drugs that are eliminated by renal clearance. *Id.* at 2-3. Mehvar also provides a variety of methods to analyze the data depending upon the linearity of the data. One model disclosed in Mehvar is a nonlinear mixed effects model that uses data obtained from a pool of patients during routine clinical monitoring. *Id.* at 4-5. In this model, the relationship between population based pharmacokinetic parameters and patient characteristics (e.g., creatinine clearance rate) is first determined. This relationship is then used to estimate pharmacokinetic parameters in an individual patient. *Id.* Mehvar further provides an example with data for sixteen patients with varying degrees of renal impairment and explains how to use this data to develop appropriate relationships between population pharmacokinetic parameters. *Id.* at 5-6. The article concludes by describing how to design a dosage regimen for individual patients based on population pharmacokinetic parameters and the characteristics of an individual patient. *Id.*

### 9.    Munar

101.    Myrna Y. Munar & Harleen Singh, *Drug Dosing Adjustments in Patients with Chronic Kidney Disease*, American Family Physician 75(10):1487-1496 (2007) ("Munar") (DEFS-TT-001323-1332) is dated May 15, 2007, and is prior art to the '399 and '004 patents.

102.     Munar discloses that "[c]hronic kidney disease affects renal drug elimination and other pharmacokinetic processes involved in drug disposition." Munar at Abstract. Accordingly, Munar recommends that drugs which are "cleared renally should be adjusted according to creatinine clearance or glomerular filtration rate" in patients with chronic kidney disease. *Id.* Further, Munar discloses that "methods for maintenance dosing adjustments are dose reductions, lengthening the dosing interval, or both." *Id.*

103.     Munar explains that "[d]osages of drugs cleared renally should be adjusted based on the patient's renal function (calculated as creatinine clearance or glomerular filtration rate); initial dosages should be determined using published guidelines and adjusted based on patient response; serum drug concentrations should be used to monitor effectiveness and toxicity when appropriate." *Id.* at 1488. Munar further states that the Cockcroft-Gault equation is one way to calculate creatinine clearance. *Id.* at 1487, 1489.

### 10.     Booka

104.     Eisuke Booka, et al., *Development of an S-1 dosage formula based on renal function by a prospective pharmacokinetic study*, Gastric Cancer 19:876-886 (2016) ("Booka") (DEFS-TT-006160-6170) was published online on August 25, 2015, and is prior art to the '399 and '004 patents.

105.     Booka discloses that "[f]or a drug eliminated primarily via renal excretory mechanisms, impaired renal function alters its pharmacokinetics to an extent that its dosage needs to be changes from that used in patients with normal renal function." Booka at 877 (DEFS-TT-006161). Booka further discloses that the FDA recommends that new drugs "be assessed in patients with impaired renal function during the development phase and that rational dosing recommendations be provided." *Id.*

42

106.    Booka discloses that the Cockcroft-Gault equation is a common serum-creatinine-based equation used to estimate renal function. *Id.* at 878 (DEFS-TT-006162).

### 11.    Lichtman

107.    Stuart M. Lichtman, et al., *International Society of Geriatric Oncology (SIOG) recommendations for the adjustment of dosing in elderly cancer patients with renal insufficiency*, Eur. J. Cancer, 43(1):14-34 (2007) ("Lichtman") (DEFS-TT-006171-6191) is dated 2007, and is prior art to the '399 and '004 patents.

108.    Lichtman discloses dosing adjustments for cancer patients based on renal function. Lichtman at Abstract. According to Lichtman, "[r]ecommendations are based on pharmacokinetic and/or pharmacodynamic data where available." *Id*.

109.    Lichtman explains:

> The impact of physiological changes associated with age (for example modifications of renal function, hepatic metabolism, body fluids and muscle/fat repartition) on the pharmacokinetic and pharmacodynamic properties of drugs can be considerable, particularly for the renal elimination of drugs and metabolites. This is especially so for those drugs that are principally renally excreted and/or are nephrotoxic. These drugs typically have a narrow therapeutic range and for patients who present with reduced renal function, careful dose adjustment is indicated to avoid drug accumulation and toxicity.

Lichtman at 15. As Lichtman further explains:

> If renal function is impaired and renal clearance reduced, a standard chemotherapy dose will clear more slowly from the body and result in a significantly increased area under the plasma concentration curve (AUC). This may lead to unacceptable toxicity. Thus, in the elderly, before initiating potentially toxic drug therapy, hydration status should be assessed and optimised and renal function evaluated. Ideally, studies to assess dose adjustments need to evaluate the relationship between drug plasma clearance, renal function, and drug-induced toxicity…For drugs that are primarily renally excreted, the dose usually needs to be reduced when the estimated GFR falls below 60 mL/min.

*Id.*

110.    Lichtman teaches that "[p]atients with a degree of renal impairment are at risk of

43

drug-induced toxicity and a higher total drug exposure ad overall toxicity due to decreased renal excretion. Both parameters can have implications for drug selection and dosing." *Id.* According to Lichtman, there are three methods to adjust dosage according to the degree of renal failure: "reduce the unitary dose without modifying the administration interval;" "increase the dosing interval without reducing the unitary dose;" and "reduce the unitary dose and increase the dosing interval." *Id.* at 16.

111.    Lichtman also explains:

For all cytotoxic drugs, both toxicity and efficacy are dependent on the plasma drug exposure that corresponds to the AUC. For a particular patient, the AUC is the ratio between dose (bioavailable dose in case of extravascular administration such as oral administration) and the elimination clearance (CL):

AUC = dose/CL for intravenous administration, and
AUC = F [x] dose/CL for extravascular administration, where F is bioavailability.

The principle of dose adjustment in elderly patients is therefore to decrease the dose in proportion to the expected decrease in the clearance.

*Id.*

112.    Lichtman further discloses that in "standard clinical practice, GFR may be evaluated by estimating the creatinine clearance (CLcr) from serum creatinine using an equation…Many different formulae exist which allow estimation of GFR based on SCr measurement. These include…Cockcroft-Gault…the Cockcroft-Gault may be more practical for drug dosing purposes…." *Id.*

### 12.    Huang

113.    S-M Huang, et al., *When to Conduct a Renal Impairment Study During Drug Development: US Food and Drug Administration Perspective*, Clinical Pharmacology & Therapeutics, Vol. 86(5): 475-479 (2009) ("Huang") (DEFS-TT-006192-6196) is dated November 2009, and is prior art to the '399 and '004 patents.

114.    Huang discloses that a "PK study should be conducted in patients with impaired renal function both when the drug is likely to be used in the patients and when the renal impairment is likely to mechanistically alter the PK of the drug and/or its metabolites." Huang at 476 (DEFS-TT-006193).

115.    Huang further discloses that "creatinine clearance (CrCL, in ml/min), estimated by the Cockcroft-Gault (C-G) equation…using a measured serum creatinine concentration (mg/d), has been by far the most widely used measurement of renal function. It is commonly used in labeling to provide guidance on dosing in patients with impaired renal function." *Id.*

116.    Huang explains that: "if a correlation is established between either measure of renal function (i.e., CrCl or eGFR) and the drug's PK, this relationship, together with our understanding of the PK–pharmacodynamics (PK/PD) relationships for both therapeutic and adverse responses, should form the basis of dosing recommendations in patients with varying degrees of renal function impairment." *Id.* 476-477 (DEFS-TT-006193-94).

117.    Huang also explains that:

> Dosing recommendations should be based on the study results from the evaluation of the relationship between CrCl … and the relevant PK parameters (e.g., AUC, maximum plasma concentration (Cmax), and clearance). Assuming that the exposure–response relationship is similar in each subgroup, the dose or dosing interval or both may be adjusted to provide a mean AUC or Cmax for drug and/or active metabolites that is similar in subjects with normal renal function and subjects with varying degrees of impaired renal function.

*Id.* at 477-478 (DEFS-TT-006194-6195).

### 13.    Emura

118.    U.S. Patent No. 7,799,783 ("Emura") (TAI-LONS-0000022-30) is titled Method of Administering an Anticancer Drug Containing α,α,α-trifluorothymidine and Tipiracil Phosphorylase Inhibitor and issued on September 21, 2010. Emura is prior art to the '399 and '004

patents.

119.    Emura discloses a "method for treating a cancer comprising orally administering a composition containing α,α,α-trifluorothymidine (FTD) and 5-chloro-6-(1-(2-iminopyrrolidin-1-yl)methyl)uracil hydrochloride in a molar ratio of 1:05 at a dose of 20 to 80 mg/m$^2$/day in terms of FTD in 2 to 4 divided portions per to patients in need of the treatment." Emura at Abstract; 1:8-12.

120.    Emura further discloses that an "anticancer drug (TAS-102) containing FTD and TPI in a molar ratio of 1:0.5" has been developed. *Id.* at 2:1-10. According to Emura, TAS-102 was evaluated in a Phase I clinical trial in the US, starting by once-a-day oral dosing. *Id.* at 2:23-28. Emura explains that "the present inventors modified the dosing schedule 2 to 3 times daily in tumor-bearing mice for the combination drug, resulting in a significantly increase anti-tumor activity compared to the once-a-day oral dosing there of despite the same total daily dose used…As a result of further administration at a daily oral dose in 2 to 4 divided portions to humans, the present invention was accomplished by the fact that, once-a-day administration was required dose of 100 mg/m2/day (as a doe of FTD) for seeing the effect, in contrast, this divided dosing schedule showed higher effect at a dose as low as 20 to 80 mg/m2/day" *Id.* at 32-43.

121.    Emura states "[i]n other words, the present invention provides a method for treating cancer, comprising administering to patients in need of cancer therapy a composition (hereinafter referred to as TAS-102) containing FTD and 5-chloro-6-(1-(2-iminopyrrolidin-1-yl)methyl)uracil hydrochloride (hereinafter referred to as TPI-1) in a molar ratio of 1:05, at an oral dose of 20 to 80 mg/m$^2$/day in terms of FTD in 2 to 4 divided portions." *Id.* at 2:44-50. As Emura explains "a more favorable therapeutic effect against cancer may be obtained despite the lower total daily dose compared to the once-a-day administration." *Id.* at 2:57-60; *see also id.* at 5:23-30.

46

122.    In terms of an administration schedule, Emura discloses "daily dosing for 5 days followed by 2 days off treatment in the week, more preferably two cycles of daily dosing for 5 days followed by 2 days off treatment in the week, and subsequent 2 weeks off treatment." *Id.* at 5:9-14.

123.    Emura discloses two clinical trials where patients with digestive cancer were administered TAS-102 at daily dose of 100 mg/m$^2$ or a daily dose of 70 mg/m$^2$ in 3 divided portions and where patients with breast cancer were administered TAS-102 twice a day at 60 mg/m$^2$/day or twice a day at 50 mg/m$^2$/day. *Id.* at Example 3 and Example 4.

### 14.    Trifluridine Monograph

124.    APO-Trifluridine, Trifluridine Ophthalmic Solution 1%, Product Monograph ("Trifluridine Monograph") is dated October 22, 2003, and is prior art to the '399 and '004 patents.

125.    The Trifluridine Product Monograph states that "[t]he pharmacokinetics of trifluridine in humans is similar to that of animals. The plasma half-life in human cancer patients following i.v. administration of the drug is short and dose-independent. . . . Following i.v. administration trifluridine is excreted in the urine largely as 5-carboxy-2'-deoxyuridine, with trace amounts of its intermediates and unchanged drug." Trifluridine Product Monograph at 2, 10. In animal studies, "[i]ntravenous and intraperitoneal pharmacokinetic studies in animals (dogs, monkeys, tumour-bearing and normal mice) reveal that 60-93% of the drug is excreted in the urine within 24 hours, mainly as the ultimate metabolite, 5-carboxy-2'-deoxyuridine, with traces of its intermediates." *Id.* at 9.

## IV.    THE ASSERTED CLAIMS OF THE PATENTS-IN-SUIT ARE INVALID UNDER 35 U.S.C. § 112 FOR LACK OF WRITTEN DESCRIPTION

126.    The written description analysis focuses on whether the patent specification demonstrates that the inventor had possession of the claimed invention at the time of filing. The

evidence at trial will show that the inventor was not in possession of the inventions of the Asserted Claims of the Patents-in-Suit.

127. First, the Asserted Claims of the Patents-in-Suit lack written description support for the treatment of patients with severe renal impairment with the specified dosages according to the claimed administration schedule. For example, a POSA would recognize that the specifications of the Patents-in-Suit state in the background of the invention that LONSURF (a combination drug containing FTD and TPI in a molar ratio of 1:0.5) is under development as a therapeutic agent for a solid cancer, but that LONSURF has *not* been administered to patients with "severe renal impairment (Clcr: 15 to 29 mL/min)" because "it is not easy to perform cancer treatment that is safe[] and has high effectiveness on a cancer patient with severe renal impairment." *See, e.g.,* '399 patent at 1:34-2:16. Thus, at the time of filing there was *no* evidence in the specifications that any patient with *severe renal impairment* had been administered LONSURF at any dose, much less the claimed dose according to the claimed administration schedule for the treatment of the claimed cancers. This is confirmed by the inventor who admitted that "[t]here had not been administration to patients with severe renal impairment as of February 5th 2016," Akaike Dep. Tr. at 56:7-12, and that "clinical results for severe renal impaired patients are not included in [the '399] patent," *id.* at 63:1-6. Further, in addition to lacking patient data, the specifications are devoid of any data, including non-clinical data, related to severe renal impairment.

128. At best, the specifications of the Patents-in-Suit disclose in Example 1 a "Dose Estimation in Cancer Patients with Severe Renal Impairment." *See, e.g.,* '399 patent at 7:54-9:63. However, Example 1 relates only to a dose estimation. More specifically, in Example 1, the pharmacokinetics of FTD was studied in patients with solid cancer, including colorectal cancer, following oral administration of an FTD/TPI combination drug (in a molar ratio of 1:05) at a dose

of 35 mg/m$^2$ twice daily for 5 days, followed by rest for 2 days, twice, followed by rest for 14 days, as repeated each cycle. *Id.* at 7:56-65. According to the specification, "[r]enal function was evaluated by calculating the value of CLcr by the Cockcroft-Gault equation…and patients were assigned into groups of control (normal, CLcr: ≥90 mL/min), mild (CLcr: 60 to 89 mL/min) and moderate (CLcr: 30 to 59 mL/min)." *Id.* at 7:66-8:3. As is readily apparent from this disclosure, no patients with severe renal impairment (CLcr: 15-29 mL/min) were included in the study. *Id.* at Example 1. Therefore, based on the pharmacokinetic data in patients who did not have severe renal impairment, the inventor stated that because "the AUC of FTD increases with the deterioration of renal function…the need for reducing the dose of FTD/TPI combination drug is suggested for patient[s] with severe renal impairment." *Id.* at 8:42-65 (emphasis added).

129.    Example 1 also discloses that "[i]n order to determine the appropriate dose for the patients with severe renal impairment, a regression analysis of oral clearance (CL/F) and creatinine clearance (CLcr) of FTD on Day 12 of administration was performed," with results depicted in Figure 1 (see below). *Id.* at 8:66-9:3.

### RELATIONSHIP BETWEEN CREATININE CLEARANCE AND ORAL CLEARANCE OF FTD



49

130.    A POSA would recognize, even from a cursory review of Figure 1, that none of the data points therein are associated with a creatinine clearance (CLcr) in the range of 15 to 29 mL/min—i.e., the range associated with severe renal impairment. *Id.* at Figure 1. Rather, the data points are clustered in a range of CLcr values above 29 mL/min (see Fig. 1, solid line, labeled CLcr=29). *Id.* A POSA would also recognize that the R2 value for this regression analysis—which shows how well the data fits the regression model—was 0.1436. This low $R^2$ value (i.e., a value closer to 0 than to 1) suggests a weak relationship between the variables and that the model is not predictive. Plaintiffs' expert, Dr. David R. Taft, disputes that the low $R^2$ value (.1436) for the regression analysis in Figure 1 would raise concerns for a POSA because it is not the "first or primary" criterion a POSA would evaluate. Taft Rebuttal at ¶633. But simply because an $R^2$ value is not the "primary" criterion a POSA would evaluate does not mean that a POSA would ignore this information. To the contrary, in view of the low $R^2$ value (.1436), a POSA would understand that the relationship between the variables and the regression analysis is not predictive, or, at best, has minimal predictive value. Given this understanding, and the assertion that the alleged invention would have been unexpected, the specifications do not demonstrate that the inventor possessed more than a hope that the invention would work—which is not sufficient for adequate written description.

131.    Further, according to the specifications, the relationship of CLcr to CL/F of FTD was approximated to a power function curve, and the CL/F of FTD in each renal impairment level was calculated from CLcr using the following "regression equation": FTD CL/F $(L/hr)=0.3432 \times CLcr$ $(mL/min)^{0.4870}$. *Id.* at 9:4-13. Based on this regression analysis *alone*, the inventor concluded that "[i]n the patient with severe renal impairment, the dose of FTD/TPI combination drug is reduced to 30 to 50 mg/m²/day as FTD-equivalent, and particularly, reduced

50

to 40 mg/m$^2$/day as FTD equivalent…." *Id.* at 9:58-62. In other words, the specifications of the Patents-in-Suit include nothing more than *speculation* as to the appropriate dose of an FTD/TPI combination drug for treating cancer in patients with severe renal impairment. But there is no evidence that this estimated dose can treat cancer in a patient with severe renal impairment. A POSA would not rely on a regression analysis, particularly one with a low $R^2$ value, using patients with normal renal function and mild and moderate renal impairment, to determine the appropriate dose to treat a patient with severe renal impairment. Even the inventor testified, "[o]ne can make any number of estimates" with respects to the dose but "the most important point…is whether the estimated would actually *work* in the patient or not." Akaike Dep. Tr. at 97:1-17 (emphasis added).

132.   Therefore, a POSA would recognize that there is no disclosure in the specifications of the Patents-in-Suit demonstrating that the inventor possessed the invention of the Asserted Claims, which is bolstered by the LONSURF FDA Approval Package, wherein the FDA stated:

> We have determined that only a clinical trial (rather than a nonclinical or observational study) will be sufficient to assess signals of a serious risk of … renal function on the pharmacokinetics of Lonsurf (trifluridine and tipiracil) resulting in excessive toxicity to include myelosuppression.
>
> Therefore, based on appropriate scientific data, FDA has determined that you are required to conduct the following:
>
> \*   \*   \*
>
> 2963-2   Conduct the ongoing clinical pharmacokinetic trial to determine an appropriate dose of Lonsurf (trifluridine and tipiracil) in patients with severe renal impairment in accordance with the FDA Guidance for Industry entitled "Pharmacokinetics in Patients with Impaired Renal Function: Study Design, Data Analysis, and Impact on Dosing and Labeling."

LONSURF FDA Approval Package, Approval Letter, at 3 (DEFS-TT-005551). Even Plaintiffs have admitted that "FDA recognized the need to proceed with caution. Indeed, rather than asking Taiho to simply extrapolate the RECOURSE data, the FDA required Taiho to '[c]omplete the

51

ongoing [dedicated renal impairment clinical study] to determine an appropriate dose of Lonsurf . . . in patients with severe renal impairment in accordance with the FDA Guidance for Industry.' DEFS-TT-005551." *See* Plaintiffs' Second Supplemental Objections and Responses to Defendants' Joint First Set of Interrogatories (Nos-14) (Supplementing Interrogatory Nos. 1-2, 4) at Supplemental Response to Interrogatory No. 2 (12/28/23).

133.    Further, during prosecution of the '399 patent, the inventor made the same argument to overcome rejections over the prior art. The Applicant asserted that none of the references cited by Examiner "concern the administration of TAS-102 to *patients with severe renal impairment*." Jan. 19, 2019 Amendment at 7 (emphasis added); *see* July 12, 2019 Response at 5.

134.    Second, claim 10 of the '399 patent and claims 1-4 and 17-18 of the '004 patent broadly recite methods of treating "gastrointestinal cancer, large bowel cancer and breast cancer." In addition to the reasons discussed above, each of these claims also lacks written description because the specifications of the Patents-in-Suit fail to demonstrate that the inventor possessed methods of treating each of these claimed cancers in patients with severe renal impairment based on the claimed dosing and administration schedule. Instead, the specification only discloses that LONSURF (a combination drug containing FTD and TPI in a molar ratio of 1:0.5) "was approved for the treatment as a therapeutic agent *for advanced and recurrent colorectal cancer* in the U.S." *Id*. at 1:34-48 (emphasis added). In other words, the specifications fail to disclose that the administration of LONSURF at the claimed dosage to patients with severe renal impairment results in treatment of *all the claimed cancers*, e.g., breast cancer. Notably, Plaintiffs' expert, Dr. Thomas Abrams, has not rebutted this argument other than to generally state "[t]he description of the invention in the provisional disclosure clearly showed that Dr. Yoshida and Taiho possessed the invention." Abrams Rebuttal at ¶254. As the evidence at trial will show, Dr. Abrams cannot rebut

this written description argument because there are simply no disclosures in the specification that would support the use of LONSURF at a reduced dose in SRI patients for the treatment of all the claimed cancers, and, more specifically, no disclosures related to a "safe" and "effective" dose of LONSURF for SRI patients for the treatment of all the claimed cancers, to the extent safety and efficacy is required. Therefore, for this additional reason, claim 10 of the '399 patent and claims 1-4 and 17-18 of the '004 patent lack written description.

135.    Accordingly, the Asserted Claims of the Patents-in-Suit are invalid for lack of written description.

### A.    Plaintiffs' Experts Offer Written Description Arguments That Are Directly Contradicted By Their Arguments Concerning Anticipation/Obviousness

#### 1.    Dr. Abrams's contradictory written description arguments

136.    As will be shown at trial, Dr. Abrams's conclusions regarding written description are unreliable at least because his conclusions are directly contradicted by the arguments he makes in support a finding that the Asserted Claims of the Patents-in-Suit are not anticipated and/or rendered obvious by the prior art.

137.    Dr. Abrams asserts that the Asserted Claims of the Patents-in-Suit are not anticipated and/or obvious in view of the prior art at least because there were no clinical trials establishing a "safe" and "effective" dose of LONSURF in SRI patients. *See, e.g.,* Abrams Rebuttal at ¶¶118 ("As part of the Approval Package, FDA required Taiho to complete a dedicated renal study to assess the impact of LONSURF on SRI patients.") (emphasis in original), 147 ("It was also generally known in the industry around 2015 and 2016 that there was an absence of studies done using LONSURF on SRI patients."), 159 ("The Approval Package has no prediction of a safe and effective dose reduction for SRI patients, nor is there any indication that LONSURF could have been used safely with SRI patients."), 205 ("the Lonsurf Report teaches nothing about

whether LONSURF may be safely and effectively administered to an SRI patient."), 217 ("The only reference that does mention the study of SRI patients is NCT '117, but this document does not have any actual data for SRI patients; it is merely the initial clinical plan to collect such data."), 243 ("The medical community knew that there were no studies involving LONSURF administration to SRI patients before 2017.") 251 ("One common thread running through nearly all of the prior art references upon which Dr. Dreicer relies is the need for a dedicated renal study to understand and analyze the effects of LONSURF on renal sufficiency.")

138.    According to Dr. Abrams, "a POSA treating a Stage IV colorectal cancer patient with SRI would *only* use treatment options where data and information from FDA or other reliable sources in which the therapeutic drug had been studied and/or analyzed *within the SRI population.* Thus, a general oncologist would not have considered dosing SRI patients with LONSURF until December 2019, when FDA approved the use of LONSURF at a reduced dose for SRI patients." *Id.* at ¶88 (emphasis added); *id.* at ¶163 ("[T]he instruction to a POSA – like the instruction to Taiho [from FDA] – was to wait until the dedicated renal study was *complete* before assessing whether and how LONSURF can be administered to an SRI patient.") (emphasis added). As Dr. Abrams explains, the FDA specifically determined "'that <u>only a clinical trial (rather than a nonclinical or observation study) will be sufficient</u> to assess signals of a serious risk of impaired hepatic or renal function on the pharmacokinetics of Lonsurf [] resulting in excessive toxicity to include myelosuppression.'" *Id.* at ¶166 (emphasis in original).

139.    In a complete about-face, however, Dr. Abrams also asserts that "Taiho was in full possession of the invention set forth in the '399 and '004 Patents as of the priority date" despite the fact that no clinical study had been completed demonstrating a "safe" and "effective" dose of LONSURF in SRI patients. *See* Abrams Rebuttal at ¶¶250-257. To support his contrary position,

Dr. Abrams contends that the provisional application (62/291,799) provided sufficient description to show that Dr. Yoshida and Taiho possessed the invention. *Id.* at ¶252. According to Dr. Abrams, the characteristics of the testing and analysis in the provisional application included: (1) a dedicated study with balanced testing; (2) data obtained at predetermined, densely-sampled intervals; (3) data from which Dr. Yoshida could analyze how FTD functions as a measure of kidney function in normal patients, mild patients, and moderate patients; (4) understanding how the concentration of FTD in the cohorts could be analyzed and understood so as to make an Interim Assessment on how LONSURF may be administered to an SRI patient; and (5) years of experience in pharmacokinetics that enabled Dr. Yoshida to make a clear assessment of what was not only a safe dosage of LONSURF to administer to an SRI patient but one that was expected to be as efficacious as Taiho had observed in the other non-SRI cohorts and other non-SRI patients who were now receiving LONSURF. *Id.* (citing TAI-LONS-03647653- 03647675.)

140. Tellingly, however, Dr. Abrams admits: "it is true that at the time of the filing of the patent application, Dr. Yoshida and Taiho had not yet completed the final arm of the dedicated kidney study [i.e., the portion of the study in SRI patients]…." Abrams Rebuttal at ¶257. This is fatal to Dr. Abrams's written description analysis. Dr. Abrams and Taiho cannot have it both ways. If a POSA would not have found it obvious and been motivated to reduce the dose of LONSURF in SRI patients with a reasonable expectation of success, based on the teachings in the prior art (i.e., based on clinical studies in patients with normal, mild, and moderate renal impairment), then for that same reason the Asserted Claims lack sufficient written description. That is, Dr. Yoshida and Plaintiffs could not have possessed the invention because, as Dr. Abrams admits, "at the time of the filing of the patent application, Dr. Yoshida and Taiho had not yet completed the final arm of the dedicated kidney study [i.e., the portion of the study in SRI patients]…." *Id.* In fact, there is

no clinical trial data in the specification of the Patents-in-Suit from SRI patients. Rather, a POSA would recognize that the specifications of the Patents-in-Suit state that LONSURF has not been administered to patients with "severe renal impairment (Clcr: 15 to 29 mL/min)" because "it is not easy to perform cancer treatment that is safe[] and has high effectiveness on a cancer patient with severe renal impairment." *See, e.g.,* '399 patent at 1:34-2:16. Further, as explained in Dr. Dreicer's Opening Expert Report, "[t]his [was] confirmed by the inventor who admitted that '[t]here had not been administration to patients with severe renal impairment as of February 5th 2016,' Akaike Dep. Tr. at 56:7-12, and that "clinical results for severe renal impaired patients are not included in [the '399] patent,' *id.* at 63:1-6." Dreicer Opening Report at ¶158.

141.    At best, the specifications of the Patents-in-Suit disclose in Example 1 a "Dose Estimation in Cancer Patients with Severe Renal Impairment." *See, e.g.,* '399 patent at 7:54-9:63. But this is based on pharmacokinetic data in patients who did not have severe renal impairment. As the inventor explained, "the AUC of FTD increases with the deterioration of renal function…[thus] the need for reducing the dose of FTD/TPI combination drug is *suggested* for patient[s] with severe renal impairment." *Id.* at 8:42-65 (emphasis added). In other words, the specifications of the Patents-in-Suit include nothing more than speculation as to the appropriate dose of an FTD/TPI combination drug for treating cancer in patients with severe renal impairment. But the specification needs more than a mere suggestion that an invention might work.

142.    Further, while the Asserted Claims do not include a safety or efficacy requirement, to the extent Plaintiffs and/or their experts argue otherwise, and the Court agrees, then it is clear that Dr. Yoshida and Plaintiffs did not possess a "safe" and "effective" method of administering LONSURF to SRI patients at a reduced dose, at least because Dr. Yoshida and Taiho admitted that they "had not yet completed the final arm of the dedicated kidney study [i.e., the portion of the

study in SRI patients]" "at the time of the filing of the patent application." Abrams Rebuttal at ¶257. And, as Dr. Abrams repeatedly stated, one cannot demonstrate the safety and efficacy of LONSURF, particularly in fragile patients such as those with severe renal impairment, in the absence of a clinical trial. Moreover, according to Dr. Abrams "[u]ntil the data [from the dedicated renal study] were gathered and analyzed, neither the FDA nor any POSA could have had the expectation that LONSURF could have been administered to SRI patients in any dose." *Id.* at ¶256. Applying that same logic, a POSA would not consider the specifications of the Patents-in-Suit to include sufficient detail to convey to a POSA that the inventor possessed the claimed invention, i.e., a "safe" and "effective" dose of LONSURF for administration to SRI patients, because the dedicated renal study in SRI patients had not been completed and the data had not been "gathered and analyzed" and included in the Patents-in-Suit (or provisional application). Indeed, even the inventor admitted that "[o]ne can make any number of estimates" with respects to the dose but "the most important point…is whether the estimated would actually *work* in the patient or not." Akaike Dep. Tr. at 97:1-17 (emphasis added).

### 1.    Dr. Taft's  contradictory written description arguments

143.    As will be shown at trial, Dr. Taft's conclusions regarding written description are unreliable at least because his conclusions are directly contradicted by the arguments he makes in support a finding that the Asserted Claims of the Patents-in-Suit are not anticipated and/or rendered obvious by the prior art.

144.    Dr. Taft repeatedly asserts that the Asserted Claims of the Patents-in-Suit are not anticipated and/or obvious in view of the prior art because there were no clinical trials establishing a "safe" and "effective" dose of LONSURF in SRI patients and the clearance equations in the prior art were not reliable for extrapolating to SRI patients. Taft Rebuttal at §IX. Then, taking a completely contradictory position, Dr. Taft claims that the specifications of the Patents-in-Suit

57

"sufficiently describe a method of treating SRI patients at the claimed dose…and dosing regimen" based on a regression analysis using data from non-SRI patients. Taft Rebuttal at §IX.

145.   However, the regression analysis disclosed in the specifications of the Patents-in-Suit provides nothing more than *speculation* as to the appropriate dose of an FTD/TPI combination drug for treating cancer in patients with severe renal impairment. *See, e.g.,* '399 patent at 8:42-65 ("the AUC of FTD increases with the deterioration of renal function…[thus] the need for reducing the dose of FTD/TPI combination drug is *suggested* for patient[s] with severe renal impairment.") (emphasis added). Indeed, the specification states that the regression analysis was based on data from normal, mild, and moderate cohorts—not patients with severe renal impairment. *See, e.g., id.* at 7:66-8:3 ("[r]enal function was evaluated by calculating the value of CLcr by the Cockcroft-Gault equation…and patients were assigned into groups of control (normal, CLcr: ≥90 mL/min), mild (CLcr: 60 to 89 mL/min) and moderate (CLcr: 30 to 59 mL/min)."); *see also* Akaike Dep. Tr. at 56:7-12, 63:1-6 (the inventor admitted that "[t]here had not been administration to patients with severe renal impairment as of February 5th 2016," and that "clinical results for severe renal impaired patients are not included in [the '399] patent.").

146.   Dr. Taft attempts to rebut this argument by asserting that "the specification need not disclose data showing that Lonsurf had actually been administered to an SRI patient or that it worked in an SRI patient." Taft Rebuttal at ¶614. But the specification needs more than a mere suggestion that an invention might work, particularly where there is an assertion (as here) that a POSA would not have expected the invention to work. *See, e.g.,* Taft Rebuttal at ¶610 ("determining that it was safe an effective to administer the claimed dosages [of LONSRUF] in SRI patients was *unexpected*") (emphasis added); *see also id.* at ¶606 ("[A POSA] looking at Teysuno—a fixed combination drug that functions similarly to Lonsurf— *would have had reason*

*to doubt* that Lonsurf would be safe and effective to administer to SRI patients.") (emphasis added). Even the inventor admitted that "[o]ne can make any number of estimates" with respects to the dose but "the most important point…is whether the estimated would actually work in the patient or not." Akaike Dep. Tr. at 97:1-17. And as Dr. Taft stated when criticizing Dr. Dreicer's use of the pharmacokinetics model based on the RECOURSE Study, "even if there had been balanced cohorts of patients in RECOURSE used to derive the pharmacokinetics model, a person of ordinary skill in the art would understand that using a population pharmacokinetics model such as this, that also employs sparsely-sampled data, to estimate a proper dose in SRI patients *would still require clinical testing in this patient population to establish a reasonable expectation of successfully treating those patients both safely and effectively*." Taft Rebuttal at ¶248; *see also id.* at ¶283. Moreover, according to Dr. Taft, "the nonlinear, time-dependent behavior is *unexpectedl*y more pronounced in patients with moderate and severe renal impairment as compared with patients having normal renal function" and "[t]his phenomenon illustrates *the importance of actually testing the estimated dosage amount of Lonsurf in SRI patients*." Taft Rebuttal at ¶153 (emphasis added). Thus, Dr. Taft's own analysis contradicts his written description arguments.

147.   Further, as Defendants' expert, Dr. Dreicer will explain at trial, during prosecution of the '399 patent, the inventor made the same argument to overcome rejections over the prior art. *See, e.g.*, Dreicer's Opening Expert Report at ¶164. That is, the inventor asserted that none of the references cited by Examiner "concern the administration of TAS-102 to patients with severe renal impairment." Accordingly, even the inventor believed that a clinical trial was needed.

148.   Further, while the Asserted Claims do not include a safety or an efficacy requirement, it appears that Dr. Taft includes these heightened requirements in his

59

anticipation/obviousness analysis. *See, e.g.,* Taft Rebuttal at e.g., ¶¶20 ("there was no reasonable expectation of success that administering a reduced dose of Lonsurf to SRI patients would be safe and effective"), 23, 246 ("Consequently, a [POSA] would not have used the equations mentioned above to determine a safe and effective dose of Lonsurf in SRI patients, whose kidney function deviates far from normal."), 320 ("Identifying a safe and effective dosing regimen for such patients using a combination therapy, like Lonsurf, compounds the complexities."), 346, 373 ("There was no reasonable expectation of success that administering a reduced dose Lonsurf (by 1.90-2.66 times or from 2-3 times from 35 mg/m2 twice daily) to SRI patients would be safe and effective."), 389, 441, 494, 537, 559, 576, 605 ("The inventor, nonetheless, satisfied this long felt but unmet need by determining via the dedicated renal impairment study that administering 20 mg/m2 twice daily to SRI patients was safe and effective."), 610 ("determining that it was safe an effective to administer the claimed dosages [of LONSRUF] in SRI patients was unexpected"), 606 ("[A POSA] looking at Teysuno—a fixed combination drug that functions similarly to Lonsurf—would have had reason to doubt that Lonsurf would be safe and effective to administer to SRI patients.").

149.    If the Court agrees that the Asserted Claim require safety and efficacy, then it is clear that Dr. Yoshida and Plaintiffs did not possess a "safe" and "effective" method of administering LONSURF to an SRI patient. Indeed, while Dr. Taft argues that "[a]t this starting dose (i.e., 40 mg/m$^2$/day as FTD equivalent), 'the efficacy can be expected while maintaining safety,'" Taft at ¶631 (citing '004 patent at 10:3-7; '399 patent at 9:61-63), the fact is, the inventor did not know this to be true until he ***completed*** the renal impairment study in SRI patients. The state of the art at the time of the claimed invention would have confirmed as much to a POSA. For example, as Dr. Taft himself recognizes, the prior art taught that the FDA required Taiho to ***complete*** the renal study to demonstrate safety and efficacy:

60

> The Lonsurf FDA Approval Package expressly states: *"[c]omplete the ongoing clinical pharmacokinetic trial to determine an appropriate dose of Lonsurf* (trifluridine and tipiracil) in patients with severe renal impairment . . . ." DEFS-TT005546 at 551 (Lonsurf FDA Approval Package). The Lonsurf FDA Approval Package further explains that the *data needed to be collected and analyzed* with respect to SRI patients from the dedicated renal impairment study "to ensure that a *safe dose can be recommended* to patients with renal or hepatic impairment." DEFS-TT-005546 at 5665 (Lonsurf FDA Approval Package) (emphasis added); DEFS-TT-005546 at 665 *("[T]he Applicant is required to complete the following ongoing pharmacology trails in Table 1 [to] ensure that a safe dose can be recommended* to patients with renal or hepatic impairment.") (emphasis added); see also DEFS-TT-005546 at 51 ("[W]e have determined that only a clinical trial (rather than a nonclinical or observational study) will be sufficient to assess signals of a serious risk of impaired hepatic and renal function on the pharmacokinetics of Lonsurf (trifluridine and tipiracil) resulting in excessive toxicity to include myelosuppression. . . .Complete the ongoing clinical pharmacokinetic trial to determine an appropriate dose of Lonsurf in patients with severe renal impairment. . . .") (emphasis added); DEFS-TT-005546 at 600 (Lonsurf FDA Approval Package) ("[C]omplete ongoing studies assessing *whether, and how, pharmacokinetics are altered in patients with severe renal impairment*. . . .")

Taft Rebuttal at ¶366 (emphasis in original). And as Dr. Taft stated when criticizing Dr. Dreicer's use of the pharmacokinetics model based on the RECOURSE Study, "even if there had been balanced  cohorts of patients in RECOURSE used to derive the pharmacokinetics model, a person of ordinary skill in the art would understand that using a population pharmacokinetics model such as this, that also employs sparsely-sampled data, to estimate a proper dose in SRI patients *would still require clinical testing in this patient population to establish a reasonable expectation of successfully treating those patients both safely and effectively*." Taft Rebuttal at ¶248; *see also id.* at ¶283.

150.    Dr. Taft also argues that "[t]he FDA came to the same conclusion that the regression analysis the inventor disclosed is a reliable way to estimate the dosage of Lonsurf in SRI patients" and "[i]f the FDA thought that Taiho's data or model were unreliable, they presumably would have required Taiho to use a different method to assess what dose, if any, should be administered to SRI patients…." Taft Rebuttal at ¶¶637-638. But the FDA specifically stated:

61

*We have determined that only a clinical trial (rather than a nonclinical or observational study) will be sufficient* to assess signals of a serious risk of … renal function on the pharmacokinetics of Lonsurf (trifluridine and tipiracil) resulting in excessive toxicity to include myelosuppression.

Therefore, based on appropriate scientific data, FDA has determined that you are required to conduct the following:

\* \* \*

2963-2    Conduct the ongoing clinical pharmacokinetic trial to determine an appropriate dose of Lonsurf (trifluridine and tipiracil) in patients with severe renal impairment in accordance with the FDA Guidance for Industry entitled "Pharmacokinetics in Patients with Impaired Renal Function: Study Design, Data Analysis, and Impact on Dosing and Labeling."

LONSURF FDA Approval Package at DEFS-TT-005551 (emphasis). Thus, the FDA did not consider the regression analysis to be sufficient to establish that LONSURF would be safe and effective in an SRI patient to treat cancer.

151.    Finally, Dr. Taft attempts to defend against obviousness by insisting that a POSA would not have expected LONSURF to be safe and effective in treating cancer in an SRI patient. *See, e.g.,* Taft Rebuttal at ¶610 ("determining that it was safe an effective to administer the claimed dosages [of LONSRUF] in SRI patients was ***unexpected***") (emphasis added); *see also* id. at ¶606 ("[A POSA] looking at Teysuno—a fixed combination drug that functions similarly to Lonsurf— would have had reason to doubt that Lonsurf would be safe and effective to administer to SRI patients."). In fact, Dr. Taft argues "the asserted patents highlight this unexpected result, stating that while 'it is not easy to perform cancer treatment that is safer and high effectiveness on a cancer patient with severe renal impairment,' 'a remarkable anticancer effect is recognized [in administering a 20 mg/m2 dose twice daily to SRI patients] while avoiding severe side effects.'" Id. at ¶611. These statements underscore the failure of the specifications of the Patents-in-Suit to teach a POSA, who would expect otherwise, that LONSURF would be safe and effective in an

62

SRI patient to treat cancer. For at least these reasons, the Asserted Claims of the Patents-in-Suit are invalid for lack of written description.

## V.    THE ASSERTED CLAIMS OF THE PATENTS-IN-SUIT ARE INVALID AS ANTICAPTED AND/OR OBVIOUS UNDER 35 U.S.C. §§ 102 and 103

152.    To the extent Plaintiffs argue at trial that the Asserted Claims of the Patents-in-Suit simply require adjusting the dose of LONSURF based on a creatinine clearance range that classifies the patient as having severe renal impairment, then the evidence will show that the Asserted Claims would have been anticipated and/or obvious. Further, to the extent Plaintiffs assert at trial that the inventor had possession of the claimed methods of treatment based on the regression analysis presented in the Patents-in-Suit, and the Court agrees, then the evidence will show that the prior art renders the Asserted Claims anticipated and/or obvious.

### A.    The Asserted Claims of the Patents-In-Suit are Invalid as Anticipated by the LONSURF FDA Approval Package and/or Obvious Over the LONSURF FDA Approval Package in View of the General Knowledge and Experience of a POSA, Optionally in Further View of FDA Guidance

153.    The evidence at trial will establish that the Asserted Claims of the Patents-in-Suit are invalid as anticipated by the LONSURF FDA Approval Package and/or obvious over the LONSURF FDA Approval Package in view of the general knowledge and experience of a POSA, optionally in further view of FDA Guidance.

#### 1.    Claim 10 of the '399 patent

154.    Claim 10 of the '399 patent depends from claims 1 and 2 and recites:

> 10. The method for treating cancer according to claim 2, wherein a dose of 40 mg/m$^2$/day as FTD-equivalent is divided in two portions.

When each of the limitations from claims 1 and 2 are read into claim 10, claim 10 requires the following:

> A method for treating cancer which is one of gastrointestinal cancer, large bowel cancer and breast cancer, comprising: detecting a creatinine clearance of a patient;

63

and orally administering to the patient with a creatinine clearance of 15 mL/min or more and 29 mL/min or less a combination drug comprising α,α,αtrifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5, wherein a dose of 40 mg/m$^2$/day as FTD-equivalent is divided in two portions for administration.

155. The evidence at trial will show that each of the limitations of claim 10 of the '399 patent is disclosed by the LONSURF FDA Approval Package and/or disclosed by the LONSURF FDA Approval Package in view of the general knowledge and experience of a POSA, optionally in further view of FDA Guidance as discussed below.

### *A method for treating cancer which is one of gastrointestinal cancer, large bowel cancer and breast cancer, comprising*

156. The preamble of the '399 patent is taught by the LONSURF FDA Approval Package. For example, the LONSURF FDA Approval Package discloses that Lonsurf tablets, 15 and 20 mg, were approved by FDA on September 22, 2015 "[f]or the treatment of patients with metastatic colorectal cancer who have previously been previously treated with fluoropyrimidine-oxaliplatin-and irinotecan-based chemotherapy, an anti-VEGF biological therapy, and if RAS wild-type, an anti-EGFR therapy." LONSURF FDA Approval Package at 1 (DEFS-TT-005546); *see also id*. at Summary Review, 2 (DEFS-TT-005590) ("This NDA relied on the results of a single multicenter, randomized (2:1), double-blind, placebo-controlled trial, Study TPU-TAS-102-301 (RECOURSE). Key eligibility criteria [included] histologically documented metastatic colorectal cancer (mCRC)…."); *id*. at Clinical Pharmacology and Biopharmaceutics Review(s), 1 (DEFS-TT-005995) (Proposed Indication: "Metastatic colorectal cancer (CRC)"), 4 (DEFS-TT-005998) ("NDA for Lonsurf … is submitted for treatment of patients with metastatic colorectal cancer (mCRC)…."); *id*. at Other Review, Clinical Inspection Summary, 2 (DEFS-TT-006130) (Taiho "seeks approval to market Lonsurf (TAS-102) for the treatment of patients with unresectable

advanced or recurrent (metastatic) colorectal cancer (mCRC)").

157.   Further, as Dr. Dreicer will confirm at trial, a POSA would have understood that metastatic colorectal cancer is a type of large bowl cancer as required by claim 10 of the '399 patent. Indeed, the Patents-in-Suit define large bowel cancer as "colorectal cancer, colon cancer, [and] rectal cancer." *See, e.g.*, '399 patent at 6:56-62. Accordingly, in view of these disclosures, the preamble of claim 10 of the '399 patent is disclosed by the LONSURF FDA Approval Package.

### *detecting a creatinine clearance of a patient; and*

158.   The LONSURF FDA Approval Package also discloses "detecting a creatinine clearance of a patient," as recited in claim 10 of the '399 patent. For example, the Clinical Pharmacology and Biopharmaceutics Review(s) disclose:

> ***Renal Impairment***: In Study RECOURSE, the mean values of AUC for trifluridine at steady state were 31% higher in patients with mild (CLcr = 60-89 mL/min, n=38) and 43% higher in patients with moderate (CLcr = 30 to 59 mL/min, n= 16) renal impairment than those in patients with normal (CLcr ≥ 90 mL/min, n=84) renal function. Similar effect of renal impairment on the tipiracil exposure was observed (34% higher in patients with mild and 68% higher in patients with moderate renal impairment than that in patients with normal renal function).

LONSURF FDA Approval Package, Clinical Pharmacology and Biopharmaceutics Review at 8 (DEFS-TT-006002).

159.   Further, the Clinical Pharmacology and Biopharmaceutics Review(s) disclose, in Table 18 and Figure 7, a summary of the daily AUC of FTD and TPI in patients from each renal function subgroup, including patients with normal, mild, and moderate renal impairment:

65

**Table 18.** Summary of Daily AUC for Each Renal Function Subgroup (PK Population in Study RECOURSE)

| Renal Impairment Based on CLcr | Analyte<br>PK Parameter<br>Unit<br>Period<br>Method | FTD<br>Daily AUC<br>ng·hr/mL<br>Day 12<br>Pop-PK | TPI HCl<br>Daily AUC<br>ng·hr/mL<br>Day 12<br>Pop-PK |
|---|---|---|---|
| Normal (CLcr >=90 mL/min) | n | 84 | 84 |
| | Mean | 38812.0 | 630.7 |
| | SD | 10905.3 | 300.5 |
| | CV | 28% | 48% |
| Mild Impairment (CLcr 60-89 mL/min) | n | 38 | 38 |
| | Mean | 50177.8 | 825.9 |
| | SD | 11835.6 | 343.0 |
| | CV | 24% | 42% |
| | Ratio of Geometric Mean to the Normal Group | | |
| | Estimate | 1.31 | 1.34 |
| | (95% CI) | (1.17 - 1.46) | (1.13 - 1.59) |
| Moderate Impairment (CLcr 30-59 mL/min) | n | 16 | 16 |
| | Mean | 54898.0 | 1060.9 |
| | SD | 13675.8 | 616.5 |
| | CV | 25% | 58% |
| | Ratio of Geometric Mean to the Normal Group | | |
| | Estimate | 1.43 | 1.65 |
| | (95% CI) | (1.22 - 1.68) | (1.29 - 2.11) |

Source: Table 1, Sponsor's response to the IR of analysis of renal function effect in Study RECOURSE

**Figure 7.** Effect of Renal Impairment on AUCss of Trifluridine in Study RECOURSE



*Id.* at 29-30 (DEFS-TT-006023-6024).

160.    In view of these disclosures in the LONSURF FDA Approval Package, it is clear that creatinine clearance was detected in the patients enrolled in the RECOURSE study because patients were divided into subgroups, i.e., normal ($CL_{CR}$ >=90 mL/min), mild ($CL_{CR}$ 60- 89 mL/min), and moderate ($CL_{CR}$ 30-59 mL/min) renal function, based on creatinine clearance. Accordingly, the LONSURF FDA Approval Package discloses this limitation of claim 10 of the '399 patent.

66

*a combination drug comprising α,α,α-trifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5*

161.    This limitation is also disclosed by the LONSURF FDA Approval Package. For example, the LONSURF FDA Approval Package states that the generic name for LONSURF is trifluridine and tipiracil. LONSURF FDA Approval Package at 1 (DEFS-TT- 005546). The Summary Review discloses that LONSURF "is a new molecular entity consisting of two drugs, trifluorithymidine (FTD; trifluridine) and tipiracil (TPI), in a fixed molar ratio of 1.0:0.5 that is supplied as tablets for oral administration in strengths of 15-mg and 20-mg, based on the trifluridine component." LONSURF FDA Approval Package, Summary Review at 2 (DEFS-TT-005590); *see also id*. at Clinical Review at 30 (DEFS-TT-005681) ("TAS-102…is a fixed combination of 1M trifluridine (FTD; α,α,α-trifluorothymidine) and 0.5 M tipiracil hydrochloride (TPI;            5-chloro-6-[(2-iminopyrrolidin-1-yl)methyl]pyrimidine-2,4-(1H,3H)-dione monohydrochloride)); *id*. at Clinical Pharmacology and Biopharmaceutics Review(s), 1 (DEFSTT-005995) ("Lonsurf (TAS-102), combination product of trifluridine and tipiracil hydrochloride at a molar ratio of 1:0.5 (Weight ratio, 1:0.471)"), 4 (DEFS-TT-005998) ("Lonsurf (combination of trifluridine and tipiracil hydrochloride at a molar ratio of 1:0.5)"); 7 (DEFS-TT-006001) ("TAS102 (Lonsurf) is a combination product of trifluridine (FTD) and tipiracil hydrochloride (TPI) at a molar ratio of 1:0.5 (weight ratio, 1:0.471) formulated in an immediate-release, film-coated tablet with two strengths of 15 mg and 20 mg (expressed as mg of trifluridine per tablet)."); *id*. at Other Reviews, Thorough QT Study Review at 2 (DEFS-TT-006088) ("TAS-102 is a combination of 1M α,α,α-trifluorothymidine (FTD) and 0.5 M 5-chloro-6-(2-iminopyrrolidin-1-yl)    methyl2,4(1H,3H)-pyrimidinedione    hydrochloride    (thymidine phosphorylase inhibitor [TPI])").

162.    Accordingly, the LONSURF FDA Approval Package discloses this limitation of claim 10 of the '399 patent.

### orally administering … wherein a dose of 40 mg/m2/day as FTD-equivalent is divided in two portions for administration

163.    The LONSURF FDA Approval Package also discloses orally administering a combination of FTD and TPI in a molar ratio of 1:0.5 (see above) at a dose of 40 $mg/m^2$/day as FTD-equivalent, divided into two portions as recited in claim 10 of the '399 patent. For example, the LONSURF FDA Approval Package discloses that Taiho's LONSURF NDA relied on the results of the RECOURSE Trial, where "[p]atients were randomized to receive trifluridine/tipiracil at a dose of 35 $mg/m^2$ based on the trifluridine component or matching placebo administered orally twice daily…." LONSURF FDA Approval Package, Summary at 2 (DEFSTT-005590); *id.* at 6 (DEFS-TT-005594)("the recommended dose of Lonsurf (35 $mg/m^2$ twice daily)"); *id.* at 9 (DEFS-TT-005597) ("Treatment regimen: Trifluridine/tipiracil 35 mg/m2 (base on trifluridine component)…orally twice daily…."); *id.* at Clinical Pharmacology and Biopharmaceutics Review(s), 1 (DEFS-TT-005595) (Dosing Regimen: "35 $mg/m^2$/dose (based on trifluridine), twice daily (BID)…."); *id.* at 4 (DEFS-TT-005598) ("The proposed dosage regimen of Lonsurf is 35 mg/m2/dose (based on trifluridine) administered orally twice daily (BID)…."); *id.* at Other Reviews Thorough QT Study Review at 1 (DEFS-TT-006087) (Therapeutic Dosing Regimen: "35 mg/m2 b.i.d."), 3 (DEFS-TT-006088) ("TAS-102 was administered orally at a dose of 35 mg/m2 twice daily (BID)"); Other Reviews, Appendix (DEFS-TT-006107) ("The recommended starting dose of TAS-102 for adults is 35 $mg/m^2$/dose administered twice daily….").

164.    Further, the LONSURF FDA Approval Package discloses that "[t]he pharmacokinetics of trifluoridine/tipiracil were characterized, demonstrating that systemic exposure (AUC) of trifluridine increased more than dose proportionally over the dose range of 15

68

to 35 mg/m$^2$ ." LONSURF FDA Approval Package, Summary Review at 7 (DEFS-TT_005595); *see also id.* at Medical Review, 31 (DEFS-TT_005682) ("After twice daily dosing of TAS-102, systemic exposure (area under the concentration curve, AUC) of trifluridine increased more than dose-proportionally over the dose range of 15 to 35 mg/m$^2$ ."); *id.* at Clinical Pharmacology and Biopharmaceutics Review(s), 7 (DEFS-TT-006001) ("The proposed dosing regimen of Lonsurf is 35 mg/m2/dose administered orally twice daily (BID) ... The tolerability TAS-102 was evaluated at dose levels of 15, 20, 25, 30, and 35 mg/m$^2$ in a Phase 1 dose-finding study conducted in Japanese patients with advanced solid tumors (Study J001-10040010)."); *id.* ("Pharmacokinetics: Systemic exposure (AUC) of trifluridine increased more than dose-proportionally over the dose range of 15 to 35 mg/m$^2$ ."); *id.* at 23.

165.    Based on these disclosures, Dr. Dreicer will confirm at trial that a POSA would understand that the LONSURF FDA Approval Package teaches administering LONSURF (TAS-102) at a dose of 35 mg/m$^2$ twice daily, and also teaches that LONSURF (TAS-102) was administered at doses ranging from 15 to 35 mg/m$^2$ twice daily, i.e., 15 mg/m$^2$ , 20 mg/m$^2$ , 25 mg/m$^2$ , 30 mg/m$^2$ , and 35 mg/m$^2$ , which corresponds to 30 mg/m$^2$/day to 70 mg/m$^2$/day divided into two doses.

166.    Additionally, the LONSURF FDA Approval Package discloses a "safety analysis based on the safety population of the RECOURSE study," where "there was a higher incidence of treatment Grade 3–4 adverse events [for TAS-102] (49% versus 10% in the TAS-102 and placebo arms, respectively)." LONSURF FDA Approval Package, Medical Review at 13 (DEFS-TT-005664); *see also id.* at Summary Review, 3 (DEFS-TT-005594) ("The most serious safety concerns identified for trifluridine/tipiracil were severe myelosuppression, with 0.2% fatality due to neutropenic sepsis and an incidence of Grade 3-4 neutropenia of 38%").

167.    The LONSURF FDA Approval Package also reports that in the RECOURSE Trial, "3.6% of patients discontinued trifluridine/tipiracil for an adverse event and 13.7% of patients required a dose reduction." *Id.* at Summary Review, 3 (DEFS-TT-005594); *see also id.* at Medical Review, 13 (DEFS-TT-005664) ("A dose reduction was required in 13.7% of patients on TAS102. The most common adverse reactions leading to dose reduction were neutropenia, anemia, febrile neutropenia, neutrophil count decreased, fatigue, and diarrhea."), 58 ("Sixty percent of patients on the TAS-102 treatment arm underwent a dose modification, including dose reduction, delay, or interruption"), 60 ("The most frequent toxicities observed with TAS-102 treatment were hematologic abnormalities including anemia, neutropenia, febrile neutropenia and thrombocytopenia, which were managed with reductions in dose and delays in cycle initiation."); *id.* at Labeling, 3 (DEFS-TT-005559) ("A maximum of 3 dose reductions are permitted to a minimum dose of 20 mg/m$^2$ twice daily."). The LONSURF FDA Approval Package also notes that "[t]he incidence of Grade ≥3 neutropenia and any Grade ≥3 drug related AEs were higher (>10%) in the trifluridine high AUC group compared with the low AUC group" and that "[t]he rate of any dose reduction was higher in the trifluridine high AUC group (23%) compared with the low AUC group (9%)." LONSURF FDA Approval Package, Clinical Pharmacology and Biopharmaceutics Review(s) (DEFS-TT-006011); *see also id.*, Table 7 (annotated below).

**Table 7.** Safety Event Summary by Trifluridine or Tipiracil AUC (PK/PD Population)

| Event | Number (%) of Patients | | | |
| --- | --- | --- | --- | --- |
| | FTD | | TPI | |
| | High AUC (>Median) (N=69) | Low AUC (≤Median) (N=69) | High AUC (>Median) (N=69) | Low AUC (≤Median) (N=69) |
| Grade 3 or Higher Neutropenia[a] | 33 (47.8) | 21 (30.4) | 29 (42.0) | 25 (36.2) |
| Relative Risk vs. Low AUC | 1.57 | | 1.16 | |
| [95% CI] | [1.02, 2.42] | | [0.76, 1.76] | |
| Grade 3 or Higher Thrombocytopenia[a] | 3 (4.3) | 2 (2.9) | 3 (4.3) | 2 (2.9) |
| Relative Risk vs. Low AUC | 1.50 | | 1.50 | |
| [95% CI] | [0.26, 8.70] | | [0.26, 8.70] | |
| Anaemia Grade 3 or Higher AE | 15 (21.7) | 12 (17.4) | 14 (20.3) | 13 (18.8) |
| Relative Risk vs. Low AUC | 1.25 | | 1.08 | |
| [95% CI] | [0.63, 2.47] | | [0.55, 2.12] | |
| Diarrhoea Grade 3 or Higher AE | 3 (4.3) | 4 (5.8) | 2 (2.9) | 5 (7.2) |
| Relative Risk vs. Low AUC | 0.75 | | 0.40 | |
| [95% CI] | [0.17, 3.23] | | [0.08, 1.99] | |
| Any Grade 3 or Higher AE | 49 (71.0) | 49 (71.0) | 49 (71.0) | 49 (71.0) |
| Relative Risk vs. Low AUC | 1.00 | | 1.00 | |
| [95% CI] | [0.81, 1.24] | | [0.81, 1.24] | |
| Any Grade 3 or Higher AE Related to Study Medication | 39 (56.5) | 31 (44.9) | 36 (52.2) | 34 (49.3) |
| Relative Risk vs. Low AUC | 1.26 | | 1.06 | |
| [95% CI] | [0.90, 1.76] | | [0.76, 1.47] | |
| Any Dose Reduction[b] | 16 (23.2) | 6 (8.7) | 11 (15.9) | 11 (15.9) |
| Relative Risk vs. Low AUC | 2.67 | | 1.00 | |
| [95% CI] | [1.11, 6.41] | | [0.46, 2.15] | |

[a] Grade 3 or higher based on laboratory data.
[b] Dose reductions based on exposure data.
n=number of patients with an event.
Source: sponsor's PK/PD study report for Study TPU-TAS-102-301 Table 10 page 23

168. The LONSURF FDA Approval Package further reports "In RECOURSE, patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n= 47) had a higher incidence … of ≥ Grade 3 adverse events, serious adverse events, and dose delays and reductions compared to patients with normal renal function (CLcr ≥ 90 mL/min, n= 306) or patients with mild renal impairment (CLcr = 60 to 89 mL/min, n=178) … patients with moderate renal impairment may require more frequent dose modification for increased toxicity." *Id.* at Medical Review(s), 31 (DEFS-TT-005682); *see also id.* at DEFS-TT-006026.

169. The LONSURF FDA Approval Package also includes the LONSURF label which states that "dose reductions are permitted to a minimum dose of 20 $mg^2$/min twice daily," i.e., 40 $mg^2$/min daily, divided in two portions.

170. As Dr. Dreicer will confirm at trial, based on these disclosures, a POSA would

71

understand that the LONSURF FDA Approval Package teaches oral administration of LONSURF at a dose of 20 mg/m$^2$ twice daily, i.e., 40 mg/m$^2$/day in clinical trials for the treatment of large bowel cancer, e.g., mCRC, and further teaches that a dose reduction below 35 mg/m$^2$ twice daily may be needed due to ≥ Grade 3 adverse events, including adverse events associated with a high AUCFTD and renal impairment (which was disclosed as providing a 31-43% higher AUCFTD compared to patients with normal renal function).

171.    Accordingly, the LONSURF FDA Approval Package discloses this limitation of claim 10 of the '399 patent.

### *to the patient with a creatinine clearance of 15 mL/min or more and 29 mL/min or less*

172.    This limitation of claim 10 of the '399 patent is taught by the LONSURF FDA Approval Package. For example, the LONSURF FDA Approval Package discloses a population pharmacokinetic (PPK) study wherein creatinine clearance was identified as a significant covariate for oral clearance (CL/F) of both FTD and TPI. LONSURF FDA Approval Package, Clinical Pharmacology and Biopharmaceutics Review(s) at 26-27. The PPK study provided the following final power function equations for CL/FFTD and CL/FTPI:

$$CL/F = 2.93 \text{ x } (CLCR/103)^{0.507} \text{ x } (ALB/3.90)^{-0.633} \text{ x } exp(hi, CL/F)$$

$$CL/F = 88.7 \text{ x } (CLCR/103)^{0.592} \text{ x } exp(hi, CL/F)$$

*Id.; see also id*. at 60-63 (Tables 33-34).

173.    Based on the PPK analysis, and using the power function equations, the FDA estimated the "mean relative ratio of FTD AUC in patients with mild…and moderate…renal impairment compared to patients with normal renal function…to be 1.07~1.32 and 1.32~1.87," respectively. *Id*. at Other Reviews, Appendix, 24. This estimate lined up with the actual clinical data from the RECOURSE Trial in which the mean relative ratio of AUCFTD was ~1.29 for mild

renal impairment and ~1.41 for moderate renal impairment. *Id*. at Clinical Pharmacology and Biopharmaceutics Review(s), 29-30 (Table 18 and Figure 7).

174.    Additionally, the FDA used the power function equations to conclude that "[i]f a patient with severe renal impairment (CLcr = 15~29 mL/min) received TAS-102 at 35 mg/m$^2$ , the mean relative of daily AUC compared to patients with normal renal function (median CLcr = 103 mL/min) in the patient population analyzed [including patients with mild and moderate renal impairment], is estimated to be 1.90~2.66." *Id.* at Other Reviews, Appendix, 25; *see also id*. at Clinical Pharmacology and Biopharmaceutics Review(s), 29-30 (Table 18). In other words, the FDA estimated that patients with severe renal impairment are expected to have an approximately 1.9-2.7 times higher AUC$_{FTD}$ than patients with normal renal function. As Dr. Dreicer will explain, based on this estimation, a POSA would reduce the recommended starting dose of 35 mg/m$^2$ twice daily in patients with severe renal impairment by 1.9 to 2.7 times, resulting in a dose of approximately 13–18.5 mg/m$^2$ twice daily (26-37 mg/m$^2$/day as FTD equivalent).[2] A POSA would recognize that this reduced dose (26-37 mg/m$^2$/day) significantly overlaps with the claimed dose (i.e., 40 mg/m$^2$/day). Accordingly, the LONSURF FDA Approval Package discloses this limitation.

175.    To the extent that this limitation is not anticipated by the LONSURF FDA Approval Package, then this limitation is obvious over the LONSURF FDA Approval Package in view of the general knowledge and experience of a POSA, optionally in further view of FDA Guidance.

---

[2] The FDA was speculative of this estimation, and simply extrapolating the RECOURSE data, and required Taiho to complete a dedicated renal impairment clinical study to determine an appropriate dose of Lonsurf . . . in patients with severe renal impairment in accordance with the FDA Guidance for Industry. *See, e.g*., FDA Approval Package, Approval Letter at DEFS-TT-005551; *see also* Plaintiffs' Second Supplemental Objections and Responses to Defendants' Joint First Set of Interrogatories (Nos-14) (Supplementing Interrogatory Nos. 1-2, 4) at Supplemental Response to Interrogatory No. 2 (12/28/23). However, to the extent that Plaintiffs argue that the inventor had possession of the claimed methods of treatment based on the dose estimation disclosed in the Patents-in-Suit, and the Court agrees, then the prior art renders the Asserted Claims anticipated and/or obvious for the reasons discussed herein.

176.    For example, as Dr. Dreicer will confirm at trial, a POSA would have understood from the Lonsurf FDA Approval Package that Lonsurf was FDA approved for the treatment of metastatic colorectal cancer at a dose of 35 mg/m$^2$ twice daily. *See* LONSURF FDA Approval Package. Further, while the LONSURF FDA Approval Package did not provide an actual AUC$_{FTD}$ in patients with severe renal impairment, a POSA would have recognized that FDA estimated the mean relative AUC$_{FTD}$ in patients with severe renal impairment to be 1.9-2.7 times higher than that in patients with normal renal function when administered 35 mg/m$^2$ twice daily, as described above. A POSA would also have been aware from the LONSURF FDA Approval Package that AUC$_{FTD}$ had, in fact, increased in patients with mild and moderate renal impairment, and that such increases were predicted by the above CL/F$_{FTD}$ power function equation. Accordingly, the evidence will show that a POSA would have been motivated to reduce the 35 mg/m$^2$ twice daily dose by a factor of 1.9-2.7 times, to a dose of 13-18.5 mg/m$^2$ twice daily (26-37 mg/m$^2$/day), based on the CL/F$_{FTD}$ power function equation, with a reasonable expectation of success. Because this reduced dose would have been expected to produce an AUC$_{FTD}$ in patients with severe renal impairment comparable to the AUC$_{FTD}$ in patients with normal renal function receiving 35 mg/m$^2$ twice daily, a POSA would have reasonably expected this dose could be used to treat metastatic colorectal cancer in patients with severe renal impairment.[3]

177.    Further, because the LONSURF FDA Approval Package disclosed that LONSURF was available as 15 and 20 mg tablets, a POSA would have been motivated to use the currently available tablets to provide a dose of 20 mg/m$^2$ twice daily (40 mg/m$^2$/day) rather than create new tablets.

178.    Moreover, a POSA would have known from the LONSURF FDA Approval

---

[3] *See* Fn2.

Package that a clinical trial was ongoing to determine the appropriate dose of LONSURF in patients with severe renal impairment, "in accordance with FDA Guidance." LONSURF FDA Approval Package, Summary Review at 16. Because these kinds of trials were routine in the art, a POSA would also have reasonably expected to determine the appropriate dose for patients having severe renal impairment through routine optimization—e.g., completion of the clinical that was already ongoing.

179. Therefore, to the extent this limitation is not anticipated by the LONSURF FDA Approval Package, the evidence at trial will demonstrate that it is obvious over the LONSURF FDA Approval Package in view of the general knowledge and experience of a POSA, optionally in further view of FDA Guidance. Further, a POSA would have been motivated to combine the LONSURF FDA Approval Package with FDA Guidance with a reasonable expectation of successfully arriving at the claimed invention because both documents concern patients with renal impairment, and the LONSURF FDA Approval Package specifically cites FDA Guidance, *see e.g.,* LONSURF FDA Approval Package, Approval Letter at DEF-TT-005551.

180. Therefore, claim 10 of the '399 patent is invalid as anticipated by the LONSURF FDA Approval Package and/or obvious over the LONSURF FDA Approval Package in view of the general knowledge and experience of a POSA, optionally in further view of FDA Guidance.

### 2. Claim 1 of the '004 patent

181. Claim 1 of the '004 patent recites:

> 1. A method for treating gastrointestinal cancer, large bowel cancer or breast cancer in a patient with a creatinine clearance of 15 mL/min-29 mL/min, comprising: orally administering a drug comprising $\alpha,\alpha,\alpha$-trifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5, at a daily dose of 30 to 40 mg/m$^2$/day as FTD-equivalent, in two to four doses a day to the patient with a creatinine clearance of 15 mL/min-29 mL/min.

75

182.    Claim 1 of the '004 patent is anticipated by the LONSURF FDA Approval Package and/or is obvious over the LONSURF FDA Approval Package in view of the general knowledge and experience of a POSA, optionally in further view of FDA Guidance for the same reasons as claim 10 of the '399 patent (the discussion of which is incorporated herein by reference)—with the caveat that claim 1 of the '004 patent does not require the "detecting" step.

**3.    Plaintiffs' experts will not be able to rebut the strong case of anticipation and/or obviousness of claim 10 of the '399 patent and claim 1 of the '004 patent**

**a)    Dr. Taft**

183.    Dr. Taft claims that the LONSURF FDA Approval Package would not have anticipated claim 1 of the '004 patent. Taft Rebuttal at ¶¶335-357. To support this assertion, Dr. Taft makes three overarching claims: (i) the dose reduction studies did not include SRI patients; (ii) dose reductions were not undertaken in SRI patients; where dose reduction were taken, they were for adverse events, not renal insufficiency; and (iii) the clearance equations were not reliable for extrapolating to SRI patients. *Id*. The evidence at trial will show that none of Dr. Taft's claims has any merit.

184.    First, Dr. Taft argues that the dose reduction studies did not include SRI patients. Taft Rebuttal at ¶¶336-339. To support this argument, he states that paragraph 178 of Dr. Dreicer's Opening Expert Report discloses administering LONSURF at 35 $mg/m^2$ twice daily (i.e., 70 $mg/m^2$ daily), which is not the same as administering 30-40 $mg/m^2/day$ divided in two doses (i.e., 15-20 $mg/m^2$ twice daily). *Id.* at ¶336. But Dr. Dreicer was not asserting that 35 $mg/m^2$ twice daily is the same as 30-40 $mg/m^2/day$ divided in two doses. He was merely identifying the standard dose of LONSURF. In the very next paragraph, Dr. Dreicer identified doses ranging from 15 to 35 $mg/m^2$ twice daily, which corresponds to 30 $mg/m^2/day$ to 70 $mg/m^2/day$ divided into two doses—which encompasses the claimed range. Dreicer Opening Expert Report at ¶179.

185.    Dr. Taft then highlights all the disclosures in the LONSURF FDA Approval Package stating that LONSURF has not been administered to SRI patients and that a renal impairment study was on-going, claiming that Dreicer ignored these disclosures. Taft Rebuttal at ¶¶338-339. This assertion is incorrect. As discussed above, the fact that a renal impairment study was on-going would have suggested to a POSA that LONSURF could be administered to an SRI patient. Further, to the extent that Dr. Taft is suggesting that these disclosures would teach away from administering LONSURF to an SRI patient, Defendants note that the concept of "teaching away" is not applicable to an anticipation analysis.

186.    Second, Dr. Taft argues that "[d]ose reductions were not undertaken in SRI patients; where dose reduction were taken, they were for adverse events, not renal insufficiency." Taft Rebuttal at ¶¶340-343. In support of his argument, Dr. Taft states: "[a]s a preliminary matter, a person of ordinary skill in the art in 2016 would not have contemplated using a reduced dose of Lonsurf in SRI patients because the dosage of Lonsurf in[sic] was reduced due to adverse events in non-SRI patients." *Id.* at ¶341. Dr. Taft, who is a pharmacokineticist, is not qualified to offer the opinion that a clinician—who makes the ultimate determination as to which medication to prescribe and at what dose—would not have reduced the dose of LONSURF in view of adverse events in patients receiving the standard 35 mg/m$^2$ twice daily dose. Further, a POSA would view the adverse events in patients with renal insufficiency as teaching a POSA to reduce the dose of LONSURF in SRI patients, and would understand that the LONSURF FDA Approval Package discloses a minimum dose of 20 mg/m$^2$ twice daily. Dr. Taft also asserts that a POSA would not have relied on the clearance equations in the LONSURF FDA Approval Package because "INH…is not universally accepted in the field of pharmacokinetics." *Id.* at ¶343. But simply because a pharmacokinetic principle was not "universally accepted" does not mean that a clinician

would have used his or her clinical judgment, in view of the teachings of the LONSURF FDA Approval Package, to reduce the dose of LONSURF in SRI patients. As Dr. Dreicer will confirm at trial, it is routine practice for a clinician, including an oncologist, to make dose modifications based on available evidence and clinical judgement.

187.    Third, Dr. Taft argues that the clearance equations were not reliable models for extrapolating to SRI patients. Taft Rebuttal at ¶¶344-357. In support of this argument, Dr. Taft points out that the "average study subject" in the clinical trials underlying the model "exhibited normal kidney function." *Id.* at ¶345. But as Dr. Taft is well aware, the underlying data included patients with normal renal function, and mild and moderate renal insufficiency—much like the modeling that the inventor relied on to support his claimed invention. Dr. Taft claims "[s]ince the underlying studies did not have a balanced cohort of patients with normal renal function and mild and moderate renal impairment, let alone any patients with SRI, a person of ordinary skill in the art in 2016 would not have viewed the clearance equation above as providing a means to extrapolate a safe and effective dose of Lonsurf in SRI patients." *Id.* at ¶346. But again, the inventor relied on similar modeling, in patients without SRI, to identify the appropriate dose of LONSURF for patients with severe renal impairment. Thus, Dr. Taft's opinion contradicts his written description position.

188.    Dr. Taft next states that "[e]ven if there had been a balanced cohort of patients used to derive the clearance equation," any dose estimate would need to be tested carefully for safety and efficacy in SRI patients and then notes that the FDA required Taiho to complete the ongoing renal study. *Id*. at ¶348. Again, the inventor relied on modeling in non-SRI patients to identify the appropriate dose of LONSURF—there was no clinical study data in SRI patients in the Patents-in-Suit. Therefore, if the Court finds such disclosure in the Patents-in-Suit sufficient to satisfy the

written description requirement, then the clearance equations in the LONSURF FDA Approval Package likewise would teach a POSA the appropriate dose of LONSURF for an SRI patient.

189.   Dr. Taft also argues that the resulting dose estimates from the LONSURF FDA Approval Package differ: 23.4-35 mg/m$^2$/day versus 26.4-36.8 mg/m$^2$/day, and that such estimates did not arise in the context of developing dosing for SRI patients. *Id.* at ¶349. These dosing estimates provide remarkably similar ranges. Further, given that the top end of these estimates include the minimum doses of LONSURF (30-40 mg/m$^2$/day) disclosed in the LONSURF FDA Approval Package (at e.g., DEFS-TT-005559, -6001, -6006), a POSA would have chosen to administer this dose to an SRI patient—contrary to Dr. Taft's arguments (at ¶350) otherwise.

190.   Dr. Taft further argues that a POSA would not have relied on the clearance equations because there was no information on how to account for TPI exposure. Taft Rebuttal at ¶¶352-356. But Dr. Taft calculated dose estimates based on FTD and TPI and provided the following table:

| FDA's Systemic Exposure Estimate for SRI Patients | Resulting Dose Estimate |
| --- | --- |
| 2-3 (FTD AUC) | 11.7-17.5 mg/m$^2$ twice daily or 23.4-35 mg/m$^2$/day |
| 1.90-2.66 (FTD AUC) | 13.2-18.4 mg/m$^2$ twice daily or 26.4-36.8 mg/m$^2$/day |
| 2.12-3.13 (TPI AUC) | 11.2-16.5 mg/m$^2$ twice daily or 22.4-33 mg/m$^2$/day[15] |

*Id.* at ¶¶354-355. The resulting dose estimates are all remarkably similar, and include the minimum doses of LONSURF (30-40 mg/m$^2$/day) disclosed in the LONSURF FDA Approval Package for patients with adverse events (at e.g., DEFS-TT-005559, -6001, -6006). In other words, it is not just the dose estimate provided by the clearance equations, but the modeling in view of the

additional information in the LONSURF FDA Approval Package that would have taught a POSA the claimed dosage of 30-40 mg/m2/day.

191.    Finally, Dr. Taft argues that Dr. Dreicer failed to account for the disclosures of the Lonsurf Report in his anticipation analysis. Taft Rebuttal at ¶357. But anticipation concerns what is taught within the four corners of the document, i.e., within the LONSURF FDA Approval Package itself.

192.    Dr. Taft also asserts that claim 10 of the '399 patent is valid for the same reasons as claim 1 of the '004 patent, despite claim 10 of the '399 patent reciting a "detecting a creatinine clearance of a patient" step. However, as the evidence will show, for the same reasons that claim 10 of the '399 patent is invalid as obvious, claim 1 of the '004 patent is likewise obvious.

### b)    Dr. Abrams

193.    Plaintiffs' expert, Dr. Abrams, asserts that the LONSURF FDA Approval Package does not anticipate the Asserted Claims for two primary reasons: (i) the reference does not teach a POSA how to safely dose LONSURF to patients with SRI; and (ii) the reference teaches away from the claimed invention. Abrams Rebuttal at ¶¶151-164. This is incorrect.

194.    Dr. Abrams appears to conflate the principles of anticipation and obviousness. For example, Dr. Abrams discusses the concept of a "reasonable expectation of success" and "teaching away" in his anticipation analysis. *See* Abrams Rebuttal at §VIII.C.i at e.g., ¶¶158 ("This information ***teaches away*** from administering LONSURF to SRI patients who were excluded from the RECOURSE study, because ***the reasonable expectation*** would have been that they would suffer significant adverse events if the data obtained were relied upon." (emphasis added)), 160 ("Any use of the Pop PK equation to predict dosing for SRI patients is fundamentally wrong, and it provides no ***reasonable expectation of success***." (emphasis added)), 162 ("*Teaching Away.* Dr.

Dreicer fails to acknowledge or address the numerous times throughout the 600-page approval package where it explicitly states that LONSURF has not been studied in SRI patients and that the recommended dosage is not intended for a patient with SRI." (emphasis in original)), 164 ("In fact, there is no ***reasonable expectation of success*** because there is no basis for this dosage." (emphasis added)). However, "reasonable expectation of success" and "teaching away" are only applicable in the context of an obviousness analysis—not anticipation. Therefore, Dr. Abrams's opinions regarding a "reasonable expectation of success" and "teaching away" in the context of anticipation have no relevance.

195.    Dr. Abrams claims that the Asserted Claims of the Patents-in-Suit are not anticipated and/or obvious because: (1) a POSA would not know that LONSURF could be "safely" and "effectively" administered to SRI patients; (2) a POSA would not know how the administration should take place and at what dosage LONSURF should be administered; and (3) the prior art references "teach away" from the claimed invention. *See, generally*, Abrams Rebuttal at §VIII.A-F. Underlying Dr. Abrams's arguments is his repeated statement that "there had been no patients with SRI studied in connection with the underlying trials for LONSURF." *See* Abrams Rebuttal at ¶147; *see also id. at e.g*., ¶¶149, 152, 156, 158, 162, 163 174, 181, 185, 210, 216, 222, 238. As an initial matter, Dr. Abrams is operating under the assumption that the Asserted Claims cannot be obvious in the absence of ***absolute scientific certainty***, i.e., in the absence of a clinical trial in SRI patients establishing a safe and effective dose. But that is not the correct analysis. Rather, a POSA would have found it obvious, and would have been motivated to administer LONSURF at a dose of 30 to 40 mg/m2/day, according to the claimed dosing regimens, to a patient with severe renal impairment, and a POSA would have had a reasonable expectation that she/he could successfully practice this claimed method of treatment.

196.    Dr. Abrams claims that the LONSURF FDA Approval Package "is not a publication that a POSA…would have used or consulted to create a treatment plan for an SRI patient." Abrams Rebuttal at ¶151. However, a POSA is presumed to be aware of all relevant prior art in the field of the invention. This includes not just research articles, but clinical trials, drug labels, and drug approval packages—which would include the LONSURF FDA Approval Package. Therefore, the LONSURF FDA Approval Package is a publication that a POSA would have used or consulted.

197.    With regard to whether the LONSURF FDA Approval Package teaches the limitations of the Asserted Claims, either explicitly or inherently, Dr. Abrams asserts that the Approval Package does not teach a POSA how to dose patients with SRI. *See* Abrams Rebuttal at § VIII.C.i.b.

198.    First, Dr. Abrams argues that "SRI is not an adverse event." *Id*. at ¶¶157-158. However, Defendants never claimed that SRI was an adverse event. Rather, as Dr. Dreicer will explain, the fact that patients with moderate renal impairment had a higher incidence of adverse events and accompanying dose reductions would teach a POSA that patients with severe renal impairment should use a reduced dose of LONSURF because it was understood that SRI patients are more prone to adverse event such as neutropenia. Dr. Abrams also argues (at ¶157): "[t]he fact that some portion of patients had adverse events provides no information as to how SRI patients could or would tolerate LONSURF, or at what dosage LONSURF should be administered." Again, the teachings in the LONSURF FDA Approval Package, i.e., that patients with renal insufficiency had a higher incidence of adverse events, would teach a POSA to reduce the standard dose of LONSURF administered to SRI patients. Moreover, the Lonsurf FDA Approval Package specifically identifies a minimum dose of 40 mg/m$^2$ daily. LONSURF FDA Approval Package at

82

DEFS-TT-005559; *see also* Dreicer Opening Expert Report at ¶184.

199.    Second, Dr. Abrams argues that there is no suggestion, teaching or prediction of a safe and effective dose for SRI patients. Abrams Rebuttal at ¶159. More specifically, Dr. Abrams argues "[t]he Approval Package has no prediction of a safe and effective dose reduction for SRI patients, nor is there any indication that LONSURF could have been used safely with SRI patients." *Id*. However, the claims do not require a "safe" and "effective" dose of LONSURF. Instead the claims recite methods of treating cancer in patients with severe renal impairment by administering 30-40 mg/m$^2$/day of LONSURF. The LONSURF FDA Approval Package does not prohibit the use of LONSURF in SRI patients. Further, the LONSURF FDA Approval Package specifically teaches dose reductions to 40 mg/m$^2$/day in patients experiencing cytotoxicity (e.g., neutropenia)—the precise type of complications one might expect an SRI patient to develop.

200.    Third, Dr. Abrams claims that the use of the Pop PK equation to predict dosing for SRI patients is fundamentally wrong because the RECOURSE trial and earlier trials did not include SRI patients. *Id*. Yet, as discuss more fully below, Plaintiffs themselves relied on modeling (i.e., linear regression analysis) in their own Patents-in-Suit—using data from patients without severe renal impairment—to identify the appropriate dose of LONSURF for SRI patients. Accordingly, if the inventor had possession of the claimed methods of treatment based on the dose estimation disclosed in the Patents-in-Suit, and the Court agrees, then for that same reason, a POSA could have relied on the Pop PK equation in the LONSURF FDA Approval Package to predict dosing for SRI patients.

201.    Fourth, Dr. Abrams argues that the QT Study disclosed in the LONSURF FDA Approval Package does not establish dosing for SRI patients. Abrams Rebuttal at ¶161. Dr. Abrams asserts that this is a cardiac study that has nothing to do with the safety and efficacy of LONSURF for SRI patients or how to dose LONSURF in SRI patients. *Id*. This is incorrect. Dr. Abrams cannot deny that the LONSURF FDA Approval Package specifically includes the following teaching:

| **Expected high clinical exposure scenario** | Severe renal impairment: If a patient with severe renal impairment (CLcr = 15~29 mL/min) received TAS-102 35 mg/m$^2$, the mean relative ratio of daily AUC compared to patients with normal renal function (median CLcr = 103 mL/min) in the patient population analyzed, is estimated to be 1.90~2.66, using the final model developed for CL/F of FTD. <br><br> FTD CL/F = 2.93 × (CLcr/103)$^{0.507}$ × (ALB/3.90)$^{-0.633}$ ×exp($\eta_{i, CL/F}$) |
|---|---|

LONSURF FDA Approval Package at DEFS-TT-006111. Nor can he deny that such a finding is directly relevant to understanding the use of LONSURF in patients with SRI. Based on this disclosure, a POSA would have been understood that the dose of LONSURF in an SRI patient should be reduced. Moreover, Dr. Abrams's claim that this "'worst case scenario'" is not relevant to safety and efficacy is disingenuous. This worst case scenario is precisely what Dr. Abrams highlighted in his report. He argued that if an SRI patient received the full dose of LONSURF, i.e., 35 mg/m$^2$ , serious or even fatal consequences could occur and thus a POSA would never consider administering LONSURF to an SRI patient absent data from a clinical trial. *See, e.g.,* Abrams Rebuttal at ¶¶199 (stating that if a POSA administered 35 mg/m$^2$ twice daily, "he or she potentially would have killed that [SRI] patient."), 191 (stating that the default dose of 35 mg/m$^2$ twice daily "would have resulted in a significant overdose.").

202.    Finally, Dr. Abrams argues that Defendants' expert, Dr. Dreicer, "fail[ed] to acknowledge or address the numerous times throughout the 600-page approval package where it explicitly states that LONSURF has not been studied in SRI patients and that the recommended

dosage is not intended for a patient with SRI," i.e., *Teaching Away*." *Id.* at ¶¶162-164. However, as explained above the concept of "teaching away" is not relevant to anticipation, but rather below when discussing obviousness.

### 4. The dependent claims of the '004 patent

#### a) Claim 2 of the '004 patent

203. Claim 2 of the '004 patent recites: "[t]he method of claim 1, wherein a dose of 40 mg/m$^2$/day as FTD-equivalent is administered in two doses a day." Claim 2 is anticipated and/or rendered obvious by the LONSURF FDA Approval Package for the same reasons discussed above for claim 1 of the '004 patent. That is, the LONSURF FDA Approval Package teaches an estimated dosage reduction of 1.9 to 2.7 times in patients with severe renal impairment, which corresponds to approximately 26-37 mg/m$^2$/day in two doses. Such teaching anticipates and/or renders obvious the administration of 40 mg/m$^2$/day, divided into two doses for the treatment of patients with a creatinine clearance of 15-29 mL/min. Further, while the 40 mg/m$^2$/day twice daily dose may result in an AUC$_{FTD}$ slightly higher than the target AUC, a POSA would understand that the target AUC could be exceeded to a reasonable degree while maintaining a tolerable level of adverse events.

204. Dr. Taft disagrees that the dosing range suggested by the Lonsurf FDA Approval Package—26-37 mg/m$^2$/day for SRI patients—encompasses the claimed administration in SRI patients of 40 mg/m2/day." *Id.* However, beyond making this conclusory statement, Dr. Taft provides no explanation for why he disagrees.

205. Accordingly, as the evidence at trial will show, claim 2 of the '004 patent is anticipated by the LONSURF FDA Approval Package and/or is obvious over LONSURF FDA Approval Package in view of the general knowledge and experience of a POSA, optionally in further view of FDA Guidance.

**b)** **Claims 3, 4, 17, and 18 of the '004 patent**

206.  Claims 3 and 4 of the '004 patent recite: "[t]he method of claim 1, wherein an administration schedule is 5-day consecutive oral administrations and 2-day rest, per week" and "[t]he method of claim 1, wherein an administration schedule of 5-day consecutive oral administrations and 2-day rest is repeated twice, followed by rest for 14 days," respectively. Claims 17 and 18 of the '004 patent recite: "[t]he method of claim 2, wherein an administration schedule is 5-day consecutive oral administrations and 2-day rest, per week" and "[t]he method of claim 2, wherein an administration schedule of 5-day consecutive oral administrations and 2-day rest is repeated twice, followed by rest for 14 days," respectively.

207.  Claims 3, 4, 17, and 18 are anticipated and/or rendered obvious by the LONSURF FDA Approval Package for the same reasons discussed above for claims 1 and 2 of the '004 patent (incorporated herein by reference). That is, the LONSURF FDA Approval Package teaches an estimated dosage reduction of 1.9 to 2.7 times in patients with severe renal impairment. Such teaching anticipates and/or renders obvious the administration of 30 to 40 mg/m$^2$/day, divided into two doses for the treatment of patients with a creatinine clearance of 15 mL/min-29 mL/min. Additionally, the LONSURF FDA Approval Package discloses "[p]atients were randomized to receive trifluridine/tipiracil at a dose of 35 mg/m$^2$ based on the trifluridine component … administered orally twice daily after meals on Days 1 through 5 and Days 8 through 12 of each 28-day cycle." LONSURF FDA Approval Package at Summary Review, 2 (DEFS-TT-005590); *see also id.* at Clinical Pharmacology and Biopharmaceutics Review(s), 1, 4. In view of these disclosures, a POSA would have understood that the reduced dosage in patients with severe renal impairment should be administered on the same administration schedule, i.e., 5-day consecutive oral administrations and 2-day rest, repeated twice, followed by rest for 14 days.

208.    Dr. Taft disagrees that the dosing range suggested by the Lonsurf FDA Approval Package—26-37 mg/m$^2$/day for SRI patients—encompasses the claimed administration in SRI patients of 40 mg/m$^2$/day." *Id.* However, beyond making this conclusory statement, Dr. Taft provides no explanation for why he disagrees.

209.    Accordingly, as the evidence at trial will show, claims 3, 4, 17, and 18 of the '004 patent are anticipated by the LONSURF FDA Approval Package and/or are obvious over LONSURF FDA Approval Package in view of the general knowledge and experience of a POSA, optionally in further view of FDA Guidance.

### c)    Claims 7, 20, 24, and 28 of the '004 patent

210.    Claims 7, 20, 24, and 28 of the '004 patent recite: "[t]he method of claim 6, wherein colorectal cancer is treated," [4] "[t]he method of claim 2, wherein colorectal cancer is treated," "[t]he method of claim 3, wherein colorectal cancer is treated," and "[t]he method of claim 4, wherein colorectal cancer is treated," respectively. Claims 7, 20, 24, and 28 are anticipated and/or are rendered obvious by the LONSURF FDA Approval Package for the same reasons discussed above for claims 1-4 of the '004 patent (incorporated herein by reference). That is, the LONSURF FDA Approval Package discloses:

- Lonsurf tablets, 15 and 20 mg, were approved by FDA on September 22, 2015 **"[f]or the treatment of patients with metastatic colorectal cancer** who have previously been previously treated with fluoropyrimidine-oxaliplatin-and irinotecan-based chemotherapy, an anti-VEGF biological therapy, and if RAS wildtype, an anti-EGFR therapy." LONSURF FDA Approval Package at 1 (DEFS-TT005546) (emphasis added).

- "This NDA relied on the results of a single multicenter, randomized (2:1), doubleblind, placebo-controlled trial, Study TPU-TAS-102-301 (RECOURSE). Key eligibility criteria [included] histologically documented metastatic colorectal cancer (mCRC)…." *Id.* at Summary Review, 2 (DEFS-TT-005590).

---

[4] Claim 6 recites "[t]he method of claim 1, wherein large bowel cancer is treated."

- Proposed Indication: "Metastatic colorectal cancer (CRC)," *id*. at Clinical Pharmacology and Biopharmaceutics Review, 1 (DEFS-TT-005995); "NDA for Lonsurf … is submitted **for treatment of patients with metastatic colorectal cancer** (mCRC)," id. at 4 (DEFS-TT-005998) (emphasis added).

- Taiho "seeks approval to market Lonsurf (TAS-102) **for the treatment of patients with unresectable advanced or recurrent (metastatic) colorectal cancer (mCRC)**…." *Id.* at Other Review, Clinical Inspection Summary, 2 (DEFS-TT006130) (emphasis added).

211.    Further, as explained above, the LONSURF FDA Approval Package teaches an estimated dosage reduction of 1.9 to 2.7 times for treating mCRC in patients with severe renal impairment, and thus anticipates and/or renders obvious the administration of 40 mg/m$^2$/day, divided into two doses for the treatment of patients with a creatinine clearance of 15 -29 mL/min.

212.    Dr. Taft states that claims 7, 20, 24, and 28 of the '004 Patent are not invalid for the same reasons he presents with respect to claims 1-4 and 17-18. Taft Rebuttal at ¶414. However, Dr. Taft has no basis to support his assertion that claims 7, 20, 24, and 28 of the '004 Patent are valid, much like he has no basis for such assertion with respect to claims 1-4 and 17-18 of the '004 Patent.

213.    Accordingly, as the evidence at trial will show, claims 7, 20, 24, and 28 of the '004 patent are anticipated by LONSURF FDA Approval Package and/or are obvious over LONSURF FDA Approval Package in view of the general knowledge and experience of a POSA, optionally in further view of FDA Guidance.

   **B.    The Asserted Claims of the Patents-In-Suit are Invalid as Obvious Over the 2015 Lonsurf Label in View of NCT '117, FDA Guidance, and the General Knowledge and Experience of a POSA**

214.    The evidence at trial will establish that the Asserted Claims of the Patents-in-Suit are invalid as obvious over the 2015 Lonsurf Label in view NCT '117, FDA Guidance, and the

88

general knowledge and experience of a POSA.

### 1. Claim 10 of the '399 patent

215.    Claim 10 of the '399 patent depends from claims 1 and 2 and recites:

10. The method for treating cancer according to claim 2, wherein a dose of 40 mg/m$^2$/day as FTD-equivalent is divided in two portions.

216.    When each of the limitations from claims 1 and 2 are read into claim 10, claim 10 requires the following:

A method for treating cancer which is one of gastrointestinal cancer, large bowel cancer and breast cancer, comprising: detecting a creatinine clearance of a patient; and orally administering to the patient with a creatinine clearance of 15 mL/min or more and 29 mL/min or less a combination drug comprising α,α,αtrifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5, wherein a dose of 40 mg/m$^2$/day as FTD-equivalent is divided in two portions for administration.

217.    The evidence at trial will show that claim 10 of the '399 patent is rendered obvious over the 2015 Lonsurf Label in view of NCT '117, FDA Guidance, and the general knowledge and experience of a POSA as discussed below.

***A method for treating cancer which is one of gastrointestinal cancer, large bowel cancer and breast cancer, comprising***

218.    The 2015 Lonsurf Label discloses in its Indication and Usage Section: "LONSURF is indicated for the treatment of patients with metastatic colorectal cancer who have been previously treated with fluoropyrimidine-, oxaliplatin- and irinotecan-based chemotherapy, and an anti-VEGF biological therapy, and if RAS wild-type, an anti-EGFR therapy." 2015 Lonsurf Label at 2 (DEFS-TT-005253). As Dr. Dreicer will testify at trial, a POSA would understand that metastatic colorectal cancer is a type of large bowel cancer. Indeed, the Patents-in-Suit define large bowel cancer as "colorectal cancer, colon cancer, [and] rectal cancer." *See, e.g.,* '399 patent, 6:56-62.

89

*a combination drug comprising α,α,α-trifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5*

219.    The 2015 Lonsurf Label discloses that LONSURF "contains trifluridine and tipiracil hydrochloride at a molar ratio of 1:0.5." *Id.* at 9 (DEFS-TT-005260); *see also id.* at 10 ("LONSURF consists of a thymidine-based nucleoside analog, trifluridine, and the thymidine phosphorylase inhibitor, tipiracil, at a molar ratio of 1:05 (weight ratio, 1:0.471).").

*wherein a dose of 40 mg/m$^2$/day as FTD-equivalent is divided in two portions for administration*

220.    The 2015 Lonsurf Label discloses that "[t]he recommended starting dose of LONSURF is 35 mg/m$^2$ up to a maximum of 80 mg per dose (based on the trifluridine component) orally twice daily within one hour of completion of morning and evening meals on Days 1 through 5 and Days 8 through 12 of each 28 day cycle until disease progression or unacceptable toxicity." 2015 Lonsurf Label at 2-3 (DEFS-TT-005253-5254). The 2015 Lonsurf Label further discloses dose reductions to "20 mg/m$^2$ twice daily," i.e., 40 mg/m$^2$/day, in patients who experience cytotoxicity, including neutropenia. *Id.*

*detecting a creatinine clearance of a patient; and orally administering to the patient with a creatinine clearance of 15 mL/min or more and 29 mL/min or less*

221.    This limitation of claim 10 of the '399 patent is taught by the 2015 Lonsurf Label in view of NCT '117, FDA Guidance, and the general knowledge and experience of a POSA. For example, the 2015 Lonsurf Label discloses a clinical study (Study 1) in which patients with metastatic colorectal cancer were administered 35 mg/m$^2$ of Lonsurf twice daily on days 1-5 and days 8-12 of each 28-day cycle. 2015 Lonsurf Label at 13 (DEFS-T-005264); *id.* at 4 (DEFS-TT-005255). The 2015 Lonsurf Label further discloses:

> In Study 1, patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n=47) had a higher incidence (difference of at least 5%) of ≥ Grade 3 adverse

events, serious adverse events, and dose delays and reductions compared to patients with normal renal function (CLcr ≥ 90 mL/min, n= 306) or patients with mild renal impairment (CLcr = 60 to 89 mL/min, n= 178).

No dose adjustment to the starting dose of LONSURF is recommended in patients with mild or moderate renal impairment (CLcr of 30 to 89 mL/min); however patients with moderate renal impairment may require dose modification for increased toxicity. No patients with severe renal impairment (CLcr < 30 mL/min) were enrolled in Study 1. *[see Clinical Pharmacology (12.3)].*

*Id.* at 8 (DEFS-TT-005259)

222.    The 2015 Lonsurf Label also discloses:

In Study 1, the estimated mean AUC of trifluridine at steady state was 31% higher in patients with mild renal impairment (CLcr = 60 to 89 mL/min, n= 38) and 43% higher in patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n= 16) than that in patient with normal renal function (CLcr ≥ 90 mL/min, n= 84) based on the population pharmacokinetic analysis. The estimated mean AUC of tipiracil was 34% higher in patients with mild renal impairment and 65% higher in patients with moderate renal impairment than that in patients with normal renal function. The pharmacokinetics of trifluridine and tipiracil have not been studied in patients with severe renal impairment (CLcr < 30 mL/min) or end-stage renal disease. *[see Use in Specific Populations (8.7)].*

*Id.* at 12 (DEFS-TT-005263).

223.    Similarly, NCT '117 discloses a Phase I study to "evaluate the safety, tolerability, and pharmacokinetics of TAS-102 in patients with advanced solid tumors with varying degrees of renal impairment." NCT '117 at 3-4 (DEFS-TT-001146-1147). The three arms of the study discloses in NCT '117 included patients with mild, moderate, and severe renal impairment. *Id.* at 5 (DEFS-TT-001148). The mild and moderate arms of the study received "35 mg/m2/dose of TAS102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle." *Id.* According to NCT '117, "[t]he dose level of [the] severe cohort will be determined based on the Interim Assessment of mild and moderate cohorts." *Id.*

224.    In view of these disclosures in the 2015 Lonsurf Label and NCT '117, a POSA would understand that creatinine clearance was detected in the patients in these studies because

91

patients were divided into subgroups, i.e., normal renal function (CLcr $\geq$ 90 mL/min), mild renal impairment (CLcr 60-89 mL/min), moderate renal impairment (CLcr 30-59 mL/min), and severe renal impairment (CLcr 15-29 mL/min ) based on creatinine clearance.

225.    With regard to orally administering the claimed dosage "to the patient with a creatinine clearance of 15 mL/min or more and 29 mL/min or less," a POSA would understand that FDA Guidance teaches that a dose adjustment may be necessary for use in patients with renal impairment because "renal impairment is likely to significantly alter the PK of a drug and/or its active/toxic metabolites." *Id.* at 2.

226.    As FDA Guidance explains, studies should be conducted "in patients with impaired renal function . . . to determine if the PK is altered to such an extent that the dosage should be adjusted from that established in the phase 3 trials." *Id.* at 3. FDA Guidance recommends a "basic full study design" with "adequate representation of patients with various degrees of renal impairment" recruited in equal numbers into the study and provides the following table of renal impairment categories:

| Group | Description | Estimated Creatinine Clearance (milliliters/minutes) |
|---|---|---|
| 1 | Normal renal function | > 80 mL/min |
| 2 | Mild renal impairment | 50-80 mL/min |
| 3 | Moderate renal impairment | 30-50 mL/min |
| 4 | Severe renal impairment | <30 mL/min |
| 5 | ESRD | Requiring dialysis |

*Id.* at 4-5.

227.    FDA Guidance describes creatinine clearance as a widely used measure of renal

92

function that is "more practical than most other alternatives as a criterion for adjusting dosage in outpatient and inpatient settings." *Id.* at 6. According to FDA Guidance, the Cockcroft-Gault formula is recognized as one way of estimating creatinine clearance based on serum creatinine levels. *Id*. FDA Guidance also recommends a data analysis to assess "whether [a] dosage adjustment is required for patients with impaired renal function and, if so, to develop dosing recommendations for such patients based on measures of renal function." *Id.* at 9.

228.    Further, as the evidence will establish, a POSA would have understood that a clinical trial was ongoing to determine the appropriate dose of Lonsurf in patients with severe renal impairment. For example, NCT '117 discloses a Phase I study to "evaluate the safety, tolerability, and pharmacokinetics of TAS-102 in patients with advanced solid tumors with" mild, moderate, and severe renal impairment. NCT '117 at 3-5 (DEFS-TT-001146-1148). According to NCT '117, "[t]he dose level of [the] severe cohort will be determined based on the Interim Assessment of mild and moderate cohorts."

229.    Accordingly, because renal impairment studies were common practice (*see, e.g.,* FDA Guidance, NCT '117), a POSA would have reasonably expected to determine the appropriate dose for a patient "with a creatinine clearance of 15 mL/min or more and 29 mL/min or less" through routine optimization. Indeed, no inventive skill would have been required to arrive at the claimed dosage because dose finding trials in renally impaired patients were specifically prescribed by and described in FDA Guidance; not to mention that a clinical trial to evaluate the impact of severe renal impairment was already ongoing (NCT '117) and it would take nothing more than routine optimization to identify the dose for patients with severe renal impairment.

230.    Moreover, a POSA administering an FTD-TPI combination drug at a molar ratio of 1:0.5 to treat metastatic colorectal cancer according to the 2015 Lonsurf Label would have been

93

motivated to reduce the dose in a patient with severe renal impairment, as compared to a patient with normal renal function. As the 2015 Lonsurf Label explains, the estimated mean AUC of FTD was 31% and 43% higher in patients with mild and moderate renal impairment, respectively, as compared to patients with normal renal function and the estimated mean AUC of TPI was 34% and 65% higher in patients with mild and moderate renal impairment, respectively, as compared to patients with normal renal function. 2015 Lonsurf Label at 12 (DEFS-TT-005262). Further, a POSA would have recognized that the 2015 Lonsurf Label disclosed that patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n=47) had a higher incidence (difference of at least 5%) of $\geq$ Grade 3 adverse events, serious adverse events, and dose delays and reductions compared to patients with normal renal function. *Id.* at 8 (DEFS-TT-005259). Therefore, as Dr. Dreicer will explain, a POSA would have expected that patients with severe renal impairment would require a dose reduction to prevent severe adverse events and would have recognized that the 2015 Lonsurf Label discloses a dose reduction to 20 mg/m$^2$ twice daily, i.e., 40 mg/m$^2$/day. *Id.* at 3 (DEFS-TT-005254). Based on FDA Guidance and NCT '117, a POSA would have been able to determine that 20 mg/m$^2$ twice daily, i.e., 40 mg/m$^2$/day, could treat a patient with severe renal impairment through routine testing— which was already ongoing.

231.    Dr. Abrams notes that the 2015 Lonsurf Label provides instructions on dose modifications due to adverse events, including neutropenia, and discloses that there have been "'[n]o dedicated clinical studies…to evaluate the effect of renal impairment on the pharmacokinetics of LONSURF.'" Abrams Rebuttal at ¶139. According to Dr. Abrams: "the 2015 Label would have informed a POSA that LONSURF should not be administered to patients with SRI and that to do so – at any dose – could be dangerous and life threatening." *Id.* Dr. Abrams misinterprets the 2015 Lonsurf Label. A POSA would not view the label as warning against the

administration of LONSURF to SRI patients, at any dose. Rather, a POSA would have found it obvious and would have been motivated by the teachings of the 2015 Lonsurf Label to reduce the dose of LONSURF administered to SRI patients. *See, e.g.,* Dreicer Opening Expert Report (at §VII.B-D). Indeed, as Dr. Dreicer will explain at trial, clinicians routinely make dose modifications for a range of oncologic drugs, without specific guidance, based on clinical judgment, i.e., taking into account the patient's performance status, medical comorbidities, degree of renal insufficiency, in what manner the agent is typically cleared from the body, and the goals of care. This is a routine part of oncologic practice. Moreover, clinicians (including oncologists) may use drugs off-label, where there is typically limited or no prospective data. To suggest that no clinician would (or should) treat a patient in the absence of clinical trial data does not reflect a true clinical perspective. The reality is, in the clinical setting of heavily treated metastatic colorectal cancer patients with severe renal insufficiency, where patients have few options to prolong survival, a POSA would have recognized that dose adjustments may be necessary in these patients and would have routinely modulated the standard dose of LONSURF®.

232.    In short, the evidence at trial will establish that claim 10 of the '399 patent is invalid as obvious over the 2015 Lonsurf Label in view of NCT '117, FDA Guidance, and the general knowledge and experience of a POSA. Based on the teachings of the 2015 Lonsurf Label, FDA Guidance, and NCT '117, a POSA would have been motivated to reduce the dose of Lonsurf described in the 2015 Lonsurf Label (i.e., 35 mg/m$^2$ twice daily) in patients with severe renal impairment to 20 mg/m$^2$ (i.e., 40 mg/m$^2$ in two doses) and it would have been nothing more than routine testing, as described in FDA Guidance, and as was on-going in NTC '117, to confirm the 20 mg/m$^2$ (i.e., 40 mg/m$^2$ in two doses) in patients with severe renal impairment.

233.    Further, a POSA would have been motivated to combine the 2015 Lonsurf Label,

NCT '117, and FDA Guidance with a reasonable expectation of successfully arriving at the claimed invention because both the 2015 Lonsurf Label and NCT '117 concern the same drug—LONSURF—and because FDA Guidance provides information related to drug administration to patients with severe renal impairment, a patient population present in both the 2015 Lonsurf Label and NCT '117.

### 2. Claim 1 of the '004 patent

234.    Claim 1 of the '004 patent recites:

> 1. A method for treating gastrointestinal cancer, large bowel cancer or breast cancer in a patient with a creatinine clearance of 15 mL/min-29 mL/min, comprising: orally administering a drug comprising $\alpha,\alpha,\alpha$-trifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5, at a daily dose of 30 to 40 mg/m$^2$/day as FTD-equivalent, in two to four doses a day to the patient with a creatinine clearance of 15 mL/min-29 mL/min.

235.    Claim 1 of the '004 patent is obvious over the 2015 Lonsurf Label in view of NCT '117, FDA Guidance, and the general knowledge and experience of a POSA for the same reasons as claim 10 of the '399 patent (the discussion of which is incorporated herein by reference)—with the caveat that the '004 patent does not require the "detecting" step. Further, a POSA would have been motivated to combine these prior art reference with a reasonable expectation of successfully arriving at the claimed invention for the same reasons discussed above for claim 10 of the '399 patent.

### 3. Plaintiffs' experts will not be able to rebut the strong case of obviousness of claim 10 of the '399 patent and claim 1 of the '004 patent

#### a) Dr. Taft

236.    Dr. Taft offers six overarching reasons as to why claim 1 of the '004 patent is not rendered obvious by the 2015 Lonsurf Label in view of NCT '117, FDA Guidance, and the general knowledge and experience of a POSA: (i) dose reductions were not undertaken in SRI patients,

96

and were for adverse events, not renal insufficiency; (ii) there is no motivation to modify the treatment existing in 2016 for SRI patients; (iii) the 2015 Lonsurf Label and NCT '117 teach away from administering a reduced dose in SRI patients; (iv) there was no reasonable expectation of success that administering a reduced dose of LONSURF to SRI patients would be safe and effective; (v) there was no motivation to combine the 2015 Lonsurf Label with NCT '117 and FDA Guidance; and (vi) similar or the same arguments and art were already discussed during the prosecution of the Patents-in-Suit. Taft Rebuttal at ¶¶419-462. But the evidence at trial will not substantiate Dr. Taft's claims.

237.    First, Dr. Taft argues that dose reductions were not undertaken in SRI patients, and were for adverse events, not renal insufficiency. Taft Rebuttal at ¶¶419-427. Dr. Taft's primary argument regarding the 2015 Lonsurf Label is that it does not disclose administering LONSURF to SRI patients. *Id.* at ¶¶419-424. But the 2015 Lonsurf Label disclosed that patients with renal insufficiency experienced increased adverse events, requiring dose reductions. The 2015 Lonsurf Label also states then "patients with moderate renal impairment *may require dose modification* for increased toxicity." 2015 Lonsurf Label at DEFS-TT-005259 (emphasis added). Thus, as Defendants' expert, Dr. Dreicer will explain, a POSA would have been motivated to reduce the dose of LONSURF in SRI patients to avoid adverse events/toxicity—given that these patients are more fragile than those with moderate renal impairment. Further, a POSA would have been motivated to start with the minimum dose, which the 2015 Lonsurf Label states is 40 mg/m$^2$ per day. 2015 Lonsurf Label at DEFS-TT-005254. A POSA would have been motivated to start at the lowest dose—to avoid adverse events/toxicity—understanding that they could titrate the dose upward as tolerated.

238.    Dr. Taft also argues that a POSA would be aware that the LONSURF FDA

Approval Package taught away from using adverse events as a proxy for renal insufficiency to determine the dose of LONSURF for SRI patients. Taft Rebuttal at ¶425. However, the LONSURF FDA Approval Package does not include any statements criticizing, discrediting, or otherwise discouraging the administration of a reduced dose of LONSURF to SRI patients. Indeed, if only a clinical trial were sufficient to establish the dose of LONSURF in an SRI patient, then the Patents-in-Suit lack adequate written description.

239.   Next Dr. Taft argues that NCT '117 teaches administering the standard dose of 35 mg/m$^2$ twice daily to SRI patients. Taft Rebuttal at ¶426. However, a POSA would understand that NCT '117 states that dosing should be adjusted based on data from patients with mild and moderate renal impairment. NCT '117 at DEFS-TT-0011148. In other words, the investigators did not "anticipate[] administering to SRI patients a dose of '35 mg/m2/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle.'"

240.   Dr. Taft also argues that a POSA would not rely on FDA Guidance because LONSURF is a combination drug. Taft Rebuttal at ¶427. However, a POSA would have known from the LONSURF FDA Approval Package that the FDA pointed Taiho to the FDA Guidance, despite the fact that the FDA knew that LONSURF was a "combination drug." *See, e.g.,* LONSURF FDA Approval Package at DEFS-TT-005604; *see also id.* at DEFS-TT-005551, -5649.

241.   Second, Dr. Taft argues there is no motivation to modify the treatment existing in 2016 for SRI patients. Taft Rebuttal at ¶¶428-436. Dr. Taft's primary argument regarding the 2015 Lonsurf Label is that it does not require dose adjustments for patients with mild and moderate renal impairments, despite adverse events. *Id.* at ¶¶428-430. However, Dr. Taft ignores the fact that the 2015 Lonsurf Label states that "patients with moderate renal impairment *may require dose modification* for increased toxicity." 2015 Lonsurf Label at DEFS-TT-005259 (emphasis).

98

Accordingly, given the disclosures related to adverse events in patients with moderate renal impairment, as well as the disclosure that "patients with moderate renal impairment *may require dose modification* for increased toxicity," a POSA would have erred on the side of caution and would have been motivated to administer the minimum dose—40 mg/m$^2$ daily, as disclosed in the 2015 Lonsurf Label (DEFS-TT-005254). Accordingly, administering a reduced dose of LONSURF to an SRI patient is consistent with the teachings of the 2015 Lonsurf Label.

242.    Further, the LONSURF FDA Approval Package does not include any statements teaching away from administering a reduced dose of LONSURF to SRI patients. Indeed, if only a clinical trial were sufficient to establish the dose of LONSURF in an SRI patient, then the Patents-in-Suit lack adequate written description. Defendants likewise disagree with Dr. Taft's assertion that the NCT '117 study investigators "anticipated administering to SRI patients a dose of '35 mg/m$^2$/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle." Taft Rebuttal at ¶433.

243.    Third, Dr. Taft argues the 2015 Lonsurf Label and NCT '117 teach away from administering a reduced dose in SRI patients. Taft Rebuttal at ¶¶437-440. But the 2015 Lonsurf Label does not teach away from administering a reduced dose of LONSURF in SRI patients. Nor does NCT '117 teach away from administering a reduced dose in SRI patients because the study investigators "anticipated administering to SRI patients a dose of '35 mg/m2/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle.'" Taft Rebuttal at ¶440.

244.    Fourth, Dr. Taft argues there was no reasonable expectation of success that administering a reduced dose of LONSURF to SRI patients would be safe and effective. Taft Rebuttal at ¶441-455. As an initial matter, the claims do not include a safety or efficacy requirement. Further, Dr. Taft argues that "oncologists would have avoided treating SRI patients

with Lonsurf, because the risk of SRI patients experiencing drug accumulation and toxicity was too great." *Id.* at ¶443. Dr. Taft has no basis (or qualifications) to opine on what an oncologist would do—he is not a clinician. Nor does he rely on Dr. Abrams (a clinician) to support his opinion. *Id.* Moreover, the paper Dr. Taft cites Lichtman, recommends "careful ***dose adjustment*** … to avoid drug accumulation and toxicity," not avoiding treatment, see Lichtman (DEFS-TT-006171) at 172 (emphasis added), which is consistent with Dr. Dreicer's opinion. *Id.*

245.    Dr. Taft also argues that administering LONSURF to SRI patients "presented several challenges," including the lack of predictability, coupled with compromised renal function, in a vulnerable cancer patient. Taft Rebuttal at ¶¶444-445. However, because Dr. Taft is not viewing the problem from a clinical perspective—he is not a clinician—he fails to take into account that heavily treated metastatic colorectal cancer patients with severe renal insufficiency had few treatment options to prolong survival, and thus a POSA would have been motivated to administer a reduced dose of LONSURF—given the paucity of treatment options available—and would have had a reasonable expectation of success given the teachings in the 2015 Lonsurf Label.

246.    Dr. Taft further relies on the fact the FDA required Taiho to complete a dedicated renal study to support his assertion that there was no reasonable expectation of success. Taft Rebuttal at ¶¶446-451. FDA regulatory requirements, i.e., to demonstrate safety and efficacy, are different than the requirements to establish obviousness. Moreover, if only a clinical trial were sufficient to establish the dose of LONSURF in an SRI patient, then the Patents-in-Suit lack adequate written description.

247.    Dr. Taft also relies on information related to Teysuno to support his assertion that there was no reasonable expectation of success. Taft Rebuttal at ¶¶452-454. However, for the same reasons discussed above Defendants disagree with Dr. Taft's analysis.

248.    Fifth, Dr. Taft argues there was no motivation to combine the 2015 Lonsurf Label with NCT '117 and FDA Guidance. Taft Rebuttal at ¶¶456-458. However, both the 2015 Lonsurf Label and NCT '117 addressed the same issue—how to administer LONSURF, with NCT '117 providing additional information on planned administration of LONSURF to SRI patients. Further, as the evidence will show, a POSA would have been motivated to combine FDA Guidance with the 2015 Lonsurf Label and NCT '117, because FDA Guidance provides further information related to renal impairment studies, such as the one disclosed in NCT '117.

249.    Finally, Dr. Taft argues that similar or the same arguments and art were already discussed during the prosecution of the Patents-in-Suit. Taft Rebuttal at ¶¶459-462. But the prior art combination that Defendants rely on was not before the patent examiner. Therefore, similar or the same arguments and art were not already discussed during the prosecution of the Patents-in-Suit.

250.    Dr. Taft also asserts that claim 10 of the '399 patent is valid for the same reasons as claim 1 of the '004 patent, despite claim 10 of the '399 patent reciting a 'detecting a creatinine clearance of a patient' step. However, as the evidence will show, for the same reasons that claim 10 of the '399 patent is invalid as obvious, claim 1 of the '004 patent is likewise obvious.

### b)    Dr. Abrams

251.    Dr. Abrams claims that the 2015 Lonsurf Label in view of NCT '117, FDA Guidance, and the general knowledge and experience of a POSA would not have rendered the Asserted Claims of the Patents-in-Suit obvious. Abrams Rebuttal at ¶¶178-202. To support this assertion, Dr. Abrams makes four overarching claims: (i) the 2015 Lonsurf Label and NCT '117 did not teach a POSA to administer LONSURF to SRI patients or how to dose SRI patients; (ii) the 2015 Lonsurf Label and NCT '117 taught away from the Asserted Claims; (iii) there was no

101

motivation to combine FDA Guidance with the 2015 Lonsurf Label and NCT '117; and (iv) a POSA would have had no expectation of success in combining the FDA Guidance with the 2015 Lonsurf Label and NCT '117. *Id.* But the evidence at trial will not substantiate Dr. Abrams' claims.

252.    First, Dr. Abrams claims that the 2015 Lonsurf Label and NCT '117 failed to teach a POSA to administer LONSURF to SRI patients or how to dose SRI patients. Abrams Rebuttal at ¶¶181-184, 192. While a study of LONSURF in SRI patients was not disclosed in the 2015 Lonsurf Label or NCT '117, this does not change the indisputable fact that the 2015 Lonsurf Label discloses that patients with moderate renal impairment had more adverse events and required dose modification. Dreicer Opening Expert Report at ¶212 (citing 2015 Lonsurf Label at DEFS-TT-005259). Nor does the lack of a clinical trial in SRI patients change the indisputable fact that the 2015 Lonsurf Label discloses dose reductions to 20 mg/m$^2$ twice daily in patients who experience cytotoxicity, including neutropenia—the very adverse events a POSA would expect an SRI patient might be susceptible to. Dreicer Opening Expert Report at ¶211 (citing 2015 Lonsurf Label at DEFS-TT-005254). Further, while the study in SRI patients in NCT '117 had not been completed, the fact that it was being conducted would have motivated a POSA to consider the use LONSURF in SRI patients—albeit at a reduced dose in view of the teachings in the 2015 Lonsurf Label. Further, a POSA would not view NCT '117 as teaching a "default" dose of 35mg/m$^2$ twice daily in SRI patients, rather a POSA would understand that the appropriate dose for SRI patients would be based on results from the mild and moderate renal impairment cohorts. Thus, a POSA would not have used a default dose of 35mg/m$^2$ twice daily in SRI patients—resulting in a significant overdose. Instead, a POSA would have optimized the dose of LONSURF based on what was known from studies in patients with mild and moderate renal impairment, particularly given the teachings of the 2015 Lonsurf Label.

253. Second, Dr. Abrams claims that the 2015 Lonsurf Label and NCT '117 "taught away" from the Asserted Claims. Abrams Rebuttal at ¶¶185-189, 193-194. Regarding the 2015 Lonsurf Label, Dr. Abrams repeatedly notes that the label discloses that LONSURF has not been studied in SRI patients. *Id.* at ¶¶185, 188. But as explained above, such disclosures do not criticize, discredit, or otherwise discourage a POSA from considering a reduced dose of LONSURF in SRI patients. Indeed, there is not a single statement in the 2015 Lonsurf Label warning against or prohibiting (e.g., a black box warning or contraindication ) the use of LONSURF in SRI patients. To the contrary, rather than avoiding the use of LONSURF in SRI patients, the 2015 Lonsurf Label would have motivated a POSA to simply reduce the dose of LONSURF in SRI patients.

254. Further, Section 2.1 of the 2015 Lonsurf Label (i.e., continue the dosing regimen "until disease progression or unacceptable toxicity") does not suggest that "a POSA would have had no basis to start treatment on LONSURF" in SRI patients. Abrams Rebuttal at ¶186 (emphasis added). This disclosure merely indicates when treatment should be stopped—in any patient. Moreover, contrary to Dr. Abrams's assertion the label does not express a preference for changing the dosing regimen as opposed to reducing the dose. *Id.* at ¶187. The label states "[r]educe dose and/or hold LONSURF as clinically indicated." 2015 Lonsurf Label at DEFS-TT005252.

255. With regard to NCT '117, the fact this reference teaches that dosing for SRI patients would be based on an Interim Assessment of mild and moderate cohorts does not teach away from the Asserted Claims. Rather, results from patients with mild and moderate impairment would inform a POSA's decision with respect to the appropriate doses of LONSURF to consider in SRI patients, and a POSA would have reasonably expected to determine the appropriate dose for an SRI patient through routine optimization.

256. Third, Dr. Abrams claims that there was no motivation to combine the FDA

103

Guidance with the 2015 Lonsurf Label and NCT '117. Abrams Rebuttal at ¶¶195-198. Dr. Abrams again falls back on his argument that LONSURF had not been studied in SRI patients. *Id.* at e.g., ¶195. But as explained above, this would not have dissuaded a POSA from investigating the claimed invention. Dr. Abrams also asserts that Dr. Dreicer relies on hindsight, that the 2015 Lonsurf Label does not teach administering $40mg/m^2$, and neither the FDA Guidance nor NCT '117 provides this missing information. *Id.* at ¶196. Dr. Abrams also criticizes NCT '117 as merely a "notice for a study" with no data, and FDA Guidance for lacking information on how to dose LONSURF to an SRI patient. *Id.* at ¶¶197-198. Dr. Abrams appears to be analyzing each of these references in a vacuum without considering the combination of teachings.

257. FDA Guidance teaches that studies should be conducted "'in patients with impaired renal function . . . to determine if the PK is altered to such an extent that the dosage should be adjusted from that established in the phase 3 trials.'" Dreicer Opening Expert Report at e.g., ¶217 (citing FDA Guidance at 3). Further, a POSA would recognize that the very studies recommended by FDA Guidance were disclosed in NCT '117. Dreicer Opening Expert Report at e.g., ¶214. That is, NCT '117 taught that LONSURF was being investigated in patients with renal insufficiency, including SRI patients, and that dosing in SRI patients would be determined after assessing results in patients with mild and moderate impairment. *Id.* (citing NCT '117 at DEFS-TT-001146-48). Thus, as the evidence will show, FDA Guidance and NCT '117 would have motivated a POSA to consider LONSURF in SRI patients—particularly in view of data from patients with mild and moderate renal insufficiency. Moreover, with respect to dosing, a POSA would have been motivated to turn to the 2015 Lonsurf Label—which includes FDA approved dosing and instructions for LONSURF. A POSA would have recognized that the 2015 Lonsurf Label discloses that patients with moderate renal impairment have more adverse events and require dose

modification. Dreicer Opening Expert Report at ¶212 (citing 2015 Lonsurf Label at DEFS-TT-005259). A POSA would also recognize that the 2015 Lonsurf Label discloses dose reductions to 20 mg/m² twice daily in patients who experience cytotoxicity, including neutropenia—the very adverse events a POSA would expect an SRI patient might be susceptible to. Dreicer Opening Expert Report at ¶211 (citing 2015 Lonsurf Label at DEFS-TT-005254). Accordingly, a POSA would have been motivated to combine the teachings of the 2015 Lonsurf Label—which discloses how to dose LONSURF—with the teachings of NCT '117 and FDA Guidance, which disclose clinical trials in renally impaired patients, including with LONSURF, to arrive at the claimed invention through routine optimization.

258.    Finally, Dr. Abrams claims that a POSA would have had no expectation of success in combining the FDA Guidance with the 2015 Lonsurf Label and NCT '117. Abrams Rebuttal at ¶¶199-202. However, only a reasonable expectation of success is required—not absolute certainty, which is what Dr. Abrams appears to require. Further, for the same reasons discussed above with respect to motivation to combine, a POSA would have had a reasonable expectation of successfully arriving at the claimed invention by combining FDA Guidance with the 2015 Lonsurf Label and NCT '117. Moreover, contrary to Dr. Abrams's concern, a POSA would not have administered 35 mg/m² twice daily to an SRI patient based on NCT '117. *Id.* at ¶199. A POSA would have been aware that NCT '117 specifically states that the dosage for an SRI patient would be determined based on the Interim Assessment of mild and moderate cohorts. NCT '117 at DEFSTT-001148. Thus, Dr. Abrams has manufactured a concern where none exists. Finally, the dosing regimen is specifically set forth in the 2015 Lonsurf Label and NCT '117. While NCT '117 states that the dosing for SRI patients will be adjusted based on the Interim Assessment of mild and moderate cohorts, there is no mention of adjusting the dosing regimen in SRI patients. Therefore, a POSA

105

would have had no reason to deviate from the dosing regimen disclosed in the 2015 Lonsurf Label and NCT '117.

### 4. The dependent claims of the '004 patent

#### a) Claim 2 of the '004 patent

259. Claim 2 of the '004 patent recites: "[t]he method of claim 1, wherein a dose of 40 mg/m$^2$/day as FTD-equivalent is administered in two doses a day." Claim 2 is rendered obvious over the 2015 Lonsurf Label in view NCT '117, FDA Guidance, and the general knowledge and experience of a POSA for the same reason discussed above for claim 1 of the '004 patent. That is, as explained above, the 2015 Lonsurf Label discloses dose reductions to "20 mg/m$^2$ twice daily." 2015 Lonsurf Label at 2-3 (DEFS-TT-005253-5254).

260. Dr. Taft asserts that claim 2 of the '004 patent is valid for the same reasons as claim 1. However, as discussed above, the evidence does not support Dr. Taft's contention that claim 1 is valid.

261. Accordingly, for all the above described reasons, claim 2 of the '004 patent is obvious over the 2015 Lonsurf Label in view of NCT '117, FDA Guidance, and the general knowledge and experience of a POSA. Further, a POSA would have been motivated to combine these prior art reference with a reasonable expectation of successfully arriving at the claimed invention for the same reasons discussed above for claim 10 of the '399 patent.

#### b) Claims 3, 4, 17, and 18 of the '004 patent

262. Claims 3 and 4 of the '004 patent recite: "[t]he method of claim 1, wherein an administration schedule is 5-day consecutive oral administrations and 2-day rest, per week" and "[t]he method of claim 1, wherein an administration schedule of 5-day consecutive oral administrations and 2-day rest is repeated twice, followed by rest for 14 days," respectively.

Claims 17 and 18 of the '004 patent recite: "[t]he method of claim 2, wherein an administration schedule is 5-day consecutive oral administrations and 2-day rest, per week" and "[t]he method of claim 2, wherein an administration schedule of 5-day consecutive oral administrations and 2-day rest is repeated twice, followed by rest for 14 days," respectively.

263.    Claims 3, 4, 17, and 18 are obvious over the 2015 Lonsurf Label in view of NCT '117, FDA Guidance, and the general knowledge and experience of a POSA for the same reasons discussed above for claims 1 and 2 of the '004 patent (incorporated herein by reference). That is, as explained above, the 2015 Lonsurf Label discloses "[t]he recommended starting dose of LONSURF is 35 mg/m$^2$ up to a maximum of 80 mg per dose (based on the trifluridine component) orally twice daily within one hour of completion of morning and evening meals on Days 1 through 5 and Days 8 through 12 of each 28 day cycle until disease progression or unacceptable toxicity." 2015 Lonsurf Label at 2 (DEFS-TT-005253). Further, NCT '117 discloses administering "35 mg/m2/dose of TAS-102 orally, twice daily on days 1-5 and days 8- 12 of each 28 day cycle," and notes that "[t]he dose level of the severe [renal impairment] cohort will be determined based on the Interim Assessment of the mild and moderate cohorts." NCT '117 at 5 (DEFS-TT-001148).

264.    Dr. Taft asserts that claims 3, 4, 17, and 18 of the '004 patent are valid for the same reasons as claims 1 and 2. However, as discussed above, the evidence does not support Dr. Taft's contention that claims 1 and 2 are valid.

265.    Accordingly, for all the above described reasons, claims 3, 4, 17, and 18 of the '004 patent are obvious over the 2015 Lonsurf Label in view of NCT '117, FDA Guidance, and the general knowledge and experience of a POSA. Further, a POSA would have been motivated to combine these prior art reference with a reasonable expectation of successfully arriving at the claimed invention for the same reasons discussed above for claim 10 of the '399 patent.

### c)    Claims 7, 20, 24, and 28 of the '004 patent

266.    Claims 7, 20, 24, and 28 of the '004 patent recite: "[t]he method of claim 6, wherein colorectal cancer is treated,"[5] "[t]he method of claim 2, wherein colorectal cancer is treated," "[t]he method of claim 3, wherein colorectal cancer is treated," and "[t]he method of claim 4, wherein colorectal cancer is treated," respectively. Claims 7, 20, 24, and 28 are obvious over the 2015 Lonsurf Label in view of NCT '117, FDA Guidance, and the general knowledge and experience of a POSA for the same reasons discussed above for claims 1-4 of the '004 patent (incorporated herein by reference). That is, the 2015 Lonsurf Label discloses in its Indication and Usage Section: "LONSURF is indicated for the **treatment of** patients with metastatic **colorectal cancer** who have been previously treated with fluoropyrimidine-, oxaliplatin- and irinotecan based chemotherapy, and an anti-VEGF biological therapy, and if RAS wild-type, an anti-EGFR therapy." 2015 Lonsurf Label at 2 (DEFS-TT-005253) (emphasis added). Further, NCT '117 discloses that the purpose of the Phase I study was to "evaluate the safety, tolerability, and pharmacokinetics of TAS-102 in patients with advanced solid tumors with varying degrees of renal impairment." NCT '117 at 3-4 (DEFS-TT_001146-1147). A POSA would understand that solid tumors include colorectal cancer. Moreover, according to NCT '117, the only solid tumor excluded was breast. *Id.* at 6 (DEFS-TT-001149).

267.    Dr. Taft asserts that claims 7, 20, 24, and 28 of the '004 patent are valid for the reasons as claims 1-4 and 17-18. However, as discussed above, the evidence does not support Dr. Taft's contention that claims 1-4 and 17-18 are valid.

268.    Accordingly, for all the above described reasons, claims 7, 20, 24, and 28 of the '004 patent are obvious over the 2015 Lonsurf Label in view of NCT '117, FDA Guidance, and

---

[5] Claim 6 recites "[t]he method of claim 1, wherein large bowel cancer is treated."

the general knowledge and experience of a POSA. Further, a POSA would have been motivated to combine these prior art reference with a reasonable expectation of successfully arriving at the claimed invention for the same reasons discussed above for claim 10 of the '399 patent.

### C.    The Asserted Claims of the Patents-In-Suit are Invalid as Obvious Over the Lonsurf Report and/or the 2015 Lonsurf Label in View of FDA Guidance, and the General Knowledge and Experience of a POSA, optionally in further view of NCT '117

269.    The evidence at trial will establish that the Asserted Claims of the Patents-in-Suit are invalid as obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of FDA Guidance, and the general knowledge and experience of a POSA, optionally in further view of NCT '117.

#### 1.    Claim 10 of the '399 patent

270.    Claim 10 of the '399 patent depends from claims 1 and 2 and recites:

10. The method for treating cancer according to claim 2, wherein a dose of 40 mg/m2/day as FTD-equivalent is divided in two portions.

When each of the limitations from claims 1 and 2 are read into claim 10, claim 10 requires the following:

A method for treating cancer which is one of gastrointestinal cancer, large bowel cancer and breast cancer, comprising: detecting a creatinine clearance of a patient; and orally administering to the patient with a creatinine clearance of 15 mL/min or more and 29 mL/min or less a combination drug comprising $\alpha,\alpha,\alpha$trifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5, wherein a dose of 40 mg/m$^2$/day as FTD-equivalent is divided in two portions for administration.

271.    The evidence at trial will show that claim 10 of the '399 patent is rendered obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of FDA Guidance, and the general knowledge and experience of a POSA, optionally in further view of NCT '117 as discussed below.

***A method for treating cancer which is one of gastrointestinal cancer, large bowel cancer***

109

*and breast cancer, comprising*

272. The Lonsurf Report discloses a combination drug product containing 15 mg of trifluridine and 7.065 mg of tipiracil HCl and 20 mg of trifluridine and 9.42 mg of tipiracil HCl used for treating advanced or recurrent colorectal cancer. Lonsurf Report at 1-5 (DEFS-TT000069-73). Likewise, the 2015 Lonsurf Label discloses in its Indication and Usage Section: "LONSURF is indicated for the treatment of patients with metastatic colorectal cancer who have been previously treated with fluoropyrimidine-, oxaliplatin- and irinotecan-based chemotherapy, and an anti-VEGF biological therapy, and if RAS wild-type, an anti-EGFR therapy." 2015 Lonsurf Label at 2 (DEFS-TT-005253). As Dr. Dreicer will testify at trial, A POSA would understand that metastatic colorectal cancer is a type of large bowel cancer. Indeed, the Patents-in-Suit specifically define large bowel cancer as "colorectal cancer, colon cancer, [and] rectal cancer." *See, e.g.*, '399 patent at 6:56-62.

*a combination drug comprising α,α,α-trifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5*

273. The Lonsurf Report discloses a combination drug product containing 15 mg of trifluridine and 7.065 mg of tipiracil HCl and 20 mg of trifluridine and 9.42 mg of tipiracil HCl used for treating advanced or recurrent colorectal cancer. Lonsurf Report at 2, 3, 5, 8 (DEFS-TT000070-71, 73, 76). The Lonsurf Report further discloses the "combination of FTD and TPI at a molar ratio of 2:1," which a POSA would understand is the same as a molar ratio of 1:0.5. *Id.* at 6 (DEFS-TT-000074). Likewise, the 2015 Lonsurf Label discloses that LONSURF "contains trifluridine and tipiracil hydrochloride at a molar ratio of 1:0.5." *Id*. at 9 (DEFS-TT-005260); *see also id.* at 10 ("LONSURF consists of a thymidine-based nucleoside analog, trifluridine, and the thymidine phosphorylase inhibitor, tipiracil, at a molar ratio of 1:05 (weight ratio, 1:0.471).").

*wherein a dose of 40 mg/m$^2$/day as FTD-equivalent is divided in two portions for administration*

274.    The Lonsurf Report discloses an initial dose of 35 mg/m$^2$ of FTD-TPI orally administered twice daily. Lonsurf Report at 3, 5 (DEFS-TT-000071, 73). The Lonsurf Report further discloses that "[t]he dose may be reduced according to the patient's condition." *Id.* Additionally, the Lonsurf Report discloses a Japanese Phase I study (Study TAS102-J0001), wherein "patients with advanced solid tumor received FTD-TPI orally as a dose of 15 to 35 mg/m$^2$/dose BID," which corresponds to 30-70 mg/m$^2$/day and overlaps with the claimed dosage.

275.    The 2015 Lonsurf Label discloses that "[t]he recommended starting dose of LONSURF is 35 mg/m$^2$ up to a maximum of 80 mg per dose (based on the trifluridine component) orally twice daily within one hour of completion of morning and evening meals on Days 1 through 5 and Days 8 through 12 of each 28 day cycle until disease progression or unacceptable toxicity." 2015 Lonsurf Label at 2-3 (DEFS-TT-005253-5254). The 2015 Lonsurf Label further discloses dose reductions to "20 mg/m$^2$ twice daily," i.e., 40 mg/m$^2$/day, in patients who experience cytotoxicity, including neutropenia. *Id.*

*detecting a creatinine clearance of a patient; and orally administering to the patient with a creatinine clearance of 15 mL/min or more and 29 mL/min or less*

276.    "Detecting a creatinine clearance of a patient; and orally administering to the patient with a creatinine clearance of 15 mL/min or more and 29 mL/min or less" as recited in claim 10 of the '399 patent is taught by the Lonsurf Report and/or the 2015 Lonsurf Label in view of FDA Guidance, and the general knowledge and experience of a POSA, optionally in further view of NCT '117.

277.    For example, the Lonsurf Report discloses a clinical study (Study TAS102-J001) where patients "were stratified by creatinine clearance (CrCL) calculated using the Cockcroft-

111

Gault equation." Lonsurf Report, 49. The Lonsurf Report states that "the incidence of adverse drug reactions related to bone marrow suppression … tended to be higher in patients with mild to moderate renal function as compared with patients with normal renal function," as depicted in the below annotated table. *Id.* at 50.

**Incidence of adverse drug reactions related to bone marrow suppression by renal function**

| Renal function | n (%) | | | |
|---|---|---|---|---|
| | Platelet count decreased (Grade 4 or lower) | Red blood cell count decreased (Grade 4 or lower) | Haemoglobin decreased (Grade 3 or 4) | Neutrophil count decreased (Grade 4) |
| Normal | 17/49 (34.7) | 8/49 (16.3) | 3/49 (6.1) | 7/49 (14.3) |
| Mild impairment | 24/50 (48.0) | 24/50 (48.0) | 14/50 (28.0) | 12/50 (24.0) |
| Moderate impairment | 8/20 (40.0) | 6/20 (30.0) | 5/20 (25.0) | 4/20 (20.0) |

The Lonsurf Report states that "[n]ormal renal function was defined as CCL of $\geq$ 90 mL/min; mild renal impairment as 60 to 89 mL/min; moderate renal impairment as 30 to 50 mL/min; severe renal impairment as 15 to 29 mL/min; and end-stage renal disease as <15mL/min." *Id.*

278.    Further, the 2015 Lonsurf Label discloses a clinical study (Study 1) in which patients with metastatic colorectal cancer were administered 35 mg/m$^2$ of LONSURF twice daily on days 1-5 and days 8-12 of each 28-day cycle. 2015 Lonsurf Label at 13 (DEFS-T-005264); *id.* at 4 (DEFS-TT-005255). The 2015 Lonsurf Label discloses:

> In Study 1, patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n=47) had a higher incidence (difference of at least 5%) of $\geq$ Grade 3 adverse events, serious adverse events, and dose delays and reductions compared to patients with normal renal function (CLcr $\geq$ 90 mL/min, n= 306) or patients with mild renal impairment (CLcr = 60 to 89 mL/min, n= 178).
>
> No dose adjustment to the starting dose of LONSURF is recommended in patients with mild or moderate renal impairment (CLcr of 30 to 89 mL/min); however patients with moderate renal impairment may require dose modification for increased toxicity. No patients with severe renal impairment (CLcr < 30 mL/min) were enrolled in Study 1. [*see Clinical Pharmacology (12.3)*].

*Id.* at 8 (DEFS-TT-005259).

279.    The 2015 Lonsurf Label also discloses:

112

In Study 1, the estimated mean AUC of trifluridine at steady state was 31% higher in patients with mild renal impairment (CLcr = 60 to 89 mL/min, n= 38) and 43% higher in patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n= 16) than that in patient with normal renal function (CLcr ≥ 90 mL/min, n= 84) based on the population pharmacokinetic analysis. The estimated mean AUC of tipiracil was 34% higher in patients with mild renal impairment and 65% higher in patients with moderate renal impairment than that in patients with normal renal function. The pharmacokinetics of trifluridine and tipiracil have not been studied in patients with severe renal impairment (CLcr < 30 mL/min) or end-stage renal disease. *[see Use in Specific Populations (8.7)].*

*Id.* at 12 (DEFS-TT-005263).

280.    Similarly, NCT '117 discloses a Phase I study to "evaluate the safety, tolerability, and pharmacokinetics of TAS-102 in patients with advanced solid tumors with varying degrees of renal impairment." NCT '117 at 3-4 (DEFS-TT-001146-1147). The three arms of the Phase I study in NCT '117 included patients with mild, moderate, and severe renal impairment. I*d*. at 5 (DEFS-TT-001148). The mild and moderate arms of the study received "35 mg/m2/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle." *Id.* According to NCT '117, "[t]he dose level of [the] severe cohort will be determined based on the Interim Assessment of mild and moderate cohorts." *Id.*

281.    In view of these above-described disclosures, a POSA would understand that creatinine clearance was detected in the patients in these studies because patients were divided into subgroups, i.e., normal renal function (CLcr ≥ 90 mL/min), mild renal impairment (CLcr 60- 89 mL/min), moderate renal impairment (CLcr  30-59 mL/min), and severe renal impairment (CLcr 15-29 mL/min ) based on creatinine clearance.

282.    With regard to orally administering the claimed dosage "to the patient with a creatinine clearance of 15 mL/min or more and 29 mL/min or less," a POSA would understand that FDA Guidance teaches that a dosage adjustment may be necessary in patients with renal impairment because "renal impairment is likely to significantly alter the PK of a drug and/or its

active/toxic metabolites." *Id.* at 2.

283.    As FDA Guidance explains, studies should be conducted "in patients with impaired renal function . . . to determine if the PK is altered to such an extent that the dosage should be adjusted from that established in the phase 3 trials." *Id.* at 3. FDA Guidance also recommends a "basic full study design" with "adequate representation of patients with various degrees of renal impairment" recruited in equal numbers into the study and provides the following table of renal impairment categories:

| Group | Description | Estimated Creatinine Clearance (milliliters/minutes) |
|---|---|---|
| 1 | Normal renal function | > 80 mL/min |
| 2 | Mild renal impairment | 50-80 mL/min |
| 3 | Moderate renal impairment | 30-50 mL/min |
| 4 | Severe renal impairment | <30 mL/min |
| 5 | ESRD | Requiring dialysis |

*Id.* at 4-5.

284.    FDA Guidance describes creatinine clearance as a widely used measure of renal function that is "more practical than most other alternatives as a criterion for adjusting dosage in outpatient and inpatient settings." *Id.* at 6. According to FDA Guidance, the Cockcroft-Gault formula is recognized as one way of estimating creatinine clearance based on serum creatinine levels. *Id.* FDA Guidance also recommends a data analysis to assess "whether [a] dosage adjustment is required for patients with impaired renal function and, if so, to develop dosing recommendations for such patients based on measures of renal function." *Id.* at 9.

285.    Further, a POSA would have understood that a clinical trial was ongoing to

114

determine the appropriate dose of Lonsurf in patients with severe renal impairment. For example, NCT '117 discloses a Phase I study to "evaluate the safety, tolerability, and pharmacokinetics of TAS-102 in patients with advanced solid tumors with" mild, moderate, and severe renal impairment. NCT '117 at 3-5 (DEFS-TT-001146-1148). According to NCT '117, "[t]he dose level of [the] severe cohort will be determined based on the Interim Assessment of mild and moderate cohorts."

286.    Accordingly, because renal impairment studies were common practice (see, e.g., FDA Guidance and NCT '117), a POSA would have reasonably expected to determine the appropriate dose for a patient "with a creatinine clearance of 15 mL/min or more and 29 mL/min or less" through routine optimization. Indeed, the evidence will show that no inventive skill would have been required to arrive at the claimed dosage because dose finding trials in renally impaired patients were specifically prescribed by and described in FDA Guidance; not to mention that a clinical trial to evaluate the impact of severe renal impairment was already ongoing (NCT '117).

287.    Moreover, a POSA administering an FTD-TPI combination drug at a molar ratio of 1:0.5 to treat metastatic colorectal cancer according to the Lonsurf Report and/or 2015 Lonsurf Label would have been motivated to reduce the dose in a patient with severe renal impairment, as compared to a patient with normal renal function. Indeed, as the 2015 Lonsurf Label explains, the estimated mean AUC of FTD was 31% and 43% higher in patients with mild and moderate renal impairment, respectively, as compared to patients with normal renal function and the estimated mean AUC of TPI was 34% and 65% higher in patients with mild and moderate renal impairment, respectively, as compared to patients with normal renal function. 2015 Lonsurf Label at 12 (DEFS-TT-005262). Further, a POSA would have recognized that the 2015 Lonsurf Label disclosed that patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n=47) had a higher incidence

115

(difference of at least 5%) of ≥ Grade 3 adverse events, serious adverse events, and dose delays and reductions compared to patients with normal renal function. *Id*. at 8 (DEFS-TT-005259). Therefore, as Dr. Dreicer will explain at trial, a POSA would have expected that patients with severe renal impairment would require a dose reduction to prevent severe adverse events and would have recognized that the 2015 Lonsurf Label discloses a dose reduction to 20 mg/m$^2$ twice daily, i.e., 40 mg/m$^2$/day. *Id.* at 3 (DEFS-TT-005254). Based on FDA Guidance and NCT '117, a POSA would have been able to determine the 20 mg/m$^2$ twice daily, i.e., 40 mg/m$^2$/day, dose in a patient with severe renal impairment through routine testing—including routine optimization of the ongoing study in NCT '117.

288.    A POSA would have been further motivated to reduce the Lonsurf dose in view of the teaching in the Lonsurf Report that "[a]s TPI appears to be hardly metabolized before excretion in urine in humans…renal impairment may increase exposure to TPI and inhibit the metabolism of FTD to affect the PK of FTD." Lonsurf Report, 49; *see also id*. at 25. Based on this disclosure, a POSA would have expected FTD exposure to increase in patients with severe renal impairment, and further expected for those patients to experience cytotoxicity, and adverse events, based on elevated FTD plasma levels. Therefore, a POSA would have reduced the dose of Lonsurf in patients with severe renal impairment to 20 mg/m$^2$, twice daily, and would have reasonably expected for those doses to be successful in treating metastatic colorectal cancer in patients with severe renal impairment with a more tolerable safety profile.

289.    In short, the evidence will demonstrate that based on the teachings of the Lonsurf Report, the 2015 Lonsurf Label, FDA Guidance, and NCT '117, a POSA would have been motivated to reduce the dose of LONSURF described in the Lonsurf Report and the 2015 Lonsurf Label (i.e., 35 mg/m$^2$ twice daily) in patients with severe renal impairment to 20 mg/m$^2$ (i.e., 40

116

mg/m$^2$ in two doses) and it would have been nothing more than routine testing, as described in FDA Guidance, and as was ongoing in NCT '117, to confirm the 20 mg/m$^2$ (i.e., 40 mg/m$^2$ in two doses) dose in patients with severe renal impairment.

290.    For all the above discussed reasons, claim 10 of the '399 patent is invalid as obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of FDA Guidance, and the general knowledge and experience of a POSA, optionally in further view of NCT '117 as discussed below. Further, a POSA would have been motivated to combine the Lonsurf Report, the 2015 Lonsurf Label, NCT '117, and FDA Guidance with a reasonable expectation of successfully arriving at the claimed invention because the Lonsurf Report, the 2015 Lonsurf Label, and NCT '117 concern the same drug—LONSURF—and because FDA Guidance provides information related to drug administration to patients with severe renal impairment, a patient population discussed in the Lonsurf Report, the 2015 Lonsurf Label and NCT '117.

### 2.    Claim 1 of the '004 patent

291.    Claim 1 of the '004 patent recites:

1. A method for treating gastrointestinal cancer, large bowel cancer or breast cancer in a patient with a creatinine clearance of 15 mL/min-29 mL/min, comprising: orally administering a drug comprising α,α,α-trifluorothymidine (FTD) and 5- chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5, at a daily dose of 30 to 40 mg/m$^2$/day as FTD-equivalent, in two to four doses a day to the patient with a creatinine clearance of 15 mL/min-29 mL/min.

292.    Claim 1 of the '004 patent is obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of FDA Guidance, and the general knowledge and experience of a POSA, optionally in further view of NCT '117 for the same reasons as claim 10 of the '399 patent (the discussion of which is incorporated herein by reference)—with the caveat that the '004 patent does not require the "detecting" step. Further, a POSA would have been motivated to combine the Lonsurf Report, the 2015 Lonsurf Label, NCT '117, and FDA Guidance with a reasonable

117

expectation of successfully arriving at the claimed invention for the same reasons as discussed above for claim 10 of the '399 patent.

### 3. Plaintiffs' experts will not be able to rebut the strong case of obviousness of claim 10 of the '399 patent and claim 1 of the '004 patent

#### a) Dr. Taft

293.    Dr. Taft has six overarching reasons as to why claim 1 of the '004 patent is not rendered obvious by the Lonsurf Report and/or the 2015 Lonsurf Label in view of FDA Guidance and the general knowledge and experience of a POSA, optionally in further view of NCT '117: (i) dose reductions were not undertaken in SRI patients, and were for adverse events, not renal insufficiency; (ii) there is no motivation to modify the treatment existing in 2016 for SRI patients; (iii) the 2015 Lonsurf Label, Lonsurf Report, and NCT '117 teach away from administering a reduced dose in SRI patients; (iv) there was no reasonable expectation of success that administering a reduced dose of LONSURF to SRI patients would be safe and effective; (v) there was no motivation to combine the Lonsurf Report or 2015 Lonsurf Label with NCT '117 and FDA Guidance; and (vi) similar or the same arguments and art were already discussed during the prosecution of the Patents-in-Suit. Taft Rebuttal at ¶¶471-518. But the evidence at trial will not substantiate Dr. Taft's claims.

294.    First, Dr. Taft argues that dose reductions were not undertaken in SRI patients, and were for adverse events, not renal insufficiency. Taft Rebuttal at ¶¶471-478. Dr. Taft's primary argument regarding the 2015 Lonsurf Label and Lonsurf Report is that they do not disclose administering LONSURF to SRI patients. *Id.* at ¶¶471-476. But the 2015 Lonsurf Label disclosed that patients with renal insufficiency experienced increased adverse events, requiring dose reductions. The 2015 Lonsurf Label also states that "patients with moderate renal impairment *may require dose modification* for increased toxicity." 2015 Lonsurf Label at DEFS-TT-005259

118

(emphasis added). Moreover, the Lonsurf Report (at DEFS-TT-000114) discloses doses as low as 30-40 mg/m$^2$/day. Thus, as Defendants' expert, Dr. Dreicer will explain, a POSA would have been motivated to reduce the dose of LONSURF in SRI patients to avoid adverse events/toxicity— given that these patients are more likely to experience adverse events/toxicity than those with moderate renal impairment. Further, a POSA would have been motivated to start with the minimum dose, which the Lonsurf Report (at DEFS-TT-000114) discloses is 30-40 mg/m$^2$ per day and the 2015 Lonsurf Label (at DEFS-TT-005254) states is 40 mg/m$^2$ per day. A POSA would have been motivated to start at the lowest doses—to avoid adverse events/toxicity—understanding that they could titrate the dose upward as tolerated.

295.    Next Dr. Taft argues that NCT '117 teaches administering the standard dose of 35 mg/m$^2$ twice daily to SRI patients. Taft Rebuttal at ¶477. However, a POSA would understand that NCT '117 states that dosing should be adjusted based on data from patients with mild and moderate renal impairment. NCT '117 at DEFS-TT-0011148. In other words, the investigators did not "anticipate[] administering to SRI patients a dose of '35 mg/m$^2$/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle.'"

296.    Dr. Taft also argues that a POSA would not rely on FDA Guidance because LONSURF is a combination drug. Taft Rebuttal at ¶478. However, a POSA would have known from the LONSURF FDA Approval Package that the FDA pointed Taiho to the FDA Guidance, despite the fact that the FDA knew that LONSURF was a "combination drug." *See, e.g.,* LONSURF FDA Approval Package at DEFS-TT-005604; *see also id.* at DEFS-TT-005551, -5649.

297.    Second, Dr. Taft argues there is no motivation to modify the treatment existing in 2016 for SRI patients. Taft Rebuttal at ¶¶479-487. Dr. Taft's primary argument regarding the 2015 Lonsurf Label is that it does not require dose adjustments for patients with mild and moderate renal

119

impairments, despite adverse events. *Id.* at ¶¶480-481. However, Dr. Taft ignores the fact that the 2015 Lonsurf Label states that "patients with moderate renal impairment **may require dose modification** for increased toxicity." 2015 Lonsurf Label at DEFS-TT-005259 (emphasis). Accordingly, given the disclosures related to adverse events in patients with moderate renal impairment, as well as the disclosure that "patients with moderate renal impairment may require dose modification for increased toxicity," a POSA would have erred on the side of caution and would have been motivated to administer the minimum dose—30-40 mg/m² daily, as disclosed in the 2015 Lonsurf Label (DEFS-TT-005254) and the Lonsurf Report (at DEFS-TT-000114). Accordingly, administering a reduced dose of LONSURF to an SRI patient is consistent with the teachings of the 2015 Lonsurf Label and the Lonsurf Report.

298.    Dr. Taft also argues that the Lonsurf Report discloses that the incidence of adverse events actually decreased in patients with moderate renal impairment as compared to patients with mild renal impairment:

**Incidence of adverse drug reactions related to bone marrow suppression by renal function**

| Renal function | n (%) | | | |
| --- | --- | --- | --- | --- |
| | Platelet count decreased (Grade 4 or lower) | Red blood cell count decreased (Grade 4 or lower) | Haemoglobin decreased (Grade 3 or 4) | Neutrophil count decreased (Grade 4) |
| Normal | 17/49 (34.7) | 8/49 (16.3) | 3/49 (6.1) | 7/49 (14.3) |
| Mild impairment | 24/50 (48.0) | 24/50 (48.0) | 14/50 (28.0) | 12/50 (24.0) |
| Moderate impairment | 8/20 (40.0) | 6/20 (30.0) | 5/20 (25.0) | 4/20 (20.0) |

Taft Rebuttal at ¶482 (citing the Lonsurf Report at DEFS-TT-000118). Dr. Taft asserts that "without any explanation for why the incidence of adverse events was less in patients with moderate renal impairment as compared to patients with mild renal impairment, a person of ordinary skill in the art in 2016 looking at the Lonsurf Report would have no expectation that the incidence of adverse events would be greater than that seen in patients with mild or moderate renal impairment" and a POSA "would not be motivated to decrease the dosage of Lonsurf in SRI

120

patients." *Id.* at ¶482. But the POSA would not be looking at the Lonsurf Report in isolation, and would also be aware of the adverse event data presented in the 2015 Lonsurf Label. Further, a POSA would recognize that patients with both mild and moderate impairment experienced a greater percentage of adverse events as compared to normal patients. Likewise, a POSA would recognize that for hemoglobin count and neutrophil count, there was minimal difference in the percentage of mild and moderate patients experiencing a decrease in these parameters. Thus, as Dr. Dreicer will explain, a POSA would have reasonably expected that an SRI patient would experience such adverse events, and at a higher incidence, in view of not just the Lonsurf Report, but also the 2015 Lonsurf Label and the general experience and knowledge of a POSA (which would include the LONSURF FDA Approval Package).

299.    Further, as discussed above, Dr. Taft's assertion that the LONSURF FDA Approval Package includes any statements teaching away from administering a reduced dose of LONSURF to SRI patients is without merit. Taft Rebuttal at ¶483. Likewise Dr. Taft's assertion that the NCT '117 study investigators "anticipated administering to SRI patients a dose of '35 mg/m$^2$/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle,'" is incorrect for the same reasons as discussed above. *Id.* at ¶484. Moreover, as discussed above, a POSA would have known from the LONSURF FDA Approval Package that the FDA pointed Taiho to the FDA Guidance, despite the fact that the FDA knew that LONSURF was a "combination drug." *See, e.g.,* LONSURF FDA Approval Package at DEFS-TT-005604; *see also id.* at DEFS-TT-005551, -5649. Therefore, contrary to Dr. Taft's assertion a POSA would have relied on FDA Guidance. Taft Rebuttal at ¶485.

300.    Third, Dr. Taft argues the 2015 Lonsurf Label, Lonsurf Report, and NCT '117 teach away from administering a reduced dose in SRI patients. But the 2015 Lonsurf Label does not

teach away from administering a reduced dose of LONSURF in SRI patients for the same reasons as discussed above. Likewise, for the reasons discussed above, any difference in the incidence of adverse events in patients with mild and moderate renal impairment disclosed in the Lonsurf Report does not teach away from administering a reduced dose of LONSURF in SRI patients. Further, contrary to Dr. Taft's assertion, the LONSURF FDA Approval Package does not include any statements teaching away from administering a reduced dose of LONSURF to SRI patients. Taft Rebuttal at ¶492. Indeed, if only a clinical trial were sufficient to establish the dose of LONSURF in an SRI patient, then the Patents-in-Suit lack adequate written description. Nor does NCT '117 teach away from administering a reduced dose in SRI patients because the study investigators "anticipated administering to SRI patients a dose of '35 mg/m$^2$/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle,'" for the same reasons as discussed above.

301. Fourth, Dr. Taft argues there was no reasonable expectation of success that administering a reduced dose of LONSURF to SRI patients would be safe and effective. Taft Rebuttal at ¶¶494-511. As an initial matter, the Asserted Claims do not include a safety or efficacy requirement. Further, Dr. Taft argues that "oncologists would have avoided treating SRI patients with Lonsurf, because the risk of SRI patients experiencing drug accumulation and toxicity was too great." *Id.* at ¶496. As explained above, Dr. Taft has no basis (or qualifications) to opine on what an oncologist would do—he is not a clinician. Nor does he cite Dr. Abrams (a clinician) to support his opinion. *Id*. Moreover, the paper Dr. Taft relies on, Lichtman, recommends "careful ***dose adjustment*** … to avoid drug accumulation and toxicity," not avoiding treatment, *see* Lichtman (DEFS-TT-006171) at 172 (emphasis added), which is consistent with Dr. Dreicer's opinion. *Id.*

302.    Dr. Taft also argues that administering LONSURF to SRI patients "presented several challenges," including the lack of predictability, coupled with compromised renal function, in a vulnerable cancer patient. Taft Rebuttal at ¶¶497-498. However, because Dr. Taft is not viewing the problem from a clinical perspective—he is not a clinician—he fails to take into account that heavily treated metastatic colorectal cancer patients with severe renal insufficiency had few treatment options to prolong survival, and thus a POSA would have been motivated to administer a reduced dose of LONSURF—given the paucity of treatment options available—and would have had a reasonable expectation of success given the teachings in the 2015 Lonsurf Label and the Lonsurf Report.

303.    Dr. Taft further relies on the fact the FDA required Taiho to complete a dedicated renal study to support his assertion that there was no reasonable expectation of success. Taft Rebuttal at ¶¶499-504, 510. But FDA regulatory requirements, i.e., to demonstrate safety and efficacy, are different than the requirements to establish obviousness. Moreover, if only a clinical trial were sufficient to establish the dose of LONSURF in an SRI patient, then the Patents-in-Suit lack adequate written description.

304.    Dr. Taft also relies on information related to Teysuno to support his assertion that there was no reasonable expectation of success. Taft Rebuttal at ¶¶505-507. However, for the same reasons discussed above, Defendants disagree with Dr. Taft's analysis.

305.    Fifth, Dr. Taft argues there was no motivation to combine the Lonsurf Report or 2015 Lonsurf Label with NCT '117 and FDA Guidance. Taft Rebuttal at ¶¶512-514. But the 2015 Lonsurf Label, Lonsurf Report, and NCT '117 address the same issue—how to administer LONSURF, with NCT '117 providing additional information on planned administration of LONSURF to SRI patients. Further, a POSA would have been motivated to combine FDA

123

Guidance with the 2015 Lonsurf Label, Lonsurf Report, and NCT '117, because FDA Guidance provides further information related to renal impairment studies, such as the one disclosed in NCT '117.

306.    Finally, Dr. Taft argues that similar or the same arguments and art were already discussed during the prosecution of the Patents-in-Suit. Taft Rebuttal at ¶¶515-517. But the prior art combination that Defendants rely on was not before the patent examiner. Therefore, similar or the same arguments and art were not already discussed during the prosecution of the Patents-in-Suit.

307.    Dr. Taft also asserts that claim 10 of the '399 patent is valid for the same reasons claim 1 of the '004 patent, despite claim 10 of the '399 patent reciting a 'detecting a creatinine clearance of a patient' step. However, as the evidence will show, for the same reasons that claim 10 of the '399 patent is invalid as obvious, claim 1 of the '004 patent is likewise obvious.

### b)    Dr. Abrams

308.    Dr. Abrams claims that the LONSURF Report and/or the 2015 Lonsurf Label in view of FDA Guidance and the general knowledge and experience of a POSA, optionally in further view of NCT '117 would not have rendered the Asserted Claims of the Patents-in-Suit obvious. Abrams Rebuttal at ¶¶203-220. To support this assertion, Dr. Abrams makes three overarching claims: (i) the Lonsurf Report did not teach a POSA whether LONSURF could have been administered to SRI patients; (ii) there was no motivation to combine the Lonsurf Report and/or the 2015 Lonsurf Label in view of the FDA Guidance, optionally in further view of NCT '117; and (iii) a POSA would have had no expectation of success in combining the Lonsurf Report and/or the 2015 Lonsurf Label in view of the FDA Guidance, optionally in further view of NCT '117. *Id.* But the evidence at trial will not substantiate Dr. Abrams' claims.

309.    First, Dr. Abrams asserts that the Lonsurf Report did not teach a POSA whether LONSURF could have been administered to SRI patients because the patients therein had normal kidney function. Abrams Rebuttal at ¶¶204-208. But Dr. Dreicer never cited the Lonsurf Report as evidence that LONSURF had been administered to SRI patients. *See, e.g.*, Dreicer Opening Expert Report at §VII.C. Rather, he noted that the Lonsurf Report discloses doses of LONSURF ranging from 30- 70mg/m$^2$/day—which overlaps with the claimed range. *Id.* at ¶238. Dr. Abrams argues that there is no reason a POSA would have selected 40 mg/m$^2$ as opposed to any of the other doses. Abrams Rebuttal at ¶206. However, a POSA would not view the Lonsurf Report in a vacuum. A POSA would have been aware that the 2015 Lonsurf Label recommends a dose reduction to 40 mg/m$^2$ daily in patients who experience cytotoxicity, including neutropenia—the very adverse events a POSA would expect an SRI patient to be susceptible to. Dreicer Opening Expert Report at ¶239 (citing 2015 Lonsurf Label at DEFS-TT-005254). Further, the Lonsurf Report states that "[t]he dose may be reduced according to the patient's condition." Dreicer Opening Expert Report at ¶238 (citing Lonsurf Report at DEFS-TT-000071, 73). Given that renal insufficiency is a "condition," and the teachings of the 2015 Lonsurf Label, a POSA would have been found it obvious to try 40 mg/m$^2$, a dose of LONSURF at the lower end of the finite range disclosed for patients with normal renal function.

310.    Second, Dr. Abrams claims that there was no motivation to combine the Lonsurf Report and/or the 2015 Lonsurf Label in view of the FDA Guidance, optionally in further view of NCT '117. Abrams Rebuttal at ¶¶209-214. Once again, Dr. Abrams falls back on the argument that LONSURF had not been studied in SRI patients. *Id.* at e.g., ¶209. But as explained above, this would not have dissuaded a POSA from investigating the claimed invention. Further, while the Lonsurf Report states that LONSURF should be carefully administered to patients with renal

125

impairment this does not demonstrate that a POSA would have lacked motivation to combine the Lonsurf Report and/or the 2015 Lonsurf Label in view of the FDA Guidance, optionally in further view of NCT '117. In fact, the precaution would have provided motivation to reduce the dose of LONSURF consistent with the teachings of the 2015 Lonsurf Label in patients who may experience cytotoxicities resulting from the drug, e.g., SRI patients.

311.    Dr. Abrams also asserts that the 2015 Lonsurf Label teaches away from the Asserted Claims, and that the FDA Guidance and NCT '117 do not supply the missing claim limitations, i.e., the claimed dose in SRI patients. This argument fails for the same reasons as discussed herein.

312.    Third, Dr. Abrams claims that a POSA would have had no expectation of success in combining the Lonsurf Report and/or the 2015 Lonsurf Label in view of the FDA Guidance, optionally in further view of NCT '117. Abrams Rebuttal at ¶¶215-220. As an initial matter, only a reasonable expectation of success is required—not absolute certainty, which is what Dr. Abrams appears to require. Further, for the same reasons discussed above, a POSA would have had a reasonable expectation of successfully arriving at the claimed invention by combining the Lonsurf Report and/or the 2015 Lonsurf Label in view of the FDA Guidance, optionally in further view of NCT '117. Moreover, Dr. Abrams is incorrect that the adverse events disclosed in the prior art for patients with mild and moderate renal impairment "are completely different from the primary concern, which is toxicity and death to an inability to excrete TPI." *See* Abrams Rebuttal at ¶218. As Dr. Dreicer will explain, it is this inability to excrete TPI that can lead to adverse events. Here, a POSA would recognize that adverse events were noted in patients with mild and moderate impairment, e.g., neutropenia and anemia, and that 13.7% of patients from the RECOURSE trial required dose reduction due to adverse events. 2015 Lonsurf Label at DEF-TT-005254-5257. It is

126

only logical that the adverse event observations would lead a POSA to reduce the dose of LONSURF in SRI patients, who have a greater degree of renal insufficiency than those with mild or moderate impairment.

### 4. The dependent claims of the '004 patent

#### a) Claim 2 of the '004 patent

313.    Claim 2 of the '004 patent recites: "[t]he method of claim 1, wherein a dose of 40 mg/m$^2$/day as FTD-equivalent is administered in two doses a day." Claim 2 is rendered obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of FDA Guidance, and the general knowledge and experience of a POSA, optionally in further view of NCT '117 for the same reason discussed above for claim 1 of the'004 patent. That is, as explained above, the Lonsurf Report discloses that "[t]he dose may be reduced according to the patient's condition." Lonsurf Report at 3, 5, 98. Further, the Lonsurf Report discloses a Japanese Phase I study (Study TAS102-J0001), wherein "patients with advanced solid tumor received FTDTPI orally as a dose of 15 to 35 mg/m$^2$/dose BID," which corresponds to 30-70 mg/m$^2$/day and overlaps with the claimed "40 mg/m$^2$/day as FTD-equivalent is administered in two doses a day." Likewise, the 2015 Lonsurf Label discloses dose reductions to "20 mg/m$^2$ twice daily." 2015 Lonsurf Label at 2-3 (DEFS-TT-005253-5254).

314.    Dr. Taft asserts that claim 2 of the '004 patent is valid for the reasons as claim 1' However, as discussed above, the evidence does not support Dr. Taft's contention that claim 1 is valid.

315.    Accordingly, for all the above described reasons, claim 2 of the '004 patent is obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of FDA Guidance, and the general knowledge and experience of a POSA, optionally in further view of NCT '117. Further, a POSA would have been motivated to combine the Lonsurf Report, the 2015 Lonsurf Label, NCT

'117, and FDA Guidance with a reasonable expectation of successfully arriving at the claimed invention for the same reasons as discussed above for claim 10 of the '399 patent.

### b)      Claims 3, 4, 17, and 18 of the '004 patent

316.    Claims 3 and 4 of the '004 patent recite: "[t]he method of claim 1, wherein an administration schedule is 5-day consecutive oral administrations and 2-day rest, per week" and "[t]he method of claim 1, wherein an administration schedule of 5-day consecutive oral administrations and 2-day rest is repeated twice, followed by rest for 14 days," respectively. Claims 17 and 18 of the '004 patent recite: "[t]he method of claim 2, wherein an administration schedule is 5-day consecutive oral administrations and 2-day rest, per week" and "[t]he method of claim 2, wherein an administration schedule of 5-day consecutive oral administrations and 2-day rest is repeated twice, followed by rest for 14 days," respectively.

317.    Claims 3, 4, 17, and 18 are obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of FDA Guidance, and the general knowledge and experience of a POSA, optionally in further view of NCT '117 for the same reason discussed above for claims 1 and 2 of the '004 patent (incorporated herein by reference). That is, as explained above, the Lonsurf Report discloses orally administering "the combination product of trifluridine and tipiracil hydrochloride (FTD-TPI)" to treat advanced or recurrent colorectal cancer at 35 mg/m$^2$/dose twice daily, "in 28-day cycles, each consisting of two 5 days on/2 days off treatment sub-cycles, followed by a 14-day rest period." Lonsurf Report at 5 (DEFS-TT-000073); *see also id.* at 3 (DEFS-TT000071). Likewise, the 2015 Lonsurf Label discloses "[t]he recommended starting dose of LONSURF is 35 mg/m$^2$ up to a maximum of 80 mg per dose (based on the trifluridine component) orally twice daily within one hour of completion of morning and evening meals on Days 1 through 5 and Days 8 through 12 of each 28 day cycle until disease progression or unacceptable toxicity." 2015 Lonsurf

128

Label at 2 (DEFS-TT-005253). Further, NCT '117 discloses administering "35 mg/m$^2$/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle," and notes that "[t]he dose level of the severe [renal impairment] cohort will be determined based on the Interim Assessment of the mild and moderate cohorts." NCT '117 at 5 (DEFS-TT-001148).

318.    Dr. Taft asserts that claims 3, 4, 17, and 18 of the '004 patent are valid for the same reasons as claims 1 and 2. However, as discussed above, the evidence does not support Dr. Taft's contention that claims 1 and 2 are valid.

319.    Accordingly, for all the above described reasons, claims 3, 4, 17, and 18 of the '004 patent are obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of FDA Guidance, and the general knowledge and experience of a POSA, optionally in further view of NCT '117. Further, a POSA would have been motivated to combine the Lonsurf Report, the 2015 Lonsurf Label, NCT '117, and FDA Guidance with a reasonable expectation of successfully arriving at the claimed invention for the same reasons as discussed above for claim 10 of the '399 patent.

c)    <b>Claims 7, 20, 24, and 28 of the '004 patent</b>

320.    Claims 7, 20, 24, and 28 of the '004 patent recite: "[t]he method of claim 6, wherein colorectal cancer is treated,"[6] "[t]he method of claim 2, wherein colorectal cancer is treated," "[t]he method of claim 3, wherein colorectal cancer is treated," and "[t]he method of claim 4, wherein colorectal cancer is treated," respectively. Claims 7, 20, 24, and 28 are obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of FDA Guidance, and the general knowledge and experience of a POSA, optionally in further view of NCT '117 for the same reason discussed above for claims 1-4 of the '004 patent (incorporated herein by reference). That is, the Lonsurf Report

---

[6] Claim 6 recites "[t]he method of claim 1, wherein large bowel cancer is treated."

129

discloses a combination drug product containing 15 mg of trifluridine and 7.065 mg of tipiracil HCl and 20 mg of trifluridine and 9.42 mg of tipiracil HCl used for treating advanced or recurrent colorectal cancer. Lonsurf Report at 1-5 (DEFS-TT-000069-73). Likewise, the 2015 Lonsurf Label discloses in its Indication and Usage Section: "LONSURF is indicated for the *treatment* of patients with metastatic *colorectal cancer* who have been previously treated with fluoropyrimidine-, oxaliplatin- and irinotecan-based chemotherapy, and an anti-VEGF biological therapy, and if RAS wild-type, an anti-EGFR therapy." 2015 Lonsurf Label at 2 (DEFS-TT005253) (emphasis added). Further, NCT '117 discloses a Phase I study to "evaluate the safety, tolerability, and pharmacokinetics of TAS-102 in patients with advanced solid tumors with varying degrees of renal impairment." NCT '117 at 3-4 (DEFS-TT_001146-1147). A POSA would understand that a solid tumor includes colorectal cancer. Moreover, according to NCT '117, the only solid tumor excluded was breast. *Id.* at 6 (DEFS-TT-001149).

321. Dr. Taft assets that claims 7, 20, 24, and 28 of the '004 patent are valid for the same reasons as claims 1-4 and 17-18. However, as discussed above, the evidence does not support Dr. Taft's contention that claims 1-4 and 17-18 are valid.

322. Accordingly, for all the above described reasons, claims 7, 20, 24, and 28 of the '004 patent are obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of FDA Guidance, and the general knowledge and experience of a POSA, optionally in further view of NCT '117. Further, a POSA would have been motivated to combine the Lonsurf Report, the 2015 Lonsurf Label, NCT '117, and FDA Guidance with a reasonable expectation of successfully arriving at the claimed invention for the same reasons as discussed above for claim 10 of the '399 patent.

**D.    The Asserted Claims of the Patents-In-Suit are Invalid as Obvious Over the Lonsurf Report and/or the 2015 Lonsurf Label in View of the Cleary Poster,**

**and the General Knowledge and Experience of a POSA, optionally in further view of NCT '117**

323.    The evidence at trial will establish that the Asserted Claims of the Patents-in-Suit are invalid as obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster, and the general knowledge and experience of a POSA, optionally in further view of NCT '117.

### 1.    Claim 10 of the '399 patent

324.    Claim 10 of the '399 patent depends from claims 1 and 2 and recites:

10. The method for treating cancer according to claim 2, wherein a dose of 40 mg/m$^2$/day as FTD-equivalent is divided in two portions.

When each of the limitations from claims 1 and 2 are read into claim 10, claim 10 requires the following:

A method for treating cancer which is one of gastrointestinal cancer, large bowel cancer and breast cancer, comprising: detecting a creatinine clearance of a patient; and orally administering to the patient with a creatinine clearance of 15 mL/min or more and 29 mL/min or less a combination drug comprising α,α,αtrifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5 wherein a dose of 40 mg/m$^2$/day as FTD-equivalent is divided in two portions for administration.

325.    The evidence at trial will show that claim 10 of the '399 patent is rendered obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster, and the general knowledge and experience of a POSA, optionally in further view of NCT '117 as discussed below.

### *A method for treating cancer which is one of gastrointestinal cancer, large bowel cancer and breast cancer, comprising*

326.    The Lonsurf Report discloses a combination drug product containing 15 mg of trifluridine and 7.065 mg of tipiracil HCl and 20 mg of trifluridine and 9.42 mg of tipiracil HCl used for treating advanced or recurrent colorectal cancer. Lonsurf Report at 1-5 (DEFS-TT-

000069-73). Likewise, the 2015 Lonsurf Label discloses in its Indication and Usage Section: "LONSURF is indicated for the treatment of patients with metastatic colorectal cancer who have been previously treated with fluoropyrimidine-, oxaliplatin- and irinotecan-based chemotherapy, and an anti-VEGF biological therapy, and if RAS wild-type, an anti-EGFR therapy." 2015 Lonsurf Label at 2 (DEFS-TT-005253). Further, the Cleary Poster discloses the administration of TAS-102 (a combination of FTD and TPI) in a "phase 3 RECOURSE trial in patients with metastatic colorectal cancer (mCRC) refractory to standard therapies…." Cleary Poster at Introduction. A POSA would understand that colorectal cancer is a type of large bowel cancer. Indeed, the Patents-in-Suit specifically define large bowel cancer as "colorectal cancer, colon cancer, [and] rectal cancer." *See, e.g.,* '399 patent at 6:56-62.

### *detecting a creatinine clearance of a patient; and*

327.    The Lonsurf Report discloses a clinical study (Study TAS102-J001) where patients "were stratified by creatinine clearance (CrCL) calculated using the Cockcroft-Gault equation." Lonsurf Report, 49. The Lonsurf Report states that "the incidence of adverse drug reactions related to bone marrow suppression … tended to be higher in patients with mild to moderate renal function as compared with patients with normal renal function," as depicted in the below annotated table. *Id.* at 50.

**Incidence of adverse drug reactions related to bone marrow suppression by renal function**

| Renal function | n (%) | | | |
|---|---|---|---|---|
| | Platelet count decreased (Grade 4 or lower) | Red blood cell count decreased (Grade 4 or lower) | Haemoglobin decreased (Grade 3 or 4) | Neutrophil count decreased (Grade 4) |
| Normal | 17/49 (34.7) | 8/49 (16.3) | 3/49 (6.1) | 7/49 (14.3) |
| Mild impairment | 24/50 (48.0) | 24/50 (48.0) | 14/50 (28.0) | 12/50 (24.0) |
| Moderate impairment | 8/20 (40.0) | 6/20 (30.0) | 5/20 (25.0) | 4/20 (20.0) |

The Lonsurf Report explains that "[n]ormal renal function was defined as CrCL of $\geq$ 90 mL/min; mild renal impairment as 60 to 89 mL/min; moderate renal impairment as 30 to 50 mL/min; severe

renal impairment as 15 to 29 mL/min; and end-stage renal disease as <15 mL/min." *Id.* This is consistent with how practitioners define renal function, and what a POSA would have known as of the priority date.

328. Further, the Lonsurf Report states that "a precaution on the use of FTD-TPI for patients with renal impairment will be provided in the package insert because the drug should be carefully administered to such patient…[.]" In view of this precaution, a POSA would be motivated to determine creatinine clearance in any patient suspected of having renal impairment.

329. The 2015 Lonsurf Label discloses a clinical study (Study 1) in which patients with metastatic colorectal cancer were administered 35 mg/m$^2$ Lonsurf twice daily on days 1-5 and days 8-12 of each 28-day cycle. 2015 Lonsurf Label at 13 (DEFS-TT-005264); *id.* at 4 (DEFS-TT-005255). The 2015 Lonsurf Label discloses:

> In Study 1, patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n=47) had a higher incidence (difference of at least 5%) of ≥ Grade 3 adverse events, serious adverse events, and dose delays and reductions compared to patients with normal renal function (CLcr ≥ 90 mL/min, n= 306) or patients with mild renal impairment (CLcr = 60 to 89 mL/min, n= 178).

> No dose adjustment to the starting dose of LONSURF is recommended in patients with mild or moderate renal impairment (CLcr of 30 to 89 mL/min); however patients with moderate renal impairment may require dose modification for increased toxicity. No patients with severe renal impairment (CLcr < 30 mL/min) were enrolled in Study 1. *[see Clinical Pharmacology (12.3)].*

*Id.* at 8 (DEFS-TT-005259).

330. The 2015 Lonsurf Label also discloses:

> In Study 1, the estimated mean AUC of trifluridine at steady state was 31% higher in patients with mild renal impairment (CLcr = 60 to 89 mL/min, n= 38) and 43% higher in patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n= 16) than that in patient with normal renal function (CLcr ≥ 90 mL/min, n= 84) based on the population pharmacokinetic analysis. The estimated mean AUC of tipiracil was 34% higher in patients with mild renal impairment and 65% higher in patients with moderate renal impairment than that in patients with normal renal function. The pharmacokinetics of trifluridine and tipiracil have not been studied in patients

133

with severe renal impairment (CLcr < 30 mL/min) or end-stage renal disease. [*see Use in Specific Populations (8.7)*].

*Id*. at 12 (DEFS-TT-005263).

331.    Similarly, NCT '117 discloses a Phase I study to "evaluate the safety, tolerability, and pharmacokinetics of TAS-102 in patients with advanced solid tumors with varying degrees of renal impairment." NCT '117 at 3-4 (DEFS-TT-001146-1147). The three arms of the Phase I study in NCT '117 included patients with mild, moderate, and severe renal impairment. *Id.* at 5 (DEFS-TT-001148). The mild and moderate arms of the study received "35 mg/m2/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle." *Id.* According to NCT '117, "[t]he dose level of [the] severe cohort will be determined based on the Interim Assessment of mild and moderate cohorts." *Id*.

332.    In view of these above-described disclosures, a POSA would understand that creatinine clearance was detected in the patients in these studies because patients were divided into subgroups, i.e., normal renal function (CLcr ≥ 90 mL/min), mild renal impairment (CLcr 60-89 mL/min), moderate renal impairment (CLcr 30-59 mL/min), and severe renal impairment (CLcr 15-29 mL/min ) based on creatinine clearance.

333.    Moreover, the Cleary Poster discloses: "CrCL was a significant covariate for CL/F in final models of both FTD and TPI. Urinary excretion is the main elimination route for TPI but a minor route for FTD. The significant relation between CrCL and CL/F of FTD is due to the secondary effect by TPI, the PK modulator of FTD." *Id.* at Summary of Covariates Analyzed. The Cleary Poster also presents the following equation for calculating the CL/F of FTD and TPI: "CL/F $(L/h) = 2.93 \times (CRcl/103)^{0.507} \times (ALB/3.90)^{-0.633}$" and "CL/F $(L/h) = 88.7 \times (CRcl/103)^{0.507} \times (ALB/3.90)^{0.592}$," respectively. *Id.* at Population PK Models for FTD and TPI. As Dr. Dreicer will explain, a POSA would have understood that in order to associate creatinine clearance (CLcr) with

134

apparent oral clearance (CL/F) as disclosed in the Cleary Poster, the authors needed to detect the creatinine clearance in the patients during the study. Further, a POSA would recognize that the Cleary Poster recommends that clinicians "monitor renal function closely in patients treated with TAS-102," and would have understood that such monitoring entails "detecting [the] creatinine clearance of [the] patient."

> *orally administering to the patient with a creatinine clearance of 15 mL/min or more and 29 mL/min or less a combination drug comprising α,α,α-trifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5 wherein a dose of 40 mg/m$^2$/day as FTD-equivalent is divided in two portions for administration*

334.   The Lonsurf Report discloses a combination drug containing 15 mg of trifluridine and 7.065 mg of tipiracil HCl and 20 mg of trifluridine and 9.42 mg of tipiracil HCl used for treating advanced or recurrent colorectal cancer. Lonsurf Report at 2, 3, 5, 8 (DEFS-TT-000070-71, 73, 76). The Lonsurf Report further discloses the "combination of FTD and TPI at a molar ratio of 2:1," which a POSA would understand is that same as a molar ratio of 1:0.5. *Id*. at 6 (DEFS-TT-000074). Likewise, the 2015 Lonsurf Label discloses that LONSURF "contains trifluridine and tipiracil hydrochloride at a molar ratio of 1:0.5." *Id.* at 9 (DEFS-TT-005260); *see also id*. at 10 ("LONSURF consists of a thymidine-based nucleoside analog, trifluridine, and the thymidine phosphorylase inhibitor, tipiracil, at a molar ratio of 1:05 (weight ratio, 1:0.471)."). Further, the Cleary Poster discloses that "TAS-102 is an oral combination treatment comprised of an antineoplastic thymidine-based nucleoside analogue, trifluridine (FTD), and the thymidine phosphorylase inhibitor, tipiracil hydrochloride (TPI), at a molar ratio of 1:0.5 (weight ratio, 1:0.47)." *Id.* at Introduction; Figure 1 (below).



335.    The Lonsurf Report further describes a Japanese phase II study (113 patients), and a Japanese phase I study (6 patients) in which patients "were stratified by creatinine clearance (CrCL) calculated using the Cockcroft-Gault equation." Lonsurf Report at 49. These studies concluded that the "incidence of adverse drug reactions related to bone marrow suppression . . . tended to be higher in patients with mild to moderate renal function as compared with patients with normal renal function." *Id.* at 49-50. The Lonsurf Report notes, however, that FTD-TPI "was not administered to patients with severe renal impairment or those with end-stage renal disease." *Id.* Instead, the Lonsurf Report indicates that a "phase I clinical study in patients with renal impairment will be conducted . . . to investigate the PK profile of FTD-TPI" in patients with renal impairment. *Id.*

336.    The Lonsurf Report explains that "[n]ormal renal function was defined as CrCL of ≥ 90 mL/min; mild renal impairment as 60 to 89 mL/min; moderate renal impairment as 30 to 50 mL/min; severe renal impairment as 15 to 29 mL/min; and end-stage renal disease as <15mL/min." Lonsurf Report at 50. Dr. Dreicer will testify that this is consistent with how practitioners define the renal function, and what a POSA would have known as of the priority date.

136

337.    The Lonsurf Report discloses that the initial adult dose of the combination product of FTD-TPI is 35 mg/m$^2$ (based on FTD) orally administered twice daily. Lonsurf Report at 3, 5 (DEFS-TT-000071, 73). The Lonsurf Report further discloses that "[t]he dose may be reduced according to the patient's condition." *Id.* at 3, 5, 98. Additionally, the Lonsurf Report discloses a Japanese Phase I study (Study TAS102-J0001), wherein "patients with advanced solid tumor received FTD-TPI orally at a dose of 15 to 35 mg/m$^2$/dose BID [i.e., twice daily]," which corresponds to 30-70 mg/m$^2$/day in two divided doses.

338.    Similarly, the 2015 Lonsurf Label discloses that "[t]he recommended starting dose of LONSURF [to treat metastatic colorectal cancer] is 35 mg/m$^2$ up to a maximum of 80 mg per dose (based on the trifluridine component) orally twice daily within one hour of completion of morning and evening meals on Days 1 through 5 and Days 8 through 12 of each 28 day cycle until disease progression or unacceptable toxicity." 2015 Lonsurf Label at 2-3 (DEFS-TT-005253-5254). The 2015 Lonsurf Label further discloses dose reductions to "20 mg/m$^2$ twice daily," i.e., 40 mg/m$^2$/day in two divided doses, in patients who experience cytotoxicity, including neutropenia. *Id.*

339.    The Cleary Poster discloses that "TAS-102 was administered at 35 mg/m$^2$ twice daily (15-35 mg/m$^2$ in the Japanese dose-finding study) 5 days a week followed by 2 days rest for 2 weeks every 4 weeks. Cleary Poster. A POSA would understand the doses reported for the Japanese dose-finding study span a range of 30-70 mg/m$^2$/day in two divided doses, which encompasses the claimed range.

340.    Accordingly, in view of these disclosures in the Lonsurf Report, the 2015 Lonsurf Label, and the Cleary Poster, a POSA would have found it obvious to orally administer a combination drug comprising α,α,α-trifluorothymidine (FTD) and 5-chloro-6-[(2-

137

iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5, at a dose of 40 mg/m$^2$/day as FTD-equivalent, divided in two portions. Moreover, a POSA would have been motivated and would have reasonably expected to successfully treat, e.g., colorectal cancer, by administering the combination drug at the claimed dosage given these teachings in the prior art.

341.    Further, a POSA would have found it obvious and would have been motivated to administer the claimed combination drug at a daily dose of 40 mg/m$^2$/day as FTD-equivalent, divided in two portions, to a patient with a creatinine clearance of 15 mL/min or more and 29 mL/min or less. For example, as discussed above, the Lonsurf Report indicates that a "phase I clinical study in patients with renal impairment will be conducted . . . to investigate the PK profile of FTD-TPI" in patients with renal impairment because results from a phase I and phase II study indicated that the "incidence of adverse drug reactions related to bone marrow suppression . . . tended to be higher in patients with mild to moderate renal function as compared with patients with normal renal function." Lonsurf Report at 49-50.

342.    Likewise, the 2015 Lonsurf Label reported that the estimated mean AUC of FTD was 31% and 43% higher in patients with mild and moderate renal impairment, respectively, as compared to patients with normal renal function and the estimated mean AUC of TPI was 34% and 65% higher in patients with mild and moderate renal impairment, respectively, as compared to patients with normal renal function. 2015 Lonsurf Label at 12 (DEFS-TT-005262). Further, the 2015 Lonsurf Label discloses that patients with moderate renal impairment (CLcr = 30 to 59 mL/min, n=47) had a higher incidence (difference of at least 5%) of ≥ Grade 3 adverse events, serious adverse events, and dose delays and reductions compared to patients with normal renal function. *Id.* at 8 (DEFS-TT-005259). Therefore, a POSA would have reasonably expected that

138

patients with severe renal impairment would require a dose reduction to prevent severe adverse events.

343.    A POSA would have recognized that the Cleary Poster discloses a regression analysis that associates apparent oral clearance (CL/F) with a patient's creatinine clearance and serum albumin levels. Cleary Poster. More specifically, the Cleary Poster provides the following regression analysis equation (or power function equation): CL/F (L/h) = 2.93 x $(CLcr/103)^{0.507}$ x $(ALB/3.90)^{-0.633}$. *Id*. A POSA would have known how to use this equation to determine the effect of creatinine clearance on apparent oral clearance. Likewise, a POSA would have known how to use this equation to estimate the $AUC_{FTD}$ in patients having varying levels of creatinine clearance, where the relationship between $AUC_{FTD}$ in patients with severe renal impairment and normal renal function could be used to determine the mean relative ratio of $AUC_{FTD}$ in patients with severe renal impairment to normal patients ($AUC_{ratio}$). A POSA would have used this $AUC_{ratio}$ to estimate the dose of Lonsurf that would provide an $AUC_{ratio}$ in patients with severe renal impairment similar to that in patient with normal renal function.

344.    Indeed, a POSA would have known to use the following equation, $[CL/F_{normal}]/[CL/F_{impaired}]$, to calculate the ratio of apparent clearance for the patient with normal renal function to apparent clearance for the patient with renal impairment, e.g., severe renal impairment. A POSA would use this ratio of $[CL/F_{normal}]/[CL/F_{impaired}]$, to estimate the $AUC_{ratio}$ at varying levels of renal function to determine what levels of $AUC_{FTD}$ could successfully treat colon cancer with a tolerable safety profile, based on the approval of Lonsurf, see, e.g., 2015 Lonsurf Label and Lonsurf Report. For example, a POSA would have known from the 2015 Lonsurf Label and the Lonsurf Report that the combination drug was tested in patients with mild and moderate renal impairment at a dose of 35 mg/m$^2$ twice daily and that this dose resulted in increase in $AUC_{FTD}$

and increases in grade 3 adverse events as compared to patients with normal renal function. As such a POSA would have been motivated to reduce the dose. Using the disclosures from the Cleary Poster, the $AUC_{ratio}$ at a various doses would have been calculated as follow: [Dose (test)] / [Dose (35 mg/m$^2$)] x [CL/$F_{normal}$]/[ CL/$F_{impaired}$]. The results would have been reviewed with the objective of selecting an $AUC_{ratio}$ providing an $AUC_{FTD}$ similar to that of a CLcr of 90 mL/min or greater (i.e., normal). A POSA would have known that the desired $AUC_{ratio}$ would have a value near or slightly above 1 (given that patients with mild and moderate renal impairment did not require initial dose reductions) such that the $AUC_{FTD}$ would be similar to that of a patient with normal renal function.

345.    Upon running the calculations for test doses ranging from 15-35 mg/m$^2$, a POSA would have determined that a dose in the range of 15-25 mg/m$^2$ twice daily would have provided an $AUC_{ratio}$ within an acceptable range, with doses at the lower end, i.e., 15-20 mg/m$^2$ twice daily (i.e., 30-40 mg/m$^2$/day), providing an $AUC_{FTD}$ closer to that of a patient with normal renal function. By providing an $AUC_{FTD}$ closer to that of a patient with normal renal function, a POSA would have reasonably expected to treat metastatic colorectal cancer, much as was seen with the 35 mg/m$^2$ twice daily dose in patient with normal renal function.[7]

346.    For all the above discussed reasons, claim 10 of the '399 patent is invalid as obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster, and the general knowledge and experience of a POSA, optionally in further view of NCT '117 as discussed below. Further, a POSA would have been motivated to combine the Lonsurf Report, the 2015 Lonsurf Label, the Cleary Poster, and NCT '117 with a reasonable expectation of successfully arriving at the claimed invention because each of these references concern the same drug—

---

[7] *See* Fn2.

LONSURF.

### 2. Claim 1 of the '004 patent

347. Claim 1 of the '004 patent recites:

1. A method for treating gastrointestinal cancer, large bowel cancer or breast cancer in a patient with a creatinine clearance of 15 mL/min-29 mL/min, comprising: orally administering a drug comprising α,α,α-trifluorothymidine (FTD) and 5-chloro-6-[(2-iminopyrrolidine-1-yl)methyl]pyrimidine-2,4(1H,3H)-dione hydrochloride in a molar ratio of 1:0.5, at a daily dose of 30 to 40 mg/m$^2$/day as FTD-equivalent, in two to four doses a day to the patient with a creatinine clearance of 15 mL/min-29 mL/min.

348. Claim 1 of the '004 patent is obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster, and the general knowledge and experience of a POSA, optionally in further view of NCT '117 for the same reasons as claim 10 of the '399 patent (the discussion of which is incorporated herein by reference)—with the caveat that the '004 patent does not require the "detecting" step. Further, a POSA would have been motivated to combine the Lonsurf Report, the 2015 Lonsurf Label, the Cleary Poster, and NCT '117 with a reasonable expectation of successfully arriving at the claimed invention for the same reasons as discussed above for claim 10 of the '399 patent.

### 3. Plaintiffs' experts will not be able to rebut the strong case of obviousness of claim 10 of the '399 patent and claim 1 of the '004 patent

#### a) Dr. Taft

349. Dr. Taft has seven overarching reasons as to why claim 1 of the '004 patent is not rendered obvious by the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster and the general knowledge and experience of a POSA, optionally in further view of NCT '117: (i) dose reductions were not undertaken in SRI patients, and were for adverse events, not renal insufficiency; (ii) the clearance equations disclosed in the Cleary Poster were not reliable for extrapolating to SRI patients; (iii) there is no motivation to modify the treatment existing in 2016

141

for SRI patients; (iv) the 2015 Lonsurf Label, Lonsurf Report, and NCT '117 teach away from administering a reduced dose in SRI patients; (v) there was no reasonable expectation of success that administering a reduced dose of LONSURF to SRI patients would be safe and effective; (vi) there was no motivation to combine the Lonsurf Report or 2015 Lonsurf Label with the Cleary Poster and NCT '117; and (vii) similar or the same arguments and art were already discussed during the prosecution of the Patents-in-Suit. Taft Rebuttal at ¶¶527-591. But the evidence at trial will not substantiate Dr. Taft's claims..

350.    First, Dr. Taft argues that dose reductions were not undertaken in SRI patients, and were for adverse events, not renal insufficiency. Taft Rebuttal at ¶¶527-535. Dr. Taft's primary argument regarding the 2015 Lonsurf Label, the Lonsurf Report, and the Cleary Poster is that they do not disclose administering LONSURF to SRI patients. *Id.* at ¶¶527-533. But the 2015 Lonsurf Label disclosed that patients with renal insufficiency experienced increased adverse events, requiring dose reductions. The 2015 Lonsurf Label also states that "patients with moderate renal impairment ***may require dose modification*** for increased toxicity." 2015 Lonsurf Label at DEFS-TT-005259 (emphasis added). Moreover, the Lonsurf Report (at DEFS-TT-000114) and the Cleary Poster discloses doses as low as 30-40 mg/m$^2$/day. Thus, a POSA would have been motivated to reduce the dose of LONSURF in SRI patients to avoid adverse events/toxicity—given that SRI patients are more likely to experience adverse events/toxicity than patients with moderate renal impairment. Further, a POSA would have been motivated to start with the minimum dose, which the Lonsurf Report (at DEFS-TT-000114) and Cleary Poster disclose is 30-40 mg/m$^2$ per day and the 2015 Lonsurf Label (at DEFS-TT-005254) states is 40 mg/m$^2$ per day. A POSA would have been motivated to start at the lowest doses—to avoid adverse events/toxicity—understanding that they could titrate the dose upward as tolerated.

351. Next Dr. Taft argues that NCT '117 teaches administering the standard dose of 35 mg/m$^2$ twice daily to SRI patients. Taft Rebuttal at ¶535. However, a POSA would understand that NCT '117 states that dosing should be adjusted based on data from patients with mild and moderate renal impairment. NCT '117 at DEFS-TT-0011148. In other words, the investigators did not "anticipate[] administering to SRI patients a dose of '35 mg/m$^2$/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle.'"

352. Second, Dr. Taft argues that the clearance equations disclosed in the Cleary Poster were not reliable for extrapolating to SRI patients. Taft Rebuttal at ¶¶536-543. To support his assertion, Dr. Taft argues that there were no SRI patients in the underlying RECOURSE trial and "a person of ordinary skill in the art in 2016 would not have viewed the clearance equation above as providing a means to extrapolate a safe and effective dose of Lonsurf in SRI patients." *Id.* at ¶¶536-537. But the Asserted Claims do not include safety and efficacy requirements. Furthermore, the regression analysis present in the Patents-in-Suit likewise was not based on data from SRI patients.

353. Dr. Taft also argues: "[e]ven if there had been a balanced cohort of patients used to derive the clearance equation above, a person of ordinary skill in the art in 2016 would have understood that the dose estimated from a PopPK model-derived clearance equation would still need to be tested carefully for both safety and efficacy in SRI patients." *Id.* at ¶538. However, if a clinical trial, and not modeling (in addition to the other disclosures in the prior art), is necessary to identify the appropriate dose of LONSURF for an SRI patient, then the Patents-in-Suit lack adequate written description.

354. Dr. Taft also argues that the Cleary Poster teaches that no dosing modification is required for SRI patients, i.e., teaches away from the claimed invention, because it states, "'[a]n

143

additional clinical trial (NCT02301117) is ongoing to establish the safety of TAS102 in patients with impaired renal function'" and that "'[d]osing of TAS-102 by body surface area is adequate to reduce the variability of exposure to FTD and TPI.'" Taft Rebuttal at ¶541. But these statements do not criticize, discredit, or discourage a POSA from considering a reduced dose of LONSURF for SRI patients. Indeed, a POSA would not have solely relied on the equations in the Cleary Poster. Rather, a POSA would have been aware of the reduced doses disclosed in the 2015 Lonsurf Label, the Cleary Poster, and the Lonsurf Report (30-40 mg/m$^2$/day) and would have been motivated, with a reasonable expectation of success, in administering these doses to an SRI patient.

355.    Third, Dr. Taft argues there is no motivation to modify the treatment existing in 2016 for SRI patients. Taft Rebuttal at ¶¶544-551. Dr. Taft's primary argument regarding the 2015 Lonsurf Label is that it does not require dose adjustments for patients with mild and moderate renal impairments, despite adverse events. *Id.* at ¶545. However, Dr. Taft ignores the fact that the 2015 Lonsurf Label states that "patients with moderate renal ***impairment may require dose modification*** for increased toxicity." 2015 Lonsurf Label at DEFS-TT-005259 (emphasis). Accordingly, given the disclosures related to adverse events in patients with moderate renal impairment, as well as the disclosure that "patients with moderate renal impairment ***may require dose modification*** for increased toxicity," a POSA would have erred on the side of caution and would have been motivated to administer the minimum dose—30-40 mg/m$^2$ daily, as disclosed in the 2015 Lonsurf Label (DEFS-TT-005254), the Cleary Poster, and the Lonsurf Report (at DEFS-TT-000114). Accordingly, administering a reduced dose of LONSURF to an SRI patient is consistent with the teachings of the 2015 Lonsurf Label, the Cleary Poster, and the Lonsurf Report.

356.    Dr. Taft also argues that the Lonsurf Report discloses that the incidence of adverse events actually decreased in patients with moderate renal impairment as compared to patients with

144

mild renal impairment:

**Incidence of adverse drug reactions related to bone marrow suppression by renal function**

| Renal function | n (%) | | | |
|---|---|---|---|---|
| | Platelet count decreased (Grade 4 or lower) | Red blood cell count decreased (Grade 4 or lower) | Haemoglobin decreased (Grade 3 or 4) | Neutrophil count decreased (Grade 4) |
| Normal | 17/49 (34.7) | 8/49 (16.3) | 3/49 (6.1) | 7/49 (14.3) |
| Mild impairment | 24/50 (48.0) | 24/50 (48.0) | 14/50 (28.0) | 12/50 (24.0) |
| Moderate impairment | 8/20 (40.0) | 6/20 (30.0) | 5/20 (25.0) | 4/20 (20.0) |

Taft Rebuttal at ¶546 (citing the Lonsurf Report at DEFS-TT-000118). Dr. Taft asserts that "[w]ithout any explanation for why the incidence of adverse events was less in patients with moderate renal impairment as compared to patients with mild renal impairment, a person of ordinary skill in the art in 2016 looking at the Lonsurf Report would have no expectation that the incidence of adverse events would be greater than that seen in patients with mild or moderate renal impairment" and a POSA "would not be motivated to decrease the dosage of Lonsurf in SRI patients." *Id.* Not so. The POSA would not be looking at the Lonsurf Report in isolation, but would also be aware of the adverse event data presented in the 2015 Lonsurf Label. Further, as Dr. Dreicer will explain, a POSA would recognize that patients with both mild and moderate impairment experienced a greater percentage of adverse events as compared to normal patients. Likewise, a POSA would recognize that for hemoglobin count and neutrophil count, there was minimal difference in the percentage of mild and moderate patients experiencing a decrease in these parameters. Thus, a POSA would have reasonably expected that an SRI patient would experience such adverse events, and at a higher incidence, in view of not just the Lonsurf Report, but also the 2015 Lonsurf Label and the general experience and knowledge of a POSA (which would include the LONSURF FDA Approval Package).

357.    Further, contrary to Dr. Taft's assertion, the LONSURF FDA Approval Package does not include any statements teaching away from administering a reduced dose of LONSURF

145

to SRI patients. Taft Rebuttal at ¶547. Indeed, if only a clinical trial were sufficient to establish the dose of LONSURF in an SRI patient, then the Patents-in-Suit lack adequate written description. Likewise, contrary to Dr. Taft's assertion, the NCT '117 study investigators did not "anticipate administering to SRI patients a dose of '35 mg/m$^2$/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle,'" for the same reasons as discussed above. *Id.* at ¶549.

358.    Dr. Taft also argues that "the Cleary Poster … provides no motivation to decrease the dosage of Lonsurf in SRI patients." Taft Rebuttal at ¶548. Dr. Taft claims that because the Cleary Poster states that "'[d]osing of TAS-102 by body surface area is adequate to reduce the variability of exposure to FTD and TPI,'" it teaches that no dose modification is required, i.e., teaches away from the claimed invention. *Id.* But this statement does not criticize, discredit, or discourage a POSA from considering a reduced dose of LONSURF for SRI patients. Indeed, given the teachings in the 2015 Lonsurf Label and Lonsurf Report regarding adverse events, a POSA would have been motivated to reduce the dose of LONSURF, and the equations in the Cleary Poster would have provided one means to calculate that reduced dose.

359.    Fourth, Dr. Taft argues the 2015 Lonsurf Label, the Lonsurf Report, and NCT '117 teach away from administering a reduced dose in SRI patients. Taft Rebuttal at ¶¶552-558. However, as the evidence will show, the 2015 Lonsurf Label does not teach away from administering a reduced dose of LONSURF in SRI patients for the same reasons as discussed above. Nor do any difference in the incidence of adverse events in patients with mild and moderate renal impairment disclosed in the Lonsurf Report teaches away from administering a reduced dose of LONSURF in SRI patients. Further, as discussed above, Dr. Taft's assertion that the LONSURF FDA Approval Package includes any statements teaching away from administering a reduced dose of LONSURF to SRI patients is incorrect. *Id.* at ¶556. Indeed, if only a clinical trial were sufficient

146

to establish the dose of LONSURF in an SRI patient, then the Patents-in-Suit lack adequate written description. Likewise, Dr. Taft's assertion that NCT '117 teaches away from administering a reduced dose in SRI patients because the study investigators "anticipated administering to SRI patients a dose of '35 mg/m$^{2/}$dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle,'" is without merit. *Id*. at ¶557.

360.    Fifth, Dr. Taft argues there was no reasonable expectation of success that administering a reduced dose of LONSURF to SRI patients would be safe and effective. Taft Rebuttal at ¶559-583. As an initial matter, the Asserted Claims do not include a safety or efficacy requirement. Further, Dr. Taft argues that "oncologists would have avoided treating SRI patients with Lonsurf, because the risk of SRI patients experiencing drug accumulation and toxicity was too great." *Id.* at ¶561. Dr. Taft has no basis (or qualifications) to opine on what an oncologist would do—he is not a clinician. Nor does he cite Dr. Abrams (a clinician) to support his opinion. *Id.* Moreover, the paper Dr. Taft relies on, Lichtman, recommends "careful ***dose adjustment*** … to avoid drug accumulation and toxicity," not avoiding treatment, *see* Lichtman (DEFS-TT-006171) at 172 (emphasis added), which is consistent with Dr. Dreicer's opinion. *Id.*

361.    Dr. Taft also argues that administering LONSURF to SRI patients "presented several challenges," including the lack of predictability, coupled with compromised renal function, in a vulnerable cancer patient. Taft Rebuttal at ¶¶562-563. However, because Dr. Taft is not viewing the problem from a clinical perspective—he is not a clinician—he fails to take into account that heavily treated metastatic colorectal cancer patients with severe renal insufficiency had few treatment options to prolong survival, and thus a POSA would have been motivated to administer a reduced dose of LONSURF—given the paucity of treatment options available—and would have had a reasonable expectation of success given the teachings in the 2015 Lonsurf Label

147

and the Lonsurf Report.

362.    Dr. Taft further relies on the fact the FDA required Taiho to complete a dedicated renal study to support his assertion that there was no reasonable expectation of success. Taft Rebuttal at ¶¶564-569, 575. But FDA regulatory requirements, i.e., to demonstrate safety and efficacy, are different than the requirements to establish obviousness. Moreover, if only a clinical trial were sufficient to establish the dose of LONSURF in an SRI patient, then the Patents-in-Suit lack adequate written description.

363.    Dr. Taft also relies on information related to Teysuno to support his assertion that there was no reasonable expectation of success. Taft Rebuttal at ¶¶570-572. However, for the same reasons discussed above, Dr. Taft's analysis is flawed.

364.    Finally, to support his assertion that there was no reasonable expectation of success, Dr. Taft argues: "the clearance equations disclosed in the Cleary Poster … are irrelevant to SRI patients, and a person of ordinary skill in the art would not have had a reasonable expectation of success using those equations to determine a safe and effective dose of Lonsurf in SRI patients. The population pharmacokinetic analyses used to create the clearance equations in the Cleary Poster are not disclosed in the context of determining dosing." Taft Rebuttal at ¶¶576-583. As an initial matter, the Asserted Claims do not require safety and efficacy. Further, if a clinical trial, and not modeling (in addition to the other disclosures in the prior art) is necessary to identify the appropriate dose of LONSURF for an SRI patient, then the Patents-in-Suit lack adequate written description. Moreover, a POSA would not have solely relied on the equations in the Cleary Poster. Rather, a POSA would have been aware of the reduced doses disclosed in the 2015 Lonsurf Label, the Cleary Poster, and the Lonsurf Report (30-40 mg/m$^2$/day) and would have been motivated, with a reasonable expectation of success, in administering these doses to an SRI patient.

148

365.    Sixth, Dr. Taft argues there was no motivation to combine the Lonsurf Report or 2015 Lonsurf Label with the Cleary Poster and NCT '117. Taft Rebuttal at ¶¶584-585. But the 2015 Lonsurf Label, Lonsurf Report, Cleary Poster, and NCT '117 address the same issue—how to administer LONSURF, with NCT '117 providing additional information on planned administration of LONSURF to SRI patients.

366.    Finally, Dr. Taft argues similar or the same arguments and art were already discussed during the prosecution of the Patents-in-Suit. Taft Rebuttal at ¶¶586-591. But the prior art ***combination*** that Defendants rely on was not before the patent examiner. Therefore, similar or the same arguments and art were already discussed during the prosecution of the Patents-in-Suit.

367.    Dr. Taft also asserts that claim 10 of the '399 patent is valid for the same reasons as claim 1 of the '004 patent, despite claim 10 of the '399 patent reciting a 'detecting a creatinine clearance of a patient' step. However, as the evidence will show, for the same reasons that claim 10 of the '399 patent is invalid as obvious, claim 1 of the '004 patent is likewise obvious.

### b)    Dr. Abrams

368.    Dr. Abrams claims that the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster and the general knowledge and experience of a POSA, optionally in further view of NCT '117 would not have rendered the Asserted Claims of the Patents-in-Suit obvious. Abrams Rebuttal at ¶¶221-240. To support this assertion, Dr. Abrams offers five overarching claims: (i) the Cleary Poster did not identify covariates in SRI patients; (ii) the Cleary Poster did not teach a POSA how to treat an SRI patient with LONSURF; (iii) the Cleary Poster taught away from treating an SRI patient with LONSURF; (iv) there was no motivation to combine the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster, optionally in further view of NCT '117; and (v) a POSA would have had no expectation of success in combining the Lonsurf

149

Report and/or the 2015 Lonsurf Label in view of the Cleary Poster, optionally in further view of NCT '117. *Id*. But the evidence at trial will not substantiate Dr. Abrams' claims.

369.    First, Dr. Abrams asserts that the Cleary Poster identifies covariates that exist from the RECOURSE Study with mostly normal patients and not a single SRI patient. Abrams Rebuttal at ¶¶221-224. Dr. Abrams notes that Cleary Poster states: "'[a]n additional clinical trial is ongoing to establish the safety of TAS-102 in patients with impaired renal function.'" *Id*. at ¶223 (internal quotations omitted). According to Dr. Abrams, this disclosure would indicate to a POSA that the data from the Cleary Poster is "not applicable to patients with impaired renal function and that the models generated from patients without SRI cannot merely be extrapolated to dosing for SRI patients." *Id*. Not so. A POSA would have relied on the equations provided in the Cleary Poster to estimate the dose of LONSURF that would provide an $AUC_{FTD}$ in patients with severe renal impairment similar to that in patient with normal renal function. Dreicer Opening Report at ¶¶284-286.

370.    Dr. Abrams also claims that a POSA would not apply the models in the Cleary Poster to SRI patients because the FDA "mandated that Taiho 'complete' its dedicated renal study…." Abrams Rebuttal at ¶223. If the Court accepts this position, then the Patents-in-Suit are invalid for lack of written description at least because the Patents-in-Suit do not include clinical data from SRI patients—i.e., the results of the dedicated renal study mandated by the FDA. Rather, the inventor estimated the appropriate dose of LONSURF in SRI patients based on a regression analysis, i.e., modeling. Again, if the Court disagrees and finds that modeling is sufficient to demonstrate that the inventor possessed the claimed method of treating cancer in an SRI patient, then, for that same reason, the modeling disclosed in the Cleary Poster in view of the teachings of the Lonsurf Report and/or the 2015 Lonsurf Label, optionally in further view of NCT '117, would

render the Asserted Claims of the Patents-in-Suit obvious.

371.    Second, Dr. Abrams argues that the Cleary Poster did not teach a POSA how to treat an SRI patient with LONSURF. Abrams Rebuttal at ¶¶225-227. But for the same reasons as discussed in the preceding paragraph, a POSA would have relied on the equations provided in the Cleary Poster to estimate the dose of LONSURF that would provide an $AUC_{FTD}$ in patients with severe renal impairment similar to that in patient with normal renal function. Dreicer Opening Report at ¶¶284-286. This estimation, using data from patients **without** severe renal impairment, is similar to what the inventor did in the Patents-in-Suit. Accordingly, if the Patents-in-Suit are found to have adequate written description based on the linear regression analysis disclosed therein, and not a clinical study in SRI patients, then for the same reasons a POSA would have found it obvious and been motivated to use the equations in the Cleary Poster to estimate the dose of LONSURF for SRI patients.

372.    Third, Dr. Abrams claims that the Cleary Poster taught away from treating an SRI patient with LONSURF. Abrams Rebuttal at ¶228. As explained above, teaching away requires a reference to criticize, discredit, or otherwise discourage investigation into the invention claimed. Here, Dr. Abrams points to a disclosure in the Cleary Poster stating: "'[c]linicians should monitor renal function closely in patients treated with [LONSURF]. An additional clinical trial is ongoing to establish the safety in patients with impaired renal function.'" Abrams Rebuttal at ¶228 (emphasis omitted) (citing TAI-LONS-02556823). Far from discrediting or discouraging the use of LONSURF in SRI patients, a POSA would have understood from this statement that LONSURF was being tested in patients with renal impairment, and would have likewise been motivated to use LONSURF in SRI patents, albeit at a reduced dose, in view of the teachings in the Lonsurf Report and/or the 2015 Lonsurf Label and/or NCT '117.

151

373.    Fourth, Dr. Abrams claims that there was no motivation to combine the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster, optionally in further view of NCT '117. Abrams Rebuttal at ¶¶229-234. Dr. Abrams claims that "[t]here is nothing in those references that suggests that they should be combined…[.]" *Id.* at ¶229. But each of these references discloses the use of LONSURF to treat mCRC patients, some of whom have renal insufficiency. Therefore, the teachings of these references suggest that they would be appropriate to combine. Dr. Abrams also questions why a POSA would only use the equations in the Cleary Poster to modify the dose of LONSURF for SRI patients but not patients with mild or moderate impairment. *Id.* at ¶¶230-231. But this is illogical. The prior art specifically stated that the FDA approved dose for patients with mild or moderate renal impairment was 35 mg/m$^2$ twice daily. *See, e.g.*, 2015 Lonsurf Label; LONSURF FDA Approval Package. Thus, there would have been no motivation for a POSA to modify the dose in patients with mild or moderate renal insufficiency. Conversely, because there was no data in SRI patients, a POSA would have been motivated to estimate the dose of LONSURF appropriate for SRI patients based on, for example the Cleary Poster.

374.    Finally, Dr. Abrams asserts that a POSA would have had no expectation of success in combining the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster, optionally in further view of NCT '117. Abrams Rebuttal at ¶¶235-240. As an initial matter, only a *reasonable* expectation of success is required—not absolute certainty, which is what Dr. Abrams appears to require.

375.    Further, Dr. Abrams argues that a "clinician POSA" would not have known how to use the equations in the Cleary Poster. *Id.* at ¶236. However, as Dr. Dreicer will explain at trial, a "POSA would typically work **as part of a team** consisting of other POSAs with a Ph.D., Pharm.D.,

152

and/or M.D. in related fields," such as a "Pharm.D. or Ph.D. in pharmacology, pharmaceutics or a related field with experience in the use of clinical data in pharmaceutical development, including specifically significant experience with pharmacokinetics (including population PK modeling), pharmaceutical formulations, pharmaceutical dose determination, and the statistical analysis of pharmacokinetic and clinical data." Dreicer's Opening Expert Report at ¶31 (emphasis added). Therefore, to the extent the so-called "clinician POSA" would not have known how to use the equations in the Cleary Poster, they could have consulted with a member of the team specializing in pharmacokinetics. Indeed, Dr. Abrams himself concedes that if he consulted with an expert in pharmacokinetics then he would consider administering LONSURF to an SRI Patient based on that data and recommendation. *See, e.g.,* Abrams Rebuttal at ¶237 ("On the other hand, if a POSA had consulted with an expert in pharmacokinetics (like Dr. Taft), who could study and analyze pharmacokinetic data to derive information that he could rely upon to predict a safe and efficacious dose for SRI patents (like those generated by the first phase of the inventor's dedicated renal impairment study), and if I were truly in need of finding such an option instead of resorting to other known options, then I would consider administering LONSURF to an SRI Patient based on that data and recommendation.") (emphasis in original).

376. Finally, for the same reasons discussed above with respect to motivation to combine, a POSA would have had a reasonable expectation of successfully arriving at the claimed invention by combining the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster, optionally in further view of NCT '117.

### 4. The independent claims of the '004 patent

#### a) Claim 2 of the '004 patent

377. Claim 2 of the '004 patent recites: "[t]he method of claim 1, wherein a dose of 40

mg/m$^2$/day as FTD-equivalent is administered in two doses a day." Claim 2 is rendered obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster, and the general knowledge and experience of a POSA, optionally in further view of NCT '117 for the same reason discussed above for claim 1 of the '004 patent. That is, as explained above, the Lonsurf Report discloses that "[t]he dose may be reduced according to the patient's condition." Lonsurf Report at 3, 5, 98. Further, the Lonsurf Report discloses a Japanese Phase I study (Study TAS102-J0001), wherein "patients with advanced solid tumor received FTDTPI orally as a dose of 15 to 35 mg/m$^2$/dose BID," which corresponds to 30-70 mg/m$^2$/day and overlaps with the claimed "40 mg/m$^2$/day as FTD-equivalent is administered in two doses a day." Likewise, the 2015 Lonsurf Label discloses dose reductions to "20 mg/m$^2$ twice daily." 2015 Lonsurf Label at 2-3 (DEFS-TT-005253-5254).

378.    Dr. Taft asserts that claim 2 of the '004 patent is valid for the same reasons as claim 1. However, as discussed above, the evidence does not support Dr. Taft's contention that claim 1 is valid.

379.    Accordingly, for all the above described reasons, claim 2 of the '004 patent is obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster, and the general knowledge and experience of a POSA, optionally in further view of NCT '117. Further, a POSA would have been motivated to combine the Lonsurf Report, the 2015 Lonsurf Label, the Cleary Poster, and NCT '117 with a reasonable expectation of successfully arriving at the claimed invention for the same reasons as discussed above for claim 10 of the '399 patent.

b)    **Claims 3, 4, 17, and 18 of the '004 patent**

380.    Claims 3 and 4 of the '004 patent recite: "[t]he method of claim 1, wherein an administration schedule is 5-day consecutive oral administrations and 2-day rest, per week" and

154

"[t]he method of claim 1, wherein an administration schedule of 5-day consecutive oral administrations and 2-day rest is repeated twice, followed by rest for 14 days," respectively. Claims 17 and 18 of the '004 patent recite: "[t]he method of claim 2, wherein an administration schedule is 5-day consecutive oral administrations and 2-day rest, per week" and "[t]he method of claim 2, wherein an administration schedule of 5-day consecutive oral administrations and 2-day rest is repeated twice, followed by rest for 14 days," respectively.

381.    Claims 3, 4, 17, and 18 are obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster, and the general knowledge and experience of a POSA, optionally in further view of NCT '117 for the same reasons discussed above for claims 1 and 2 of the '004 patent (incorporated herein by reference). That is, as  explained above, the Lonsurf Report discloses orally administering "the combination product of trifluridine and tipiracil hydrochloride (FTD-TPI)" to treat advanced or recurrent colorectal cancer at 35 mg/m$^2$/dose twice daily, "in 28-day cycles, each consisting of two 5 days on/2 days off treatment sub-cycles, followed by a 14-day rest period." Lonsurf Report at 5 (DEFS-TT-000073); *see also id.* at 3 (DEFS-TT-000071). Likewise, the 2015 Lonsurf Label discloses "[t]he recommended starting dose of LONSURF is 35 mg/m$^2$ up to a maximum of 80 mg per dose (based on the trifluridine component) orally twice daily within one hour of completion of morning and evening meals on Days 1 through 5 and Days 8 through 12 of each 28 day cycle until disease progression or unacceptable toxicity." 2015 Lonsurf Label at 2 (DEFS-TT-005253). Further, NCT '117 discloses administering "35 mg/m$^2$/dose of TAS-102 orally, twice daily on days 1-5 and days 8-12 of each 28 day cycle," and notes that "[t]he dose level of the severe [renal impairment] cohort will be determined based on the Interim Assessment of the mild and moderate cohorts." NCT '117 at 5 (DEFS-TT-001148).

382.    Dr. Taft asserts claims 3, 4, 17, and 18 of the '004 patent are valid for the same

155

reasons as claims 1 and 2. However, as discussed above, the evidence does not support Dr. Taft's contention that claims 1 and 2 are valid.

383.    Accordingly, for all the above described reasons, claims 3, 4, 17, and 18 of the '004 patent are obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster, and the general knowledge and experience of a POSA, optionally in further view of NCT '117. Further, a POSA would have been motivated to combine the Lonsurf Report, the 2015 Lonsurf Label, the Cleary Poster, and NCT '117 with a reasonable expectation of successfully arriving at the claimed invention for the same reasons as discussed above for claim 10 of the '399 patent.

### c)    Claims 7, 20, 24, and 28 of the '004 patent

384.    Claims 7, 20, 24, and 28 of the '004 patent recite: "[t]he method of claim 6, wherein colorectal cancer is treated,"[8] "[t]he method of claim 2, wherein colorectal cancer is treated," "[t]he method of claim 3, wherein colorectal cancer is treated," and "[t]he method of claim 4, wherein colorectal cancer is treated," respectively. Claims 7, 20, 24, and 28 are obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster, and the general knowledge and experience of a POSA, optionally in further view of NCT '117 for the same reason discussed above for claims 1-4 of the '004 patent (incorporated herein by reference). That is, the Lonsurf Report discloses a combination drug product containing 15 mg of trifluridine and 7.065 mg of tipiracil HCl and 20 mg of trifluridine and 9.42 mg of tipiracil HCl used for treating advanced or recurrent colorectal cancer. Lonsurf Report at 1-5 (DEFS-TT-000069-73). Likewise, the 2015 Lonsurf Label discloses in its Indication and Usage Section: "LONSURF is indicated for the treatment of patients with metastatic colorectal cancer who have been previously treated with fluoropyrimidine-,

---

[8] Claim 6 recites "[t]he method of claim 1, wherein large bowel cancer is treated."

oxaliplatin- and irinotecan-based chemotherapy, and an anti-VEGF biological therapy, and if RAS wild-type, an anti-EGFR therapy." 2015 Lonsurf Label at 2 (DEFS-TT005253) (emphasis added). Further, NCT '117 discloses that the purpose of the study was to "evaluate the safety, tolerability, and pharmacokinetics of TAS-102 in patients with advanced solid tumors with varying degrees of renal impairment." NCT '117 at 3-4 (DEFS-TT_001146-1147). A POSA would understand that a solid tumor includes colorectal cancer. Moreover, according to NCT '117, the only solid tumor excluded was breast. *Id*. at 6 (DEFS-TT-001149).

385.    Dr. Taft asserts that claims 7, 20, 24, and 28 of the '004 patent are valid for the same reasons discussed above with respect to claims 1-4 and 17-18. However, as discussed above, the evidence does not support Dr. Taft's contention that claims 1-4 and 17-18 are valid.

386.    Accordingly, for all the above described reasons, claims 7, 20, 24, and 28 of the '004 patent are obvious over the Lonsurf Report and/or the 2015 Lonsurf Label in view of the Cleary Poster, and the general knowledge and experience of a POSA, optionally in further view of NCT '117. Further, a POSA would have been motivated to combine the Lonsurf Report, the 2015 Lonsurf Label, the Cleary Poster, and NCT '117 with a reasonable expectation of successfully arriving at the claimed invention for the same reasons as discussed above for claim 10 of the '399 patent.

### E.    Secondary Considerations

387.    Defendants are not aware of any secondary considerations that would overcome the strong case of obviousness here. Plaintiffs' experts, Dr. Abrams and Dr. Taft, disagree, asserting that "there are secondary considerations with a nexus to the treatment of SRI patients with LONSURF that can overcome…a finding [of obviousness]," Abrams Rebuttal at ¶¶241-257, and "the evidence of long felt but unmet need, unexpected results, and copying only add to my

conviction that the asserted claims would not have been obvious to a person of ordinary skill in February 2016," Taft Rebuttal at ¶¶596-612. However, the evidence at trial will establish that these assertions are without merit.

### 1.    Long-felt but unmet need

#### a)    NCT '117 did not solve a long-felt but unmet need

388.    Dr. Abrams contends "[t]here are few treatment options available for SRI patients with metastatic colorectal cancer who have undergone other courses of therapies, even less so before the Patents at issue here were filed." Abrams Rebuttal at ¶242. Yet Dr. Abrams has failed to present any evidence (e.g., not even a single paper) stating that there was a long-felt but unmet need for treatment options for SRI patients with metastatic colorectal cancer.

389.    Instead, Dr. Abrams states that "[t]he medical community knew that there were no studies involving LONSURF administration to SRI patients before 2017." *Id.* at ¶243 (citing Salvatore 2015 at -1149, Kish 2016 at -1657, Burnes 2016 at -1724, and the '399 patent at 2:2-7). But simply because there were no studies involving the administration of LONSURF to SRI patients does not mean there was a long-felt but unmet need for treatment options for SRI patients with metastatic colorectal cancer. At best, Salvatore 2015, Kish 2016, and Burnes 2016 suggest a need for treatment options for mCRC in patients who are refractory to, or are not considered candidates for, currently available therapies. However, none of these references disclose a need for such treatment in patients with severe renal impairment—which Plaintiffs claim is the invention. *See, e.g.,* '399 patent at 1:17-18 ("The present invention relates to a method for treating cancer patients with severe renal impairment."), 2:30-32; '004 patent at 1:20-21 ("The present invention relates to a method for treating cancer patients with severe renal impairment."), 2:34-36. Thus, Dr. Abrams has not established a long-felt but unmet need, much less a long-felt but unmet

158

need commensurate in scope with the alleged invention.

390.    Dr. Abrams also claims that "[t]he dedicated renal study (NCT '117) … resolved the long-felt unmet need to safely and effectively treat mCRC patients with SRI." Abrams Rebuttal at ¶243. He further contends that "[i]t was only after Taiho commenced the dedicated renal study for LONSURF that reliable data and information became available (first to Taiho and later to the public) that there was a means for administering LONSURF safely and effectively to SRI patients." *Id.* at 245. Again, as discussed above, Dr. Abrams has presented no evidence that there was a long-felt but unmet need for a method for treating cancer patients with severe renal impairment. Further, the Asserted Claims do not include a safety and efficacy requirement. Thus, any evidence related to safety and efficacy has no nexus to the Asserted Claims. Moreover, Dr. Abrams has failed to provide any evidence—not even a single article—demonstrating that LONSURF has actually been administered to an SRI patient to treat mCRC in view of NCT '117.

### b)    LONSURF did not solve a long-felt but unmet need

391.    Dr. Taft contends that prior to LONSURF, there was a lack of therapeutic options in patients with mCRC requiring treatment beyond second line. Taft Rebuttal at ¶599. According to Dr. Taft, this unmet need led to the development of LONSURF. *Id.*

392.    As an initial matter Dr. Taft is a Professor of Pharmacokinetics (a Ph.D.)—not a clinician. He does not treat cancer patients, much less cancer patients with severe renal impairment, and he does not prescribe medication, including LONSURF. Therefore, Dr. Taft is not qualified to offer the opinion that there was an alleged medical need for therapeutic options in patients with mCRC requiring treatment beyond second line, or to offer the opinion that LONSURF met this need.

393.    Notwithstanding that Dr. Taft lacks the qualifications to offer an opinion on an

alleged long-felt need for a medical treatment, there must be a link (i.e., a "nexus") between the alleged long-felt but unmet need and the claimed invention. The alleged evidence of long-felt but unmet need must be commensurate in scope with the claims. Here, the claimed invention relates to a method for treating cancer patients with severe renal impairment. *See, e.g.*, '399 patent at 1:17-18, 2:30-32; '004 patent at 1:20-21, 2:34-36. Yet Dr. Taft fails to identify a single reference discussing a long-felt but unmet need for a method of treating cancer in patients with severe renal impairment. Instead, each of the references cited by Dr. Taft discusses the need for a method of treating mCRC or gastrointestinal intestinal cancers, but does not express a need for such treatment in patients with severe renal impairment. Taft Rebuttal at ¶¶600-604. Tellingly, Dr. Taft makes the following conclusory statement: "I further understand that this need especially existed for patients with SRI, because prior to the claimed invention in the asserted patents, there was no third line treatment available for SRI patients." *Id.* at ¶605. Yet Dr. Taft includes no citation to support this statement. *Id.* And, as explained above, Dr. Taft is a Professor of Pharmacokinetics (Ph.D.)—not a clinician. He does not treat cancer patients, much less cancer patients with severe renal impairment. Therefore, it is unlikely that Dr. Taft has any personal knowledge that would support his statement—i.e., "that this need [therapeutic options in patients with mCRC requiring treatment beyond second line] especially existed for patients with SRI ." Accordingly, Dr. Taft has failed to demonstrate that there was a long-felt but unmet need for a method of treating cancer patients with severe renal impairment.

### 2.  Alleged evidence of copying carries little weight here and does not overcome a finding of obviousness

394.    Dr. Abrams claims that Defendants copied LONSURF, including the dosage, after the December 2019 Lonsurf label amendment to include the dosage for SRI patients. Abrams Rebuttal at ¶¶246-249. Likewise, Dr. Taft asserts that Defendants copied LONSURF's SRI dose

and dosing regimen, and this is evidence supporting the non-obviousness of the Asserted Claims of the Patents-in-Suit. Taft Rebuttal at ¶¶612-613. However, the fact that a generic drug company copies a patented drug to obtain FDA approval is generally not considered compelling evidence of nonobviousness at least because the generic drug label must copy the branded drug label. Indeed, as Dr. Abrams noted, while Defendants tried to remove the dosing language regarding SRI patients from their label, the FDA did not permit Defendants to do so for reasons of safety. Id. at ¶247 (citing TAILONS-03649696 at -9706 ("FDA concludes that omitting patent-protected information concerning patients with severe renal impairment from labeling would render generic [FTD/TPI] tablets less safe than Lonsurf for all remaining, nonprotected conditions of use.")). Accordingly, any alleged evidence of copying does not outweigh the substantial evidence of obviousness discussed herein.

### 3. Comparison to Teysuno does not provide evidence of unexpected results

395.    Dr. Taft claims that it was unexpected that LONSURF was safe and effective to administer to SRI patients. Taft Rebuttal at ¶¶606-611. As evidence, Dr. Taft relies on the dosing for Teysuno (S-1)—a three-drug combination of tegafur, gimeracil, and oteracil. Id. Dr. Taft argues that because the Teysuno Global Investigator's Brochure states that treatment with S-1 is not recommended in patients with severe renal impairment "due to the possibility of unexpectedly higher exposure to the antic-cancer agent (5-FU) 'as a result of fluctuations in renal function in these patients, unless the benefits clearly outweigh the risks," a POSA would have expected that LONSURF should not administered to SRI patients. Id. at ¶¶608-609 (emphasis in original) (citing TAI-LONS-03091545-3091716 at 3091669). Not so.

396.    Dr. Taft provides no reason why a POSA would have applied the teachings of Teysuno to LONSURF. Indeed, while the Global Investigator's Brochure for Teysuno specifically

recommends against administering Teysuno to SRI patients, no such warning is included in the LONSURF FDA Approval Package or 2015 Lonsurf Label. Instead, the LONSURF FDA Approval Package and 2015 Lonsurf Label simply state that LONSURF has not been administered to SRI patients. Further, the recommendation against administering Teysuno to SRI patients was based on "the possibility of *unexpectedly* higher exposure to 5-FU as a result of fluctuations in renal function in these patients." TAI-LONS-03091545-3091716 at -3091669 (emphasis added). However, Taiho told the FDA in its April 28, 2020 Citizen's Petition that results from the renal impairment study (i.e., NCT '117 (a/k/a TO-TAS-102-107)) "demonstrated that severe renal impairment had the *expected* effect of greatly increasing the TPI exposure leading to an increased FTD exposure." TAI-LONS-03649788-3649821 at -3649792 (emphasis added). Further, simply because Dr. Yoshida, inventor of the Patents-in-Suit, thought it might be difficult to estimate the dose of LONSURF for SRI patients (*see* Taft Rebuttal at ¶¶609, 610), does not mean that it was unexpected that LONSURF was safe and effective to administer to SRI patients.

162